UNITED STATES DISTRICT COURT OF OFFICE

DISTRICT OF MASSACHUSETTS A 9: 32

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| BAY STATE SAVINGS BANK,<br>    Plaintiff<br><br>    V.<br><br>BAYSTATE FINANCIAL SERVICES, LLC,<br>    Defendant | CIVIL ACTION NO. 4:03-CV-40273-NMG |

## MEMORANDUM IN SUPPORT OF BAY STATE SAVINGS BANK'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................1

II.   SUMMARY OF EVIDENCE .............................................................................1

III.  ARGUMENT ......................................................................................................6

    A.    Bay State® Is Likely to Succeed on the Merits of Its Claims................................7

        1.    The Bay State® Mark Has Acquired Distinctiveness and Secondary Meaning Giving Rise to Common Law Trademark Rights That Are Senior to Any Rights of Baystate Financial.........................................................................8

        2.    The State and Federal Registrations Are Prima Facie Evidence of the Bank's Exclusive Right to Use the Bay State® Mark..........................................................................9

        3.    Bay State®'s Registrations Are Valid, and Were Not Procured by Fraud.......................................................................9

        4.    Baystate Financial's Use of the Mark Is Likely to Cause Dilution Under M.G.L. c. 110B §12........................................12

        5.    Baystate Financial's Use of the Mark is Likely to Cause Confusion Under Lanham Act §43(a). ......................................13

        6.    Baystate Financial's State Registration Was Granted Improperly and Should Be Cancelled Under M.G.L. c. 110B, §§3 and 8...................................................................14

        7.    Baystate Financial Is Not Likely Establish a "Limited Area" Defense Under Applicable Trademark Law.....................16

    B.    Bay State® Will Suffer Irreparable Harm If Baystate Financial Continues to Use the Bay State® Mark. .............................................17

    C.    The Balance of Harms Strongly Favors Bay State®...........................................18

    D.    Granting Injunctive Relief Will Serve the Public Interest. ..................................19

    E.    No Bond Or Only a Nominal Bond Should Be Required. ...................................19

IV.  CONCLUSION.................................................................................................19

## TABLE OF AUTHORITIES

**Cases**

ActMedia, Inc. v. Active Media Intern., Inc., 1996 WL 466527 (N.D. Ill. 1996) ........................ 19

Allard Enterprises, Inc. v. Advanced Programming Resources, Inc., 146 F.3d 350
  (6th Cir. 1998)................................................................................................................... 15

American Optical Corp. v. North American Optical Corp., 489 F. Supp. 443
  (N.D.N.Y., 1979) ................................................................................................................ 12

Bayshore Group Ltd. v. Bay Shore Seafood Brokers, Inc., 762 F. Supp. 404 (D.
  Mass. 1991)................................................................................................................... 15, 17

Boston Athletic Assn' v. Sullivan, 867 F.2d 22 n.1 (1st Cir. 1989)......................................... 6, 13

Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co., Inc., 9 F.3d 175
  (1st Cir. 1993)....................................................................................................................... 8

Brown-Bridge Mills, Inc. v. Eastern Fine Paper, Inc., 700 F.2d 759 (1st Cir. 1983) .................. 10

Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F. Supp. 994 (D. Mass.
  1988) ................................................................................................................................. 7, 8

Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods
  Corp., 799 F.2d 6 (1st Cir. 1986)......................................................................................... 18

Charles Schwab & Co., Inc. v. Hibernia Bank, 665 F.Supp. 800 (N.D. Cal. 1987) ..................... 13

Chase Federal Sav. and Loan Ass'n. v. Chase Manhattan Financial Services, Inc.,
  681 F. Supp. 771 (S.D. Fla. 1987) ......................................................................................... 9

Comp Examiner Agency, Inc. v. Juris, Inc., 1996 WL 376600 (C. D. Cal. 1996) ....................... 19

Far Out Productions, Inc. v. Oskar, 247 F.3d 986 (9th Cir. 2001)............................................. 12

First Keystone Federal Sav. Bank v. First Keystone Mortg., Inc., 923 F. Supp. 693
  704 (E.D. Pa. 1996) ............................................................................................................. 13

First Nationwide Bank v. Nationwide Sav. and Loan Ass'n., 682 F. Supp. 965
  (E.D. Ark. 1988) ..................................................................................................... 13, 14, 18

Foxtrap, Inc. v. Foxtrap, Inc., 671 F.2d 636 (D.C. Cir. 1982) .................................................. 16

Great Scott Food Market, Inc. v. Sunderland Wonder, Inc., 348 Mass. 320 (1965)........... 7, 12, 18

Hasbro, Inc. v. Clue Computing, Inc., 66 F.Supp.2d 117 (D.Mass. 1999), aff'd,
  232 F.3d 1 (1st Cir. 2000)..................................................................................................... 12

Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70 (2nd Cir. 1988)................................................ 17

Home Sav. of America v. Home Sav. Ass'n., 219 U.S.P.Q. 157 (S.D. Tex. 1982) ...................... 17

Horizon Financial F.A. v. Horizon Bancorp., No. 87-0405, U.S.P.Q. 2d 1696
  (E.D. Pa. 1987) ..................................................................................................... 13, 14, 18, 19

Hotmail Corp. v. Van$ Money Pie Inc., 47 U.S.P.Q. 2d 1020 (N.D. Cal. 1998) ......................... 19

International Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079 (7th
  Cir. 1988).............................................................................................................................. 8

Jefferson Bankshares, Inc. v. Jefferson Sav. Bank, 14 U.S.P.Q. 2d 1443 (W.D. Va.
  1989) ..................................................................................................................... 9, 13, 14, 18

Keebler Co. v. Rovira Biscuit Corp., 624 F.2d 366 (1st Cir. 1980) ........................................... 12

Malibu, Inc. v. Reasonover, 246 F. Supp.2d 1008 (N.D.Ind. 2003)........................................... 15

Money Store v. Harriscorp Finance, Inc., 689 F.2d 666 (7th Cir. 1982) .................................... 10

Mosely v. V. Secret Catalogue, Inc., 537 U.S. 418 (2003)........................................................ 12

Natural Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383 (3rd Cir. 1985),
cert. denied, 474 U.S. 920 (1985) ........................................................................ 17

NEC Electronics, Inc. v. New England Circuit Sales, Inc., 722 F. Supp. 861 (D.
Mass. 1989) ........................................................................................................... 14

