UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

BAY STATE SAVINGS BANK,
Plaintiff

V.

BAYSTATE FINANCIAL SERVICES, LLC,
Defendant

CIVIL ACTION NO. 4:03-CV-40273-NMG

## AFFIDAVIT OF GERRY A. BLODGETT, ESQ.

Gerry A. Blodgett on oath deposes and says:

1.      I am a principal in the firm of Blodgett & Blodgett P.C. of Worcester, MA. I was admitted to the Massachusetts Bar in 1977. I was admitted to practice before the U.S. Patent and Trademark Office ("PTO") in 1971. A majority of my law practice is concentrated on prosecuting patent and trademark applications in the PTO. I have taken formal trademark courses at both the J.D. and L.L.M. level. I have participated for two years as a federal appeals court law clerk in trademark appeals from the U.S. Patent and Trademark Office, involving both substantive and procedural issues. Over 35 years of professional practice, I have prepared and prosecuted approximately 500 federal and Massachusetts trademark and service mark registration applications. I have participated in numerous administrative proceedings and appeals and litigation involving trademarks and service marks. A curriculum vitae summarizing my background is attached at the end of this affidavit.

2.      *Bay State Savings Bank® ("Bay State®") engaged my services in 1999 to prosecute a series of state and federal trademark registrations.* I provided advice on trademark

issues, prepared applications and other supporting documents, and represented the bank in proceedings with the Massachusetts Secretary of State and the PTO. Copies of the state application and the "file wrappers" for federal registration are included in Exhibits 11-A to 11-M.[1] The earlier applications stated that the marks were used for banking and financial services, but this was expanded at the suggestion of the PTO. The applications and resulting registrations are illustrated in the following chart:

| Mark | First Use | Federal Registration | State Registration | Services described |
|---|---|---|---|---|
| Bay State | 5/16/1895 | 5/15/01 | 10/14/99 | IC 036. US 100 101 102. G & S: Banking Services And Financial Services, Namely, Financial Investment In The Field Of Real Estate, Stocks, Bonds, Commercial Paper, And Other Securities, Financial Management And Planning And Financial Guarantee And Surety. |
| Bay State Savings Bank | 5/16/1895 | 5/22/01 | 7/20/99 | IC 036. US 100 101 102. G & S: Banking Services And Financial Services, Namely, Financial Investment In The Field Of Real Estate, Stocks, Bonds, Commercial Paper, And Other Securities, Financial Management And Planning, And Financial Guarantee And Surety. |
| Bay State Online | 7/5/01 | 10/1/02 | 11/14/01 | IC 036. US 100 101 102. G & S: Banking services provided by means of a global computer network. |
| Bay State Investment Services | 2/5/02 | 7/30/02 | 6/3/02 | Investment Services, namely, mutual fund brokerage and investment, annuity underwriting, brokerage in the field of stocks, bonds, life insurance and long term care insurance and insurance agencies and underwriting in the field of life insurance and long term care insurance, in Class 36 (U.S. Cls. 100, 101 and 102) |
| Bay State Bank | 5/30/03 | pending | 6/19/03 | IC 036. US 100 101 102. G & S: Banking services and on-line banking services; and financial services, namely, financial investment in the field of real estate, stocks, bonds, commercial paper, and other securities, financial management and planning and financial guarantee and surety |
| Bay State Savings Bank & Minuteman Head Design | 11/25/99 | 7/16/02 | 1/7/00 | IC 036. US 100 101 102. G & S Banking Services And Financial Services, Namely, Financial Investment Advice and Brokerage In The Filed of Real Estate, Stocks, Bonds, Commercial Paper, and Other Securities; Risk Management Insurance and Annuity Brokerage; Brokerage of Insurance Primarily Designed As an Investment and Investment Annuity Brokerage; Financial Management and Planning; And Financial Guarantee and Surety |
| Minuteman Investment Services | 1/10/01 | 7/16/02 | | Brokerage and investment, annuity underwriting and brokerage in the field of stocks and bonds. |

---

[1] All exhibit references are to the Appendix of Exhibits.

