UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BAY STATE SAVINGS BANK,<br><br>Plaintiff,<br><br>v.<br><br>BAYSTATE FINANCIAL SERVICES, LLC,<br><br>Defendant. | Civil Action No. 4:03-cv-40273-NMG |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Since 1983, defendant Baystate Financial Services, LLC ("Baystate Financial") has offered financial services such as life insurance, the purchase and sale of securities, and financial planning. Nearly twenty years later, plaintiff Bay State Savings Bank ("Bank") adopted the name "Bay State Investment Services" under which it now offers similar financial services as those offered by Baystate Financial. Despite peacefully coexisting since 1983, the Bank now requests an injunction preventing Baystate Financial from using its 20-year-old mark in connection with financial services the Bank has just recently begun offering. For the reasons discussed below, the Bank's motion should be denied.

## FACTUAL BACKGROUND

Baystate Financial is one of New England's oldest and largest financial firms and was founded as a general agency of the New England Life Insurance Company ("New England Life"). See Affidavit of David C. Porter ("Porter Aff."), submitted herewith, at ¶ 2. Baystate Financial offers various business-related products and services, including deferred compensation, business income insurance, key employee insurance, profit sharing, simplified employee

pensions, 401(k) plans, managed care medical benefits, dental insurance, group life insurance, short-term and long-term disability insurance and HMOs. *Id.* at ¶ 11. The company also offers a variety of products and planning strategies for individuals, including permanent life insurance, term insurance, long-term care insurance, mutual funds, annuities, IRAs, education funding, charitable giving, and estate and retirement planning. *Id.* at ¶ 12. Baystate Financial has never provided traditional banking services. *Id.* at ¶ 13; Affidavit of Richard D. Wilson ("Wilson Aff."), submitted herewith, at ¶ 9.

In 1982, Baystate Financial's predecessor, the Desautels & Wilson Partnership d/b/a Desautels & Wilson Insurance Agency (the "Desautels & Wilson Agency"), a general agency of New England Life, began answering its telephones as "Baystate Financial Services." *See* Wilson Aff. at ¶¶ 2-3. The Desautels & Wilson Agency's Annual Report for that year explained that its use of the name was in recognition of the wide variety of financial services the agency had come to offer. *Id.* at ¶ 3 and Exhibit A, p. 18. The report explained that, "[w]ith the grouping of our insurance, investment, financial planning, group benefits, and pension services under one marketing identification, we believe you will be better able to serve your clients and the other advisors." *Id.* It further stated: "Baystate Financial Services is a name that accurately describes what we have become. It is a name that we can promote without it having to change." *Id.*

In the years that followed, the number of partners in the Desautels & Wilson Agency changed from time to time, but the organization continued doing business as Baystate Financial Services. In January 1983, after expanding to become the Wilson, Bergstrom & Denton Partnership d/b/a Wilson, Bergstrom & Denton Insurance Agency (the "Wilson, Bergstrom & Denton Agency"), the agency adopted the service marks BAYSTATE, BAYSTATE FINANCIAL and BAYSTATE FINANCIAL SERVICES (the "BAYSTATE Marks"), and

continued using the Baystate Financial Services trade name. *Id.* at ¶ 4. On April 10, 1990, the Wilson, Bergstrom & Denton Agency obtained Massachusetts Service Mark Registration No. 44104 for the mark BAYSTATE FINANCIAL SERVICES (the "First Registration"), which included a date of first use of January 1, 1983. *Id.* at ¶ 6 and Exhibit C.

From 1982 to August 1996, the Wilson, Bergstrom & Denton Agency and its successors-in-interest continuously used the BAYSTATE Marks in commerce and continuously conducted business as Baystate Financial Services in connection with their financial services and products. *Id.* at ¶¶ 4-10; Porter Aff. at ¶¶ 5-8; Affidavit of Richard Denton ("Denton Aff."), submitted herewith, at ¶¶ 2-4 and Exhibits A-D.[1] During that period, the partnerships offered financial products and services like IRAs, mutual funds, group life insurance, disability insurance, business income insurance, and estate and retirement planning. *See* Wilson Aff. at ¶ 9. The partnerships promoted their business as Baystate Financial Services, particularly within the financial services industry, and at trade meetings like the Boston Life Underwriters Association. *Id.* at ¶ 10; Denton Aff. at Exhibits A-D. They also used letterhead bearing the name Baystate Financial Services and presented their business under that name in interactions with the public. *See* Wilson Aff. at ¶ 10 and Exhibit B; Denton Aff. at ¶ 3 and Exhibits A-D.

