# EXHIBIT A

United States District Court
District of Massachusetts
Central Division

```
                                   )
BAY STATE SAVINGS BANK,            )
        Plaintiff,                 )
                                   )
        v.                         )    Civil Action No.
                                   )    03-40273-NMG
BAYSTATE FINANCIAL SERVICES,       )
LLC,                               )
        Defendant.                 )
                                   )
```

**MEMORANDUM & ORDER**

**Gorton, J.**

In this civil action in which the Plaintiff, Bay State Savings Bank ("Savings Bank") alleges federal and state trademark infringement, Savings Bank seeks a preliminary injunction against the Defendant's use of its Baystate mark.

I.  **Factual Background**

The following facts are stated as alleged in the Complaint (Docket No. 1), the Defendant's Answer and Counterclaim (Docket No. 3), the Reply to Counterclaim (Docket No. 4), the Memorandum in Support of the Motion for Preliminary Injunction filed by Savings Bank (Docket No. 6) and in the opposition thereto filed by the Defendant, Baystate Financial Services, LLC ("Financial")(Docket No. 13).

Savings Bank is a Massachusetts-chartered mutual savings

-1-

bank with its principal place of business in Worcester, Massachusetts.  It has operated in Central Massachusetts since 1895.  Financial is a duly organized Massachusetts limited liability company with its principal place of business in Boston and additional locations in, among other places, Worcester, Wellesley, Lynnfield, Marlboro and Canton, Massachusetts.

### A.  The History of Savings Bank

Since its formation by special legislation in 1895, Savings Bank has used the name "Bay State Savings" for banking and financial services.  Its services have expanded from savings and home mortgages to include life insurance, savings bonds, mortgage and disability insurance, IRA, SEP and Keough retirement and educational accounts, and various investment products including Investment Unit Accounts, Life Saver Annuities, stocks, bonds and mutual funds.  From January, 1999 to February, 2002, the investment services were identified with Minuteman Investment Services mark but they were sponsored by Savings Bank, sold by personnel located in Savings Bank offices and marketed primarily to Savings Bank customers.

Savings Bank has invested in advertising and other means to raise its public profile.  It has spent over $5.2 million since 1960 in advertising and each of its branches have consistent "cape" style architecture with modern trade dress.  The "Bay

State" mark is displayed at each location.

According to surveys in 1999 and 2001, approximately 75% of the general population recognizes the "Bay State" mark. Half of those surveyed reported that they had seen or heard Savings Bank advertisements. Moreover, those surveys indicated that Savings Bank customers (1) had a stronger appetite for mutual funds than the general population, (2) kept half their investment dollars at Savings Bank, and (3) believed that the Savings Bank products and services are improving. Finally, over 80% of customers would recommend Savings Bank to others and customers associate it with a wide range of financial services including insurance, mutual funds and bonds.

In 1999, Savings Bank asserted common law trademark rights to prevent another entity from using the names "Bay State" and "Bay State Bank." See Bay State Savings Bank v. Bay State Bancorp, 99-CV-12383-NMG. Between 1999 and 2002, Savings Bank obtained state and federal service mark registration for the "Bay State", "Bay State Savings Bank" and "Bay State Investment Services" marks. In its applications for service mark registration, Savings Bank claimed that it used the marks for "banking and financial services to consumers and business" and, by amendment, for "financial investment in the field of real estate, stocks, bonds, commercial paper, and other securities

-3-

financial management and planning, and financial guaranty and surety."

**B.    The History of Financial**

Financial was founded as a general agency of the New England Life Insurance Company ("New England Life") and offers various business-related products and services, including deferred compensation, business income insurance, key employee insurance, profit sharing, simplified employee pensions, 401(k) plans, managed care medical benefits, dental insurance, group life insurance, short-term and long-term disability insurance and HMO's.

Financial also provides various products for individuals, including permanent life insurance, term insurance, long-term care insurance, mutual funds, annuities, IRA's, education funding, charitable giving and estate and retirement planning. Financial has not, however, provided traditional banking services.

Financial's origins date back to 1982, when the Desautels & Wilson Partnership, dba Desautels & Wilson Insurance Agency, a general agency of New England Life, began answering its telephones as "Baystate Financial Services". The agency selected that name in recognition of the wide variety of financial services it had come to provide to its clients and other advisors

-4-

and stated in its annual report that "[i]t is a name that we can promote without it having to change." Financial promotes and sells services to its customers through what it calls its "Bank Affiliate Program."

