UNITED STATES DISTRICT COURT
DISTRIST OF MASSACHUSETTS

Civil Action No. 4:03-cv-40273-NMG

BAY STATE SAVINGS BANK
Plaintiff,

v.

BAYSTATE FINANCIAL SERVICES, LLC
Defendant.

DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1

II.     FACTS ...................................................................................................2

III.    LEGAL ANALYSIS...............................................................................2

     A.    Summary Judgment is Favored Where, as Here, the Material Facts
          Are Undisputed and the Moving Party is Entitled to Judgment As
          A Matter of Law...........................................................................2

     B.    The Bank Cannot Prove That It Has A Protectable Mark As To
          Baystate Financial .......................................................................3

          1.    Baystate Financial Is The First User And Has Priority Over
               The Bank In The Field of Insurance and Financial Services ...............4

          2.    The Natural Expansion Doctrine Does Not Assist The Bank
               In Establishing Priority .............................................................7

          3.    The Bank Marks Are Not Distinctive and are Geographically
               Descriptive ...............................................................................10

          4.    The Bank Marks Lack Secondary Meaning.........................................11

               a.    Klein's Surveys Do Not Show that the Term "Bay
                    State" Has Acquired Secondary Meaning in Reference
                    to Insurance and Investment Products ...........................12

                    (i)    The Survey Fails to Show Secondary Meaning
                        For the Proper Time Period................................12

                    (ii)    The Fact that 38.6% of Respondents Identify
                        "Bay State" With "Baystate Savings Bank" Does
                        Not Establish Secondary Meaning......................13

                    (iii)    The Survey Does Not Address the Issue of
                        Whether Bay State Savings Bank is Identified
                        With Non-Banking Financial Services Which is
                        the Seminal Issue in the Case............................16

                  (b)    The Circumstantial Evidence Does Not Assist in the
                      Secondary Meaning Analysis ......................................17

C.     The Bank Cannot Prevail On Its Dilution Or Cyberpiracy Claim .................18

D.     The Bank Cannot Prevail On Its Claim Under M.G.L. c. 100 § 4 ................18

E.     The Bank Cannot Prevail On Its 93A Claim ................................................18

**CONCLUSION**...................................................................................................19

## **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..........................................3

*Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863 (8th Cir. 1994)..........................10

*Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785 (5th Cir. 1984) ......................10

*Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996).................................7,8

*Bayshore Group Ltd. v. Bay Shore Seafood Brokers, Inc.*, 762 F. Supp. 404 (D. Mass. 1991)..........................................................................3

*Beacon Mut. Ins. Co. v. OneBeacon Ins. Corp.*, 376 F. Supp. 2d 251 (D. RI 2005)..............................................................................13

*Black Dog Tavern Co., Inc. v. Hall*, 823 F. Supp. 48 (D. Mass. 1993) .................18

*Board of Governors of Fed. Reserve Sys. v. Investment Co. Inst.*, 450 U.S. 46, 70 (1981)...............................................................................8

*Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175 (1st Cir. 1993)............................4,11, 13,14,16

*Calamari Fisheries v. The Village Catch*, 698 F. Supp. 994 (D. Mass. 1988)  ..............................................................................3,4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................2

*China Clipper Restaurant v. Yue Joe*, 45 N.E. 2d 748 (Mass. 1942) ....................18

*Colby College v. Colby College-New Hampshire*, 508 F.2d 804 (1st Cir. 1974)..................................................................................13

*Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432 (3rd Cir. 2000)..................................................................3,6,8,10, 11,13,17

*Co-Rect Prod., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324 (8th Cir. 1985)................................................................................11

*First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.*, 923 F. Supp. 693 (E.D. Pa. 1996) .....................................................11,19

*Investment Co. Inst. v. Camp*, 401 U.S. 617 (1971) ...........................................9

*Investment Co. Inst. v. Federal Deposit Ins. Co.*, 815 F.2d 1540 (D.C. Cir. 1987) ...................................................................................................................9

*I.P. Lund Trading, APS. v. Kohler Co.*, 118 F. Supp. 2d 92, 107 (D. Mass. 2000) ...............................................................................................................12,13

*Leejay, Inc. v. Bed Bath & Beyond,* Inc., 942 F. Supp. 699, 701 n.2 (D. Mass. 1996)...........................................................................................................3

*McNeil-PPC, Inc. v. Merisant Co.*, 2004 WL 3316380, *10-*20 (D. Puerto Rico July 29, 2004) .................................................................................13

*Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 675 F.2d 482, 486 (1st Cir. 1981).................................................................................................2

*Quaker State Oil Ref. Co. v. Steinberg*, 189 A. 473 (Pa. 1937).............................11

*Scott Paper v. Scott's Liquid Gold*, 589 F.2d 1225 (3d. Cir 1978)........................13

*Securities Indus. Ass'n v. Board of Governors of Fed. Reserve Sys.*, 839 F.2d 47, 57 (2nd Cir. 1988)........................................................................................9

*Simon Property Group v. MySimon, Inc.*, 104 F. Supp. 2d 1033 (S.D. Ind. 2000) ...............................................................................................20

*S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694 (1st Cir. 1979) .....................................................................................................................4

*Two Peso v. Taco Cabana, Inc.*, 505 U.S. 763 (1992)........................................3,4

*Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812 (1st Cir. 1987) .....................................................................................................................3

