UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BAY STATE SAVINGS BANK, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BAYSTATE FINANCIAL ) <br> SERVICES, LLC, ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 4:03-cv-40273-FDS |

### RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1 Defendant Baystate Financial Services, LLC submits the following Statement of Undisputed Material Facts establishing that there is no genuine issue to be tried on any of Plaintiff's claims.

### The Parties

1. Baystate Financial Services, LLC ("Baystate Financial") is a Massachusetts limited liability corporation with a principal place of business at One Exeter Plaza, Suite 1400, Boston, Massachusetts. Exhibit 1 (Complaint ¶3).

2. Bay State Savings Bank (the "Bank") is a Massachusetts chartered mutual savings bank which traditionally offered loan and deposit banking services. Ex. 1 (Complaint ¶5-6).

### Baystate Financial Services History

3. Baystate Financial is one of New England's oldest and largest financial firms and was founded as a general agency of the New England Life Insurance Company ("New England Life"). Ex. 2 (Affidavit of David C. Porter ("Porter Aff.") at ¶ 2).

4. Baystate Financial offers various business-related products and services, including deferred compensation, business income insurance, key employee insurance, profit sharing, simplified employee pensions, 401(k) plans, managed care medical benefits, dental insurance, group life insurance, short-term and long-term disability insurance and HMOs. Ex. 2 (Porter Aff. at ¶ 11).

5. Baystate Financial also offers a variety of products and planning strategies for individuals, including permanent life insurance, term insurance, long-term care insurance, mutual funds, annuities, IRAs, education funding, charitable giving, and estate and retirement planning. Ex. 2 (Porter Aff. at ¶ 12). Baystate Financial has never provided traditional banking services. Ex. 2 (Porter Aff. at ¶ 13); Ex. 3 (Affidavit of Richard D. Wilson ("Wilson Aff.") at ¶ 9).

6. In 1982, Baystate Financial's predecessor, the Desautels & Wilson Partnership d/b/a Desautels & Wilson Insurance Agency (the "Desautels & Wilson Agency"), a general agency of New England Life, began answering its telephones as "Baystate Financial Services." Ex. 3 (Wilson Aff. at ¶¶ 2-3).

7. The Desautels & Wilson Agency's Annual Report for 1982 explained that its use of the name was in recognition of the wide variety of financial services the agency had come to offer. The report explained that, "[w]ith the grouping of our insurance, investment, financial planning, group benefits, and pension services under one marketing identification, we believe you will be better able to serve your clients and the other advisors." It further stated: "Baystate Financial Services is a name that accurately describes what we have become. It is a name that we can promote without it having to change." Ex. 3 (Wilson Aff., ¶ 3 and Ex. A., p. 18).

8. In the years that followed, the number of partners in the Desautels & Wilson Agency changed from time to time, but the organization continued doing business as Baystate

2

Financial Services. In January 1983, after expanding to become the Wilson, Bergstrom & Denton Partnership d/b/a Wilson, Bergstrom & Denton Insurance Agency (the "Wilson, Bergstrom & Denton Agency"), the agency adopted the service marks BAYSTATE, BAYSTATE FINANCIAL and BAYSTATE FINANCIAL SERVICES (the "BAYSTATE Marks"), and continued using the Baystate Financial Services trade name. Ex. 3 (Wilson Aff. at ¶ 4).

9. On April 10, 1990, the Wilson, Bergstrom & Denton Agency obtained Massachusetts Service Mark Registration No. 44104 for the mark BAYSTATE FINANCIAL SERVICES (the "First Registration"), which included a date of first use of January 1, 1983. Ex. 3 (Wilson Aff. at ¶ 6 and Exhibit C).

10. From 1982 to August 1996, the Wilson, Bergstrom & Denton Agency and its successors-in-interest continuously used the BAYSTATE Marks in commerce and continuously conducted business as Baystate Financial Services in connection with their financial services and products. *Id.* at ¶¶ 4-10; Ex. 2 (Porter Aff. at ¶¶ 5-8); Ex. 4 (Affidavit of Richard Denton ("Denton Aff."), submitted herewith, at ¶¶ 2-4 and Exhibits A-D).

  (a) During that period, the partnerships offered financial products and services like IRAs, mutual funds, group life insurance, disability insurance, business income insurance, and estate and retirement planning. Ex. 3 (Wilson Aff. at ¶ 9).

