UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BAY STATE SAVINGS BANK,<br>        Plaintiff<br><br>        V.<br><br>BAYSTATE FINANCIAL SERVICES, LLC,<br>        Defendant | CIVIL ACTION NO. 4:03-CV-40273-NMG |

**MEMORANDUM IN SUPPORT OF BAY STATE SAVINGS
BANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION......................................................................................................1

II.  STATEMENT OF UNDISPUTED FACTS ......................................................2

III. ARGUMENT ..........................................................................................................9

    A.   Partial Summary Judgment Is Appropriate On Particular Issues If
        Baystate Financial Cannot Adduce Sufficient Evidence To Prove
        Counterclaims Or Defenses For Which It Has The Burden Of
        Proof                                      9

    B.   Baystate Financial Cannot Prove By Clear And Convincing
        Evidence That The Bay State® Registrations Are Invalid Because
        Of Alleged Fraud.            9

    C.   Bay State Financial State Registration Was Granted Improperly
        And Should Be Cancelled Under M.G.L. c. 110B, §§ 3 and 8      13

    D.   Baystate Financial Cannot Prove That Its Use Of The Baystate
        Financial Name Acquired Secondary Meaning Prior To The Date
        Of The Bay State Registrations, And Consequently Cannot Prove
        A Limited Area Defense      15

    E.   Baystate Financial Cannot Prove Essential Elements Of Its
        Counterclaim For Cybersquatting      17

    F.   Baystate Financial Cannot Prove That It Has Used The Baystate
        Name Continuously From A Date Prior To May 1, 1997 And
        Cannot Prove Privity With Any Other Party That Used The Name
        Prior To That Date      18

    G.   The Pleadings Establish, As A Matter Of Law, That Baystate
        Financial's Use Of The Baystate Name Is Likely To Cause
        Confusion In Relation To The Bay State® Marks      19

IV. CONCLUSION ....................................................................................................20

i

## TABLE OF AUTHORITIES

**Cases**

Allard Enterprises, Inc. v. Advanced Programming Resources, Inc., 146 F.3d 350
(6th Cir. 1998)...............................................................................................................14

Brown-Bridge Mills, Inc. v. Eastern Fine Paper, Inc., *700 F.2d 759* (1st Cir. 1983) ..................10

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ......................................................................... 9

Far Out Publications, Inc. v. Oskar, 247 F.3d 986 (9th Cir. 2001).................................................11

Foxtrap, Inc. v. Foxtrap, Inc., 671 F.2d 636) (D.C. Cir. 1982)..................................................15

General Healthcare Limited v. Qashat, Doc. No. 200-10191-RBC (D. Mass.,
2003) ...........................................................................................................................14

Metro Traffic Control, Inc. v. Shadow Network, Inc., 104 F.3d 336 (Fed. Cir.
1997).............................................................................................................................11

Money Store v. Harriscorp Finance, Inc., 689 F.2d 666 (7th Cir. 1982) .....................................10

Natural Footwear Ltd. v. Hart, Shaffner and Marx, 760 F.2d 1383 (3rd Cir. 1985),
cert. denied 474 U.S. 920 (1985) ....................................................................................16

Sallen v. Corinthians Licenciamenthos Ltd., 273 F.3d 14 (1st Cir. 2001)............................ 14, 15

San Juan Products, Inc. v. San Juan Pools of Kansas, Inc., 849 F.2d 468 (10th Cir.
1988) ...........................................................................................................................10

Schott Motorcycle Supply v. American Honda Motor Co., 976 F.2d 58 (1st Cir.
1992) ...........................................................................................................................19

Shields v. Zuccarini, 254 F.3d 476 (3rd Cir. 2001) ............................................................ 17, 18

Society of Accredited Marine Surveyors, Inc. v. Sanlan, Doc. No. 01-11877-GAO
(D. Mass., 2005) ...........................................................................................................11

Soo Line Railroad Co. v. St. Louis Southwestern Railway Co., 125 F.3d 481 (7th
Cir. 1997)................................................................................................................ 19, 20

Texaco Puerto Rico v. Medina, 834 F.2d 242 (1st Cir. 1987)..................................................... 9

Thrifty Rent-A-Car System, Inc. v. Thrift Cars, Inc., 639 F.Supp. 750 (D.Mass.
1986), aff'd, 831 F.2d 924 (1st Cir. 1987)............................................... 9, 15, 16, 17

United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219 (10th Cir.
2000) ...........................................................................................................................10

V & V Food Products, Inc. v. Cacique Cheese Co., Inc., 683 F. Supp. 662
(N.D.Ill., 1988)............................................................................................................10

**Statutes**

15 U.S.C. §1052(f).....................................................................................................................12

15 U.S.C. §1115 (b)(5) .............................................................................................................15

15 U.S.C. §1115 (Lanham Act, §33) ..................................................................................... 9, 15

15 U.S.C. §1115(a) ....................................................................................................................... 9

15 U.S.C. §1125(c)(1)................................................................................................................17

15 U.S.C. §1125(d) ............................................................................................................. 14, 17

15 U.S.C. §1125(d)(1)(B)(i) .....................................................................................................18

Bank Holding Company Act of 1956..........................................................................................11

Banking Act of 1933 (the Glass-Steagall Act).........................................................................11

M.G.L. c. 110B, §3 ................................................................................. 13, 14, 15
M.G.L. c. 110B, §3(f) ..................................................................................... 13
M.G.L. c. 110B, §8 ................................................................................. 13, 15
St. 1907, c. 561 .............................................................................................. 3

