UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BAY STATE SAVINGS BANK,
Plaintiff

V.

BAYSTATE FINANCIAL SERVICES, LLC,
Defendant

Civil Action No. 4:03-cv-40273-FDS

## SECOND AFFIDAVIT OF ROBERT J. LEWIS

Robert J. Lewis on oath deposes and states:

1. I am the President and CEO of Bay State Savings Bank ("Bay State" or the "Bank"). Bay State is a mutual corporation that is operated for the benefit of its depositors under the laws that govern savings banks. There are no stockholders.

2. On March 24, 2004 I filed an Affidavit and Exhibits in support of Bay State Savings Bank's Motion for Preliminary Injunction. I reaffirm that each of the statements made in that Affidavit are true and accurate. This Affidavit supplements my earlier statements and deposition testimony for purposes of the Bank's Motion For Partial Summary Judgment. It relies on exhibits that were submitted in support of the Motion for Preliminary Injunction, and also on the additional documents and transcripts that will accompany the Affidavit of John T. McInnes, Esq.

3. As indicated in my earlier Affidavit, the Bank has obtained state and federal service mark registrations for Bay State®, Bay State Savings Bank®, Bay State Online®, and Bay State Investment Services®. The bank used the services of Gerry A. Blodgett, Esq., an experienced and reputable attorney who specializes in patents and trademarks. I consulted Mr. Blodgett and relied on his advice in all respects pertaining to the applications. I believed

at the time I signed declarations in support of each of the applications that the declarations were accurate and warranted, and I continue to believe it today.

4. To the best of my knowledge, then and now, the Bank is the senior user of the Bay State® marks for banking and financial services, as described in my previous affidavit.

5. I believed at the time I signed declarations that the descriptions of services for the Bay State® and Bay State Savings Bank® registrations were appropriate and justified, and I continue to believe it today.

6. The descriptions for the Bay State Online® and Bay State Investment Services® registrations were prepared at a later date, and are slightly different from the earlier registrations. This is because the Bay State Online® and Bay State Investment Services® marks were intended for use with particular categories of products and services that were slightly different than the earlier registrations, although still within the same International Class 36 category of banking and financial services.

7. For example, the Bay State Online® mark was intended for use in connection with Internet Banking services that applied Internet technology to traditional banking practices.

8. Similarly, the Bay State Investment Services® mark was intended for use in connection with services that previously carried the sub-brand Minuteman Investment Services®. The Minuteman services had previously been offered under general sponsorship of the Bay State® marks, just as the Camry sub-brand is sponsored under the Toyota Motor Company trademark. For example, newspaper ads for Minuteman Investment Services included the Bay State® marks, and indicated that Bay State® sponsored the services.

9. I believed at the time I signed the supporting declarations that the description of services for each of the Bay State® applications was accurate and fully warranted, and I continue to believe it today.

10. My earlier affidavit describes (at ¶5) a list of services that the Bank now offers and the dates they were introduced. The description is generally accurate, but there is one issue I wish to clarify. The Bank first sponsored sales of stocks, bonds and mutual funds starting in 1994 under an arrangement with a registered broker dealer named FISCO. The Bank promoted FISCO's services using the Bay State marks, and the services were offered in the Bank's branches, but FISCO provided the broker dealer services.

11. The FISCO relationship terminated in approximately 1998, but the Bank intended to (and did) replace FISCO after conducting due diligence to find an appropriate replacement. The Bank entered a new relationship with a different broker dealer named INFINEX in January 2000. The new relationship was in place, and the Bank was offering stocks, bonds and mutual funds to its customers through INFINEX by the time those products were added to the trademark applications. Even during the interim between FISCO and INFINEX the Bank sold savings bonds and other securities including savings bonds, retirement accounts and annuities. The Bank has been selling savings bonds to customers since at least 1961, various retirement accounts since 1976 and SBLI Life Saver Annuities since 1988.

12. The Bank makes real estate investments for its own account in community development and economic development projects. Examples of these investments include the Harbor Point project in Boston and The Odd Fellows Project on South Main Street, Worcester. The Bank also provides financing for various Community Development Corp. ("CDC") and other projects to create urban housing or promote economic development. The

Bank often publicly identifies itself as a lender or sponsor of these projects on signage and otherwise, especially where the projects serve community purposes.

13. Throughout its existence, Bay State Savings Bank® has offered financial management and planning services at a very practical level. The Bank cultivates trusting relationships with customers. Customers often seek input and guidance from Bank personnel in a broad range of important financial decisions including home purchases, refinancing, retirement planning, college planning, etc.

14. Bank personnel are trained to assist customers, and to undertake due diligence to assure that its products and services are suitable for the particular customer. This applies across the entire range of products and services.

15. To give just one example, an annuity is a promise to pay a set sum of money to an individual. This is characterized in Massachusetts under the Banking Statutes as an insurance product, but annuities are also considered securities for certain purposes. Ex. 9, pg.53. Annuities are not suitable for all customers. Bank personnel obtain information about the customer's circumstances. They act as a conduit to the organization that offers the particular annuity. The Bank has sponsored and sold SBLI Life Saver Annuities since 1988 and annuities from other providers via FISCO and INFINEX.

16. The Bank offers guarantee and surety services including letters of credit, performance bonds for infrastructure improvements and standing letters of credit for businesses that are required to furnish security to parties in various business and real estate development projects.

17. The Bank sponsors the services of underwriters, including SBLI, when it offers their products to customers. The Bank performs due diligence, to determine the suitability of

investments to individual customers. It also takes applications and furnishes information to facilitate the underwriting process.

18.   Until 2001, SBLI products, including SBLI annuities, were sold directly by Bay State Savings Bank employees who were licensed for that purpose. Now, these activities are carried out by INFINEX under sponsorship by the Bank.

19.   The Bank has also registered various Internet domain names for use in connection with its Bay State Online® banking services. The domain names were registered in good faith to identify the source of the services. The Bank has received no inappropriate economic benefit at the expense of Bay State Financial from its domain name registrations, and had no improper intent.

20.   Baystate Financial's banking law expert, former Massachusetts Commissioner of Banks Michael C. Hanson, Esq., described in his deposition the rigorous examinations that are conducted by the Bank Commissioner's Office every 12 to 18 months. In Mr. Hanson's words, the examination teams include three to ten members, the process lasts up to two weeks, and the examiners inspect "everything" relating to the Bank's operation. The examinations of Bay State Savings Bank® have never criticized the Bank for offering products or services that were outside the scope permitted by state or federal law.

21.   My original affidavit estimated that the Bank's cumulative advertising expenses through 2004 were approximately $5.2 million. The total of 2005 expenses and the 2006 budget for advertising is over $900,000. Yearly advertising expenditures have now grown to as much as $631,000. Consequently, I estimate that the total amount the Bank has spent for advertising and promotions now exceeds $6.1 million.

Signed under the pains and penalties of perjury this 3rd day of May, 2006.

_____
Robert J. Lewis