Northern Trust Corp. v. Northern Bank & Trust Co., 22 U.S.P.Q. 2d 1391 (D.
Mass. 1991) ........................................................................................................... 13

Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp., 80 F. Supp. 2d
815 (N.D. Ill. 1999) .............................................................................................. 15

President and Trustees of Colby College v. Colby College-New Hampshire, 508
F.2d 804 (1st Cir. 1975) .......................................................................................... 8

Raxton Corp. v. Anania Associates, Inc., 635 F.2d 924 n.9 (1st Cir. 1980) .................. 14

Rollins Environmental Services, Inc. v. Superior Court, 368 Mass. 174 (1975) ............ 9

Sallen v. Corinthians Licenciamentos Ltda, 273 F.3d 14 (1st Cir. 2001) ..................... 15

San Juan Products, Inc. v. San Juan Pools of Kansas, Inc., 849 F.2d 468 (10th Cir.
1988) ..................................................................................................................... 10

Stern's Miracle-Gro Products, Inc. v. Shark Products, Inc., 823 F. Supp. 1077
(S.D.N.Y. 1993) .................................................................................................... 14

Sun Banks of Florida, Inc. v. Sun Federal Sav. and Loan Ass'n, 651 F.2d 311 (5th
Cir. 1981) ......................................................................................................... 13, 14

Tally-Ho, Inc. v. Coast Community College Dist., 889 F.2d 1018 (11th Cir. 1989) ...... 15

TEC Engineering Corp. v. Budget Molders Supply, Inc., 82 F.3d 542 (1st Cir.
1996), following remand, 927 F. Supp. 528 (D. Mass. 1996) ................................. 6

The Bay State Savings Bank v. Bay State Bancorp., 99cv12383-NMG ........................ 4

Thrifty Rent-A-Car System, Inc. v. Thrift Cars, Inc., 639 F.Supp. 750 (D.Mass.
1986), aff'd, 831 F.2d 924 (1st Cir. 1987) ................................................... 9, 16, 17

United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219 (10th Cir.
2000) ..................................................................................................................... 10

V & V Food Products, Inc. v. Cacique Cheese Co., Inc., 683 F. Supp. 662
(N.D.Ill., 1988) ..................................................................................................... 10

Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812 (1st Cir. 1987) ..... 12, 13

Yale Elec. Corp. v. Robertson, 26 F.2d 972 (2nd Cir. 1928) ......................................... 7

**Statutes**

15 U.S.C. §1057(c) (Lanham Act, §7(c)) ..................................................................... 16

15 U.S.C. §1115 (Lanham Act, §33) ........................................................................ 9, 16

15 U.S.C. §1125 (d) .................................................................................................... 15

15 U.S.C. §1125(a) (Lanham Act, §43(a)) ............................................................ 1, 7, 8

Bank Holding Company Act of 1956 ........................................................................... 10

Banking Act of 1933 (the Glass-Steagall Act) ............................................................ 10

M.G.L. c. 110B .............................................................................................................. 9

M.G.L. c. 110B, §12 .............................................................................................. 1, 7, 12

M.G.L. c. 110B, §3 ...................................................................................................... 14

M.G.L. c. 110B, §4 ........................................................................................................ 9

M.G.L. c. 110B, §8 ................................................................................................. 14, 15

St. 1907, c. 561 ............................................................................................................. 2

**Other Authorities**

37 C.F.R. §2.56(2) ................................................................................................................... 10

37 C.F.R. §2.88(c)................................................................................................................... 11

J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR
   COMPETITION §§16:4, 24:90.1 (4th Ed. 1997) ................................................................ 12, 15

J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR
   COMPETITION §26:12 (2d ed., 1984) ................................................................................ 17

J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR
   COMPETITION §26:4 (4th Ed. 1997) ................................................................................ 16

**Regulations**

General Counsel's Opinion No. 6, 48 Fed. Reg. 22989 (May 23, 1983)....................................... 11

## I.    INTRODUCTION

Bay State Savings Bank® ("Bay State®") brings this motion to prevent dilution of the Bay State® service mark under M.G.L. c. 110B, §12, and confusion under 15 U.S.C. §1125(a) ("Lanham Act, §43(a)"). It has used the Bay State® mark for banking and other financial services since 1895. Surveys in 1999 and 2001 show that the mark is widely recognized and exclusively associated with Bay State®. In 1999 and 2001, respectively, Bay State® obtained state and federal service mark registrations for banking and financial services including investments.

Baystate Financial Services, LLC ("Baystate Financial") is a general agent of New England Life that adopted the Baystate name on May 1, 1997. Its name, services and products are sufficiently similar to cause dilution and confusion. Until recently, its use of the Baystate name was limited. On November 26, 2003, it announced a major expansion, including an acquisition in Worcester, and plans to expand the use of its name. Baystate Financial asserts that it is the senior user and that Bay State® acquired the state and federal registrations by fraud. These arguments are false. Baystate Financial refuses to stop using the Bay State® mark. Efforts to negotiate have failed, and Bay State® now finds it necessary to bring this motion.

## II.    SUMMARY OF EVIDENCE

*Plaintiff has used the name Bay State Savings Bank® continuously since 1895 and is popularly known as Bay State®.* It is headquartered in an attractive century-old building facing the Worcester City Common and has branch locations in Worcester, Auburn and Holden. Each branch has consistent and attractive "Cape" style architecture with modern trade dress. The Bay State® mark is prominently displayed at each location. Bay State®'s primary geographic market

consists of Worcester and the surrounding communities, but its customers live in approximately 431 different postal zip codes in Massachusetts, and in 29 other states. Lewis Aff., ¶¶2-4,11.[1]

*Bay State® provides a broad range of financial products and services.* At first, this consisted of savings accounts and home mortgages. St. 1907, c. 561 authorized savings banks to offer Savings Bank Life Insurance ("SBLI"). Available records show sales of SBLI dating to at least 1962. In addition to SBLI, the services have included sales of savings bonds since 1960; mortgage and disability insurance by 1971; IRA, SEP and Keough retirement and educational accounts by 1976; Investment Unit Accounts by 1981; SBLI Life Saver Annuities by 1988; and sales of stocks, bonds and Mutual Funds by 1994. From January 1999 to February 2002, the investment services were identified with the Minuteman Investment Services® mark, but they were exclusively sponsored by Bay State®[2]; sold by personnel in located in Bay State® offices; and target marketed primarily to Bay State® customers. The investment services were fully disclosed in Annual Reports and authorized by law. Lewis Aff., ¶¶5-6.