3.  *Baystate Financial has brought a counterclaim inappropriately alleging that four of the registrations were procured by fraud.* The factual allegations of the counterclaim are incorrect. Moreover, they reflect incorrect interpretations of trademark law. This affidavit is intended to provide correct and accurate information. It also provides my professional opinions that: (a) Bay State® is the common law owner of the Bay State® marks; (b) Baystate Financial is a subsequent user and not the owner of the Bay State® marks; (c) the Bay State® registrations are valid and were not procured by fraud; and (d) Baystate Financial's state registration of the name Baystate Financial Services is invalid and subject to cancellation.

BAY STATE® IS THE COMMON LAW OWNER
OF THE BAY STATE MARKS

4.  *In trademark law, the "owner" of a mark is the first party that appropriated the mark to its own use and used it sufficiently to generate secondary meaning.* See Memorandum in Support of Bay State Savings Bank's Motion for Preliminary Injunction ("Plaintiff's Memorandum") at pp. 15-16 and n. 21.

5.  *Bay State® has used the mark since 1985 in a manner that has generated secondary meaning.* The public recognition and good will associated with Bay State® are reflected by the growth, prominence and present size of Bay State®. Consumer surveys in August of 1999 and August of 2001 provide direct evidence that a substantial portion of the public associates the Bay State® mark exclusively with Bay State®, and perceive Bay State® as offering a broad range of financial services. See Affidavits of Robert J. Lewis ("Lewis Aff.") and Kelly Myers ("Myers Aff.").

6.  *In my opinion, Bay State® acquired common law ownership of the Bay State® mark in connection with financial services long before Baystate Financial was incorporated in 1997, and before its alleged predecessors supposedly began to use the mark in 1983.*

## BAYSTATE FINANCIAL IS A SUBSEQUENT USER AND
## NOT THE OWNER OF THE BAY STATE® MARKS

7.  *Baystate Financial's application to register the "Baystate Financial Services" mark in Massachusetts states that the mark was used for the first time on May 1, 1997.* The application was signed under oath before a notary public on May 27, 1997. It includes a sworn statement that all of the statements in the application are true. The Massachusetts Service Mark form specifically states that the claimed date of first use should include use by any predecessors in interest. Based on this information, the first use of the mark by Baystate Financial Services occurred on May 1, 1997, approximately 102 years later than the first use by Bay State Savings Bank®.

8.  *Baystate Financial incorrectly alleges that, contrary to the 1997 application, a predecessor in interest began to use the Bay State service mark on January 1, 1983.* It further alleges that a predecessor registered "Baystate Financial Services" with the Secretary of State of Massachusetts on April 10, 1990. See Counterclaim ¶¶ 6-7. There are at least two flaws in this position. First, it is contradicted by the 1997 service mark application, as discussed above in paragraph 7. Second, even if true, the 1990 registration was allowed to expire. If Baystate Financial had, in fact, owned the 1990 registration the proper and customary practice would be to renew that registration rather than filing a new one.

9.  *Baystate Financial asserts that its use of the Bay State® service mark is senior as to investment services.* However, Bay State® has offered investment products for decades, including stocks and mutual funds since 1994. Furthermore, even if Baystate Financial had been the first to use the name for stocks and mutual funds, this argument begs the question of whether the other investment services offered by Baystate Financial or its predecessors are sufficiently similar to the Bay State® services to cause dilution or confusion. The test is whether consumers

perceive the Baystate Financial use of the mark as "so foreign to [Bay State's] as to insure against identification of the two." See Plaintiff's Memorandum at pp. 7-8. A comparison of services provided by Baystate Financial shows substantial similarity to those of Bay State®, even if sales of stocks, bonds and mutual funds are not considered. See Lewis Aff., ¶17. In my opinion, based on all the available evidence including a review of all the relevant information including the 1999 and 2001 surveys, the services offered by Baystate Financial are too similar to insure against identification with Bay State®. See Great Scott Food Market, Inc. v. Sunderland Wonder, Inc., 348 Mass. 320, 325 (1965).