In August 1996, New England Life acquired from the line of partnerships the First Registration, the BAYSTATE Marks, the goodwill associated with the BAYSTATE Marks and the Baystate Financial Services trade name. *Id.* at ¶ 10 and Exhibit D. New England Life immediately sold these rights and interests to David C. Porter ("Porter"), as a general agency of

---

[1] On June 29, 1990, the Wilson, Bergstrom & Denton Agency became the Wilson & Bergstrom Partnership d/b/a Wilson & Bergstrom Insurance Agency (the "Wilson & Bergstrom Agency"). *See* Wilson Aff. at ¶ 7. On March 1, 1992, the Wilson & Bergstrom Agency assigned to the Richard Wilson Insurance Agency (the "Wilson Agency") the First Registration, the continuing exclusive right to use the BAYSTATE Marks, the goodwill associated with the BAYSTATE Marks and the Baystate Financial Services trade name. *Id.* at ¶ 8. In August 1996, the Wilson Agency sold these rights and interests to New England Life. *Id.* at ¶ 10 and Exhibit D.

3

New England Life. *See* Porter Aff. at ¶ 6. From August 1996 to approximately January 2, 1997, Porter continuously used the BAYSTATE Marks in commerce and continued doing business as Baystate Financial Services. *Id.* On January 2, 1997, Porter organized Porter/Desautels LLC ("Porter/Desautels") and transferred to it the First Registration, the BAYSTATE Marks, the goodwill associated with the BAYSTATE Marks and the Baystate Financial Services trade name. *Id.* at ¶ 7. On May 19, 1997, Porter/Desautels changed its name to Baystate Financial Services, LLC, the named defendant in this action. *Id.* at ¶ 8. From January 2, 1997 to the present, Baystate Financial has continuously used the BAYSTATE Marks in commerce and has continued doing business as Baystate Financial Services in connection with its financial services and products. *Id.* at ¶¶ 7-8 and Exhibits C-H.[2]

## ARGUMENT

To obtain a preliminary injunction in a trademark infringement action, "[t]he heart of [the] test is . . . whether the harm caused plaintiff without the injunction *in light of* the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause [the] defendant[]." *Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F. Supp. 994, 1005 (D. Mass. 1988) (citations omitted) (emphasis in original). As demonstrated below, the Bank is not entitled to the extraordinary relief it seeks.

---

[2] Also on May 19, 1997, Baystate Financial reregistered the "BAYSTATE FINANCIAL SERVICES" mark with the Secretary of the Commonwealth of Massachusetts (the "Second Registration"). *Id.* at ¶ 9. It did so because, until 1997, Baystate Financial's predecessors had operated as general agencies of New England Life. *Id.* After Baystate Financial established itself as an LLC in 1997, it decided to reregister the BAYSTATE FINANCIAL SERVICES mark in case the change in the form of ownership had any bearing on Baystate Financial's use of the mark. *Id.* In completing the application for the Second Registration, Baystate Financial inadvertently listed the date of first use of the BAYSTATE FINANCIAL SERVICES mark as May 1, 1997. *Id.* at ¶ 10. In fact, however, before establishing the LLC, Porter had acquired from New England Life in August 1996 all of his predecessor's right, title and interest in the BAYSTATE Marks, the First Registration, the goodwill associated with the BAYSTATE Marks and the Baystate Financial Services trade name. *Id.* Porter understood that his predecessors first used the BAYSTATE Marks and Baystate Financial Services trade name in 1983. *Id.*

4

## I. THE BANK IS UNLIKELY TO PREVAIL ON ITS TRADEMARK INFRINGEMENT CLAIM

The Bank's trademark infringement claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) requires it to prove: (1) ownership of a distinctive mark entitled to trademark protection; (2) use of that mark in interstate commerce; and (3) use of the mark by Baystate Financial in a manner likely to cause confusion as to the origin of the goods or services. *See Calamari*, 698 F. Supp. at 1006.

### A. The Bank Marks Are Not Distinctive

The Lanham Act protects only distinctive marks. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768-69 (1992). Whether a mark is afforded protection depends on where it fits along a spectrum of categories that include generic, descriptive, suggestive, arbitrary and fanciful marks. *Id.* at 768. A generic term identifies a kind of product but does not distinguish its source (e.g., "aspirin" or "cola"); such terms are not afforded trademark protection. *See S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir. 1979). A descriptive mark is one that portrays a characteristic of the product to which it refers, and is entitled to protection only if it has acquired "secondary meaning" such that consumers associate the product with a particular source. *See Calamari Fisheries*, 698 F. Supp. at 1006-07. Finally, suggestive, arbitrary and fanciful marks, by their nature, identify the particular source of a product and are considered "inherently distinctive." *See Two Pesos*, 505 U.S. at 768. Inherently distinctive marks are protected without proof of secondary meaning. *Id.*

A registered mark is presumed valid and entitled to protection. *See* 15 U.S.C. § 1115(a). This presumption may be rebutted, however, by proof that the mark is either generic or merely descriptive and without secondary meaning. *See Calamari*, 698 F. Supp. at 1007. In addition, as discussed in more detail in subsection C below, a registered mark is subject to another party's

prior use of the same or similar mark. *See Bayshore Group Ltd. v. Bay Shore Seafood Brokers, Inc.*, 762 F. Supp. 404, 411 (D. Mass. 1991).