The number of partners in the agency changed over the ensuing years, but the succeeding entities continued to do business as "Baystate Financial Services". In 1983, after the agency had expanded, it adopted the service marks "Baystate," "Baystate Financial" and "Baystate Financial Services" and has used the Baystate Financial Services trade name continuously since that time. On April 10, 1990, the agency obtained Massachusetts Service Mark Registration No. 44104 for the mark "Baystate Financial Services" ("the 1990 Registration"), which included a date of first use of January 1, 1983. Financial has not obtained federal registration of its marks.

From 1982 to 1996, the agency promoted its business, used letterhead and otherwise presented its business to the public as "Baystate Financial Services". In 1996, the successor-in-interest to the agency sold the 1990 Registration, the Baystate marks, the goodwill associated with those marks and the Baystate Financial Services trade name to New England Life.

New England Life immediately sold those rights and interests to David C. Porter ("Porter"), as a general agency of New England

-5-

Life.  From August, 1996 to January, 1997, Porter continuously used the Baystate marks in commerce and continued doing business as "Baystate Financial Services".  On January 2, 1997, Porter organized Porter/Desautels LLC ("Porter/Desautels") and transferred to it the 1990 Registration, the Baystate marks, the goodwill associated with the Baystate Marks and the "Baystate Financial Services" trade name.

On May 19, 1997, Porter/Desautels changed its name to "Baystate Financial Services, LLC".  From January 2, 1997 to the present, Financial has continuously used the Baystate marks in commerce and has continued to do business as "Baystate Financial Services" in connection with its financial services and products.

C.   **The Instant Dispute**

On December 23, 2002, Savings Bank requested, in writing, that Financial discontinue its use of the Baystate mark. Financial did not comply with that request.  On November 23, 2003, Financial announced its merger with the Patriot Group, a local franchise of New England Financial, a subsidiary of MetLife, Inc.  That merger included the acquisition of a 38-employee financial planning business located across the Worcester City Common from Savings Bank's headquarters.

Although Financial does not advertise, its expansion from its headquarters in Boston to central Massachusetts has caused

-6-

local newspapers to misidentify Financial as "Bay State."  In the Boston Business Journal, Porter indicated that Financial will seek to increase its rate of growth and its exposure as it expands to Western Massachusetts and south toward Hartford. Financial has begun to promote itself on the Internet under the name "Baystate Financial Services" and created a website at the Internet address "baystatefinancial.com".  "Baystate Financial" is the domain name registrant of that website.

On December 4, 2003, Savings Bank filed a complaint with this Court in which it sought injunctive and monetary relief against Financial on its claims for (1) unfair competition under Section 43(a) of the Trademark Act of 1946, as amended, 15 U.S.C. § 1125(a)("the Lanham Act"), (2) dilution of a famous mark under Section 43(c) of the Lanham Act, (3) cyber-squatting under Section 43(d) of the Lanham Act, (4) unlawful use of a trade name under M.G.L. c. 110, § 4, (5) violation of the state trademark statutes, M.G.L. c. 110, §§ 4, 11, 12 and 13, and (6) unfair and deceptive trade practices in violation of M.G.L. c. 93A, § 11.

In its answer and counterclaim, Financial raises eight affirmative defenses and alleges that Savings Bank is liable for the identical violations of state and federal law of which it is accused.  In addition, Financial alleges (1) cyberpiracy arising from Savings Bank's establishment of certain domain names and (2)

-7-

fraudulent registration of Savings Bank's marks.

In its Motion for Preliminary Injunction (Docket No. 5), Savings Bank moves to prevent dilution of its service mark under M.G.L. c. 110B, § 12 and confusion under 15 U.S.C. § 1125(a) ("Lanham Act, § 43(a)").  Pursuant to Fed. R. Civ. P. 65, Savings Bank seeks to have this Court order Financial to refrain from using, authorizing or employing the name or mark "Bay State" or any colorable imitation of Savings Bank's names and the mark "Bay State" in the delivery of financial services, including without limitation the use of the name "Baystate Financial Services, LLC."

## II.  Legal Analysis

To obtain a preliminary injunction in a trademark case, a party must show that (1) there is a substantial likelihood of its success on the merits, (2) without the injunction, there exists a significant risk of irreparable harm, (3) the balance of hardships tilts in its favor and (4) the granting of the injunction will not negatively affect the public interest.  See TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 544 (1st Cir. 1996).