*Yamaha Intern. Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572 (Fed. Cir. 1988) ...................................................................................................................10

**Statutes**

Glass-Steagall Act of 1933 ...........................................................................................8

Gramm-Leach-Bliley: Federal Preemption of Massachusetts Bank
Insurance Sales Rules, 20 Ann. Rev. Banking L. 121, 128 (2001) .....................1,7,8

Lanham Act, § 2(f).......................................................................................................10
Lanham Act, § 43(a) .....................................................................................................3

1998 Mass. Acts 129, § 3 ..............................................................................................7

M.G.L. c. 93A.........................................................................................................1,18
M.G.L. c. 110 §4.....................................................................................................1,18
M.G.L. c. 110B, §§11, 12 and 13 .........................................................................1,3,18

12 U.S.C. §§ 24 (Seventh) and 335 ..............................................................................9
15 U.S.C. § 1052(f)......................................................................................................10
15 U.S.C. § 1115(a) .......................................................................................................4
15 U.S.C. § 1125(a) .....................................................................................................1,3
15 U.S.C. § 1125(c)(1)...................................................................................................1
15 U.S.C. § 1125(d) ..................................................................................................1,18

**Regulations**

12 C.F.R. §§ 337.4(a)(2) and 337.4(b) ..........................................................................9
37 C.F.R. § 2.68............................................................................................................13
211 C.M.R. § 142.04......................................................................................................8

Interagency Statement on Retail Sales of Non Deposit Investment
Products, 1 Fed. Reserve Req. Serv. 3-1579-51 (Transmittal 177, Nov.
1995) ........................................................................................................................10,17

**Secondary Sources**

2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR
COMPETITION § 16.5  (4th ed. 2006) .....................................................................7,13

## I.    **INTRODUCTION**

This is an action for trademark infringement by Plaintiff Bay State Savings Bank, a Worcester, Massachusetts based bank (the "Bank") against Defendant Baystate Financial Services, LLC, a Massachusetts based company which provides financial investment and insurance products to its clients ("Baystate Financial").[1]  In June, 2004 this Court denied Bank's motion for a preliminary injunction seeking to prevent Baystate Financial from using the "Baystate" name in connection with the offering of financial services products.

In its decision, the Court found that: (1) Baystate Financial was the first user of the mark in the investment and insurance industry; (2) the Bank failed to establish sufficient secondary meaning in its mark to prevent Baystate Financial from competing in a different industry (banking v. insurance and investments); and  (3) even if the court were to assume that the Bank had established secondary meaning in its marks among savings banks, that is insufficient to preclude Baystate Financial from using a similar mark within the financial services industry, rejecting Plaintiff's "natural expansion" argument.  Rule 56.1 Stmt. ¶ 25.

This Court found that, as a matter of law, banks were unable to offer the sale of insurance and securities prior to the enactment of the state and federal laws passed in 1998 and 1999 and therefore held:

> Within the area of financial services and investments, [Baystate] Financial
> pre-dates the Bank.  Financial has used the Bay State marks since at least
> 1983 which is long before the Bank began to use its Bay State Investment
> Services mark in connection with insurance and investment related
> products.  Thus, the Bank has failed to demonstrate a likelihood of success
> on the merits of its trademark infringement claim.

---

[1] Plaintiffs have brought five trademark infringement claims.  Count I is a claim for trademark infringement under 15 U.S.C. §1125(a) regarding protection of unregistered marks; Count II is a claim for dilution under 15 U.S.C. §1125(c)(1); Count III is a claim for cyberpiracy under 15 U.S.C. §1125(d); Count IV is a claim for failure to receive written permission to use a person's name in connection with a business, M.G.L. c. 110 §4; and finally, Count V encompasses state law claims for counterfeit use of trademarks under M.G.L. c. 110B, §§11, 12 and 13. Count VI seeks declaratory relief and Count VII recovery under M.G.L. c. 93A.

*Id.* at p. 17.

This Court's ruling on the preliminary injunction is instructive, and its logic should be followed now unless Plaintiff can establish additional facts it did not present to the Court at the Preliminary Injunction hearing, or unless Plaintiff can demonstrate that the prior ruling was erroneous as a matter of law. Since fact discovery adds nothing new to Plaintiff's position, and since there were no errors of law, the Court should grant Baystate Financial's Motion for Summary Judgment.

## II.     FACTS

In support of this motion Defendant Bay State Financial Services relies on the Facts set out in the Rule 56.1 Separate Statement which has been filed with this Motion and Memorandum of Law.

## III.     LEGAL ANALYSIS

### A.     Summary Judgment is Favored Where, as Here, the Material Facts Are Undisputed and the Moving Party is Entitled to Judgment as A Matter of Law

Under Rule 56 (c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). To be genuine, a factual dispute must be supported by substantial evidence. *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 675 F.2d 482, 486 (1st Cir. 1981). The moving party may meet its burden by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 325. Where the moving party makes such a showing, the non-moving party cannot survive summary judgment by relying on evidence that is merely

2

colorable, conclusory, speculative or not significantly probative. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-51 (1986).