  (b) The partnerships promoted their business as Baystate Financial Services, particularly within the financial services industry, and at trade meetings like the Boston Life Underwriters Association. Ex. 3 (Wilson Aff. at ¶ 10); Ex. 4. (Denton Aff. at Exhibits A-D).

  (c) They also used letterhead bearing the name Baystate Financial Services and presented their business under that name in interactions with the public. Ex. 3 (Wilson Aff. at ¶ 10 and Exhibit B); Ex. 4 (Denton Aff. at ¶ 3 and Exhibits A-D).

11. On June 29, 1990, the Wilson, Bergstrom & Denton Agency became the Wilson & Bergstrom Partnership d/b/a Wilson & Bergstrom Insurance Agency (the "Wilson & Bergstrom Agency"). Ex. 3 (Wilson Aff. at ¶ 7).

12. On March 1, 1992, the Wilson & Bergstrom Agency assigned to the Richard Wilson Insurance Agency (the "Wilson Agency") the First Registration, the continuing exclusive right to use the BAYSTATE Marks, the goodwill associated with the BAYSTATE Marks and the Baystate Financial Services trade name. Ex. 3 (Wilson Aff. at ¶ 8).

13. In August 1996, the Wilson Agency sold these rights and interests to New England Life. Ex. 3 (Wilson Aff. at ¶ 10 and Exhibit D).

14. In August 1996, New England Life acquired from the line of partnerships the First Registration, the BAYSTATE Marks, the goodwill associated with the BAYSTATE Marks and the Baystate Financial Services trade name. Ex. 3 (Wilson Aff. at ¶ 10 and Exhibit D).

15. New England Life immediately sold these rights and interests to David C. Porter ("Porter"), as a general agency of New England Life. Ex. 2 (Porter Aff. at ¶ 6).

16. From August 1996 to approximately January 2, 1997, Porter continuously used the BAYSTATE Marks in commerce and continued doing business as Baystate Financial Services. Ex. 2 (Porter Aff. at ¶ 6).

17. On January 2, 1997, Porter organized Porter/Desautels LLC ("Porter/Desautels") and transferred to it the First Registration, the BAYSTATE Marks, the goodwill associated with

the BAYSTATE Marks and the Baystate Financial Services trade name. Ex. 2 (Porter Aff. at ¶ 7).

18. On May 19, 1997, Porter/Desautels changed its name to Baystate Financial Services, LLC, the named defendant in this action. Ex. 2 (Porter Aff. at ¶ 8).

19. From January 2, 1997 to the present, Baystate Financial has continuously used the BAYSTATE Marks in commerce and has continued doing business as Baystate Financial Services in connection with its financial services and products. Ex. 2 (Porter Aff. at ¶¶ 7-8 and Exhibits C-H).

20. On May 19, 1997, Baystate Financial reregistered the "BAYSTATE FINANCIAL SERVICES" mark with the Secretary of the Commonwealth of Massachusetts (the "Second Registration"). It did so because, until 1997, Baystate Financial's predecessors had operated as general agencies of New England Life. After Baystate Financial established itself as an LLC in 1997, it decided to reregister the BAYSTATE FINANCIAL SERVICES mark in case the change in the form of ownership had any bearing on Baystate Financial's use of the mark. Ex. 2 (Porter Aff. at ¶ 9).

21. In completing the application for the Second Registration, Baystate Financial inadvertently listed the date of first use of the BAYSTATE FINANCIAL SERVICES mark as May 1, 1997. Ex. 2 (Porter Aff. at ¶ 10). In fact, however, before establishing the LLC, Porter had acquired from New England Life in August 1996 all of his predecessor's right, title and interest in the BAYSTATE Marks, the First Registration, the goodwill associated with the BAYSTATE Marks and the Baystate Financial Services trade name. *Id.* Porter understood that his predecessors first used the BAYSTATE Marks and Baystate Financial Services trade name in 1983. *Id.*

### Bay State Savings Bank's Contact With Baystate Financial

22. On December 23, 2002, Baystate Financial Services received a letter from the Bank's attorney Gerry Blodgett asking Baystate Financial Services to cease and desist using the Baystate Financial Services name. The letter claimed that the Bank had been using the "Bay State" mark for banking and *financial* services for over 100 years. Ex. 1 (Complaint, Ex. A) (emphasis added).