**Other Authorities**
McCarthy on Trademarks ..................................................................... 11, 14, 16

**Rules**
Fed. R. Civ. P. 56(d) ........................................................................................ 9
Rule 30(b)(6) ...................................................................................... 1, 7, 16

**Regulations**
37 C.F.R. §2.56(2) ......................................................................................... 12
37 C.F.R. §2.88(c) ......................................................................................... 12
General Counsel's Opinion No. 6, 48 Fed. Reg. 22989 (May 23, 1983) ................ 12, 13

## I.    <u>INTRODUCTION</u>

Bay State Savings Bank® ("Bay State®" or the "Bank") brings this action to prevent dilution and confusion concerning its registered service marks including Bay State®, Bay State Savings Bank®, Bay State Online® and Bay State Investment Services® (collectively, the "Bay State® marks").  It has used the Bay State® mark continuously since 1895.  In 1999 and 2001, respectively, the Bank obtained state and federal service mark registrations for the names Bay State® and Bay State Savings Bank® in International Class 36, which covers banking and financial services.  In 2001 and 2002 it obtained state and federal registrations for Bay State Online®.  In 2002 it obtained state and federal registrations for Bay State Investment Services®. It has also registered a series of internet domain names that include the Bay State® marks.

Baystate Financial Services, LLC ("Baystate Financial") adopted the Baystate name on May 1, 1997.  Its name, services and products are sufficiently similar to cause dilution and confusion.  Prior to November 2003, its operations were mainly in Boston.  On November 26, 2003, it announced a major expansion, including an acquisition in Worcester.  In this lawsuit it asserts various defenses and counterclaims including the allegations that the Bank's registrations of the Bay State® marks are invalid because of fraud.

This motion for partial summary judgment seeks to resolve six issues relating to Baystate Financial's defenses and counterclaims that, if granted, will simplify and expedite the trial.  It is based to a large extent on statements made by Baystate Financial's Expert Witnesses and its Rule 30(b)(6) witness.  It seeks partial summary judgment establishing that:

1. Baystate Financial cannot prove by clear and convincing evidence that the Bay State® registrations are invalid because of alleged fraud;

2.  The Baystate Financial state registration was improperly granted and should be canceled under M.G.L. c. 110B, §§3 and 8.

3.  Baystate Financial cannot prove that its use of the Baystate Financial name acquired secondary meaning prior to the date of the Bay State® registrations, and consequently cannot prove a "limited area defense";

4.  Baystate Financial cannot prove essential elements of its counterclaim for cybersquatting;

5.  Baystate Financial cannot prove that it has used the Baystate Financial name continuously from a date prior to May 1, 1997, and cannot prove privity with any other party that used the name prior to that date; and

6.  The pleadings establish, as a matter of law, that Baystate Financial's use of the Baystate name is likely to cause confusion in relation to the Bay State® marks.

## II.    STATEMENT OF UNDISPUTED FACTS[1]

*The Bank has used the name Bay State Savings Bank® continuously since 1895 and is often referred to as Bay State Bank. SMF, ¶1.* It is headquartered in an attractive century-old building facing the Worcester City Common and has branch locations in Worcester, Auburn and Holden. The Bay State® mark is prominently displayed at each location. *SMF, ¶2.* Bay State®'s primary geographic market consists of Worcester and the surrounding communities, but its

---

[1]     The Statement of Undisputed Facts is a summary of Bay State's® Statement of Material Facts, filed with the Court with its Motion for Summary Judgment. Citations are to the Statement of Material Facts and shall be referred to as (SMF, ¶____).

customers live in approximately 431 different postal zip codes in Massachusetts, and in 29 other states. SMF,¶3.[2]

*Bay State® provides a broad range of financial products and services.*  At first, this consisted of savings accounts and home mortgages.  St. 1907, c. 561 authorized savings banks to offer Savings Bank Life Insurance ("SBLI").  Available records show sales of SBLI dating to at least 1962.  In addition to SBLI, the services have included sales of savings bonds since 1960; mortgage and disability insurance by 1971; IRA, SEP and Keough retirement and educational accounts by 1976; Investment Unit Accounts by 1981; SBLI Life Saver Annuities by 1988; and sales of stocks, bonds and Mutual Funds from 1994 to 1998, and continuously since January 2000.  *SMF,¶4.*  From January 2000 to February 2002, the investment services were promoted as a sub-brand under the Minuteman Investment Services® mark (*SMF,¶5),* but they were exclusively sponsored by Bay State®[3]; sold by personnel in located in Bay State® offices; and target marketed primarily to Bay State® customers. *SMF,¶8.*  The investment services were fully disclosed in Annual Reports and authorized by law.  *SMF,¶9.*

*Bay State® has advertised and promoted itself in newspapers and trade journals since 1895 (SMF,¶10) and has invested in community relations by charitable giving.  SMF,¶11.* Advertising expenditures have grown from $7,059 in 1960 (the first year in which they are segregated) to as much as $631,000.  Since at least 1995, this has included statewide advertising in The Banker & Tradesman.  The total from 1960 to 1997, when Baystate Financial

---

[2]    This motion is supported by the Affidavits of Robert J. Lewis ("Lewis Aff."), Gerry A. Blodgett, Esq. ("Blodgett Aff."), David C. Porter ("Porter Aff."), and R. Kelley Myers ("Myers Aff.") and an Appendix of Exhibits, Volumes I-III, sequentially numbered, (referred to by exhibit as "Ex. ___.").  Volumes I and II were submitted previously in support of plaintiff's Motion for Preliminary Injunction.