*Bay State® has advertised and promoted itself in newspapers and trade journals since 1895 and has invested in community relations by charitable giving.* Advertising expenditures have grown from $7,059 in 1960 (the first year in which they are segregated) to as much as $415,000. Since at least 1995, this has included statewide advertising in The Banker & Tradesman. The total from 1960 to 1997, when Baystate Financial incorporated, is approximately $2.7 million. Total to date including the 2004 budget exceeds $5.2 million just

---

[1]  This motion is supported by the Affidavits of Robert J. Lewis ("Lewis Aff."), Gerry A. Blodgett, Esq. ("Blodgett Aff."), and R. Kelley Myers ("Myers Aff.") and an Appendix of Exhibits (referred to by exhibit as "Ex. ___.").

[2]  The ad introducing Minuteman® states: "No two customers are alike. That's why Bay State Savings Bank introduces Minuteman Investment Services." Another ad featuring the Bay State® mark describes Minuteman® as "a division of Bay State Savings Bank." In many such ads, the Bay State® mark is more prominent than Minuteman®. Lewis Aff., ¶6.

for advertising, without counting charitable donations of several hundred thousand dollars. Lewis Aff., ¶7-8.

*Bay State® has been featured in many unsolicited news articles reporting matters of public interest*, including the appointment of community leaders to serve in various leadership positions, and the bank's support of community activities. Lewis Aff. ¶9.

*Bay State® has increased in size, prominence, sales and customers.* Assets have grown from $20,241 in 1895 to over $245 million. As of 1997, when Baystate Financial incorporated, loans and deposits were $90.5 million and $115.6 million, respectively. Lewis Aff., ¶10.

*Consumer surveys in August of 1999 and 2001 show that the Bay State® mark is widely recognized and highly regarded.* The proportion of the general population who recognized the Bay State® mark was 70% in 1999 and 76% in 2001. Half reported that they had seen or heard Bay State® ads. Bay State®'s favorability ratings far surpassed those of larger competitors such as Fleet and Bank Boston. Myers Aff., ¶¶7,10; Ex. 9 and 10.

*Bay State®'s rating for "products and services satisfaction" shows that consumers view the bank as providing a wide range of financial services.* The 1999 survey shows that Bay State® customers had a stronger appetite for Mutual Funds than the general population; kept half their household investment dollars at Bay State®; and believed that the products and services are improving. Over 81% of customers would recommend Bay State® to others, a higher proportion than customers of other banks. The 2001 survey contains similar information, and shows that customers associate Bay State® with a wide range of financial services including insurance, mutual funds and bonds. Myers Aff., ¶¶7,10; Ex. 9 and 10.

*Bay State® asserted common law trademark rights in 1999 in the case of The Bay State Savings Bank v. Bay State Bancorp., 99cv12383-NMG, to successfully prevent another organization from using the names Bay State and Bay State Bank.*  Lewis Aff., ¶15.

*Bay State® obtained state and federal service mark registrations in 1999 and 2001, respectively.*  They include, among others:

| Mark | First Use | Federal Registration | State Registration | Services described |
|------|-----------|----------------------|--------------------|--------------------|
| Bay State | 5/16/1895 | 5/15/01 | 10/14/99 | IC 036: Banking Services And Financial Services, Namely, Financial Investment In The Field Of Real Estate, Stocks, Bonds, Commercial Paper, And Other Securities, Financial Management And Planning And Financial Guarantee And Surety. |
| Bay State Savings Bank | 5/16/1895 | 5/22/01 | 7/20/99 | IC 036: Banking Services And Financial Services, Namely, Financial Investment In The Field Of Real Estate, Stocks, Bonds, Commercial Paper, And Other Securities, Financial Management And Planning, And Financial Guarantee And Surety. |
| Bay State Investment Services | 2/5/02 | 7/30/02 | 6/3/02 | IC 036: Investment Services, namely, mutual fund brokerage and investment, annuity underwriting, brokerage in the field of stocks, bonds, life insurance and long term care insurance and insurance agencies and underwriting in the field of life insurance and long term care insurance. |

The applications were handled by Gerry A. Blodgett, Esq., a reputable patent and experienced trademark attorney.  They state that Bay State® had been using the mark for "BANKING AND FINANCIAL SERVICES TO CONSUMERS AND BUSINESSES" in International Class ("IC") 36 since 1895.[3]  The description of services was amended in good faith at the PTO's suggestion to add "FINANCIAL INVESTMENT IN THE FIELD OF REAL ESTATE, STOCKS, BONDS, COMMERCIAL PAPER, AND OTHER SECURITIES FINANCIAL MANAGEMENT AND PLANNING, AND FINANCIAL GUARANTY AND SURETY," all in IC 36.  Bay State relied on Mr. Blodgett in all respects.  Lewis Aff., ¶¶14-15; Blodgett Aff., ¶2.

---

[3]    International Class ("IC") 36 includes:  Insurance, financial affairs, monetary affairs, and real estate affairs.

*Baystate Financial stated under oath, in its Massachusetts service mark application, that it first used the Bay State® mark for financial services on May 1, 1997.* The registration is in IC 36, the same as Bay State®'s registrations. It has not sought federal registration. Lewis Aff., ¶18-19.

*Baystate Financial uses the mark in similar channels of trade.* Through its "Bank Affiliate Program," Baystate Financial offers its services through banks that are similar to Bay State®, sometimes using the Baystate name to promote those services. Lewis Aff., ¶¶20-21.

*Baystate Financial incorrectly alleges that predecessors in interest have used the mark since 1983 and obtained a state registration in 1990.* In its state registration, Baystate Financial admits under oath that the mark was first used on May 1, 1997. A 1990 state registration, apparently by an unrelated party, expired because the owner did not renew it. Lewis Aff., ¶22; Blodgett Aff. ¶¶7-8.

*On December 23, 2002, Bay State® notified Baystate Financial, in writing, to discontinue use of the Bay State® mark.* Baystate Financial did not comply. Lewis Aff., ¶23.