10. *Baystate Financial's use of the Bay State® mark is subsequent to that of Bay State®. In addition, in my opinion, the 1997 registration of Baystate Financial Services was improper under M.G.L. c. 110B § 3(f) because it "so resembles . . . a mark or trade name previously used in the Commonwealth by another and not abandoned, as to be likely, when applied to the goods and services of the applicant, to cause confusion or mistake or deceive."* A mark that was issued contrary to §3(f) is subject to cancellation under M.G.L. c. 110B § 8(3)(c). In addition, M.G.L. c. 110B §8(3)(b) provides for cancellation of any mark upon finding "that the registrant is not the owner of the mark." In my opinion, for the reasons stated above, Baystate Financial is not the owner of the Bay State® mark, and the Baystate Financial registration should be cancelled.

## THE BAY STATE REGISTRATIONS ARE VALID AND WERE NOT PROCURED BY FRAUD

11. *Baystate Financial's claim of fraud is mainly based on five allegations that are repeated in virtually the same form for each of the challenged registrations.* The allegations are that: (1) the "specimens" submitted to the PTO are deficient; (2) Bay State®'s applications falsely

claim first use of the mark for investment services, as distinguished from banking services, in 1895; (3) the Bay State® mark had not become distinctive of the investment services, as alleged in Bay State®'s declaration of distinctiveness; (4) the Banking Act of 1933 (the "Glass-Steagall Act") and Bank Holding Company Act of 1956 prohibited Bay State from providing investment services until 1999; and (5) the investment services were offered exclusively under the Minuteman® rather than the Bay State® mark until at least May 2003. See. e.g., Counterclaim, ¶¶ 37, 38 and 40; 42, 43 and 45; 47, 48 and 50; 54-56; and 60. The relevant facts are as follows:

12. *The specimens submitted with the applications meet all applicable requirements of the PTO.* They show the mark as actually used to sell and advertise Bay State®'s services, or, in the case of Bay State Investment Services®, as it was intended to be and subsequently was in fact used. Under 37 C.F.R. §2.56(2), it is sufficient for an application to include "one specimen showing the mark as used on or in connection with the goods, or in the sale or advertising of the services in commerce." The specimen is not required to show on its face how or when it was used. That information is provided elsewhere in declarations supporting the applications. The specimen for Bay State Investment Services® is a letter that was sent by mail through the U.S. Postal Service to selected Bay State® customers located in Massachusetts. At about the same time, ads using the Bay State Investment Services® mark were published in The Boston Globe and the Providence Journal. The letter and newspaper ads promote services that are offered in commerce including sales of stocks, bonds and mutual funds in public security markets. See Lewis Aff., ¶25.a.[2] See also 15 U.S.C. §1051 (a)(3)(c). For trademark purposes, the definition of "commerce" includes "all commerce which may lawfully be regulated by congress." 15 U.S. C.

---

[2] 15 U.S.C. § 1127(2) defines use of a mark in commerce on services as "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one state . . . and the person rendering the services is engaged in commerce in connection with the services."

§1127. Congress can and does regulate advertising, securities markets and the U.S. mail. Thus, the mark was used in commerce. The specimens were examined and accepted by the PTO. The PTO could have rejected the specimen, if there were questions about its sufficiency. The federal registrations are prima facie evidence under 15 U.S.C. §1115(a) that the marks are validly registered, that Bay State® owns the marks, and that Bay State® has the exclusive right to use the marks in commerce in connection with banking and financial services.

13. *The applications correctly state that Bay State® has used the mark for banking and financial services since 1895.* 37 C.F.R. §2.88(c) states that "The statement of use may be filed only when the applicant has made use of the mark in commerce on or in connection with all of the goods or services ... for which the applicant will seek registration.... If more than one item of goods or services is specified in the statement of use, the dates of use required in ... this section need be for only one of the items specified in each class, provided the particular item to which the dates apply is designated." In this case, all the services are in Class 36. It was therefore sufficient to give the date of only one service when all of the services encompassed in the application are within a single class. To the extent that the service recitations overlap, as in the case of banking services and financial services, they are not in fact more than one service. Thus, the date of the first use for the one is the same as the first use of the other.