The Bank obtained federal registrations for the "Bay State," "Bay State Savings Bank" and "Bay State Investment Services" marks (the "Bank Marks") on May 15, 2001, May 22, 2001 and July 30, 2002, respectively. *See* Memorandum in Support of Bank's Motion for Preliminary Injunction (the "Bank's Memorandum") at p. 4. Significantly, the U.S. Patent and Trademark Office ("PTO") initially denied each of the Bank's applications because, among other things, they were deemed to be geographically descriptive. *See* Bank's Appendix of Exhibits ("Appendix"), pp. 712, 795-96, 920-21. The PTO agreed to register the Bank Marks only after the Bank submitted Declarations under § 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), stating that the marks had "***become*** distinctive of the services through applicant's substantially exclusive and continuous use in commerce for at least the five years immediately before the date of this statement." *Id.* at pp. 764, 775-76, 853, 864-65, 929, 931-32 (emphasis added).

It is well established that the submission of evidence under § 2(f) in connection with a trademark application "amounts to a concession" that the mark is not inherently distinctive. *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994). *See also Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1577 (Fed. Cir. 1988) (where registration was initially sought on basis of distinctiveness, "subsequent reliance by the applicant on § 2(f) assumes the mark has been shown or conceded to be merely descriptive"). Since the PTO allowed the Bank's applications only after the Bank submitted evidence under § 2(f), the Bank Marks cannot be considered inherently distinctive. *See Aromatique*, 28 F.3d at 1577. Even the Bank appears to concede this point. *See* Bank's Memorandum at pp. 8-9.

6

Regardless of this concession, however, by their very nature, the Bank Marks are not inherently distinctive but are merely descriptive of the types of services offered by the Bank and of the geographic location from which those services originate. *See Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 787 (5th Cir. 1984) ("Bank of Texas" is not inherently distinctive because it combines the generic term "bank" with the geographical term "Texas"); *First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.*, 923 F. Supp. 693, 704-05 (E.D. Pa. 1996) ("First Keystone Federal Savings" is geographically descriptive, which is a weak type of mark); *Quaker State Oil Ref. Co. v. Steinberg*, 189 A. 473, 474 (Pa. 1937) ("Quaker State" is a descriptive, geographical term not capable of exclusive appropriation as a trade name).

### B.   The Bank Marks Lack Secondary Meaning

A geographically descriptive mark is protected only if it has secondary meaning, such that "the mark no longer causes the public to associate the goods with a particular place, but to associate the goods with a particular source." *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 181 (1st Cir. 1993). A mark lacks secondary meaning "where, despite a degree of association between the mark and the producer, the original meaning remains dominant; so long as the mark remains descriptive in its primary significance, subsidiary connotations cannot justify trademark treatment." *Id.* at 182 (citations omitted).

A plaintiff must not only establish secondary meaning in a descriptive mark generally, but also must show that its mark had such secondary meaning before the defendant began using the same or similar mark. *See Co-Rect Prod., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1986). Accordingly, the Bank must show that its marks had acquired secondary meaning in connection with the kinds of financial services at issue in this litigation

7

before Baystate Financial's first use of any similar marks.[3] Although the Bank contends that Baystate Financial first used the BAYSTATE FINANCIAL SERVICES mark on May 1, 1997, the date listed in the Second Registration, the facts show that Baystate Financial and its predecessors obtained common law rights in the BAYSTATE Marks and the Baystate Financial Services trade name in 1983. *See* Wilson Aff. at ¶¶ 3-11; Porter Aff. at ¶¶ 5-10; Denton Aff. at ¶¶ 2-4. Nevertheless, regardless of which date is deemed controlling, the Bank Marks did not acquire secondary meaning prior to 1983 or 1997.

To show that its marks have secondary meaning, the Bank relies heavily on image and positioning surveys conducted on its behalf in 1999 and 2001. Given the dates of these surveys, however, they are entirely irrelevant to whether the Bank Marks acquired secondary meaning before Baystate Financial adopted and began using the BAYSTATE Marks and Baystate Financial Services trade name in 1983.[4] The surveys also identify the Bank's competitors as other banks – Baystate Financial is not mentioned anywhere in the surveys – and also define the Bank's market area as limited to Worcester, Shrewsbury, Holden and Auburn. *See* Appendix, Exhibits 9 and 10. These descriptions of the Bank's competitors and market area speak volumes about whether, as of 2001, the Bank actually offered the kinds of financial services at issue in

---

[3] The Bank's registration of its marks does not shift the burden of proof to Baystate Financial given the circumstances in which the PTO ultimately allowed the Bank's applications. Where, as here, acquired distinctiveness (i.e., secondary meaning) was an issue before the PTO, it is presumed that the mark acquired secondary meaning only as of the effective date of its registration. *See Aromatique*, 28 F.3d at 870; *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, Inc.*, No. 00-2317-JRTFLN, 2002 WL 1763999, at *5 (D. Minn. July 26, 2002). Since the Bank Marks were not federally registered until 2001 (or state registered until 1999), it is incumbent upon the Bank to prove that its marks had acquired secondary meaning prior to those dates.