### A.   Likelihood of Success on the Merits

Savings Bank claims that it is likely to succeed on the merits of its claims of dilution under Massachusetts law and

-8-

confusion under the Lanham Act.  With respect to the dilution claim, an injunction to that effect under Massachusetts law requires Savings Bank to prove (1) ownership of a mark that is registered or valid at common law and (2) likelihood that the distinctive quality of the mark will be diluted.  See Great Scott Food Market, Inc. v. Sunderland Wonder, Inc., 348 Mass. 320, 325 (1965), quoting Yale Elec. Corp. v. Robertson, 26 F.2d 972, 974 (2d Cir. 1928)(Hand, J.).

With respect to the claim of confusion, to enjoin activity that may lead to confusion of protected trademarks, pursuant to Section 43(a) of the Lanham Act, Savings Bank must prove (1) ownership of a protected mark and (2) use by another in commerce that is likely to cause confusion as to the source of goods or services.  See Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F. Supp. 994, 1006 (D. Mass. 1988).  Under both claims, however, Savings Bank must prove that its marks are entitled to protection.

### 1)  *The Protectability of the Savings Bank's Trademarks*

According to the decision of the U.S. Supreme Court in Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768-69 (1992), whether a mark is afforded trademark protection depends upon where the mark fits along a spectrum of categories that includes generic, descriptive, suggestive, arbitrary and fanciful marks.

-9-

Id. at 768.

While a generic term, which identifies a kind of product but does not distinguish its source (such as "aspirin" or "cola") is not afforded trademark protection, S.S. Kresge Co. v. United Factory Outlet, Inc., 598 F.2d 694, 696 (1st Cir. 1979), a descriptive mark, which portrays a characteristic of the product to which it refers, is entitled to protection only if it has acquired "secondary meaning" such that consumers associate the product with a particular source. See Calamari Fisheries v. The Village Catch, Inc., 698 F. Supp. 994, 1006-07 (D. Mass. 1988).

In contrast, suggestive, arbitrary and fanciful marks identify the particular source of a product and are considered "inherently distinctive." See Two Pesos, 505 U.S. at 768. Inherently distinctive marks are protected from the time of initial use without proof of secondary meaning. Id.

Savings Bank contends that it developed common law trademark rights before its mark was registered and before Financial's use of the mark in 1997. Relying on Calamari Fisheries, 698 F. Supp. at 1008, Savings Bank claims that its long and exclusive use of the "Baystate" mark and its size and prominence as a banking institution provide the bank with common law trademark protection because those factors establish the descriptive mark's secondary meaning.

-10-

Savings Bank further relies upon its extensive advertising expenditures and promotional endeavors which, the bank claims, have resulted in positive media coverage and favorable recognition. See President and Trustees of Colby College v. Colby College-New Hampshire, 508 F.2d 804, 808 (1st Cir. 1975); Calamari Fisheries, 698 F. Supp. at 1009. The 1999 and 2001 surveys provide direct evidence, according to Savings Bank, of the marks' secondary meaning by establishing that a significant percentage of consumers associate the Savings Bank marks with the Plaintiff. See Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co., Inc., 9 F.3d 175, 182 (1st Cir. 1993). Thus, Savings Bank claims that it has established the secondary meaning of its mark in the area of banking and finance that is necessary to entitle a descriptive mark to protection.

Savings Bank has failed, however, to prove that it has established sufficient secondary meaning in its mark to prevent Financial from competing in what amounts to a different industry. Although Savings Bank is not categorically precluded from succeeding on the merits of a claim of trademark infringement if, for example, another savings bank were to adopt the term "Bay State" (or a similar iteration), the bank is unlikely to attain the same success here.

Savings Bank is a geographically descriptive mark and

-11-

therefore is entitled to protection only if the mark "no longer causes the public to associate the goods with a particular place, but to associate the goods with a particular source." Boston Beer Co. v. Slesar Bros. Brewing Co., 9 F.3d 175, 181 (1st Cir. 1993). See also First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc., 923 F. Supp. 693, 704-05 (E.D. Pa. 1996) (geographically descriptive term is a weak mark).

Savings Bank's 1999 and 2001 surveys demonstrate that a relatively small portion of the consuming public was familiar with the bank's services. Survey evidence showed that, among residents of towns where Savings Bank is active in banking and advertises extensively, approximately 10% to 20% of residents identified Savings Bank as a bank they could recall offhand. Moreover, even among Savings Bank's own customers, less than half recalled seeing any of its advertising.