### B.    The Bank Cannot Prove That It Has A Protectable Mark As To Baystate Financial.

"The right to trademark and service mark rights is based on prior use, or the one who first uses the marks in connection with a peculiar line of business." *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F. 2d 812, 815 (1st Cir. 1987); *see also Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.*, 214 F.3d 432, 438 (3rd Cir. 2000) ("With respect to ownership of an unregistered mark, the first party to adopt a mark can assert ownership as long as it continuously uses the mark in commerce.") (citation omitted). Trademark rights are not created by registration of a mark, and a registered mark's priority is subject to another party's prior use. *Id*; *Bayshore Group Ltd. v. Bayshore Seafood Brokers, Inc.*, 762 F. Supp. 404, 411 (D. Mass 1991).    To prevail on a claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) the Bank must prove: (1) ownership (i.e., first use) of a distinctive mark entitled to trademark protection; (2) use of that mark in interstate commerce; and (3) use of the mark by Baystate Financial in a manner likely to cause confusion as to the origin of the goods or services. *See Calamari Fisheries v. The Village Catch*, 698 F. Supp. 994, 1006 (D. Mass. 1988).[2]

The Lanham Act protects only distinctive marks. *Two Peso v. Taco Cabana, Inc.*, 505 U.S. 763, 768-69 (1992).    Therefore, the inquiry into whether a term is subject to trademark protection depends on where it fits along a spectrum of distinctiveness, i.e., whether the terms

---

[2] Although the trademark infringement discussion focuses primarily on the Lanham Act claim, this section also addresses the claims under M.G. L. § 110B.    "Trademark infringement is defined in essentially the same terms under the Lanham Act and under Massachusetts law and therefore the merits of any of the state claims will not be different enough to merit separate discussion." *Leejay, Inc. v. Bed Bath & Beyond, Inc.*, 942 F. Supp. 699, 701 n.2 (D. Mass. 1996).

are generic, descriptive, suggestive or arbitrary. *S.S. Kresge Co. v. United Factory Outlet, Inc.,* 598 F.2d 694, 696 (1st Cir 1979); *See Calamari Fisheries,* 698 F. Supp. at 1006-07; *Two Pesos,* 505 U.S. at 768. Geographical terms such as "Bay State" are considered descriptive terms and are entitled to protection only if they have acquired "secondary meaning" such that consumers associate the product with a particular source, *See Calamari Fisheries,* 698 F. Supp. at 1006-07; *Boston Beer Co. v. Slesar Bros. Brewing Co.,* 9 F.3d 175, 181 (1st Cir. 1993).[3] The Bank's case is subject to dismissal by summary judgment because the undisputed facts establish that Baystate Financial is the first user of the disputed marks and the Bank's marks lack secondary meaning.

1.  **Baystate Financial Is The First User And Has Priority Over The Bank In The Field Of Insurance And Financial Services.**

As the Court has already held, Baystate Financial is the prior user of the Baystate mark in the field of insurance and investment services. Baystate Financial has used the BAYSTATE Marks and the Baystate Financial Services trade name in connection with its various insurance and investment services since at least 1983. Rule 56.1 Stmt. ¶¶ 6-21. Nothing developed through discovery has cast any doubt on this finding.

Similarly, the Court's Preliminary Injunction ruling rejected the Bank's argument that it had been providing insurance and investment products before Baystate Financial. The Bank's argument was based on allegations that it had offered bank related insurance, such as Savings Bank Life Insurance ("SBLI") and mortgage life and disability insurance, and deposit IRA and Keough accounts ("Deposit Products"). The Bank also claimed that its relationship with a third party vendor, FISCO, which provided the Bank's clients access to insurance and investment services, was not sufficient to establish that it was conducting that type of business. This Court

---

[3] Although a registered mark is presumed valid and entitled to protection; *See* 15 U.S.C. § 1115(a), this presumption is rebutted when there is proof that the mark is either generic or merely descriptive and without secondary meaning. *See Calamari Fisheries,* 698 F. Supp. at 1007.

found that the Bank's efforts in these regards were insufficient to establish that it had conducted activities that competed with Baystate Financial. Rule 56.1 Stmt., pp. 16-17. (FISCO relationship was *de minimus*; insurance business was limited); *see infra* (prior to 1999, Bank prohibited from providing non-deposit investment and insurance products).

Discovery has provided no additional facts which should change the Court's analysis. Mr. Lewis, the Bank's President and Rule 30(b)(6) deponent, did not add any evidence of additional Deposit Product business conducted by the Bank, and as to the Deposit Product business conducted prior to 1994, he could not testify as to how much, if any, revenue was generated by the Bank. Rule 56.1 Stmt. ¶ 32. Specifically, neither Mr. Lewis nor any other of the Bank witness nor any other Bank documents are able to establish that the Bank generated any revenue, prior to its relationship with FISCO (and prior to 1983), from SBLI, Keough or IRA accounts, and mortgage death and disability accounts. *Id.*

As for the FISCO relationship, this Court's prior ruling that such *de minimus* revenue cannot support a finding that the Bank was providing investment products should stand. Bolstering the Court's prior ruling, Mr. Lewis testified that because of banking regulations, the Bank was precluded from providing investment services in its own name; that FISCO and the Bank had separate office space; that FISCO's accounts were separate from the Bank's accounts; and that marketing materials had to disclose that the two entities were independent entities. Rule 56.1 Stmt. ¶ 34. Rather than support the Bank's position, discovery has proven that the FISCO relationship is insufficient, as a matter of law, to establish that the Bank was providing insurance and investment services.