23. After investigating the matter, Baystate Financial Services responded to the Bank's letter on February 20, 2003 and pointed out that Baystate Financial was the first user of the mark in connection with the offering of financial services. Baystate Financial also pointed out that, as a matter of law, the prohibitions placed on banks by the Glass-Steagle Act in force between 1933-1999 prohibiting banks from offering general insurance and investment services precluded the Bank and Baystate Financial Services from offering the same products. Ex. 6 (Brian French Aff. ¶ 3, Ex. B).

24. On December 4, 2003, the Bank filed this trademark infringement action against Baystate Financial Services. Ex. 1 (Complaint).

25. On June 25, 2004 Judge Gorton denied the Bank's Motion for a Preliminary Injunction. Ex. 12.

### Products Offered By the Bank

26. Robert Lewis, the Bank President and designated 30(b)(6) witness provided testimony about the products offered by the Bank. Ex. 5 (Lewis Dep. Generally, Specifics outlined below).

27.     The Bank admits that prior to 2003, it never offered financial services such as non-deposit investment or general insurance products like those provided by Baystate Financial under any version of the "Bay State" name. Ex. 5 (Lewis Dep., pp. 116-117).

28.     In addition to providing loans and savings accounts, at various points in time before 1994, the Bank did offer savings bonds, savings bank life insurance ("SBLI") and SBLI annuities, mortgage and disability insurance, IRA, SEP and Keough accounts. Ex. 5 (Lewis Dep., p. 80). But all of these offerings were deposit related products and Bank customers could not purchase stocks or mutual funds in connection with any of these products. Ex. 5 (Lewis Dep., pp. 80-97).

29.     The IRA products offered through the Bank were deposit oriented products, i.e. CD products. Ex. 5 (Lewis Dep., p. 80-81).

30.     The mortgage insurance was only available to people borrowing money to purchase a home through the Bank and was not a very popular product. Ex. 5 (Lewis Dep., p. 96).

31.     Regarding SEPS and Keoghs, Lewis does not know what types of products are associated with these offerings but he is not aware of anything pre-1994 that was anything other than a deposit product. Ex. 5 (Lewis Dep., pp. 82-84).

32.     The Bank has not provided any evidence of the amount of revenue generated by any of the activities described in paragraphs 28 – 31. Ex. 5 (Lewis Dep., pp. 96-97).

33.     In 1994, the Bank entered into a third party arrangement with "FISCO", an independent broker/dealer to provide investment services to Bank customers and fee income to the Bank. Ex. 5 (Lewis Dep., pp. 35-38).

34. Because of Banking Regulations, FISCO was prevented from commingling any marketing materials with the Bank's materials, the two entities were kept physically separate in the Bank, the individuals offering the products were FISCO employees, the customer accounts were maintained separately, and all written materials contained disclaimers that the products were not Bank products. Ex. 5 (Lewis Dep., pp. 35-38).

35. The Bank's annual reports for 1994 through 1998 show that the FISCO sales were insubstantial. According to the Bank's documents and Mr. Lewis' deposition testimony, the Bank received fee income from the FISCO brokerage services between 0.0% and 0.1% of its total income for the years 1994-1998. Ex. 17[1], pp. 143, 177, 213, 246, 272; and Ex. 5 (Lewis Dep., p. 38).

36. In 1998, the Bank ended its relationship with FISCO. Ex. 5 (Lewis Dep., p. 39).

37. From 1998 to 2001, there were no products offered by the Bank or through a third party vendor regarding the non-deposit investment and insurance products at issue in this case. Ex. 5 (Lewis Dep., pp. 72-77).

38. In 2001, the Bank offered non-deposit investment and insurance products through a third-party vendor named INFINEX. The products were offered to customers under the name Minuteman Investment Services, not under the name Bay State Savings Bank. Ex. 5 (Lewis Dep., p. 103, 41, 76, 95-98, Ex. 27).

39. Minuteman Investment Services offered non-deposit Investment Products through INFINEX until April, 2003. Ex. 5 (Lewis Dep., p. 117).

---

[1] Exhibit 17 represents select documents previously submitted by the Bank as part of its Appendix to Motion for Preliminary Injunction.

40. The Bank claims that it adopted the name Minuteman Investment Services because it did not want the "investment services" under the name of the Bank. Ex. 5 ( Lewis Dep., p. 110).

41. In April 2003, Bay State Savings Bank changed the name of the program run under Minuteman Investment services to Baystate Investment Services. Ex. 5 (Lewis Dep., p. 117).