[3]    The ad introducing Minuteman® states:  "No two customers are alike.  That's why Bay State Savings Bank introduces Minuteman Investment Services."  Another ad featuring the Bay State® mark describes Minuteman® as "a division of Bay State Savings Bank."  In many such ads, the Bay State® mark is more prominent than Minuteman®.  Lewis Aff., ¶6.

incorporated, is approximately $2.7 million.  Total advertising expenditures from 1960 to date including the 2006 budget exceeds $6.1 million, without counting charitable donations of several hundred thousand dollars.  *SMF,¶12.*

*Bay State® has been featured in many unsolicited news articles reporting matters of public interest*, including the appointment of community leaders to serve in various leadership positions, and the bank's support of community activities.  *SMF,¶13.*

*Bay State® has increased in size, prominence, sales and customers.*  Assets have grown from $20,241 in 1895 to over $284 million.  In 1997, when Baystate Financial incorporated, total assets stood at $206.1 million.  *SMF,¶14.*

*Consumer surveys in August of 1999 and 2001 showed that the Bay State® mark was widely recognized and highly regarded.  SMF,¶15.*  The proportion of the general population who recognized the Bay State® mark was 70% in 1999 and 76% in 2001.  Half reported that they had seen or heard Bay State® ads.  *SMF,¶16.*  Bay State®'s favorability ratings far surpassed those of larger competitors such as Fleet and Bank Boston.  *SMF,¶17.*

*Bay State®'s rating for "products and services satisfaction" shows that consumers view the bank as providing a wide range of financial services.  SMF,¶18.*  The 1999 survey shows that Bay State® customers had a stronger appetite for Mutual Funds than the general population; kept half their household investment dollars at Bay State®; and believed that the products and services are improving.  Over 81% of customers would recommend Bay State® to others, a higher proportion than customers of other banks.  *SMF,¶19.*  The 2001 survey contains similar information, and shows that customers associate Bay State® with a wide range of financial services including insurance, mutual funds and bonds.  *SMF,¶20.*

4

*Bay State® obtained state and federal service mark registrations in 1999 and 2001,*

*respectively.*  They include, among others:

| Mark | First Use | Federal Registration | State Registration | Services described |
|------|-----------|---------------------|--------------------|--------------------|
| Bay State | 5/16/1895 | 5/15/01 | 10/14/99 | IC 036: Banking Services And Financial Services, Namely, Financial Investment In The Field Of Real Estate, Stocks, Bonds, Commercial Paper, And Other Securities, Financial Management And Planning And Financial Guarantee And Surety. |
| Bay State Savings Bank | 5/16/1895 | 5/22/01 | 7/20/99 | IC 036: Banking Services And Financial Services, Namely, Financial Investment In The Field Of Real Estate, Stocks, Bonds, Commercial Paper, And Other Securities, Financial Management And Planning, And Financial Guarantee And Surety. |
| Bay State Online | 7/5/01 | 10/1/02 | 11/14/01 | IC 036: US 100, 101, 102.  G & S Banking services provided by means of a global computer network. |
| Bay State Investment Services | 2/5/02 | 7/30/02 | 6/3/02 | IC 036: Investment Services, namely, mutual fund brokerage and investment, annuity underwriting, brokerage in the field of stocks, bonds, life insurance and long term care insurance and insurance agencies and underwriting in the field of life insurance and long term care insurance. |

*SMF,¶21.*

The applications were handled by Gerry A. Blodgett, Esq., a reputable and experienced

trademark attorney.  *SMF,¶22.*  The Bay State® and Bay State Savings Bank® applications state

that the Bank had been using the mark for "BANKING AND FINANCIAL SERVICES TO

CONSUMERS AND BUSINESSES" in International Class ("IC") 36 since 1895.  *SMF,¶23.*[4]

The description of services was amended in good faith by July 18, 2000 at the PTO's suggestion

to add "FINANCIAL INVESTMENT IN THE FIELD OF REAL ESTATE, STOCKS, BONDS,

COMMERCIAL PAPER, AND OTHER SECURITIES FINANCIAL MANAGEMENT AND

PLANNING, AND FINANCIAL GUARANTY AND SURETY," all in IC 36.  *SMF,¶24.*  Bay

State relied on Mr. Blodgett in all respects.  *SMF,¶25.*  The descriptions for Bay State Online®

and Bay State Investment Services® are as described in the table above.

---

[4]    International Class ("IC") 36 includes:  Insurance, financial affairs, monetary affairs, and real estate affairs.