*On November 23, 2003, Baystate Financial announced a major expansion including a 38-employee financial planning business located across the Worcester City Common from Bay State®'s headquarters.* The announcement asserts that the expansion made Baystate Financial the largest financial planning operation in New England with 168 employees and annual sales of $176 million, and that the expansion will continue. Lewis Aff., ¶24.

*Baystate Financial does not conduct paid advertising, but does promote itself by other means that threaten dilution and confusion.* Until recently, its activities were confined to Boston. Some newspapers misidentify it as "Bay State," suggesting that the Baystate name is not

well recognized.  At least in its Worcester office, the Baystate Financial mark is barely displayed.

The Boston Business Journal ("BBJ") recently observed that:

> Baystate Financial has been growing, *albeit under the radar*.  However [Baystate Financial CEO David] Porter recently told the Boston Business Journal that *the next couple years will present solid growth opportunities - and more recognition -* for Baystate Financial, as it looks to expand to Western Massachusetts and south toward Hartford.  Lewis Aff., ¶27 and Ex. 21.  (Emphasis added).

> *Baystate Financial admits that the parties' present and proposed use of the Bay State®*

*mark will cause dilution and confusion.*  Baystate Financial's counterclaim alleges that:

> The BAYSTATE Marks and Bank Marks are similar if not virtually identical.  The dominant or core element of the respective marks is Baystate and Bay State.  The only appreciable difference between the marks is a single space, an almost insignificant distinction.  The parties' core marks sound the same and look the same, and therefore convey the same commercial impression to consumers.  *It is unlikely that consumers will be able to distinguish between the BAYSTATE Marks associated with Baystate Financial's long-standing and highly regarded financial services business and the Bank Marks representing the Bank's neophyte financial services offerings.*

See Defendant's Counterclaim, ¶32.  (Emphasis added).

### III.   ARGUMENT

A party is entitled to preliminary injunctive relief in a trademark case[4] if it can show that (1) it is likely to succeed on the merits of its claims, (2) it will suffer irreparable injury if the injunction is not granted, (3) such injury outweighs the harm which the other party will suffer if the injunction is not granted, and (4) the public interest will not be adversely affected by the granting of the injunction.  TEC Engineering Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 544 (1st Cir. 1996), following remand, 927 F. Supp. 528 (D. Mass. 1996).

---

[4]    While this case technically involves a service mark, as opposed to a trademark, the legal analysis is the same.  Boston Athletic Assn' v. Sullivan, 867 F.2d 22, 23 n.1 (1st Cir. 1989).

A.    Bay State® Is Likely to Succeed on the Merits of Its
      Claims.

This motion seeks to prevent dilution and confusion. To enjoin dilution under M.G.L. c.

110B, § 12, Bay State® must prove: (1) ownership of a mark that is registered or valid at

common law, and (2) likelihood that the "distinctive quality of the mark" will be diluted.[5] The

concept of dilution was explained in Great Scott Food Market, Inc. v. Sunderland Wonder, Inc.,

348 Mass. 320, 325 (1965) (quoting Yale Elec. Corp. v. Robertson, 26 F.2d 972, 974 (2nd Cir.

1928)(Hand, J.)):

> [I]t has of recent years been recognized that a merchant may have a sufficient
> economic interest in the use of his mark outside the field of his own exploitation
> to justify interposition by a court. His mark is his authentic seal; by it he vouches
> for the goods which bear it; it carries his name for good or ill. If another uses it,
> he borrows the owner's reputation, whose quality no longer lies within his own
> control. This is an injury even though the borrower does not tarnish it, or divert
> sales by its use; for a reputation, like a face, is the symbol of its possessor and
> creator, and another can use it only as a mask. And so it has come to be
> recognized that, unless the borrower's use is so foreign to the owner's as to insure
> against identification of the two, it is unlawful.

In contrast, to justify relief under Lanham Act, §43(a) , 15 U.S.C., §1125(a), Bay State®

must prove: (1) ownership of a protected mark; and (2) use by another in commerce that is likely

to cause confusion as to the source of goods or services.[6] Calamari Fisheries, Inc. v. The Village

Catch, Inc., 698 F. Supp. 994, 1006 (D. Mass. 1988).

---

[5]    M.G.L. c. 110B, §12 states that: "Likelihood of injury to business reputation or of dilution of the distinctive
       quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at
       common law, shall be ground for injunctive relief notwithstanding the absence of competition between the
       parties or the absence of confusion as to the source of goods or services."

[6]    Lanham Act, §43(a), 15 U.S.C. §1125(a)(1)(A) provides a cause of action against any person who uses in
       commerce a word, term, symbol or device, or a false or misleading description or representation that "is
       likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of
       such person or another person, or as to the origin, sponsorship, or approval of his goods, services or
       commercial activities by another person."

    1.      The Bay State® Mark Has Acquired Distinctiveness and Secondary
             Meaning Giving Rise to Common Law Trademark Rights That Are Senior
             to Any Rights of Baystate Financial.

Bay State® developed common law trademark rights long before its mark was registered, and long before Baystate Financial's first use in 1997. See Calamari Fisheries, Inc., 698 F. Supp. at 1008 (long and exclusive use a factor in establishing secondary meaning). Bay State® is a large and prominent banking institution. Id. (size and prominence of plaintiff's enterprise a factor in establishing secondary meaning). It has conducted extensive advertising and promotional efforts, and has been the subject of many newspaper articles reflecting favorable recognition. See President and Trustees of Colby College v. Colby College-New Hampshire, 508 F.2d 804, 808 (1st Cir. 1975)(normal consequence of substantial publicity may be inferred); Calamari Fisheries, 698 F. Supp. at 1009 (through favorable restaurant reviews by the media and its advertising, plaintiff became known to restaurant-going public for its seafood); and McKenney & Long, Federal Unfair Competition: Lanham Act §43(a), §3.05 at 3-58 (publicity by third-parties and other indicia of recognition of the product in the marketplace are evidence of secondary meaning)(citing cases).

Surveys in 1999 and 2001 provide direct evidence of secondary meaning by establishing that a significant percentage of consumers associate Bay State® with the plaintiff. See Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co., Inc., 9 F.3d 175, 182 (1st Cir. 1993) (citing inter alia President & Trustees of Colby College, 508 F.2d at 809; and International Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1085 (7th Cir. 1988)(survey evidence well-recognized means of establishing secondary meaning; in fact it is only direct

evidence on the question)).[7]  The survey evidence, along with evidence of growth, size,

advertising, prominence and use of the Bay State® mark establish secondary meaning in the area

of banking and finance.[8]

> 2.    The State and Federal Registrations Are Prima Facie
> Evidence of the Bank's Exclusive Right to Use the Bay
> State® Mark.