14. *The Bay State® mark was distinctive of the services described in the applications.* Where the specimen presented shows the mark as used in advertising, the specimen must communicate the general nature of the services provided. It need not list all of the services. See Trademark Manual of Examining Procedure ("TMEP") ¶ 904.01(a). Where the service recitations overlap, proof of distinctiveness for one shows distinctiveness for the other. In any event, the 1999 and 2001 surveys show that the Bay State® mark had become distinctive of a

broad range of services including investments. The applications were examined and accepted by the PTO, which issued the TMEP. The registrations are prima facie evidence under 15 U.S.C. §1115(a) that the marks are validly registered, that Bay State® owns the marks, and that Bay State® has the exclusive right to use them in commerce in connection with banking and financial services.

15.  *The declarations of distinctiveness filed by Bay State® are accurate and valid.* Clearly, as proven by the various surveys, Bay State®'s long use of the mark Bay State® for banking and financial services has established secondary meaning, that is, the term Bay State® in the context of financial services refers to Bay State Savings Bank®, in the minds of consumers.

16.  *The Banking Act of 1993 (the "Glass-Steagall Act") and the Bank Holding Company Act of 1956 did not prohibit Bay State® from buying and selling securities for customers in the period from 1933 to 1999.* This is established in two respects: First, Bay State® had the right to and did, in fact, sell U.S. Savings Bonds during all relevant periods. U.S. Savings Bonds are securities, but are totally outside of the prohibitions of Glass-Steagall. Thus, Bay State® was legally selling securities and investments during all relevant periods, and had the right to claim such services in Bay State®'s service mark applications. Second, Bay State® is a state chartered bank. In 1983, the General Counsel of the Federal Deposit Insurance Corporation ("FDIC") issued an opinion addressing this issue. The opinion states in relevant part:

> A non-member bank may . . ., consistent with the Glass-Steagall Act, purchase and sell securities for the account of a customer if it is without recourse and solely upon the order of the customer.

General Counsel's Opinion No. 6, 48 Fed. Reg. 22989 (May 23, 1983). It is more than reasonable to rely on an opinion of the General Counsel of the FDIC that is published in the Federal Register. Bay State® conducted such transactions publicly. The arrangement was

announced in its 1994 Annual Report, and passed review by state regulators. See Lewis Aff., ¶25.b.

17. *Bay State® used the Bay State Investment Services® mark in a manner that satisfied all of the requirements for federal trademark registration.* The specimen submitted in the Bay State Investment Services® application is a copy of a promotional letter that was sent to bank customers via the U.S. Mail on February 5, 2002. On May 1, 2002, Bay State® used the mark in ads that were published in The Boston Globe and the Providence Journal. Lewis Aff., ¶29.a. The services at issue, i.e. selling stocks and mutual funds, are regulated for Congress. Commerce includes all commerce that can lawfully be regulated by congress. 15 U.S.C. §1127. In my opinion, the mark was used in commerce.

18. *The fact that Bay State® used the Minuteman Investment Services® mark for investment services from 1999 to approximately 2002 does not detract from its registration or trademark rights for Bay State Investment Services®.* Prior to Bay State®'s transition from use of the Minutemen Investment Services® mark for its investment services to the Bay State Investment Services® mark, Bay State® sponsored Minuteman Investment Services® in much the same way that Ford sponsors Taurus: to differentiate different products from the same sponsor. There is ample evidence that the Minuteman Investment Services® were target marketed primarily to Bay State® customers. The Minuteman Investment Services® were based in Bay State® branches. Bay State®'s sponsorship was a matter of public record; the ad that first introduced Minuteman Investment Services® states: "No two investors are alike. That's why Bay State Savings Bank introduces Minuteman Investment Services." A subsequent ad refers to "Minuteman Investment Services, a division of Bay State Savings Bank." The Bay State® and Minuteman Investment Services® marks both appear in the ad, but the Bay State® mark is larger

and more prominent. See Lewis Aff., ¶6. Consumer surveys in 1999 and 2001 indicate that consumers and customers associate Bay State® with a broad range of financial services that include stock, bond and mutual fund investments in addition to other bank services. See Myer Aff. Thus, Baystate Financial's use of the Bay State® mark creates likelihood of dilution and confusion.