[4] Although Baystate Financial has operated under the BAYSTATE Marks and the Baystate Financial Services trade name since 1983, the Bank failed to raise any objection until December 23, 2002, when it wrote to Baystate Financial and demanded that it "immediately change the name of [Baystate Financial's] business to a name that is not similar to [the Bank's] service marks." *See* Appendix, Exhibit 17. Despite the decades of service that Baystate Financial has provided under the BAYSTATE Marks, and all of Baystate Financial's related investments of time, energy and money, the Bank now seeks to enjoin Baystate Financial from using its 20-year-old marks after having sat on rights for years. The doctrine of laches should prohibit the Bank from asserting this action against Baystate Financial. *See Micromuse, Inc. v. Micromuse, PLC.*, 304 F. Supp.2d 202, 218 n. 21 (D. Mass. 2004).

this matter and whether it truly considered Baystate Financial to be infringing upon the Bank Marks prior to adopting the Bay State Investment Services mark in 2002.

To the extent these surveys are at all relevant, it is because they vividly illustrate that the Bank Marks *lack* secondary meaning. Indeed, the 1999 survey was based on a series of 10-minute telephone interviews with 602 respondents, of which 301 were known Bank customers and 301 were randomly selected from the communities of Worcester, Shrewsbury, Holden and Auburn. *See* Appendix, p. 571. The survey results, which were within a margin of error of ± 4.5%, showed the following:

- When asked, "When you think of banks, what names come to mind?," **only 12% of the random sample mentioned the Bank**. *Id.* at p. 580.[5]

- When prompted, only 7 in 10 respondents from the random sample said they knew of the Bank. The survey found that **"this is a relatively weak level of total awareness when compared with others in the marketplace"** and that the Bank's low level of total awareness "is a significant concern, since awareness precedes trial by potential prospects." *Id.* at p. 582 (emphasis added).

- The survey concluded that the Bank "shows **significant weakness** among prospective customers in terms of awareness." *Id.* at p. 614 (emphasis added).

The 2001 survey consisted of telephone interviews of 268 Bank customers and 185 random respondents selected from Worcester, Auburn or Holden. *See* Appendix, pp. 644-45.[6] The results, which were within a ± 4.6% margin of error, showed the following:

- When asked to name all the banks they could think of without prompting, **only 12% of the random sample mentioned the Bank first, and only 18% mentioned the Bank at all**. Even among the Bank's customers, only 44% identified the Bank first. *Id.* at p. 647.

---

[5] Even if these results were not so abysmal, the question was of little relevance to establishing secondary meaning in the first place. *See Chase Fed. Sav. & Loan Ass'n v. Chase Manhattan Fin. Srvs.*, 681 F. Supp. 771, 780-81 (S.D. Fla. 1987) (survey that asked respondents to name financial institutions that came to mind was entitled to little weight in action to establish that Chase Federal Savings & Loan had obtained secondary meaning in term "Chase"; relevant question would be, "[W]hen you hear the name 'Chase,' what does it mean to you?").

[6] Unlike the 1999 survey, the 2001 survey did not include any respondents from Shrewsbury. *Id.* at p. 644. Although the 2001 survey failed to explain why Shrewsbury was excluded, it is fair to assume that it was intentionally limited to the three communities in which the Bank has a physical presence: Worcester, Auburn and Holden. *See* Affidavit of Robert J. Lewis (the "Lewis Aff.") at ¶ 3.

9

- When asked whether they recalled seeing, hearing or reading any advertising for any area banks in the past 12 months, **only 11% of the random sample recalled any such advertising for the Bank**. Among Bank customers, only 45% recalled such advertising. *Id.* at p. 650.

- The 2001 survey found that "[c]onvenience appears to be the most important factor when choosing a bank." When known Bank customers were asked how they first learned of their primary financial institution "over one-half (52%) said that they found out about their primary bank because it was *close to where they live*." (Emphasis in original). Only 8% of those respondents said that they first found out about their bank through some form of advertising. *Id.* at p. 652.

Overall, the results of these surveys show that consumer awareness of the Bank is quite low *in the very communities where its branches are located*. Far from establishing that the Bank Marks had acquired secondary meaning prior to 1983, these surveys confirm that the Bank Marks do not have secondary meaning and, as discussed above, reveal that the Bank did not consider Baystate Financial to be a "competitor" or to be infringing on the Bank Marks until after the Bank had adopted the Bay State Investment Services mark in 2002.

The Bank also contends that its marks acquired secondary meaning through advertising and promotional efforts. *See* Bank's Memorandum at pp. 8-9. In terms of advertising, "it is not the amount of money spent on advertising that is important, but the results achieved with the money spent." *Bank of Texas*, 741 F.2d at 788. Here, the record is devoid of *any* evidence that the Bank's promotional efforts imbued its marks with secondary meaning. To the contrary, the Bank's own surveys show that its advertising has been largely unsuccessful, even as it relates to the promotion of the Bank's traditional banking services, and that the Bank's marketing efforts have not resulted in anything remotely approaching secondary meaning in connection with financial services. Moreover, of the numerous advertisements the Bank presented to the Court, none related to the marketing of the Bank Marks for the financial services at issue until May 2003, when the Bank started promoting Bay State Investment Services. *See* Appendix, p. 429.