Moreover, the combined use of a geographic term with a generic term such as "bank" fails to render a trademark inherently descriptive. In a closely analogous case, the United States Court of Appeals for the Fifth Circuit held that the combination of "bank" with "Texas" was descriptive of the kind of services offered and the place from which such services originated. Bank of Texas v. Commerce Southwest, Inc., 741 F.2d 785, 787 (5th Cir. 1984). To establish secondary meaning for its

-12-

marks, Savings Bank "must show that the primary significance of
the term in the mind of the consuming public is not the product
but the producer." Id., citing Kellogg Co. v. Nat'l Biscuit Co.,
305 U.S. 111, 118 (1938).

Given the location of both parties in Massachusetts and
their operations in Massachusetts and in bordering states,
Savings Bank simply cannot sustain its claim that the use of the
"Bay State" marks allows it to exclude all competitors that bear
a similar name and operate in a similar field. See Boston Beer
Co., 9 F.3d at 181-82. See also Burke-Parsons-Bowlby Corp. v.
Appalachian Log Homes, Inc., 871 F.2d 590, 595 (6th Cir.
1989)(holding that "[a] trademark that is primarily
geographically descriptive must have acquired secondary meaning
to invoke the protection of the Lanham Act.").

Savings Bank's registration of its marks does not
necessarily change the outcome of the foregoing analysis.
Although a registered mark is presumed valid and entitled to
protection, such a presumption may be rebutted by proof that the
mark is either generic or is merely descriptive and lacks
secondary meaning. See Calamari Fisheries, Inc. v. The Village
Catch, Inc., 698 F. Supp. 994, 1007 (D. Mass. 1988), citing
Liquid Controls Corp. v. Liquid Control Corp., 802 F.2d 934, 936
(7th Cir. 1986).

-13-

In the instant case, Savings Bank obtained state and federal trademark registration.  The United States Patent and Trademark Office ("the PTO") recognized, however, that the terms "Bay State," "Bay State Savings Bank" and "Bay State Investment Services" were geographically descriptive.  As a result, the PTO agreed to register the marks only after the bank submitted declarations stating that the marks had become distinctive of the services offered by Savings Bank through the bank's substantially exclusive and continuous use in commerce for at least five years prior to the filing of the statement.  This Court is free to construe Savings Bank's submission of such evidence as a concession that its marks are not inherently distinctive.  See Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 869 (8th Cir. 1994), citing Yamaha Int'l Corp. v. Hoshino Gakki Co., 840 F.2d 1572, 1577 (Fed. Cir. 1988).

### 2)  Financial's Different Business

Even if the Court were to assume that Savings Bank has established secondary meaning in its marks among savings banks, that conclusion is insufficient to preclude Financial altogether from using a similar mark within the financial services industry.

In the wake of the stock market crash of 1929 and the Great Depression that followed, Congress passed the Banking Act of 1933, Pub. L. No. 73-66, 48 Stat. 162 (as codified in various

-14-

provisions of Title 12 of the United States Code, "the Glass-Steagall Act") which separated the business of commercial and investment banking.  That separation remained in effect, subject to certain exceptions, until the passage of the Gramm-Leach-Bliley Act of 1999, Pub. L. No. 106-102, title I, § 101(a), 113 Stat. 1341.  Although the Glass-Steagall Act enforced, from 1933 to 1999, a strict ban on securities underwriting by banks that collected deposits and made loans, commercial banks were not entirely foreclosed from providing some investment services to their customers.

For example, as Savings Bank aptly notes, in 1983, the Federal Deposit Insurance Company ("FDIC") issued a legal opinion in which the FDIC's general counsel held that a bank that was not a member of the Federal Reserve System was permitted to "purchase and sell securities for the account of a customer if it is without recourse and solely upon the order of the customer." General Counsel's Opinion No. 6 – The Legality of Discount Brokerage Services When Offered By Insured Nonmember Banks, 48 Fed. Reg. 22989, 22990 (May 23, 1983).  In other words, insured, nonmember banks were legally permitted to offer discount brokerage services to its customers.  Id. at 22989.