Finally, and perhaps most troubling, is the fact that Mr. Lewis's deposition established that the Bank has provided false statements under oath on at least two occasions in its quixotic

quest to corner the "Bay State" name for its exclusive use.  In June of 2000, after the U.S. Patent and Trademark Office ("PTO") initially denied the Bank's trademark applications for being geographically descriptive, Mr. Lewis, on behalf of the Bank, submitted a declaration under oath that the marks had "become distinctive of the services [i.e., sale of stocks, bonds and mutual funds] through applicant's *substantially exclusive and continuous use* in commerce for at least five years immediately before the date of this statement."  Rule 56.1 Stmt. ¶¶ 58 and 65. Similarly, in an Affidavit filed with the Court in connection with the preliminary injunction, Mr. Lewis stated:

> "The services that Bay State® has offered *continuously* since 1994 are as follows:
>
> f.  Investment services including purchases and sales of stocks, bonds and mutual funds, including services that Bay State® sponsored using the Minuteman Investment Services® mark from Jan. 2001 to Feb. 2002."

Lewis Aff. ¶ 5 (emphasis added).

At his deposition, however, Mr. Lewis acknowledged that between the end of the FISCO relationship in 1998, and the beginning of 2001, the Bank did not offer investment services such as stocks, bond or mutual funds at all.  Rule 56.1 Stmt. ¶ 37.  Contrary to the PTO declaration and the Affidavit, the Bank was not offering insurance and investment products for two years during the relevant time period.  *See Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.*, 214 F.3d 432, 438 (3rd Cir. 2000) ("first party to adopt a mark can assert ownership so long as it *continuously* was the mark in commerce" (emphasis added).  Given the two year gap, the Bank cannot establish continuity.

**2.    The Natural Expansion Doctrine Does Not Assist The Bank In Establishing Priority.**

The Bank is not aided by the so-called "natural expansion" doctrine. Under this doctrine, "[w]hen a senior user of a mark on product line *A* expands later into product line *B* and finds an intervening user, priority in product line *B* is determined by whether the expansion is 'natural' in that customers would have been confused as to source or affiliation **at the time of the intervening user's appearance**." 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16.5 (4th ed. 2006) (emphasis added). As a matter of law, the Bank cannot show that at the time Baystate Financial began using the BAYSTATE Marks in 1983, consumers could have reasonably expected the Bank to offer the kinds of financial services at issue in this case. In fact, the Bank's failure to take any action for nearly twenty years is a tacit acknowledgment that it did not deem Baystate Financial a competitor.

Significantly, when Baystate Financial began using the BAYSTATE Marks, the Bank was prohibited from offering, and in fact did not offer, most of the insurance and investment services at issue. For instance, with respect to insurance, the Supreme Court held in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 28 (1996) that a federal law allowing national banks to sell insurance as agents in small towns preempted a Florida statute that prohibited agents affiliated with financial institutions from engaging in insurance activities. Following *Barnett*, Massachusetts repealed its anti-affiliation statute in 1998, *see* 1998 Mass. Acts. 129, § 3, as did many other states, "and for the first time affirmatively authorized banks in Massachusetts to own or affiliate with an insurance agency, and otherwise engage in the insurance agency business." Kenneth F. Ehrlich, *Gramm-Leach-Bliley: Federal Preemption of Massachusetts Bank Insurance Sales Rules?*, 20 ANN. REV. BANKING L. 121, 128 (2001). In addition, the regulations implementing the new Massachusetts statute required banks entering the

7

insurance agency business to be licensed by the Division of Insurance. *See* 211 C.M.R. §
142.04. The Bank did not obtain its license to offer insurance services until July 19, 2001. Rule
56.1 Stmt. ¶ 67.

In a strikingly similar case, *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency,
Inc.*, 214 F.3d 432, 435 (3rd Cir. 2000), Commerce Insurance Agency, Inc. ("CIA"), a small
company engaged in the insurance industry for over thirteen years, sought an injunction
prohibiting Commerce National Insurance Services ("CNIS"), a recently formed corporation,
from using the "Commerce" mark to promote its insurance business. CNIS was a subsidiary of
Commerce Bancorp, Inc. ("CBI"), which had used the "Commerce" mark in connection with its
banking services prior to CIA's adoption of the mark. *Id.* Significantly, the court found that
New Jersey law limited banks from engaging in the insurance industry at the time CIA was
formed. *Id.* at 442. In New Jersey, as in Massachusetts, state law prohibited banks from selling
general insurance services or products until after 1996, when the Supreme Court issued its
*Barnett* decision. *Id.* The court held:

> **"This prior statutory bar eviscerates the possibility that prior to 1996
> southern New Jersey consumers reasonably expected CBI to engage in the
> insurance industry. Moreover, it is apparent that CBI had no expectation of
> engaging in the general insurance industry until the *Barnett* decision."**

*Id.* (emphasis added). This decision squarely addresses the issues presented in this action and
shows that the Bank may not invoke the natural expansion doctrine in connection with insurance
services.