42. The Bank has never realized any substantial income from the products offered through Bay State Investment Services. In 2004, of the Bank's total revenue of $12 million, it earned $223,200 from Bay State Investment Services. Ex. 5 (Lewis Dep., p. 89, Ex. 25).

43. In 2005, the Bank earned approximately $200,000 from Bay State Investment Services. Ex. 5 (Lewis Dep., p. 93).

44. Lewis is unaware of the revenue under Minuteman for 2001 and 2002 (Ex. 5 (Lewis Dep., p. 89)), and the Bank has provided no other evidence of revenue generated in those years.

## The Bank's Alleged Trademarks

45. In 1999, the Bank began registering various trademarks which included the name "Bay State." Exs. 14-16.

46. The United States Patent and Trademark Office ("PTO") initially denied each of the Bank's applications for "Bay State", "Bay State Savings Bank" and "Bay State Investment Services" because, among other things the marks were deemed to be geographically descriptive. Registrations, Exhibit 14 at 712; Ex. 15 at 795-96; Ex. 16 at 920-21.[2]

---

[2] In connection with its Motion for Preliminary Injunction, Plaintiff submitted all of its Trademark filings as Exhibit 11 to the Appendix. Baystate Financial has reproduced as Exhibit 14-16 to this Motion only the pages cited herein. Page numbers refer to the Appendix page numbers on the lower right of the documents.

9

47. Ultimately, the PTO agreed to register the Bank Marks only after the Bank submitted Declarations under § 2(f) of the Lanham Act, 15 U.S.C. sec 1052 (f), stating that the marks had "become distinctive of the services through applicant's substantially exclusive and continuous use in commerce for at least five years immediately before the date of this statement. Registrations, Ex. 14 at 764, 775-76; Ex. 15 at 864-65, Ex. 16 at 931-32.

*Bay State Mark – Registration No. 2,450,573*
*and Bay State Savings Bank Mark Registration 2,452,511*

48. On July 16, 1999, the Bank filed Application No. 75/753185 with the USPTO for registration of the "Bay State" mark for "banking and financial services to consumers and businesses" (the "Bay State Application"). The Bay State Application matured into Registration No. 2,450,573 on May 15, 2001 (the "Bay State Registration"). Ex. 14 at 703-704; 778-779.

49. On July 16, 1999, the Bank also filed Application No. 75/753188 with the USPTO for registration of the mark "Bay State Savings Bank" for "banking and financial services to consumers and businesses" (the "Bay State Savings Bank Application"). The Bay State Savings Bank Application matured into Registration No. 2,452,511 on May 22, 2001 (the "Bay State Savings Bank Registration"). Ex. 15 at 784-788; 868.

50. As part of the Bay State and Bay State Savings Bank Applications, the Bank submitted Declarations claiming that the date the marks were first used in connection with banking and financial services to consumers and businesses was "at least as early as May 16, 1895." However, the specimens submitted with each Application did not show any use of the mark in connection with financial services. Ex. 14 at 708-709; Ex. 15 at 791-792.

51. On the initial Application, the Bank misrepresented the length of time it had been using both marks for financial services at the time it submitted the application that led to each

Registration. *See* Lewis testimony that the Bank did not begin offering financial services under the "Bay State" name until 2003. Ex. 5. (Lewis Dep., pp. 116-117; 54-57).

52.     On June 28, 2000, in response to the USPTO Office Action denying registration of the "Bay State" and "Bay State Savings Bank" marks on geographically descriptive grounds, among others, (Ex. 14 at 710-713; Ex. 15 at 793-797) the Bank amended the description of "financial services" on its initial application. The supplemental Affidavit amending the description, signed by Mr. Lewis, claimed the Bank provided "financial services, namely, financial investment in the field of real estate, stocks, bonds, commercial paper and other securities, financial management and planning, and financial guarantee and surety, in international class 36." (Ex. 14 at 762-765; Ex. 15 at 851). The specimen submitted in support of the Bay State and Bay State Savings Applications failed to show that the marks had been used in connection with these amended financial services. Ex. 14 at 708-709; Ex. 15 at 791-792).

53.     Mr. Lewis admitted in his deposition that the Bank did not provide the type of financial services listed on the Office Action Response until 2003, almost three years after the Office Action Response was filed in the PTO. *See supra*, at ¶¶ 26-44.