5

*The declarations supporting the trademark applications were in good faith.* Bay State® President Robert J. Lewis believed when he signed the declarations, and still believes now, that the declarations were true and correct. The same is true of the internet domain name registrations. *SMF,¶26.*

*Baystate Financial's trademark expert, Lawrence R. Robins, Esq., testified that he saw no evidence of bad faith or misrepresentation in the applications for the Bay State® marks. SMF,¶27.* He was asked to review Mr. Blodgett's report and Affidavit to identify areas he did not agree with. Mr. Blodgett's report represented that the applications were in good faith. Mr. Robins did not take issue with that assertion and testified that he found no indication of bad faith or misrepresentation. *SMF,¶28.*

*Baystate Financial's banking law expert, former Massachusetts Banks Commissioner Michael C. Hanson, Esq., testified that the Bank could properly offer all the services described in Mr. Lewis' Affidavit from the date the affidavit says the services were introduced. SMF,¶29.* In addition, the Bank Commissioner's Office imposed rigorous inspections every 12 to 18 months that would have detected irregularities, but there were no irregularities at Bay State Savings Bank®. *SMF,¶30.*

*Baystate Financial stated* <u>under oath</u>*, in its Massachusetts service mark application, that it first used the Bay State® mark for financial services on May 1, 1997. SMF,¶31.* The registration is in IC 36, the same as Bay State®'s registrations. *SMF,¶32.* It claims that it did not know of Bay State Savings Bank at the time. It has not sought federal registration. *SMF,¶33.*

*Baystate Financial incorrectly alleges that predecessors in interest have used the mark since 1983 and obtained a state registration in 1990.* The Wilson, Bergstrom & Denton insurance agency (the "Wilson Agency") of Boston obtained a state registration for the name

Baystate Financial Services in 1990, but there are three flaws in Baystate Financial's attempt to tack on to this prior use. First, a letter from the Wilson Agency's attorney warned that he had not conducted a search and that the registration would be cancelled if another party could prove prior use of the Bay State name. *SMF,¶38*. Second, the 1990 registration expired in 2000 because the Wilson Agency did not renew it. *SMF,¶39*. Third, the Wilson Agency never transferred its rights to Baystate Financial. In December 2003 the Wilson Agency purported to assign the expired registration to New England Life (*SMF,¶40),* but by then the registration had expired. *SMF,¶39*. New England Life has not attempted to transfer the expired rights to Baystate Financial. *SMF,¶40*. Baystate Financial is an independent agency and is not affiliated with New England Life. *SMF,¶41*.

 *Baystate Financial incorrectly asserts that it acquired the rights of the earlier Baystate Financial Services.* Its Rule 30(b)(6) witness, David C. Porter, was asked to describe the assets that Baystate Financial acquired when it started business in 1997. His list did not include rights to the Baystate Financial Services mark. It only included physical assets. *SMF,¶42*. Baystate Financial should be bound by this testimony.

 *The Baystate Financial name has not acquired secondary meaning.* Baystate Financial's survey expert Thomas Dupont testified that the Baystate Financial name has not acquired secondary meaning. *SMF,¶34*. Its Rule 30(b)(6) witness David Porter indicated that Baystate Financial does very little advertising, that advertising expenditures were less than $10,000 last year. *SMF,¶35*.

 *On December 23, 2002, Bay State® notified Baystate Financial, in writing, to discontinue use of the Bay State® mark.* Baystate Financial did not comply. *SMF,¶44.*

*On November 23, 2003, Baystate Financial announced a major expansion including a 38-employee financial planning business located across the Worcester City Common from Bay State®'s headquarters.* The announcement asserts that the expansion made Baystate Financial the largest financial planning operation in New England with 168 employees and annual sales of $176 million, and that the expansion will continue. *SMF,¶45.*

*Although Baystate Financial does not conduct paid advertising, it does promote itself by other means that threaten dilution and confusion.* Until 2003, its activities were confined to Boston. Some newspapers have misidentified it as "Bay State," suggesting that the Baystate name is not well recognized. *SMF,¶46.* At least in its Worcester office, the Baystate Financial mark is barely displayed. *SMF,¶47.* However, Baystate Financial does sponsor a radio show concerning financial planning and investment issues. The show is broadcast from three stations including one in Worcester. *SMF,¶48.* Radio listeners will not see the name in writing. When broadcast by radio, they will only hear the name "Baystate." This magnifies the threat of confusion and dilution, since the Bay State marks are wifely recognized and Baystate Financial is not. A Boston Business Journal article summarized the long-term threat from Baystate Financial's low profile use of the Baystate name:

> Baystate Financial has been growing, *albeit under the radar*. However [Baystate Financial CEO David] Porter recently told the Boston Business Journal that *the next couple years will present solid growth opportunities - and more recognition* - for Baystate Financial, as it looks to expand to Western Massachusetts and south toward Hartford. (Emphasis added). *SMF,¶50.*

*Baystate Financial admits that the parties' present and proposed use of the Bay State® mark will cause dilution and confusion. SMF,¶51.* Baystate Financial's counterclaim alleges that:

The BAYSTATE Marks and Bank Marks are similar if not virtually identical. The dominant or core element of the respective marks is Baystate and Bay State. The only appreciable difference between the marks is a single space, an almost insignificant distinction. The parties' core marks sound the same and look the same, and therefore convey the same commercial impression to consumers. *It is unlikely that consumers will be able to distinguish between the BAYSTATE Marks associated with Baystate Financial's long-standing and highly regarded financial services business and the Bank Marks representing the Bank's neophyte financial services offerings.* See Defendant's Counterclaim, ¶32. (Emphasis added). *SMF, ¶52.*.

## III.    ARGUMENT

A.    Partial Summary Judgment Is Appropriate On Particular Issues If Baystate Financial Cannot Adduce Sufficient Evidence To Prove Counterclaims Or Defenses For Which It Has The Burden Of Proof

Fed. R. Civ. P. 56(d) permits the court to grant partial summary judgment specifying facts that appear without controversy, and directing such further proceedings as are just. Under the rule of Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) and Texaco Puerto Rico v. Medina, 834 F.2d 242, 247 (1st Cir. 1987) the Bank is entitled to partial summary judgment on particular issues if Baystate Financial fails to adduce sufficient evidence to prove elements that are essential to counterclaims or defenses as to which it would have the burden of proof at trial.