Title 15 U.S.C. §1115 (the "Lanham Act"), and M.G.L. c. 110B "statutorily expanded the

common law rights of a senior user who registers its mark under the Act." See Thrifty Rent-A-

Car System, Inc. v. Thrift Cars, Inc., 639 F.Supp. 750, 755 (D.Mass. 1986), aff'd, 831 F.2d 924,

932 (1st Cir. 1987).  Subject to certain enumerated defenses, federal registrations:

> . . . shall be prima facie evidence of the validity of the registered mark and of the
> registration of the mark, of the registrant's ownership of the mark, and of the
> registrant's exclusive right to use the registered mark in commerce on or in
> connection with the goods or services specified in the registration subject to any
> conditions or limitations stated therein.

15 U.S.C. §1115(a).  See M.G.L. c. 110B, §4.[9]

> 3.    Bay State®'s Registrations Are Valid, and Were Not
> Procured by Fraud.

"An allegation of fraud must be proved by clear, unequivocal and convincing evidence

and not by a mere preponderance of the evidence which leaves the issue in doubt."  Brown-

---

[7]    The survey is highly probative of secondary meaning because (a) it was not conducted for the purpose of litigation, (b) a proper foundation has been laid for its admissibility, and (c) it obtained answers to questions relevant to this litigation.  See Chase Federal Sav. and Loan Ass'n. v. Chase Manhattan Financial Services, Inc., 681 F. Supp. 771, 779-781 (S.D. Fla. 1987) (citing cases).

[8]    See Jefferson Bankshares, Inc. v. Jefferson Sav. Bank, 14 U.S.P.Q. 2d 1443 (W.D. Va. 1989) (concluding on similar facts that mark "Jefferson National Bank" had developed a secondary meaning in the area of banking and finance); see also President & Trustees of Colby College, 508 F.2d at 808 (secondary meaning in a geographically descriptive mark where the mark no longer causes the public to associate the services with a particular place but with a particular source).

[9]    M.G.L. c. 110B is modeled on the Lanham Act, which was enacted in 1946.  Therefore, cases construing the Lanham Act are "instructive" in c. 110B.  See Rollins Environmental. Services., Inc. v. Superior Court, 368 Mass. 174, 179-180 (1975).  M.G.L. c. 110B, §4 states that subject to certain enumerated defenses, registration shall be: "prima-facie evidence of the registrant's exclusive right to use the registered mark in this commonwealth on goods or services specified in the registration."

Bridge Mills, Inc. v. Eastern Fine Paper, Inc., 700 F.2d 759, 764 (1st Cir. 1983). Fraud exists

"only when there is a deliberate attempt to mislead the Patent Office into registering the mark."

Money Store v. Harriscorp Finance, Inc., 689 F.2d 666, 670 (7th Cir. 1982). Moreover:

> A claim of fraud in the procurement of a federal trademark requires the following
> elements be alleged and proven: 1) a false representation regarding a material fact;
> 2) knowledge or belief that the representation is false ("scienter"); 3) an intention
> to induce the listener to act or refrain from acting in reliance on the
> misrepresentation; 4) reasonable reliance on the misrepresentation; 5) damage
> proximately resulting from such reliance.

V & V Food Products, Inc. v. Cacique Cheese Co., Inc., 683 F. Supp. 662, 666 (N.D.Ill., 1988)

(citing United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1226 (10th Cir.

2000), and San Juan Products, Inc. v. San Juan Pools of Kansas, Inc., 849 F.2d 468, 473 (10th

Cir. 1988)).

Baystate Financial alleges that (1) the "specimens" submitted to the PTO are deficient;

(2) the Bay State® applications falsely claim first use of the mark for investment services in

1895; (3) the Bay State® mark had not become distinctive of the services; (4) the Banking Act of

1933 (the "Glass-Steagall Act") and the Bank Holding Company Act of 1956 prohibited such use

until 1999; and (5) the investment services were initially offered under the Minuteman® rather

than the Bay State® mark. See, e.g., Counterclaim, ¶¶ 38, 40.

Each of these allegations is false. (1) The specimens accurately show the mark as actually

used to sell and advertise Bay State®'s services, including the Bay State Investment Services®.[10]

(2) The applications correctly state that Bay State® has used the mark for banking and financial

services since 1895. It is sufficient to give the date of only one service when all of the services

---

[10]    The specimens were examined and accepted by the PTO. Under 37 C.F.R. §2.56(2), it is sufficient for an
application to include "one specimen showing the mark as used on or in connection with the goods, or in the
sale or advertising of the services in commerce." Blodgett Aff., ¶12.

encompassed in the application are within a single class.[11]  (3) The 1999 and 2001 surveys show

that the Bay State® mark had become distinctive of a broad range of services including

investments.  (4) Federal law did not prohibit state chartered banks such as Bay State® from

offering investment services.  General Counsel's Opinion No. 6, 48 Fed. Reg. 22989 (May 23,

1983).[12]  (5) Bay State® sponsored the Minuteman® services in much the same way that Ford

sponsors the Taurus:  to differentiate different products.  The ads state that Bay State®

"introduces" Minuteman® services and that Minuteman® is a division of Bay State®.  Surveys

reflecting satisfaction with Bay State® products and services show consumer awareness that Bay

State® sponsored the investment services.  Lewis Aff., ¶25, Blodgett Aff., ¶¶4-17.  The

descriptions and dates of first use were examined and accepted by the PTO, which could have

rejected the applications if they were deficient in any respect whatsoever.

Finally, even if Baystate Financial could prove the existence of fraud, cancellation would

not deprive Bay State® of its common law rights to the marks:

> Moreover, even if [appellees] knowingly submitted a false declaration such that
> the appellees' federal registration should be canceled, the appellees could (and
> did) still bring suit alleging common law trademark infringement.... "[i]t has been
> held several times that even if defendant succeeds in proving that the plaintiff's
> registration was fraudulently obtained, plaintiff's common law rights in the mark
> continue unabated" even if the registration is canceled.