## BAYSTATE FINANCIAL'S STATE REGISTRATION IS INVALID AND SUBJECT TO CANCELLATION UNDER M.G.L. C. 110B, §§4 AND 8

19. *M.G.L. C. 110B §3(f) forbids the registration of any mark that "so resembles . . . a mark or trade name previously used in the Commonwealth by another and not abandoned, as to be likely, when applied to the goods and services of the applicant, to cause confusion or mistake or to deceive."* Bay State® used the mark for more than a century before Baystate Financial existed. See Counterclaim, ¶ 32. Baystate Financial admits in pleadings that the marks are likely to cause confusion. A mark that was improperly issued can be cancelled under M.G.L. C. 110B §8(3). In my opinion, the mark was improperly issued and should be cancelled.

20. *In addition, M.G.L. C. 110B §8(3) provides for cancellation of any mark upon finding "that the registrant is not the owner of the mark."* Ownership in the trademark context includes common law rights. Ownership is established by evidence that a party used the mark sufficiently to establish "secondary meaning." 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:4 (4th Ed. 1997) ("Ownership is governed by priority of use"). In my opinion, the mark is owned by Bay State®, not by Baystate Financial.

Signed under pains and penalties of perjury this 17th day of March 2004.

_____
Gerry A. Blodgett

# *BLODGETT & BLODGETT, P.C.*

*43 HIGHLAND STREET*
*WORCESTER, MASSACHUSETTS 01609-2797*
*Telephone: 508-753-5533*
*Telecopier: 508-755-1837*
*Email: pct-law@ix.netcom.com*
*URL: bablaw.com*

Patents, Trademarks, Unfair Competition and Copyright Law (US. and Foreign). Trial, Appellate and Federal Agency Practice.

**GERRY A. BLODGETT**, born Washington, D.C., August, 1947; admitted to bar, 1977, Massachusetts; 1978, District of Columbia; registered to practice before U.S. Patent and Trademark Office 1971.

Education: Worcester Polytechnic Institute (B.S.Ch.E., 1970; M.S.Ch.E., 1972) Suffolk University (J.D., cum laude, 1976); George Washington University (LL.M., Pat. Law and Trade Reg., 1980);

Courts Admitted to Practice: Massachusetts, U. S. Supreme Court, U.S. First Circuit, U.S. District of Columbia, U.S. Court of Appeals for the Federal Circuit, U.S. Court of Claims.

Publications: "Federal Courts Have the Power to Order a State Agency to Cure a Constitutional Violation of Another State Agency," 9 Suffolk U. L. Rev. 317-26, 1975; "Patent Fraud and Rule 10b-5: A New Liability for Patent Fraud," 10 Suffolk U. L. Rev. 1064-1106, 1976; "Law and Lubricants," Proceedings of the International Symposium on Metalworking Lubrication, 1980; "Relative Significance -A Concept in Chemical Structural Obviousness Cases," 63 J. Pat. Off. Soc'y., 69-125, 1981.

Positions: Patent Agent, Blodgett & Blodgett, P.C., 1970-1976;
Technical Advisor to Phillip B. Baldwin, U.S. Court of Customs and Patent Appeals, 1976-1978;
Patent, Trademark, and Copyright Attorney, Blodgett & Blodgett, P.C., 1978- present.

Member: Worcester County, Massachusetts and American Bar Associations; American Intellectual Property Law Association; Boston Patent Law Association.

Military: Major, U.S. Army Reserves (Inactive)

**PRACTICE AREAS:** Patents, Trademarks, and Copyrights.