Finally, the Bank's claim that its marks acquired secondary meaning as a result of the Bank's growth since 1895 is wholly unsupported. *See* Bank's Memorandum at p. 9. There simply is no evidence that the Bank's growth in assets and general banking activities over the years resulted in any consumer association of the Bank Marks with the kinds of financial services Baystate Financial has offered for decades. *See Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 595 (6th Cir. 1989) (a mark lacks secondary meaning where it still primarily denotes a geographic area instead of a source).

### C.    Baystate Financial Is The Prior User Of Its Marks

Baystate Financial has used the BAYSTATE Marks and the Baystate Financial Services trade name in connection with its various insurance, investment and financial planning services since at least 1983. *See* Wilson Aff. at ¶¶ 3-11; Porter Aff. at ¶¶ 5-10; Denton Aff. at ¶¶ 2-4. By contrast, the Bank only recently began offering these kinds of financial services under the Bank Marks. Since trademark protection rests on prior use, the Bank cannot prevail on its trademark infringement claim. *See Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 815 (1st Cir. 1987); *Bayshore*, 762 F. Supp. at 411.

The Bank contends that before 1997 it offered savings bonds; savings bank life insurance ("SBLI") and SBLI annuities; mortgage and disability insurance; IRA, SEP and Keough accounts; and investment unit accounts. *See* Bank's Memorandum at p. 2. These items, however, are not the kinds of investment and insurance-related products or services at issue in this litigation.[7]

---

[7] For instance, despite the intended separation of commercial and investment banking following passage of the Glass-Steagall Act of 1933 (addressed further below), banks were permitted to deal in certain "bank eligible securities," such as federal, state and municipal obligations. *See* 12 U.S.C. §§ 24 (Seventh). Similarly, the SBLI program was enacted in Massachusetts in 1907 as a low-cost life insurance product to be offered specifically by state-chartered savings banks. *See* M.G.L. c. 178, *repealed by* St. 1990, c. 499, § 22; *The Sav. Bank Life Ins. Co. of Ma. v. SBLI USA Mut. Life Ins. Co.*, No. A-00-3255, 2000 WL 1758818, *1 (E.D. Pa. Nov. 29, 2000). In addition, the "mortgage and disability insurance" which the Bank claims to have provided presumably refers to credit-related

11

The Bank also claims that it began selling stocks, bonds and mutual funds in 1994. *See* Bank's Memorandum at p. 2. Although the Bank fails to clarify this point in its Memorandum, the materials it submitted show that its purported securities sales were conducted from 1994 to 1999 through "FISCO," an independent broker/dealer with whom the Bank had contracted to provide investment services to Bank customers and fee income to the Bank. *See* Lewis Aff. at ¶ 5 n. 2 and Appendix, p. 141. Nowhere in its materials, however, did the Bank include evidence of having offered these investment services under the Bank Marks. To the contrary, in offering services through FISCO, the Bank was required to disclose to its customers that the investment products were not deposits of the bank. *See* Interagency Statement on Retail Sales of Nondeposit Investment Products, 1 Fed. Reserve Reg. Serv. 3-1579.51 (Transmittal 177, Nov. 1995).

Even if the FISCO sales had been offered under the Bank Marks, the Bank's annual reports for 1994 through 1998 show that these sales were insubstantial. According to the Bank's documents, it received fee income from brokerage services in the following amounts: $7,948 in fee income out of approximately $7.3 million in total income for 1994 (0.1% of total income); $47,185 out of $8.8 million in total income for 1995 (0.5% of total income); $10,156 out of $9.6 million in total income for 1996 (0.1% of total income); $4,650 out of $10 million for 1997 (0.05% of total income); and $0.00 in fee income for 1998. *See* Appendix, pp. 143, 177, 213, 246, 272. This *de minimus* sales volume shows that the Bank Marks are not protected. *See ACCU Personnel, Inc. v. AccuStaff, Inc.*, 846 F. Supp. 1191, 1207 (D. Del. 1994) (sales of

---

insurance which banks have offered for years as part of their lending activities. Products like credit life and disability insurance originated in the early 1900s and "[i]n no way ... involve the operations of a general life insurance business." *Independent Bankers Ass'n of Am. v. Heimann*, 613 F.2d 1164, 1168 (D.C. Cir. 1980). Finally, IRA, SEP, Keough and investment unit accounts are in keeping with a bank's fiduciary activities. Indeed, the Employee Retirement Income Security Act of 1974 ("ERISA") gave birth to the IRA, for which Congress specifically envisioned banks serving as custodians. *See Investment Co. Inst. v. Conover*, 790 F.2d 925, 927 (1986); 26 U.S.C. § 408(a). Moreover, while the Bank did not provide details regarding its investment unit accounts, this likely refers to a common trust fund, "long known to the banking industry, by which a bank commingles the assets of individual trusts and invests those assets collectively." *Conover*, 790 F.2d at 928. Banks have been able to offer such accounts so long as they act as trustees of the assets and not as managing agents. *Id.* at 930.