That conclusion by the FDIC permitted Savings Bank to offer limited securities brokerage services to its clients.  Savings

-15-

Bank did not, however, offer those services under its name.
Pursuant to federal regulations, Savings Bank offered its
investment products through an entity known as FISCO and later
through Minuteman Investment Services.  Savings Bank's primary
business remained that of a savings bank.  It realized de minimus
profits from its investment business and to the extent consumers
recognized the "Bay State" name, they recognized it as a savings
bank.

With respect to its insurance business, customers could not
have readily identified the "Bay State" marks with the insurance
industry because, prior to 1998, banks and their affiliates were
prohibited by law from obtaining licenses as insurance agents or
brokers or from engaging in the insurance agency business.  See
Kenneth F. Ehrlich, Gramm-Leach-Bliley: Federal Preemption of
Massachusetts Bank Insurance Sales Rules?, 20 Ann. Rev. Banking
L. 121, 128 (2001).  The Savings Bank Life Insurance ("SBLI")
policies sold by Savings Bank since 1962 were originally
conceived of by Louis Brandeis when he was in private practice in
Boston as a way to sell life insurance policies to primarily
working class customers directly through their savings banks
rather than through aggressive and often unscrupulous insurance
salesmen.  See Raymond A. Guenter, Bank Insurance Powers -
Yesterday, Today and Tomorrow, 17 Ann. Rev. Banking L. 351, 373-

-16-

74 (1998).

That concept has evolved from an internal department of the savings banks with separate assets and liabilities to one in which the policies are directly underwritten by a life insurance company owned by the savings banks. See id. at 374; M.G.L. c. 178A (1997). Nevertheless, the motivation behind any savings bank's expansion into the insurance business was to provide an imprimatur of a local, and presumably trustworthy, savings bank to the life insurance industry. The "Bay State" marks of Savings Bank therefore remained connotative of a savings bank rather than an insurance agency because that connotation was the intended result of the SBLI structure.

Within the area of financial services, insurance and investments, Financial pre-dates Savings Bank. Financial has used the "Bay State" marks since at least 1983 which is long before Savings Bank began to use its "Bay State" Investment Services mark in connection with insurance and investment-related products. Thus, Savings Bank has failed to demonstrate a likelihood of success on the merits of its trademark infringement claims.

**B.  Irreparable Harm to Savings Bank**

In the context of trademark law, irreparable harm is presumed if a plaintiff demonstrates a likelihood of success on

-17-

the merits.  See Camel Hair & Cashmere Inst. v. Assoc. Dry Goods
Corp., 799 F.2d 6, 14-15 (1st Cir. 1986)(holding that where there
is a high probability of consumer confusion, "injury irreparable
in the sense that it may not be fully compensable in damages
almost inevitably follows."); see also Hypotherm, Inc. v.
Precision Prods., Inc., 832 F.2d 697, 699-700 (1st Cir.
1987)(noting that "few harms are more corrosive in the
marketplace than the inability of a trademark holder to control
the quality of bogus articles thought (erroneously) to derive
from it.").  Savings Bank is not at risk of continuing and
irreparable harm because it has failed to establish a substantial
likelihood of success on the merits.

   **C.    The Balance of Harms**

   Savings Bank contends that in cases of dilution and
confusion, the harm falls mainly on the senior user while the
risk of harm to the junior user, in this case Financial, is
minimal.  In support, Savings Bank explains that Financial has
not established the requisite secondary meaning associated with
its mark in order to obtain trademark protection.  Moreover,
Financial has not paid for advertising and the signage at its
newly acquired Worcester office is temporary.  The only cost
incurred by Financial, according to Savings Bank, will be that
associated with changing its sign and letterhead.  That risk was

assumed by Financial when it continued to use its name following Savings Bank's objection.  See McDonald's Corp. v. McBagel's, Inc., 649 F. Supp. 1268, 1279 (S.D.N.Y. 1986).

Savings Bank's argument significantly discounts the fact that the offering of relevant financial services by Financial actually predates Savings Bank's entry into investment services by approximately 20 years.  As such, Financial would actually suffer harm if it were compelled to change its name.  Thus, Savings Bank has failed to prove that the balance of harms tilts in its favor.

### D.   The Public Interest

Finally, Savings Bank has failed to prove that the public interest will be furthered by granting its preliminary injunction.

**ORDER**

After considering the pleadings and the oral arguments of counsel, and based upon the foregoing memorandum, the Motion for Preliminary Injunction (Docket No. 5) is hereby **DENIED**.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated: June 25, 2004