Similarly, with respect to investment services, the Glass-Steagall Act of 1933 ("Glass-
Steagall") separated the banking and securities industries "as completely as possible." *Board of
Governors of Fed. Reserve Sys. v. Investment Co. Inst.*, 450 U.S. 46, 70 (1981). Among Glass-
Steagall's provisions, § 16 generally prohibits national banks and state-chartered banks that are

members of the Federal Reserve system ("state member banks") from directly dealing in securities, with the exception of certain "bank eligible securities" like federal, state and municipal obligations. *See* 12 U.S.C. §§ 24 (Seventh) and 335. Under § 21, any firm engaged in the business of issuing, underwriting, selling or distributing securities is prohibited from the business of receiving deposits. This section not only prohibits businesses engaged in securities activities from receiving deposits, but also prevents depository institutions from selling and distributing securities. *See Investment Co. Inst. v. Camp*, 401 U.S. 617, 639 (1971); *Securities Indus. Ass'n v. Board of Governors of Fed. Reserve Sys.*, 839 F.2d 47, 57 (2nd Cir. 1988). In addition, while § 21 applies to those same banks covered by § 16, it also covers state-chartered institutions like Bay State Savings Bank which are FDIC insured but are not members of the Federal Reserve system. *See Investment Co. Inst. v. Federal Deposit Ins. Co.*, 815 F.2d 1540, 1547 (D.C. Cir. 1987). Thus, with certain narrow exceptions, the Bank was prohibited throughout the relevant period from selling or distributing securities.

Although regulatory interpretations in the 1980s and 1990s permitted banks to engage in limited securities-related activities, these services were subject to tight restrictions. In 1984, for instance, the FDIC adopted rules providing that an insured nonmember bank could maintain a "bona fide" subsidiary that engaged in securities work, but required, among other things, that the subsidiary be physically separate and distinct from the bank's operations and that it not share a common name or logo with the bank. *See* 12 C.F.R. §§ 337.4(a)(2) and 337.4(b). Similarly, in 1994, various federal banking agencies issued a joint statement recognizing the ability of banks to sell certain "nondeposit investment products" through independent broker/dealers – such as the Bank's arrangement with FISCO – while simultaneously imposing disclosure and other obligations on participating banks, such as the responsibility to inform bank customers that

securities sales conducted through independent broker/dealers are not deposits of the bank.  *See*

*Interagency Statement on Retail Sales of Non Deposit Investment Products*, 1 Fed. Reserve Req.

Serv. 3-1579.51 (Transmittal 177, November 1995).  In sum, since the Bank generally was

prohibited from directly selling investment products under the Bank Mark, the principles in

*Commerce National Insurance* apply to render the natural expansion doctrine inapplicable.

Accordingly, with respect to insurance and investments, Baystate Financial is the senior user as a

matter of law, and is entitled to continue using its name.

### 3.     The Bank Marks Are Not Distinctive and are Geographically Descriptive.

In connection with the federal registrations for the "Bay State," "Bay State Savings

Bank" and "Bay State Investment Services" marks (the "Bank Marks"), the U.S. Patent and

Trademark Office ("PTO") initially denied each of the Bank's applications because, among other

things, they were deemed to be geographically descriptive.  Rule 56.1 Stmt. ¶¶ 52 and 63.  The

PTO later agreed to register the Bank Marks only after the Bank submitted Declarations under §

2(f) of the Lanham Act, 15 U.S.C. § 1052(f), stating that the marks had "***become*** distinctive of

the services through applicant's substantially exclusive and continuous use in commerce for at

least the five years immediately before the date of this statement."  Rule 56.1 Stmt. at ¶¶ 58 and

65.

It is well established that the submission of evidence under § 2(f) in connection with a

trademark application "amounts to a concession" that the mark is not inherently distinctive.

*Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994); *Yamaha Int'l Corp. v.*

*Hoshino Gakki Co. Ltd.*, 840 F.2d 1572, 1577 (Fed. Cir. 1988).[4]

---

[4] Regardless of this exchange with the PTO, by their very nature, the Bank Marks are not inherently distinctive but are merely descriptive of the types of services offered by the Bank and of the geographic location from which those services originate.  *See Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 787 (5th Cir. 1984) ("Bank of

### 4.    The Bank Marks Lack Secondary Meaning

The Bank must not only establish secondary meaning in the descriptive mark generally, but also must show that its mark had such secondary meaning before the Baystate Financial began using the same or similar mark. *See Commerce National,* 214 F.3d at 439-440 (bank failed to establish secondary meaning as of date of issuance agency adopted similar name); *Co-Rect Prod., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985).

Among the factors courts look at to establish secondary meaning are (1) the length and manner and use of the mark; (2) the nature and extent of advertising and promotion for the mark; and (3) the efforts made in the direction of promoting a conscious connection in the public's eye between the name or mark and a particular product or venture. *Boston Beer Co.*, 9 F.3d at 182. The Bank has produced scant evidence of secondary meaning with respect to insurance and investment products it was offering in 1983. In its ruling on the Preliminary Injunction, the Court rejected the Bank's claims of secondary meaning, ruling that it "must show that the primary significance of the term in the mind of the consuming public is not the product but the producer." Rule 56.1 Stmt. ¶ 25 at p. 13. The only direct evidence of secondary meaning is from consumer surveys and testimony. The Bank initially sought to establish secondary meaning based on a series of marketing surveys conducted in 1999 and 2001, which the Court has already rejected, finding that these surveys "demonstrate that a relatively small portion of the consuming public was familiar with the bank's services." Rule 56.1 Stmt. ¶ 25 at p. 12.[5]   Through

---

Texas" is not inherently distinctive because it combines the generic term "bank" with the geographical term "Texas"); *First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.*, 923 F. Supp. 693, 704-05 (E.D. Pa. 1996) ("First Keystone Federal Savings" is geographically descriptive, which is a weak type of mark); *Quaker State Oil Ref. Co. v. Steinberg*, 189 A. 473, 474 (Pa. 1937) ("Quaker State" is a descriptive, geographical term not capable of exclusive appropriation as a trade name).