54.     In addition to Mr. Lewis' testimony set out above which clarifies that the Bank was not offering these investment services at the time the application was filed, the Bank's attorney, Gerry Blodgett testified that he did not intend for the June 28, 2000 Amendments to the applications to suggest that the Bank was offering investments in real estate, stock and other financial services. Ex. 8 (Blodgett Dep., pp. 89-96).

55.     Blodgett testified that the reference to "real estate" meant that the bank would participate in investments in real estate by providing loans. Ex. 8 (Blodgett Dep., p. 90).

56. Blodgett testified that the reference to financial investment in stocks did not mean that the Bank was offering financial investment in stocks directly at this time but that individuals could borrow money to invest in stocks. "It does not say that they [the Bank] were selling stocks or acting as a brokerage." Ex. 8 (Blodgett Dep., pp. 91-92).

57. There were not any descriptions of insurance services in the trademark applications. Ex. 8 (Blodgett Dep., pp. 96-97); Ex. 14 at 703-704; Ex. 15 at 785-787.

58. Also, as part of its June 28, 2000 response to the USPTO's objection that the Bay State mark and Baystate Savings Bank mark were geographically descriptive, the Bank submitted Declarations dated May 10, 2000 and May 12, 2000 in which it claimed that the marks had "become distinctive of the services through the applicant's substantially exclusive and continuous use in commerce for at least the five (5) years immediately before the date of this statement." Ex. 14 at 775-776; Ex. 15 at 864-865.

59. At the time the Bank made this statement, however, the Bank knew that (i) Baystate Financial was the senior user in commerce of the BAYSTATE Marks, including the senior user of the BAYSTATE FINANCIAL SERVICES mark, which had been registered in Massachusetts more than ten years earlier and again in 1997.

> Q. Isn't it a fact Mr. Lewis, you knew at that time [November 1999 when filing registration for Bay State Investment Services] about the identity of Bay State Financial Services?
>
> A. We knew about Baystate Financial Services. When we did – Gary [sic] Blodgett, I believe, may have done a search, and Baystate Financial Services was shown in that search."

Ex. 5 (Lewis Dep., pp. 112-113). As a result, the Bank knew that its use was not "exclusive."

60. The representation that the Bank had continuously used the Marks in connection with the offering of financial services in the last five years was also false. According to the testimony of the Bank's President, the Bank was not offering any non-deposit investment or insurance services from 1998- 2001 and these products were not offered in connection with the "Bay State" name until April, 2003. Ex. 5 (Lewis Dep. pp. 25-26). Further, the Bank was unable to produce any information about the revenues generated in 2001 or 2002. (Lewis Dep., p. 89).

61. In reference to the Bank's attempt to register "Bay State" standing alone, Lewis testified that the Bank does not use "Bay State" standing alone and, in fact, is prohibited from doing so as the result of the settlement agreement with Bay State Federal Savings Bank. (Lewis Dep., pp. 13-14, Ex. 13).

62. In short, the Bank made serious misrepresentations on its trademark applications for "Bay State" and "Bay State Savings Bank." See *supra*.

### *Bay State Investment Services Mark – Registration No. 2,601,830*

63. On November 22, 1999, the Bank filed Intent-to-Use Application No. 75/847386 with the USPTO for registration of the mark Bay State Investment Services for "sale of mutual funds, stocks and bonds, annuities, life insurance and long term care" (the "Bay State Investment Services Application"). Ex. 16 at 917-919. The Bay State Investment Services Application matured into Registration No. 2,601,830 on July 30, 2002 (the "Bay State Investment Services Registration"). Ex. 16 at 936. The PTO had initially rejected the application in part because the mark was geographically descriptive. Ex. 16 at 920.

64. On October 27, 2000, in response to a USPTO Office Action denying registration of the Bay State Investment Services mark in part on geographically descriptive grounds, the

Bank amended the services recitation to "investment services, namely, mutual fund, brokerage and investment, annuity underwriting, brokerage in the field of stocks, bonds, life insurance and long-term care insurance and insurance agencies and underwriting in the field of life insurance and long-term care insurance, in Class 36." Ex. 16 at 928-930.

65. As part of its October 27, 2000 response to the USPTO's objection that the Bay State Investment Services mark was geographically descriptive, the Bank submitted a Declaration dated May 10, 2000, again signed by Mr. Lewis, in which it claimed that the Bay State mark "has become distinctive of the services through the applicant's substantially exclusive and continuous use in commerce for at least the five (5) years immediately before the date of this statement." Ex. 16 at 931-932.