B.    Baystate Financial Cannot Prove By Clear And Convincing Evidence That The Bay State® Registrations Are Invalid Because Of Alleged Fraud.

Title 15 U.S.C. §1115 (the "Lanham Act") "statutorily expanded the common law rights of a senior user who registers its mark under the Act." See Thrifty Rent-A-Car System, Inc. v. Thrift Cars, Inc., 639 F.Supp. 750, 755 (D.Mass. 1986), aff'd, 831 F.2d 924, 932 (1st Cir. 1987). Subject to certain enumerated defenses, 15 U.S.C. §1115(a) provides that federal and state registrations:

> . . . shall be prima facie evidence *of the validity of the registered*
> *mark* and of the registration of the mark, of the registrant's
> ownership of the mark, and of the registrant's exclusive right to use
> the registered mark in commerce on or in connection with the
> goods or services specified in the registration subject to any
> conditions or limitations stated therein.  (Emphasis added).

Baystate Financial's Counterclaim asserts that the Bay State registrations should be

cancelled because of alleged fraud.  However, "[a]n allegation of fraud must be proved by clear,

unequivocal and convincing evidence and not by a mere preponderance of the evidence which

leaves the issue in doubt."  Brown-Bridge Mills, Inc. v. Eastern Fine Paper, Inc., 700 F.2d 759,

764 (1st Cir. 1983).  Fraud exists "only when there is a deliberate attempt to mislead the Patent

Office into registering the mark."  Money Store v. Harriscorp Finance, Inc., 689 F.2d 666, 670

(7th Cir. 1982).  Moreover:

> A claim of fraud in the procurement of a federal trademark requires
> the following elements be alleged and proven: 1) a false
> representation regarding a material fact; 2) knowledge or belief that
> the representation is false ("scienter"); 3) an intention to induce the
> listener to act or refrain from acting in reliance on the
> misrepresentation; 4) reasonable reliance on the misrepresentation;
> 5) damage proximately resulting from such reliance.

V & V Food Products, Inc. v. Cacique Cheese Co., Inc., 683 F. Supp. 662, 666 (N.D.Ill., 1988)

(citing United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1226 (10th Cir.

2000), and San Juan Products, Inc. v. San Juan Pools of Kansas, Inc., 849 F.2d 468, 473 (10th

Cir. 1988)).

Bay State® president Robert Lewis signed the declarations required for all the trademark

applications.  SMF., ¶.  He believed the declarations were accurate and justified when he signed

them, and still believes it today.  SMF., ¶26.  He relied on experienced and reputable trademark

counsel, Gerry Blodgett, who likewise testified that he believed the information in the

applications to be accurate and appropriate in all respects. SMF.,¶¶25,28. There is no evidence

that the information in the applications was false, but even if Baystate Financial were to nitpick

the accuracy of the applications, there is no evidence that Mr. Lewis or Mr. Blodgett prosecuted

the applications in bad faith, or with scienter.[5] "Statements of honest, but perhaps incorrect

belief or innocently made inaccurate statements of fact do not constitute 'fraud.' Fraud requires

proof of a knowingly false statement made with an intent to deceive the PTO." McCARTHY

ON TRADEMARKS, §31.66, *citing* Metro Traffic Control, Inc. v. Shadow Network, Inc., 104

F.3d 336 (Fed. Cir. 1997)(accepting the Trademark Board's distinction between a false statement

and a fraudulent statement; while statements made in the oath may be false, they are not

fraudulent unless made with the intent to mislead the PTO); Far Out Publications, Inc. v. Oskar,

247 F.3d 986 (9th Cir. 2001)(since there was no evidence of the affiant's state of mind, summary

judgment was proper); Society of Accredited Marine Surveyors, Inc. v. Sanlan, Doc. No. 01-

11877-GAO (D. Mass., 2005).

There is no evidence here that the applications were even incorrect, let alone fraudulent.

Baystate Financial's counterclaim alleges that (1) the "specimens" submitted to the PTO are

deficient; (2) the Bay State® applications falsely claim first use of the mark for investment

services in 1895; (3) the Bay State® mark had not become distinctive of the services; (4) the

Banking Act of 1933 (the "Glass-Steagall Act") and the Bank Holding Company Act of 1956

---

[5]     Mr. Blodgett stated, in his expert report in this case, that "the Bay State® registrations are valid and were
not produced by fraud." Lawrence Robins, expert for Baystate Financial, stated under oath that he was
hired by Baystate Financial to identify all areas concerning Mr. Blodgett's report that he disagreed with.
Mr. Robins did not dispute Mr. Blodgett's assertion that the registrations were obtained in good faith and
stated as much at his deposition. SMF., ¶28. Mr. Robins is an agent of Baystate Financial and his
statements may be construed by the Court as an evidentiary admission by a party-opponent, such admissions
effectively eliminating any dispute of material fact concerning the "scienter" element of Baystate
Financial's counterclaim.

prohibited such use until 1999; and (5) the investment services were initially offered under the Minuteman® rather than the Bay State® mark.  See, e.g., Counterclaim, ¶¶ 38, 40.