---

[11]  37 C.F.R. §2.88(c) states that "The statement of use may be filed only when the applicant has made use of
the mark in commerce on or in connection with all of the goods or services ... for which the applicant will
seek registration ....  If more than one item of goods or services is specified in the statement of use, the
dates of use required in ... this section need be for only one of the items specified in each class, provided
the particular item to which the dates apply is designated."  Blodgett Aff., ¶13.

[12]  General Counsel's Opinion No. 6 states that:  "A nonmember bank may ..., consistent with the Glass-
Steagall Act, purchase and sell securities for the account of a customer if it is without recourse and solely
upon the order of the customer."  Blodgett Aff., ¶16.

Far Out Productions, Inc. v. Oskar, 247 F.3d 986, 996 (9th Cir. 2001) (citing J. McCarthy,

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§16:4, 24:90.1 (4th Ed.

1997) ).[13]

       4.    Baystate Financial's Use of the Mark Is Likely to Cause Dilution Under M.G.L. c. 110B §12.

One form of dilution is "blurring." Blurring occurs when "a significant segment of the

target group sees the two marks as essentially the same," or when "one mark [will be] seen by

customers as now identifying two sources." Hasbro, Inc. v. Clue Computing, Inc., 66 F.Supp.2d

117, 135 (D.Mass. 1999), aff'd, 232 F.3d 1 (1st Cir. 2000) (quoting 3, McCarthy §24:90.1).[14] See

also Great Scott Food Market, 348 Mass. at 325; and American Optical Corp. v. North American

Optical Corp., 489 F. Supp. 443, 451 (N.D.N.Y., 1979) (interpreting New York anti-dilution

statute identical to M.G.L. c. 110B, §12). This is a rare case in which the likelihood of dilution is

established by the pleadings. Baystate Financial specifically alleges that:

> The BAYSTATE Marks and Bank Marks are similar if not virtually identical.
> The dominant or core element of the respective marks is Baystate and Bay State.
> The only appreciable difference between the marks is a single space, an almost
> insignificant distinction. The parties' core marks sound the same and look the
> same, and therefore convey the same commercial impression to consumers. *It is
> unlikely that consumers will be able to distinguish between the BAYSTATE Marks
> associated with Baystate Financial's long-standing and highly regarded financial
> services business and the Bank Marks representing the Bank's neophyte financial
> services offerings.*

---

[13]    See also Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 816 (1st Cir. 1987) (cancellation of a federal trademark cannot extinguish common law rights that the federal registration did not confer) (citing Keebler Co. v. Rovira Biscuit Corp., 624 F.2d 366, 372 (1st Cir. 1980)).

[14]    Although Hasbro is instructive as to the definition of blurring, there are important distinctions between the Federal Trademark Dilution Act ("FTDA") at issue in Hasbro, 15 U.S.C. §1125(c)(1), and the state law invoked in this motion. Unlike its federal counterpart, M.G.L. c. 110B, §12 does *not require* proof that the mark is "famous" or proof of actual harm. Mosely v. V. Secret Catalogue, Inc., 537 U.S. 418, 430-433 (2003).

See Counterclaim, ¶32. (Emphasis added). Taken at face value, this more than satisfies the test

that a significant segment of the target group will see the two marks as essentially the same, or

one mark identifying two sources. See also, Lewis Aff., ¶¶20-21.

> 5.    Baystate Financial's Use of the Mark is Likely to Cause Confusion Under Lanham Act §43(a).

Boston Athletic Ass'n. v. Sullivan, 867 F.2d 22, 29 (1st Cir. 1989), requires the court to

consider eight factors in evaluating likelihood of confusion:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of plaintiff's mark.

The likelihood of confusion, like that of dilution, is largely established by the pleadings.

See Counterclaim, ¶32 and Lewis Aff. ¶¶20-21.  Addressing these factors in the order listed:  (1)

The similarity of the marks is admitted.[15]  (2) The similarity of goods and services is admitted.[16]

(3), (4) and (5) The channels of trade, advertising and class of prospective purchasers are the

same.[17]  Baystate Financial even sells through state chartered banks that are similar in size and

---

[15]    See Horizon Financial F.A. v. Horizon Bancorp., No. 87-0405, U.S.P.Q. 2d 1696 (E.D. Pa. 1987) ("Horizon Financial, F.A." and "Horizon Bank of Pennsylvania" found "strikingly similar" in appearance, sound and meaning); First Nationwide Bank v. Nationwide Sav. and Loan Ass'n., 682 F. Supp. 965, 976 (E.D. Ark. 1988) ("the difference between the generic words 'savings' and 'bank' will not be the focus of purchasers' attention"); Jefferson, 1989 U.S. Dist. LEXIS 10392, *7) ("Jefferson National Bank" and "Jefferson Savings Bank" found "very similar").  The two marks share the dominant phrase "Bay State." First Keystone Federal Sav. Bank v. First Keystone Mortg., Inc., 923 F. Supp. 693 704 (E.D. Pa. 1996).

[16]    "This is not a case where the services of [one institution] greatly differ from the other ... or where each [institution] caters to a distinct customer group." Horizon Financial, 1987 U.S. Dist. LEXIS 643, at *26; see also Northern Trust Corp. v. Northern Bank & Trust Co., 22 U.S..PQ. 2d 1391 (D. Mass. 1991). "[Banking and investment services] are products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." Charles Schwab & Co., Inc. v. Hibernia Bank, 665 F.Supp. 800, 808 (N.D. Cal. 1987). "With this similarity of service comes the potential for the public's mistaken assumption of convexity between the providers of the related services. The more likely the public is to make such an association, the less similarity in the marks is needed for a finding of likelihood of confusion." Sun Banks of Florida, Inc. v. Sun Federal Sav. and Loan Ass'n, 651 F.2d 311, 318 (5th Cir. 1981).

[17]    These factors are considered together. See, e.g., Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 816 (1st Cir. 1987) .

character to Bay State®.[18]  (6) Bay State® is not aware of actual confusion, perhaps because

Baystate Financial has not yet advertised extensively in Bay State®'s primary geographic market.