$212,000 to customers in Pennsylvania and of $3,600 to customers in Delaware fell short of the *de minimus* threshold for a company providing temporary employee services); *Philip Morris, Inc. v. Imperial Tobacco, Co.*, 251 F. Supp. 362, 371, 378 (E.D. Va. 1965) (sporadic and casual shipment of less than 51,000 cigarettes per year did not create trademark rights).

### D. The Natural Expansion Doctrine Does Not Assist The Bank

The Bank is not aided by the so-called "natural expansion" doctrine. Under this doctrine, "[w]hen a senior user of a mark on product line *A* expands later into product line *B* and finds an intervening user, priority in product line *B* is determined by whether the expansion is 'natural' in that customers would have been confused as to source or affiliation **at the time of the intervening user's appearance**." 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16.5 (4th ed. 2003) (emphasis added). The Bank has failed to show that at the time Baystate Financial began using the BAYSTATE Marks in 1983, consumers could have reasonably expected the Bank to offer the kinds of financial services at issue in this case. In fact, the Bank's failure to take any action for nearly twenty years is a tacit acknowledgment that it did not deem Baystate Financial a competitor.

In *Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc.*, 857 F.2d 80, 82 n. 1 (2nd Cir. 1988), the court held that a defendant's prior use of the mark "Physicians & Surgeons" on bar soaps did not entitle the company to extend the mark's use to skin creams and lotions where bar soaps were the only products advertised under the mark from 1888 to 1981, the year the company began applying the mark to its creams and lotions. *Id.* Similarly, where traditional banking services were the only services offered under the Bank Marks from 1895 to 2003, when the Bank began marketing investment products under the Bay State Investment Services mark, consumers in 1983 could not have been confused about the source of Baystate

Financial's services, which were not banking-related. *See also Clark & Freeman Corp. v. Heartland Co., Ltd.*, 811 F. Supp. 137, 142 (S.D. N.Y. 1993) (where plaintiff had senior rights to "Heartland" mark for women's boots, those rights did not give plaintiff priority over defendant's intervening use of "Heartland" for shirts, sweaters, trousers and jackets).

Significantly, when Baystate Financial began using the BAYSTATE Marks, the Bank was prohibited from offering, and in fact did not offer, most of the insurance and investment services at issue. For instance, with respect to insurance, the Supreme Court held in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 28 (1996) that a federal law allowing national banks to sell insurance as agents in small towns preempted a Florida statute that prohibited agents affiliated with financial institutions from engaging in insurance activities. Following *Barnett*, Massachusetts repealed its anti-affiliation statute in 1998, *see* 1998 Mass. Acts. 129, § 3, as did many other states, "and for the first time affirmatively authorized banks in Massachusetts to own or affiliate with an insurance agency, and otherwise engage in the insurance agency business." Kenneth F. Ehrlich, *Gramm-Leach-Bliley: Federal Preemption of Massachusetts Bank Insurance Sales Rules?*, 20 ANN. REV. BANKING L. 121, 128 (2001).[8]

In a strikingly similar case, *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 435 (3rd Cir. 2000), Commerce Insurance Agency, Inc. ("CIA"), a small company engaged in the insurance industry for over thirteen years, sought an injunction prohibiting Commerce National Insurance Services ("CNIS"), a recently formed corporation, from using the "Commerce" mark to promote its insurance business. CNIS was a subsidiary of Commerce Bancorp, Inc. ("CBI"), which had used the "Commerce" mark in connection with its

---

[8] In addition, the regulations implementing the new Massachusetts statute required banks entering the insurance agency business to be licensed by the Division of Insurance. *See* 211 C.M.R. § 142.04. The Bank did not obtain its license to offer insurance services until July 19, 2001. *See* Affidavit of Brian K. French ("French Aff."), submitted herewith, at Exhibit A.

banking services prior to CIA's adoption of the mark. *Id.* Significantly, the court found that New Jersey law limited banks from engaging in the insurance industry at the time CIA was formed. *Id.* at 442. In New Jersey, as in Massachusetts, state law prohibited banks from selling general insurance services or products until after 1996, when the Supreme Court issued its *Barnett* decision. *Id.* The court held: "**This prior statutory bar eviscerates the possibility that prior to 1996 southern New Jersey consumers reasonably expected CBI to engage in the insurance industry. Moreover, it is apparent that CBI had no expectation of engaging in the general insurance industry until the *Barnett* decision.**" *Id.* (emphasis added). This decision squarely addresses the issues presented in this action and shows that the Bank may not invoke the natural expansion doctrine in connection with insurance services.