[5] Myers stated in his deposition that: (1) the surveys were designed to be used for marketing purposes and were not designed to test for secondary meaning (Rule 56.1 Stmt. ¶ 93); (2) he is "not qualified to speak about trademark issues. It is not my area of expertise." (Rule 56.1 Stmt. ¶ 94); and (3) he did not actually design the 1999 survey or

discovery, the Bank has designated another expert to attempt to establish secondary meaning. As a matter of law, however, neither survey provides adequate evidence to establish secondary meaning.

(a) **Klein's Surveys Do Not Show That The Term "Bay State" Has Acquired Secondary Meaning In Reference To Insurance And Investment Products.**

Klein was asked to design a survey "that would show the extent to which the Bay State name was associated with the Bank…" (Rule 56.1 Stmt. ¶ 72). Klein concluded:

> with regard to secondary meaning of the words "Bay State" it is my opinion that a substantial proportion of the relevant market associates the words "Bay State" with "Bay State Savings Bank". In the market research study that I designed…approximately [38.6%][6] of the relevant market associated the words "Bay State" with a particular financial institution in the Worcester area and identified "Bay State Saving Bank" as that institution. Rule 56.1 Stmt. ¶ 73.

This survey fails to assist Plaintiff in satisfying its burden of proving secondary meaning in that: (1) It does not determine whether the Bank had secondary meaning at the time Baystate Financial first used the mark in 1983; (2) 38.6% is not an adequate association as a matter of law to qualify a term as having obtained secondary meaning; and (3) The survey does not address the issue of whether "Bay State Savings Bank" is identified with non-banking financial services which is the seminal issue in the case.

(i) **The Survey Fails to Show Secondary Meaning For the Proper Time Period.**

Plaintiff is required to establish secondary meaning in a mark at the time and place that the defendant began use of the mark. *See, I.P. Lund Trading v. Kohler*, 118 F.Supp. 2d 92, 104

---

evaluate and summarize the data gathered for that survey; (Rule 56.1 Stmt. ¶ 95) and report generally). Further, there is no conclusion in Myer's Expert Report as to whether or not the surveys confer secondary meaning. But even if Plaintiff attempts to rely on Myers' prior affidavit which states that "the survey shows that the Bay State mark is widely recognized and highly regarded"; Mr. Myers testified that he does not know what the term Bay State Mark Means. (Rule 56.1 Stmt. ¶ 96).

[6] Klein's summary states that this number is approximately 39%, but the actual number is 38.6%. Rule 56.1 Stmt. ¶ 73.

(D. Mass 2000);  *Scott Paper v. Scott's Liquid Gold,* 589 F.2d 1225, 1231 (3d. Cir 1978);

*McCarthy, McCarthy on Trademarks and Unfair Competition,* section 15:4 (4th Ed. 1997).  In

*Commerce National, supra*, the court held that a recent survey "is not particularly probative of

customer views in 1983."  *Commerce National*, 214 F.3d at 440.  Klein admits that his survey

measures secondary meaning  presently and does not attempt to establish secondary meaning as

of 1983 or even  1997.[7]  Rule 56.1 Stmt. ¶ 87.  As a result of the inappropriate time parameters,

the Court should not rely on this survey to establish secondary meaning.

### (ii)    The Fact That 38.6% of Respondents Identify "Bay State" With "Baystate Savings Bank" Does Not Establish Secondary Meaning

Courts typically view survey evidence indicating 50% or more of the consuming public

associate a mark with the company source as sufficient to demonstrate secondary meaning.  *See,*

*e.g. I.P. Lund Trading, Inc. v. Kohler Co.,* 118 F. Supp. 2d 92, 107 (D. Mass. 2000); *see also*

*Colby College v. Colby College-New Hampshire*, 508 F.2d 804, 809 (1st Cir. 1974) (average well

over 50% of all respondents meets standard); *Beacon Mut. Ins. Co. v. OneBeacon Ins. Corp.*, 376

F. Supp. 2d 251, 257-58 (D. RI 2005) (69% meets standard); *McNeil-PPC, Inc. v. Merisant Co.*,

2004 WL 3316380, *10-*12 (D. Puerto Rico July 29, 2004) (average of 58% meets standard).

Although percentages below 50% can be a factor in establishing secondary meaning,

numbers in the 30% range have not, without other extenuating factors, risen to the level

necessary to establish secondary meaning.  *Boston Beer Co.*, 9 F.3d at 182-83 *and I.P. Lund*

*Trading, Inc.*, 118 F. Supp. 2d at 107 (36%, 33% and 31% figures inadequate to prove secondary

meaning).  In furtherance of the position that percentages below 50% are suspect, the *Boston*

---

[7] The Bank contends that Baystate Financial's use did not begin until 1997 because it filed a new state registration in 1997 instead of renewing a prior registration filed by a predecessor company.  Without conceding abandonment, the fact that an application for registration has been abandoned, shall not affect any rights an entity may have in the mark which is subject to that application. See 37 C.F.R. sec. 2.68.  Likewise the filing of a new registration does not affect the continuum of rights .  However, even if the court determines Baystate Financial's first use to be in 1997, the analysis of this motion does not change.