66. At the time it filed that Declaration as part of its October 27, 2000 response, the Bank knew that the statements regarding exclusivity and continuous use were false, fraudulent or misleading. *See, supra* at ¶¶ 26-44.

67. The record shows that the Bank did not obtain its license to offer insurance services until July 19, 2001. Ex. 6 (Affidavit of Brian French, Ex. A).

68. Moreover, in connection with its efforts to register Bay State Investment Services, the Bank submitted a Statement of Use that included a Declaration that "applicant is using or is using through a related company the mark in commerce on or in connection with all the goods/services listed in the Application/Notice of Allowance." The services listed in the Bay State Investment Services Notice of Allowance were "investment services, namely, mutual fund, brokerage and investment, annuity underwriting, brokerage in the field of stocks, bonds, life insurance and long-term care insurance and insurance agencies and underwriting in the field of

life insurance and long-term care insurance." The Statement of Use declared the date of first use in commerce as February 5, 2002. Ex. 16 at 941.

69. At the time it submitted its Statement of Use, the Bank knew: (i) it was not using the Bay State Investment Services mark in commerce for the services listed in the Notice of Allowance because it was using Minuteman Investment Services for those financial services. Ex. 5 (Lewis Dep., p. 103, 41, 76, 95-98, Ex. 27); (ii) the Bank was not using the Bay State Investment Services mark in interstate commerce because the specimen submitted with the Statement of Use was addressed to a Massachusetts resident; Ex. 16 at 943 and (iii) the Bank had not been using the mark since February 5, 2002 because it was using Minuteman Investment Services at that time and, in fact, used that mark until April 2003. Ex. 5 (Lewis Dep., p. 117). Thus, at the time it submitted the Statement of Use, the Bank knew that the statements and documents submitted in connection with the Statement of Use were false, fraudulent and/or misleading.

### Robert Klein Survey Re: Secondary Meaning

70. To support its claims that the Bank Marks have secondary meaning the Bank submitted a survey prepared by Robert Klein. Exhibit 9.

71. Klein's survey population was limited to those in zip codes within a 10 mile radius of any Worcester zip code. Ex. 9, (Klein Survey, p. 7).

72. Klein was asked to design a survey that would show the extent to which the Bay State name was associated with Savings Bank. Ex. 10 (Klein Dep., p. 22).

73. Klein concluded that: "with regard to the secondary meaning of the words "Bay State" it is my opinion that a substantial proportion of the relevant market associates the words "Bay State with Bay State Savings Bank." In the market research study that I

designed...approximately 39% of the relevant market associated the words "Bay State" with a particular financial institution in the Worcester area and identified "Bay State Savings Bank" as that institution." Ex. 9 (Klein Survey, p. 2).

74. The actual association was 38.6% not 39%. Ex. 9 (Klein Survey, p. 9).

75. Klein's survey results showed that 38.6% of the people surveyed associated the words "Bay State" with Bay State Savings Bank. Ex.9 (Klein Survey p.9).

76. Klein admitted that the 38.6% result is weak. More particularly, he admitted at his deposition that "if there's any weakness, you know, any weakness, it would be our 38 percent association of Bay State...." Ex. 10 (Klein Dep., p. 98).

77. The question that Klein asked survey participants in order to come up with his 38.6% association was: "Thinking about the Worcester area and the different types of financial institutions, when you hear the words 'Bay State' do you or do you not think of any particular financial institution or institutions in the Worcester area? That is, do you or do you not associate the words "Bay State" with any particular financial institution or institutions in the Worcester area?" Ex 9. (Klein Survey, p. 8).

78. In determining that 38.6% percent of the respondents surveyed associated the words "Bay State" with Bay State Savings Bank, Klein combined answers of those surveyed who responded "Bay State Bank" and "Bay State Savings Bank". Ex. 9 (Klein Survey, p. 9 Table 2); Ex. 10 (Klein Dep., p. 29).

79. Klein did not ask his survey participants if they intended a response of "Bay State Bank" to mean Bay State Savings Bank. Ex. 9 (Klein Survey, Appendix I) (Lack of Questions).

80. When asked "How is it that you determined that the answer "Bay State Bank" is the equivalent of Bay State Savings Bank" he answered: "It has been my experience that people

16

tend to shorten names and don't give full names and full legal names in response to question." Klein Dep., pp. 30-31).