Each of these allegations is false. (1) The specimens accurately show the mark as actually used to sell and advertise Bay State®'s services, including the Bay State Investment Services®.[6] (2) The applications correctly state that Bay State® has used the mark for banking and financial services since 1895. SMF.,¶23.  It is sufficient to give the date of only one service when all of the services encompassed in the application are within a single class.  It makes no difference that some of the listed services were introduced at a later date.[7]  (3) The Bank's use of the Bay State® marks for more than five years creates a presumption that the mark had become distinctive. 15 U.S.C. §1052(f).  In addition, the 1999 and 2001 surveys show that the Bay State® mark had become distinctive of a broad range of services including investments. SMF., ¶¶ 18-20.  (4) Federal law did not prohibit state chartered banks such as Bay State® from offering investment services.  General Counsel's Opinion No. 6, 48 Fed. Reg. 22989 (May 23, 1983).[8]  Baystate Financial's expert witness, Michael Hanson, Esq., reviewed the list of services that Bay State® provided, including the investment services.  He acknowledged that savings banks could provide such services indirectly under arrangements with broker dealers such as INFINEX (SMF.,¶ 29), which is precisely what Bay State® did.  (5) Bay State® sponsored the Minuteman® services as a sub-brand in much the same way that Toyota sponsors sub-brands such as Camry and Prius:  to

---

[6]    The specimens were examined and accepted by the PTO.  Under 37 C.F.R. §2.56(2), it is sufficient for an application to include "one specimen showing the mark as used on or in connection with the goods, or in the sale or advertising of the services in commerce."  Blodgett Aff., ¶12; Ex. 32, p. 9.

[7]    37 C.F.R. §2.88(c) states that "The statement of use may be filed only when the applicant has made use of the mark in commerce on or in connection with all of the goods or services … for which the applicant will seek registration ….  If more than one item of goods or services is specified in the statement of use, the dates of use required in … this section need be for only one of the items specified in each class, provided the particular item to which the dates apply is designated."  Blodgett Aff., ¶13; Ex. 32, p. 10.

differentiate different products. SMF.,¶ 5. The ads plainly state that Bay State® "introduces"

Minuteman® services and that Minuteman® is a division of Bay State®.  SMF.,¶ 10.  Surveys

reflecting satisfaction with Bay State® products and services show consumer awareness that Bay

State® sponsored the investment services.  SMF.,¶¶18-20.  There is nothing unusual or

inappropriate in the proposition that Bay State® sponsored the Minuteman® sub-brand and that

both marks were associated with the financial services.  The descriptions and dates of first use

were examined and accepted by the PTO, which could have rejected the applications if they were

deficient in any respect whatsoever.  SMF.,¶30.

     C.     Bay State Financial State Registration Was Granted Improperly
                 And Should Be Cancelled Under M.G.L. c. 110B, §§ 3 and 8

     M.G.L. c. 110B, §3(f) forbids the registration of any mark that "so resembles … the mark

or trade name previously used in the Commonwealth by another and not abandoned, as to be

likely, when applied to the goods and services of the applicant, to cause confusion or mistake or

to deceive."  Bay State® used the mark for over a century before Baystate Financial existed.

SMF.,¶1. Furthermore, Baystate Financial makes a judicial admission that the marks are likely to

cause confusion.  SMF.,¶¶51,52.  As such, the mark that was improperly issued can be cancelled

under M.G.L. c. 110B, §8(3)(c).  See Blodgett Aff., ¶18.

     In addition, M.G.L. c. 110B, §8(3)(b) provides for cancellation of any mark upon finding

"that the registrant is not the owner of the mark."  Ownership, in this context, includes common

law rights and is established by evidence that a party used the mark sufficiently to establish

---

[8]     General Counsel's Opinion No. 6 states that:  "A nonmember bank may …, consistent with the Glass-
Steagall Act, purchase and sell securities for the account of a customer if it is without recourse and solely
upon the order of the customer."  Blodgett Aff., ¶16.

secondary meaning.  Sallen v. Corinthians Licenciamenthos Ltd., 273 F.3d 14, 24 (1st Cir. 2001)

("mark owner must be understood against the back drop of U.S. trademark law, which provides

some protections to unregistered mark") (construing 15 U.S.C. §1125(d)).

Ownership of a trademark is founded upon actual use of the mark and not the mere

creation of it.  Therefore, "the party who first appropriates the mark through use, and for whom

the mark serves as a designation of source, acquires superior rights to it."  J. Thomas McCarthy

*McCarthy on Trademarks and Unfair Competition*, §§ 16:4, 24:90.1 (4th Ed. 1997) "In the

absence of federal registration, prior ownership of a mark is only established as the first actual

use of a mark in a genuine commercial transaction."  Allard Enterprises, Inc. v. Advanced

Programming Resources, Inc., 146 F.3d 350, 358 (6th Cir. 1998); *accord* General Healthcare

Limited v. Qashat, Doc. No. 200-10191-RBC (D. Mass., 2003).

Bay State® was the first to use the mark, beginning with savings accounts in 1895

(SMF.,¶1), SBLI sales dating back to at least 1962, sales of savings bonds since 1960; mortgage

and disability insurance by 1971; IRA, SEP and Keough retirement and educational accounts by

1976; Investment Unit Accounts by 1981; SBLI Life Saver Annuities by 1988; and sales of

stocks, bonds and Mutual Funds from 1994 to 1998, and continuously since January 2000.

SMF.,¶4.  At best, Baystate Financial can trace its use of the mark to 1983 and more likely, only

to 1997.