However, Baystate Financial's name is often misspelled as "Bay State" in the news media,

demonstrating its failure to achieve secondary meaning and strong likelihood of confusion.  (7)

Intent to trade on Bay State®'s name and goodwill can be inferred from Baystate Financial's

continued use and expansion of the mark with knowledge of Bay State®'s rights.[19]  (8) Bay

State® is a relatively strong mark, which Bay State® has used and advertised continuously since

1895.[20]

> 6.    Baystate Financial's State Registration Was Granted Improperly and
>        Should Be Cancelled Under M.G.L. c. 110B, §§3 and 8.

M.G.L. c. 110B, §3(f) forbids the registration of any mark that "so resembles ... a mark

or trade name previously used in the commonwealth by another and not abandoned, as to be

likely, when applied to the goods and services of the applicant, to cause confusion or mistake or

to deceive." Bay State® used the mark for over a century before Baystate Financial existed.

---

[18]    See Horizon Financial, 1987 U.S. Dist. LEXIS 643, at *26; Sun Banks, 651 F.2d at 318 (identity of
prospective customers largely result of comparable services offered).

[19]    See Raxton Corp. v. Anania Associates, Inc., 635 F.2d 924, 930 & n.9 (1st Cir. 1980).  That bad faith is
further evidenced by Baystate Financial's continued use of the mark after Bay State gave notice of the
infringement.  See Stern's Miracle-Gro Products, Inc. v. Shark Products, Inc., 823 F. Supp. 1077, 1087
(S.D.N.Y. 1993)("When a company appropriates an identical mark that is well-known and has acquired a
secondary meaning, an inference can be drawn that the company intends to capitalize on the goodwill and
reputation of the mark, as well as any confusion that might result as to the common origin between the mark
and the senior user's product").  The evidence clearly shows that, as in Stern's, the defendant has
"continued to use ... [a mark confusingly similar to the Bay State name and Mark] with knowledge of
plaintiff's objection to the use of the Mark.  This continued use of the Mark tends to indicate a measure of
bad faith on the defendant's part."  Id.

[20]    See NEC Electronics, Inc. v. New England Circuit Sales, Inc., 722 F. Supp. 861, 866 (D. Mass. 1989)
(considering mark "strong" based on active advertising for eleven years); and First Nationwide Bank, 682
F. Supp. at 975) (geographically descriptive mark, ordinarily weak, can become strong through extensive
advertising and sales).  Even if Bay State's mark is weak, "it is entitled to protection against use of a
confusingly similar mark where [as here] directly competitive services are involved."  Jefferson, 1989 U.S.
Dist. LEXIS 16165, at *21) .

Baystate Financial admits that the marks are likely to cause confusion. A mark that was improperly issued can be cancelled under M.G.L. c. 110B, §8(3)(c). <u>See</u> Blodgett Aff., ¶18.

M.G.L. c. 110B, §8(3)(b) provides for cancellation of any mark upon finding "that the registrant is not the owner of the mark." Ownership, in this context, includes common law rights. It is established by evidence that a party used the mark sufficiently to establish secondary meaning. <u>Sallen v. Corinthians Licenciamentos Ltda</u>, 273 F.3d 14, 24 (1st Cir. 2001) ("'Mark owner' must be understood against the backdrop of U.S. trademark law, which provides some protections to unregistered mark") (construing 15 U.S.C. §1125 (d)).[21] Bay State® was the first to use the mark. Baystate Financial admits similarity and the overlap is likely to cause dilution and confusion. <u>See</u> Blodgett Aff., ¶19.

---

[21] "Trademark law provides that ownership of a trademark is founded upon actual use of the mark, not the mere creation of it. Thus, 'the party who first appropriates the mark through use, and for whom the mark serves as a designation of source, acquires superior rights to it.' J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§16:4, 24:90.1 (4th ed. 1997) ('ownership is governed by priority of use').... '[I]n the absence of federal registration, prior ownership of a mark is only established as of the first actual use of a mark in a genuine commercial transaction.' <u>Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.</u>, 146 F.3d 350, 358 (6th Cir. 1998); <u>see also</u> <u>Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.</u>, 80 F. Supp. 2d 815, 879 (N.D. Ill. 1999) ('Thus, to gain protection under the Lanham Act one must establish rights under the common law, which confers ownership on the person who employs the first actual use of a mark in a genuine commercial transaction. In short, one must win the race to the marketplace')." <u>Malibu, Inc. v. Reasonover</u>, 246 F. Supp.2d 1008, 1012 (N.D.Ind. 2003). <u>See</u> also <u>Bayshore Group Ltd. v. Bay Shore Seafood Brokers, Inc.</u>, 762 F. Supp. 404, 411 (D. Mass. 1991) (quoting <u>Tally-Ho, Inc. v. Coast Community College Dist.</u>, 889 F.2d 1018, 1023 (11th Cir. 1989)) ("The first to use a mark on a product or service in a particular geographic market, *the senior user*, acquires rights in the mark in that market ... *Junior users* ... [are those] who subsequently use the same or similar mark on similar products or services. ...")(emphasis supplied).

7.    Baystate Financial Is Not Likely Establish a "Limited Area"
Defense Under Applicable Trademark Law

At common law, "two parties who innocently adopt similar trademarks and use them in separate markets carve out territories for themselves. Within its territory, each party can use its mark free from interference by the other." Thrifty Rent-A-Car Syst., Inc. v. Thrift Cars, Inc., 639 F. Supp. 750, 753 (D. Mass. 1986), aff'd, 831 F.2d 1177 (1st Cir. 1987). This was codified in Section 33(b)(5) of the Lanham Act, 15 U.S.C. §1115(b)(5), which "confers upon a junior user, such as [Baystate Financial], the right to continued use of an otherwise infringing mark in a remote geographical area[22] if that use was established prior to the other party's [state registration or federal application].[23]" Thrifty, 831 F.2d at 1181.[24] To sustain its "limited area" defense, Baystate Financial "is required to demonstrate (1) that it adopted its mark before[Bay State®'s 1999 application] under the ... Act, and without knowledge of [Bay State]'s prior use; (2) the extent of the trade area in which [Baystate Financial] used the mark prior to [Bay State]'s registration; and (3) that [Baystate Financial] has continuously used the mark in the pre-registration trade area." Id. (citing Foxtrap, Inc. v. Foxtrap, Inc., 671 F.2d 636, 640 (D.C. Cir. 1982)).