Similarly, with respect to investment services, the Glass-Steagall Act of 1933 ("Glass-Steagall") separated the banking and securities industries "as completely as possible." *Board of Governors of Fed. Reserve Sys. v. Investment Co. Inst.*, 450 U.S. 46, 70 (1981). Among Glass-Steagall's provisions, § 16 generally prohibits national banks and state-chartered banks that are members of the Federal Reserve system ("state member banks") from directly dealing in securities, with the exception of certain "bank eligible securities" like federal, state and municipal obligations. *See* 12 U.S.C. §§ 24 (Seventh) and 335. Under § 21, any firm engaged in the business of issuing, underwriting, selling or distributing securities is prohibited from the business of receiving deposits. This section not only prohibits businesses engaged in securities activities from receiving deposits, but also prevents depository institutions from selling and distributing securities. *See Investment Co. Inst. v. Camp*, 401 U.S. 617, 639 (1971); *Securities Indus. Ass'n v. Board of Governors of Fed. Reserve Sys.*, 839 F.2d 47, 57 (2nd Cir. 1988). In addition, while § 21 applies to those same banks covered by § 16, it also covers state-chartered

15

institutions like Bay State Savings Bank which are FDIC insured but are not members of the Federal Reserve system. *See Investment Co. Inst. v. Federal Deposit Ins. Co.*, 815 F.2d 1540, 1547 (D.C. Cir. 1987). Thus, with certain narrow exceptions, the Bank was prohibited throughout the relevant period from selling or distributing securities.

Although regulatory interpretations in the 1980s and 1990s permitted banks to engage in limited securities-related activities, these services were subject to tight restrictions. In 1984, for instance, the FDIC adopted rules providing that an insured nonmember bank could maintain a "bona fide" subsidiary that engaged in securities work, but required, among other things, that the subsidiary be physically separate and distinct from the bank's operations and that it not share a common name or logo with the bank. *See* 12 C.F.R. §§ 337.4(a)(2) and 337.4(b). Similarly, in 1994, various federal banking agencies issued a joint statement recognizing the ability of banks to sell certain "nondeposit investment products" through independent broker/dealers – such as the Bank's arrangement with FISCO – while simultaneously imposing disclosure and other obligations on participating banks, such as the responsibility to inform bank customers that securities sales conducted through independent broker/dealers are not deposits of the bank. *See* Interagency Statement, *supra*. In sum, since the Bank generally was prohibited from directly selling investment products under the Bank Mark, the principles in *Commerce National Insurance* apply to render the natural expansion doctrine inapplicable.

### E. The BAYSTATE Marks And Bank Marks Are Not Confusingly Similar With Respect To The Relevant Financial Services

To prevail on its trademark infringement claim, the Bank also must prove that Baystate Financial's use of the BAYSTATE Marks will confuse consumers regarding the origin of the goods and services. *See Calamari*, 698 F. Supp. at 1006. Courts consider the following factors in assessing likelihood of confusion: (1) the similarity of the marks; (2) the similarity of the

goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of plaintiff's mark. *See Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 29 (1st Cir. 1989).

With respect to the first factor, while "Baystate" and "Bay State" are obviously similar, it is only in connection with the Bank's adoption of the Bay State Investment Services mark that these similarities become problematic.[9] As for factors two through five, which typically are considered as a group, *see CCBN.com, Inc. v. c-call.com, Inc.*, 73 F. Supp.2d 106, 112 (D. Mass. 1999), the parties were necessarily engaged in different kinds of marketing strategies and had different customer groups until the Bank began advertising Bay State Investment Services in 2003. The Bank also has failed to present any evidence of actual confusion regarding the parties' marks. This is likely because the Bank only recently began marketing Bay State Investment Services, and because the kinds of services each party offers generally are higher priced services in which "there is likely a greater degree of contemplation and care associated with their selection by the consumer" as opposed to the lower-cost services and products associated with "impulse" purchases; actual confusion is more likely when the products involved are low value items. *See Chase Federal Savings & Loan*, 681 F. Supp. at 787; *CCBN*, 73 F. Supp.2d at 113.

As for Baystate Financial's intent, there is no evidence that it adopted the BAYSTATE Marks to confuse or deceive prospective purchasers. To the contrary, Baystate Financial's predecessor began using the Baystate Financial Services name in 1982, and adopted the BAYSTATE Marks in 1983, in recognition of the wide variety of financial services it had come

---

[9] Although the Bank contends that Baystate Financial conceded in its Answer and Counterclaim that the parties' marks are confusingly similar, Baystate Financial limited its allegations regarding such similarities to the kind of financial services offered by Baystate Financial. *See* Defendant's Answer and Counterclaim at ¶¶ 30-33.