*Beer* court notes that "a positive response rate of 36 % is hardly overwhelming." *Id.* at 183, note

5. EVEN THE BANK'S EXPERT WHO CONDUCTED THE SURVEY ADMITTED ON HIS

OWN INITIATIVE AT HIS DEPOSITION THAT THE 38% FINDING IS WEAK. (Klein

Dep., p. 98) stating "if there's any weakness, you know, any weakness, it would be our 38

percent association of Bay State..."). Rule 56.1 Stmt. ¶ 76.

     Further weakening the survey is the fact that the Bank used a very narrow sample for its

survey. The Bank's branch offices are all in Worcester county. The population surveyed by

Klein all lived within a 10 mile radius of any Worcester zip code. Rule 56.1 Stmt. ¶ 71. The fact

that the identification was only 38.6% with the group of people who live so close to the Bank

gives rise to the inference that in the market tested, this mark is in fact a weak mark. But even if

the Court finds 38.6% to be a valid threshold for establishing secondary meaning, a close review

of the survey responses shows that 38.6% of respondents did not actually answer the question by

identifying Bay State Savings Bank as their response.

     The survey question asked in the secondary meaning survey was:

> "Thinking about the Worcester area and the different types of financial
> institutions, when you hear the words "Bay State" do you or do you not
> think of any particular financial institution or institutions in the Worcester
> area? That is, do you or do you not associate the words "Bay State" with
> any particular financial institution or institutions in the Worcester area?"

Rule 56.1 Stmt. ¶ 77. In determining that 38.6 % of the respondents surveyed responded with

"Bay State Savings Bank," Klein combined the answers of respondents who replied "Bay State

Savings Bank" with those who replied "Bay State Bank". Rule 56.1 Stmt. ¶ 78. When Klein

was asked at his deposition "How is it that you determined that the answer "Bay State Bank" is

the equivalent of "Bay State Savings Bank" he answered : "It has been my experience that

people tend to shorten names and don't give full names and full legal names in response to

questions." (Rule 56.1 Stmt. ¶ 80). This assumption is not based on any scientific principal nor did Klein ask respondents if they intended their answer of "Bay State Bank" to mean "Bay State Savings Bank." (Rule 56.1 Stmt. ¶ 81). Further, the assumption is not supported by the facts of this case.

Bank President Robert Lewis testified in his deposition that the Bank never referred to itself as "Bay State Bank" and always referred to itself as "Bay State Savings Bank". (Rule 56.1 Stmt. ¶ 61). Further, there was a Massachusetts Bank named "Bay State Federal Savings Bank" which marketed itself as "Bay State Bank" – the exact name given by some of the respondents. In a settlement agreement relating to a trademark action that the Bank filed against Bay State Federal Savings Bank both Banks agreed not to use the term "Bay State Bank" as an identifier for either bank. (Rule 56.1 Stmt. ¶ 61).

When the responses are broken down and allocated specifically to "Bay State Savings Bank" or "Bay State Bank" only 18.3% of respondents associated "Bay State" with "Bay State Savings Bank".[8]   Rule 56.1 Stmt. ¶ 82. Even if the court could be persuaded that the 38.6% number is enough for plaintiff to have created a presumption of secondary meaning – plaintiff has not provided any evidence – and it is plaintiff's burden to do so - to show that all of the answers it has included in the 38.6% calculation can accurately be attributed to the Bank. Therefore, 38.6% is not an accurate representation of the survey data; and is clearly not indicative of secondary meaning.

---

[8] Appendix K to the Klein Report (attached as Exhibit 9) illustrates the tabulation of data. This shows that 49 of the survey participants responded to the question with Bay State Savings Bank. The total number of respondents was 246. 49/246= 19.9%. Subtract the 1.6% for noise which Klein applied to all calculations and the respondents who identified Bay State with Bay State Savings Bank decreases to 18.3%. Rule 56.1 Stmt. ¶ 82.

(iii)    **The Survey Does Not Address the Issue of Whether Bay State Savings Bank is Identified With Non-Banking Financial Services Which is the Seminal Issue in the Case.**

To prove that a mark has attained secondary meaning plaintiff must show that " the mark no longer causes the public to associate the goods with a particular place but to associate the goods with a particular source." *Boston Beer Co.*, 9 F.3d 175, 181 (1st Cir. 1993).    Klein admits that he was unaware that Bay State Investment Services and not Bay State Savings Bank is the name under which insurance and investment products similar to Bay State Financial Services are marketed. (Rule 56.1 Stmt. ¶ 84). Not one respondent, in answer to the question asked by Klein associated the words "Bay State' with Bay State Investment Services. Rule 56.1 Stmt. ¶ 86.   In addition, Klein did not design a survey which asked any questions that could be deemed to associate insurance and investment products with a particular source. He did not evaluate whether the survey population identified investment products and insurance with EITHER Bay State Savings Bank or Bay State Investment Services. Rule 56.1 Stmt. ¶ 83.[9] Although Defendant does not concede that  Klein's survey provides any evidence of secondary meaning, at most it shows that some consumers identify the term "Bay State" with Bay State Savings Bank. But it fails to show  that even one potential customer identifies investment and insurance products with the Bank or Bay State Investment Services.