81. Klein did not cite any scientific principal in his report or at the time of his deposition to support this "experience." See Ex. 9 (Klein Survey pp. 8-9); Ex. 10 (Absence of information).

82. When the responses which make up the 38.6% association are broken down and allocated specifically to "Bay State Savings Bank" or "Bay State Bank," only 18.3% of respondents associated "Bay State" with Bay State Savings Bank. Ex. 9 (Klein Survey, Appendix K).

83. Klein did not evaluate whether or not the survey population identified investment products and insurance with either Bay State Savings Bank or Bay State Investment Services. Ex. 9 (Klein Survey generally); Ex. 10 (Klein Dep., p. 46).

84. Klein admits that he was not aware that Bay State Investment Services offers the investment products and that they are not offered under the Bay State Savings Bank name. Ex. 10 (Klein Dep. p. 57).

85. Klein was not asked to associate a particular product or Service with the name Bays State in designing the survey. Ex. 10 (Klein Dep., p. 38).

86. Not one respondent in Klein's survey associated the words Bay State with Bay State Investment Services. Ex. 9 (Klein Survey, Appendix K).

87. Klein's Survey measures secondary meaning of Bay State as of December 2005 and January 2006. Ex. 10 (Klein Dep. p. 48).

88. Thomas Dupont, Defendant's expert who performed a secondary meaning survey did specifically inquire as to what types of services the population identified with Bay State Savings Bank. Ex. 7, (Dupont Survey, pp. 9-10).

89. Dupont asked survey participants if they had ever heard of Bay State Savings Bank. If they responded yes, he then asked them: "What financial products or services, if any, do you identify with Bay State Savings Bank". Only 8.9% of those surveyed indicated that they believed the Bank offered insurance and investment services. *Id.* at p. 10.

90. Dupont's survey used the same population parameters as Klein. He surveyed people with in a 10 mile radius of any Worcester zip code and drew survey participants from the exact same zip codes from which Klein drew his population. Ex. 7 (Dupont Survey, p. 3).

91. Dupont also asked if respondents had ever heard of Merrill Lynch and then asked the same questions regarding the types of services asked about Bay State Savings Bank. 72.9% of the responding population identified Merrill Lynch with investment services which indicates that "the failure of respondents to identify non-banking financial services with Bay State Savings Bank is not due to the fact that such services don't readily come to mind – it is due to the fact that they just don't associate those services with Bay State Savings Bank." Ex. 7 (Dupont Survey, p. 10).

**Image & Positioning Surveys Submitted by Plaintiff in Support of Secondary Meaning**

92. This Court has already determined that the Image and Positioning Surveys are not sufficient evidence to establish secondary meaning. Ex. 12 (Memorandum and Order at p. 12).

93. Kelly Myers, the Expert who prepared a report analyzing the Image and Positioning Surveys stated that the surveys were designed to be used for marketing purposes and were not designed to test for secondary meaning. Ex. 11 (Myers Dep., p. 94).

94.  Myers also testified that he is "not qualified to speak about trademark issues. It is not my area of expertise." Ex. 11 (Myers Dep., p. 149).

95.  Myers did not design the 1999 survey or evaluate and summarize the data for that survey. Ex. 11 (Myers Dep., pp. 57 and 69; and report generally).

96.  Mr. Myers has a statement in his affidavit which states that the " survey shows that the Bay State mark is widely recognized and highly regarded." Mr. Myers testified at his deposition that he does not know what the term "Bay State Mark" means. Ex. 11 (Myers Dep., pp. 71-72).

97.  None of the Bank's advertisements related to the marketing of the Bank Marks for the financial services at issue until May 2003 when the Bank began promoting Bay State Investment Services. Ex. 17 at 429.

Defendants,
BAYSTATE FINANCIAL SERVICES, LLC.,
By its attorneys,

*Maureen Mulligan*

Christopher P. Litterio (BBO #551098)
Maureen Mulligan (BBO#556482)
RUBERTO, ISRAEL & WEINER, P.C.
100 North Washington Street
Boston, Massachusetts 02114
(617) 742-4200

Dated: May 8, 2006

### CERTIFICATE OF SERVICE

I, Maureen Mulligan, hereby certify that on this 8th day of May, 2006, a true copy of the within document was served upon plaintiff's counsel of record via electronic mail.

*Maureen Mulligan*
Maureen Mulligan

U:\MSM\Baystate Financial\pleadings\Statement of Facts.doc