Additionally, Baystate Financial admits that its mark and services so resemble the Bay

State® mark and services as to cause confusion and dilution.  SMF.,¶¶51,52.  Its counterclaim on

this point must be treated as a judicial admission.  Bay State®'s prior use coupled with this

admission gives rise to cancellation under M.G.L. c. 110B, §§ 3 and 8.

14

Baystate Financial, through its expert, Thomas Dupont, testified that Baystate Financial has not acquired secondary meaning, nor has it made any effort to establish secondary meaning through advertisement and promotion.  SMF.,¶¶ 34,35.  These undisputed facts show that Baystate financial is not the owner of the mark, therefore, the mark should be cancelled under M.G.L. c. 110B, §8(3)(b).  <u>Sallen</u>, 273 F.3d at 24.

       D.     Baystate Financial Cannot Prove That Its Use Of The Baystate
            Financial Name Acquired Secondary Meaning Prior To The Date
            Of The Bay State Registrations, And Consequently Cannot Prove
            A Limited Area Defense

Section 33(b)(5) of the Lanham Act, 15 U.S.C. §1115(b)(5) "confers upon a junior user, such as [Baystate Financial], the right to continue use of an otherwise infringing mark in a remote geographical area if that use was established prior to the other parties [federal registration or federal publication, whichever is earlier]."  15 U.S.C. §1115 (b)(5); <u>Thrifty Rent-A-Car Syst., Inc. v. Thrift Cars, Inc.</u>, 639 F.Supp. 750, 753 (D. Mass. 1986), <u>aff'd</u>, 831 F.2d 1177(1st Cir. 1987).  To sustain its "limited area" defense, Baystate Financial "is required to demonstrate (1) that it adopted its mark before [Bay State®'s federal trademark publication (February 20, 2001)] and without knowledge of [Bay State®'s] prior use; (2) the extent of the trade area in which [Baystate Financial] used the mark prior to [Bay State®'s] registration; and (3) that [Baystate Financial] has continuously used the mark in the pre-registration trade area."  <u>Id</u>. (citing <u>Foxtrap, Inc. v. Foxtrap, Inc.</u>, 671 F.2d 636, 640) (D.C. Cir. 1982)).

The "scope of protection afforded by [the limited area defense] is limited.  A pre-existing good faith users' rights are frozen to the geographical location where the user established a *market penetration* as of the date of registration.  Such users are unable to thereafter acquire additional protection superior to that obtained by the registrant." (emphasis added)  <u>Thrifty Rent-</u>

A-Car, Id. 31 F.2d at 1181 (citing Natural Footwear Ltd. v. Hart, Shaffner and Marx, 760 F.2d 1383, 1395 (3rd Cir. 1985), cert. denied 474 U.S. 920 (1985)).

Market penetration is based on whether a party's mark is sufficiently known in a geographical area sufficient to create a likelihood of confusion among customers, should the senior user enter the same area. Thrifty Rent-A-Car, 639 F. Supp. at 753 (citing to McCarthy, *Trademarks and Unfair Competition*, §26:12 at 309 (2nd Ed., 1984). Secondary meaning must be established for anyone to confuse Baystate Financial with another company for market penetration purposes. Therefore, Baystate Financial is required to show that it established brand recognition in its mark in a limited geographical area in order to use the "limited area defense".

Baystate Financial has failed to show the extent of the geographic area, if any, where its mark had become sufficiently known prior to the Bay State® publication in February 2001. Its Rule 30(b)(6) representative, David C Porter, testified that company wide advertising expenditures are less than $10,000.00 per year. SMF.,¶35. At least some of those ads are to attract job applicants, not to promote Baystate Financial or its services. Baystate Financial made no effort to create secondary meaning. SMF.,¶34.

More importantly, Baystate Financial's expert, Thomas Dupont, made statements at his deposition that are dispositive of this issue. He testified that Baystate Financial has not acquired secondary meaning. SMF.,¶34. This is an admission that should foreclose the issue for purposes of summary judgment because absence of secondary meaning proves that Baystate Financial had no market penetration. This point is significant for several reasons, but especially because it forecloses Baystate Financial's ability to prove a "limited area defense".

In any event, it is undisputed that Baystate Financial did not use its mark in or around Worcester County until 2003, years after the Bay State® publications and registrations, therefore,

any limited area defense would not include the Worcester County area.  Thrifty Rent-A-Car, 639

F. Supp. at 753.

       E.       **Baystate Financial Cannot Prove Essential Elements Of Its
Counterclaim For Cybersquatting**

     To maintain its counterclaim under the Anticybersquatting Consumer Protection Act of

1999, 15 U.S.C. §1125(d), Baystate Financial has the burden to prove that: (1) "Baystate" is

entitled to protection because it is distinctive, famous or registered with the PTO; (2) Bay

State®'s domain names are identical or confusingly similar to Baystate Financial's mark; and (3)

Bay State® registered the domain names with the bad faith intent to profit from them.  Shields v.

Zuccarini, 254 F.3d 476, 482 (3rd Cir. 2001).  The words "distinctive" and "famous" are

synonymous with secondary meaning, which is determined by weighing the factors listed in 15

U.S.C. §1125(c)(1);  Shields, 254 F.3d at 482.  A mark is distinctive and famous if consumers

have come to associate it exclusively with a particular source of products or services.

     The Bank's domain names concern variations of its legal name, on which the Bank has

valid federal registrations.  Baystate Financial has no such federal registrations.  Baystate

Financial's survey expert, Thomas Dupont, and its Rule 30(b)(6) witness, David Porter, have

essentially admitted that it cannot establish secondary meaning.  SMF.,¶¶34,35.  Thus, Baystate

Financial cannot claim that its mark is registered, famous or distinctive.