The "scope of protection afforded by [the limited area defense] is limited. A pre-existing good faith user's rights are frozen to the geographical location where the user established a

---

[22]    "A 'remote' territory is one where, at the critical date of the junior user's first use, the senior user's mark was not known by customers in that territory, such that no one would have been confused as to source. As the Court stated in Rectanus, the markets are 'remote' if 'the mark means one thing in one market, an entirely different thing in another.' The 'remoteness' enquiry is therefore an issue of the territorial dimension of likelihood of confusion." McCarthy on Trademarks §26:4 (4th Ed. 1997).

[23]    The relevant date in this case, under Section 33(b)(5)(A), is the date of Bay State®'s federal applications. See Lanham Act §7(c), 15 U.S.C. §1057(c). Thrifty concerned a regulation that had been granted in 1964 under a predecessor of the Lanham Act. Therefore, in Thrifty, the date of registration was decisive. See Section 33(b)(5)(B).

[24]    Bay State®'s registrations are governed by Section 33(a). However, Section 33(a) incorporates the limited area defense of Section 33(b)(5). See 15 U.S.C. §§1115(a) and (b)(5).

market penetration as of the date of registration. Such users are unable thereafter acquire additional protection superior to that obtained by the registrant." Thrifty Rent-A-Car, 831 F.2d at 1181 (citing Natural Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1395 (3rd Cir. 1985), cert. denied, 474 U.S. 920 (1985)). "A court delimits the area by examining the party's reputation, advertising, and sales with respect to the territory in question. ... The test is whether the party's mark is sufficiently known there, or whether its sales are of sufficient volume, to create a likelihood of confusion among consumers, should [the senior] user enter the same territory." Thrifty Rent-A-Car, 639 F. Supp. at 753 (citing 2 McCarthy, *Trademarks and Unfair Competition* §26:12 at 309 (2d ed., 1984)). The chance that Baystate Financial can establish a limited area defense for the Bay State® mark, which it only began using in May 1997 is very remote. If a limited area defense is available at all,[25] it is likely to be confined to the immediate environs of Baystate Financial's primary service area in Boston, Massachusetts.[26]

B.    Bay State® Will Suffer Irreparable Harm If Baystate Financial
      Continues to Use the Bay State® Mark.

"Likelihood of confusion due to the subsequent use of a confusingly similar mark by its very nature causes irreparable harm." Home Sav. of America v. Home Sav. Ass'n., 219 U.S.P.Q. 157 (S.D. Tex. 1982). See also Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 73 (2nd Cir. 1988) (likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm); Bayshore Group Ltd., 762 F. Supp. at 408 ("considerable authority exists for the view that the irreparable injury factor is satisfied once the plaintiff demonstrates that the defendant is

---

[25]    Given the fact that Bay State® had been using the "Bay State®" mark in the Worcester area for 102 years before Baystate Financial began calling itself "Baystate Financial Services," and the proximity of Worcester to Boston, Baystate Financial may have a difficult time proving that it adopted the name without knowledge of Bay State®'s prior use.

wrongly trading on the plaintiff's reputation") (citing Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 14 (1st Cir. 1986)); and Great Scott Food Market, 348 Mass. at 325. It is not possible to maintain a status quo. The harm can only grow worse as long as the situation continues. See Horizon Financial, 1987 U.S. Dist. LEXIS 643, at *33.

C.    The Balance of Harms Strongly Favors Bay State®.

The harm in cases of dilution and confusion falls mainly on the senior user with the established reputation. The risk to Baystate Financial is minimal. The evidence of secondary meaning in "Baystate Financial" is scant or non-existent. There is no evidence of paid advertising. The signage at its newly acquired Worcester office is temporary. Until quite recently, it emphasized "New England Financial Services," not Baystate Financial. Unless defendant can show that "Baystate Financial" has acquired secondary meaning, there will be no irreparable harm at all. The only harm Baystate Financial will suffer if an injunction issues will be the cost of changing signs and letterhead. "Any investment defendant may have made in the name [Bay State] after plaintiff's objection was a calculated risk and is no reason to deny injunctive relief." First Nationwide Bank, 682 F. Supp. at 978). The balance of harms favors Bay State® based on the distinctiveness of its mark and the fact that Baystate Financial is still in a "start up" phase in forms of both geographic expansion and advertising expenditures to promote the name. See Jefferson, 1989 U.S. Dist. LEXIS 10392, at ** 2, 11) ; and Horizon Financial, 1987 U.S. Dist. LEXIS 643, at *34-35.

---

[26]    In particular, Baystate Financial is likely to face virtually insurmountable obstacles in attempting to establish secondary meaning in the "Baystate Financial Services" mark in the areas surrounding Baystate Finanacial's Worcester and central Massachusetts branches, since they were not acquired until November 2003, and have only been using the "Baystate Financial Services" mark since mid-1997.

D.    Granting Injunctive Relief Will Serve the Public Interest.

The policy of trademark law is to protect parties that have a valid right to use a specific

mark and to prevent consumer confusion. "In light of the likelihood of confusion caused by the

defendant's use of the name [Baystate Financial] and the similarity between the two trade marks,

. . . the public interest is best served by the granting of [a] preliminary injunction against

defendant's use of the name and mark because the injunction will prevent further confusion

between plaintiff's and defendant's services in [Massachusetts]." Horizon Financial, 1987 U.S.

Dist. LEXIS 643, at *35-36.

E.    No Bond Or Only a Nominal Bond Should Be Required.

No bond or only a nominal bond should be required. See Horizon Financial, 1987 U.S.

Dist. LEXIS 643, at *33 ($25,000 bond); Comp Examiner Agency, Inc. v. Juris, Inc., 1996 WL

376600 (C. D. Cal. 1996) ($5,000 bond); ActMedia, Inc. v. Active Media Intern., Inc., 1996 WL

466527 (N.D. Ill. 1996) (no bond); Hotmail Corp. v. Van$ Money Pie Inc., 47 U.S.P.Q. 2d 1020

(N.D. Cal. 1998) ($100 bond).

## IV.    CONCLUSION

For the reasons stated, Bay State Savings Bank® requests that this Court issue an order

that prevents Baystate Financial from using the Bay State® mark.

BAY STATE SAVINGS BANK
By its attorneys,

James C. Donnelly, Jr., Esq., BBO #129700
Ann Marie Dirsa, Esq., BBO #650173
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
(508) 791-8500

Dated: March 26, 2004