17

to offer. *See* Wilson Aff. at ¶ 3 and Exhibit A, p. 18. According to that agency's 1982 Annual Report, "[w]ith the grouping of our insurance, investment, financial planning, group benefits, and pension services under one marketing identification, we believe you will be better able to serve your clients and the other advisors. . . . Baystate Financial Services is a name that accurately describes what we have become. It is a name that we can promote without it having to change." *Id.* Significantly, the Bank was not offering the same kinds of financial services as Baystate Financial in 1983. Accordingly, there is no basis to conclude that Baystate Financial adopted the BAYSTATE Marks to usurp any goodwill associated with the Bank Marks.

Finally, with regard to the strength of the Bank Marks, geographically descriptive marks are generally considered weak marks – a weakness largely confirmed by the results of the 1999 and 2001 surveys. *See First Keystone Federal*, 923 F. Supp. at 704-05. In light of the foregoing factors, there is no likelihood of confusion between the BAYSTATE Marks and the Bank Marks regarding the Bank's traditional banking services.

## II. THE BANK CANNOT PREVAIL ON ITS DILUTION CLAIM

Just as the Bank is unlikely to prevail on its trademark infringement claim, it also is unlikely to succeed in establishing dilution of its mark under M.G.L. c. 110B, § 12. To prevail under this statute, the Bank must show that its marks are distinctive and that Baystate Financial's use of the same or similar marks is likely to cause dilution. *See Black Dog Tavern Co., Inc. v. Hall*, 823 F. Supp. 48, 59 (D. Mass. 1993). Since Baystate Financial previously established that the Bank Marks are not distinctive, *see* pp. 5-11, *supra*, the Bank is unlikely to succeed on its dilution claim.

Even if its marks were distinctive, however, the Bank cannot show a likelihood of dilution. Indeed, the Bank bases its claim on a charge of dilution by "blurring." *See* Bank's

18

Memorandum at p. 12. For blurring to occur, however, "the marks must be similar enough that a **significant segment of the target group** sees the two marks as **essentially the same**." *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp.2d 117, 135 (D. Mass. 1999) (citations omitted) (emphasis added). In light of the 1999 and 2001 consumer surveys demonstrating the Bank's weak consumer awareness in the very communities where it is physically located, *see* Bank's Appendix, Exhibits 9 and 10, it is difficult to imagine how the Bank could establish that a significant segment of its target group views the Bank Marks and BAYSTATE Marks as essentially the same. Moreover, as discussed in relation to the likelihood of confusion element of the Bank's trademark infringement claim, many of the factors courts consider in determining whether blurring is likely to occur, including the similarity of the marks and products, intent, and the relevant consumers, *see Hasbro*, 66 F. Supp.2d at 137, militate in the Bank's favor. Finally, where, as here, a plaintiff fails to present sufficient evidence to show that the defendant's use of its trademark is likely to dilute plaintiff's mark, courts generally decline to rule in the plaintiff's favor. *See PPG Indus., Inc. v. Clinical Data Inc.*, 620 F. Supp. 604, 609 (D. Mass. 1985); *Black Dog Tavern*, 823 F. Supp. at 59.

### III.    THE BALANCE OF HARMS FAVORS BAYSTATE FINANCIAL

The preliminary injunction the Bank seeks would result in Baystate Financial's loss of a name it adopted more than twenty years ago in connection with its financial services. The Bank seeks this result even though it did not offer relevant financial services under the Bank Marks until very recently. In fact, while the Bank registered the Bay State Investment Services mark in 2002, it did not actually advertise under that mark until May 2003. *See* Appendix, p. 429. Before then, the Bank offered investment services under its Minuteman Investment Services

mark. *Id.* ("Minuteman Investment Services has a new name and a new look! We're now Bay State Investment Services").

Significantly, this advertisement appeared roughly three months after Baystate Financial had written to the Bank on February 20, 2003, confirming Baystate Financial's senior rights in the BAYSTATE Marks and seeking to obtain an agreement from the Bank not to use its Bank Marks in connection with financial services. *See* French Aff. at Exhibit B. As the Bank's May 7, 2003 advertisement makes clear, the Bank not only refused to enter into the requested agreement with Baystate Financial, but also abandoned the Minuteman Investment Services mark, which had already been used in previous advertisements, *see* Bank's Appendix, pp. 414-418, in favor of the Bay State Investment Services mark. Under these circumstances, the Bank can hardly claim that whatever harm it might conceivably suffer if its request for an injunction is denied would outweigh the obvious damage Baystate Financial will certainly experience if it is prohibited from using the marks and trade name it has used in connection with its financial services for over twenty years.

## CONCLUSION

For the foregoing reasons, the Bank's motion should be denied.

BAYSTATE FINANCIAL SERVICES, LLC.,
By its attorneys,

_____
Debra K. Mayfield (BBO #549389)
Christopher P. Litterio (BBO #551098)
Brian K. French (BBO #637856)
RUBERTO, ISRAEL & WEINER, P.C.
100 North Washington Street
Boston, Massachusetts 02114

Dated: April 21, 2004

U:\BKF\Baystate Financial\Pleadings\opposition.pi.doc

I certify that a true copy of this document has been served by mail/by-hand upon all counsel of record on 4/21/04.

_____
BRIAN K. FRENCH