---

[9] In contrast, Thomas Dupont, Defendant's Expert who performed a secondary meaning survey did specifically inquire as to what services the population identified with Bay State Savings Bank. Rule 56.1 Stmt. ¶ 88. Dupont asked the respondents if they had ever heard of Bay State Savings Bank. If the respondent said yes, he then asked "What financial products or services, if any do you identify with Bay State Savings Bank. Only 8.9% of Respondents who recognized Bay State Savings Bank indicated that the Bank offered insurance and investment services. Rule 56.1 Stmt. ¶ 89.  For comparison purposes, Dupont also asked if respondents had ever heard of Merrill Lynch and then asked the same questions regarding the types of services asked about Bay State Savings Bank. 72.9% of the responding population identified Merrill Lynch with investment services which indicates that "the failure of respondents to identify non-banking financial services with Bay State Savings Bank is not due to the fact that  such services don't readily come to mind – it is due to the fact that they just don't associate those services with Bay State Savings Bank." Rule 56.1 Stmt. ¶ 91.

16

(b)    **The Circumstantial Evidence Does Not Assist in the Secondary Meaning Analysis.**

The Bank also contends that its marks acquired secondary meaning through advertising and promotional efforts. Here, the record is devoid of *any* evidence that the Bank's promotional efforts imbued its marks with secondary meaning and as set forth above, any evidence which speaks to that issue as of 1983. To the contrary, the Bank's own image and positioning surveys show that its advertising has been largely unsuccessful, even as it relates to the promotion of the Bank's traditional banking services, and that the Bank's marketing efforts have not resulted in anything remotely approaching secondary meaning in connection with financial services. Moreover, of the numerous advertisements the Bank produced, none related to the marketing of the Bank Marks for the financial services at issue until May 2003, when the Bank started promoting Bay State Investment Services. Rule 56.1 Stmt. ¶ 97.

Further, there is no evidence that the Bank made an effort to promote a conscious connection in the public's eye between "Bay State" and financial services prior to 2003. In fact, they were prevented by law from doing so. *See Interagency Statement on Retail Sales of Nondeposit Investment Products*, 1 Fed. Reserve Reg. Serv. 3-1579.51 (Transmittal 177, Nov. 1995). (Banks required to disclose to customers that investment products not deposits of the Bank; see also discussion in Section (c), *supra*.) In addition, the Bank's President testified that prior to 2003 he did not want the investment services products associated with the Bank. Rule 56.1. Stmt. ¶ 40. Finally, given the peaceful coexistence between the Bank and Baystate Financial since 1983, the Bank is hard pressed to establish that it had acquired secondary meaning with respect to investment and insurance products. *See Commerce National*, 214 F. 3d at 440 (Plaintiff's and Defendant's "harmonious coexistence for 13 years cuts against Plaintiff's claim of secondary meaning"). There simply is no evidence that the Bank's growth in assets and

general banking activities over the years resulted in any consumer association of the Bank Marks with the kinds of financial services Baystate Financial has offered for decades. *See* Rule 56.1 Stmt. ¶ 42. (Only $223,200 of Bank's $12 million dollar revenue attributable to investment services in 2004).

### C.     The Bank Cannot Prevail on its Dilution or Cyberpiracy Claim.

To prevail on a dilution claim under M.G.L. c. 110B, § 12 or a Cyberpiracy claim the Bank must show that it owns marks that have become distinctive. *See Black Dog Tavern Co., Inc. v. Hall*, 823 F. Supp. 48, 59 (D. Mass. 1993); 15 U.S.C. 1125 (d). Since Baystate Financial has established that it is the senior user and the Bank Marks are not distinctive, the Bank cannot succeed on its dilution claim.

### D.     The Bank Cannot Prevail on its Claim Under M.G.L.C. 110 §4

Chapter 110, § 4 of Massachusetts General Laws creates a property right that a person possesses which allows them to prevent a former business associate from using their name in connection with the business without written consent. This statute is inapplicable on its face, since the Bank and Baystate Financial were never formerly in business together, nor is Baystate Financial using the Bank's exact name. *See generally China Clipper Restaurant v. Yue Joe*, 45 N.E.2d 748 (Mass. 1942) (court dismisses case because Defendant not using the exact same name as Plaintiff where Defendant added "Inc." to the end of "China Clipper Restaurant").

### E.     The Bank Cannot Prevail on its 93A Claim

Since Baystate Financial was fully within its rights to use the marks at issue and in fact has shown priority of use in the marks, Plaintiffs cannot maintain a 93A claim. *See Black Dog Tavern Co. v. Hall*, 823 F. Supp. 48, 60 (D. Mass. 1993).

18

## CONCLUSION

For the foregoing reasons, the Bank's motion should be denied.

BAYSTATE FINANCIAL SERVICES, LLC.,
By its attorneys,

_____
Christopher P. Litterio (BBO #551098)
Maureen Mulligan (BBO#556482)
RUBERTO, ISRAEL & WEINER, P.C.
100 North Washington Street
Boston, Massachusetts 02114
(617) 742-4200

Dated:  May 8, 2006

## CERTIFICATE OF SERVICE

I, Maureen Mulligan, hereby certify that on this 8th day of May, 2006, a true copy of the within document was served upon plaintiff's counsel of record via electronic mail.

_____
Maureen Mulligan

U:\MSM\Baystate Financial\pleadings\Memorandum in Support of Motion for SJ.doc

19