     Bay State® had no bad faith intent to profit from use of the domain names.  In

determining whether a party had bad faith intent, a court may consider the following factors

(among others), also known as safe harbor provisions:

          (I)      the trademark or other intellectual property rights of the person, if any, in
the domain name;

          (II)     the extent to which the domain name consists of the legal name of the
person or a name that is otherwise commonly used to identify that person;

(III)    the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; … (other factors omitted).

15 U.S.C. §1125(d)(1)(B)(i); <u>Shields</u>, 254 F.3d at 484.

Bay State®'s registered domain names fall squarely into the first three "safe harbors". It owns state and federal trademarks on the same or similar marks. The domain name incorporates Bay State®'s legal name. Bay State® uses the domain name to make bona fide offerings of products and services. Baystate Financial cannot prove any bad faith on the part of Bay State®.

The intent to profit element is also wholly unsupported. The Bank's president, Robert Lewis, states that the Bank had no intent to profit at the expense of Baystate Financial. There is nothing in the record to contradict him. Nor would it even make sense to suggest otherwise. The only conceivable way that Bay State® could profit at the expense of Baystate Financial would be if its use of the Baystate name had become "distinctive" to Baystate Financial within the meaning of trademark law. As shown above, it has not. The undisputed material facts fail to support Baystate Financial's counterclaim under the Anticybersquatting Consumer Protection Act of 1999.

F.    Baystate Financial Cannot Prove That It Has Used The Baystate Name Continuously From A Date Prior To May 1, 1997 And Cannot Prove Privity With Any Other Party That Used The Name Prior To That Date

Baystate Financial's state service mark application represents under oath that it first used the Baystate Financial name on May 1, 1997. SMF.,¶31. This is a compelling admission, but Baystate Financial claims it was a mistake. It claims that it acquired preexisting rights from the Wilson Agency dating back to 1983, including a 1990 state registration. This claim is flawed in at least the following respects.

The Wilson Agency obtained a state registration for the name "Baystate Financial Services" in 1990. The attorney that obtained the registration cautioned the Wilson Agency that a search had not been conducted, and if someone were using the mark prior to 1990, they "could theoretically stop you even though they have not registered it." SMF.,¶38. Bay State® was using the mark for over 100 years prior to 1990(SMF.,¶1), and could have stopped the Wilson Agency's use of the mark.

In any event, the 1990 registration expired in 2000 because the Wilson Agency did not renew it. SMF.,¶39. Despite the failure to renew, the Wilson Agency purported to retroactively assign the expired registration to New England Life in December 2003. SMF.,¶40. There is no evidence that New England Life attempted to transfer the expired registration to anyone, much less Baystate Financial. Because Baystate Financial is an independent agency and not affiliated with New England Life (SMF.,¶41), Baystate Financial cannot tack back to an expired registration dated 1990 or the prior use of the mark started by the Wilson agency in 1983.

        G.      The Pleadings Establish, As A Matter Of Law, That Baystate Financial's Use Of The Baystate Name Is Likely To Cause Confusion In Relation To The Bay State® Marks

"A party's assertion of a fact in a pleading is a judicial admission by which it is normally bound throughout the course of a proceeding." Schott Motorcycle Supply v. American Honda Motor Co., 976 F.2d 58, 61 (1st Cir. 1992)(citations omitted). "[A]lthough the rule smacks of legalism, judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." Soo Line Railroad Co. v. St. Louis Southwestern Railway Co., 125 F.3d 481, 483 (7th Cir. 1997) citing Schott, supra.

Baystate Financial has unequivocally alleged that the Baystate Financial marks and the Bay State® marks are "similar if not virtually identical," that the only difference is "a single space, an almost insignificant distinction," and that the marks "sound the same and look the same, and therefore convey the same commercial impression to consumers."  SMF.,¶¶51,52.  It further elaborates that:

> It is unlikely that consumers will be able to distinguish between the BAYSTATE Marks associated with Baystate Financial's long-standing and highly regarded financial services business and the Bank Marks representing the Bank's neophyte financial services offerings.  Id.

Naturally, the Bank takes exception to the polemics and hyperbole of this allegation, but it is more than sufficient to corroborate the Bank's survey evidence that independently shows a likelihood of confusion.  The Baystate Financial sponsored radio show broadcast in the Worcester area adds to the likelihood of confusion.  The allegation is contained in a pleading.  It is a binding admission.  It binds Baystate Financial, and forecloses this important issue for trial.

## IV.    CONCLUSION

For the reasons stated, Bay State Savings Bank® requests that this Court grant partial summary judgment on the issues identified above.

BAY STATE SAVINGS BANK

By its attorneys,


_____/s/  John T. McInnes_____
James C. Donnelly, Jr., Esq., BBO # 129700
John T. McInnes, Esq., BBO # 657488
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA  01608-1477
(508) 791-8500

Dated: May 8, 2006

CERTIFICATE OF SERVICE

I, John T. McInnes, hereby certify that I have this day served a copy of the foregoing document, by mailing a copy, first class mail, postage prepaid, to Christopher P. Litterio, Esq., Ruberto Israel & Weiner, PC, 100 North Washington Street, Boston, MA 02114.

/s/ John T. McInnes
John T. McInnes, Esq.

Dated: May 8, 2006