UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BAY STATE SAVINGS BANK, )<br><br>Plaintiff, )<br><br>v. )<br><br>BAYSTATE FINANCIAL<br>SERVICES, LLC, )<br><br>Defendant. ) | Civil Action No. 4:03-cv-40273-FDS |

## DEFENDANT BAYSTATE FINANCIAL SERVICES, LLC'S MEMORANDUM IN SUPPORT OF MOTION TO STRIKE ROBERT LEWIS AFFIDAVITS IN CONNECTION WITH PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Bay State Savings Bank has submitted two Affidavits from Robert Lewis, the Bank's President (attached as Exhibits A and B, respectively). Each of these Affidavits are fraught with conclusions, assertions, statements of belief and opinions. In addition, there are statements in these Affidavits that contradict Mr. Lewis' testimony in this case. None of these types of statements are appropriate for affidavits in connection with a Motion for Summary Judgment and in each instance should be stricken from the record.

Affidavits supporting or opposing summary judgment "shall be made upon personal knowledge, shall set forth facts that would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Mass. R. Civ. P. 56(e). An affidavit "bereft of 'specific facts'" demonstrating the presence or absence of a triable issue is inadequate. *See, e.g., Great Barrington Sav. Bank v. Gens*, 8 Mass. App. Ct. 942, 942 (1979); *see also Baldwin v. Mortimer*, 403 Mass. 142, 144 (1988). Additionally, an affidavit is improper if the facts it states are not admissible. *See, e.g., Botschafter v. Federal Deposit Ins.*

*Corp.*, 33 Mass. App. Ct. 595, 596 (1992) ("offer of hearsay, general denials, and statements of

fact about which he had no personal knowledge was insufficient"). Mere assertions, statements

of belief, and opinions of non-experts are not proper. *See, e.g., Polaroid Corp. v. Rollins

Environmental Svcs., Inc.*, 416 Mass. 684, 696 (1993) ("bare assertions and conclusions . . .

beliefs, and assumptions are not enough"); *First Nat'l Bank of Boston v. Ibarra*, 47 Mass. App.

Ct. 660, 663 (1999); *Museum of Fine Arts v. Beland*, 432 Mass. 540, 543 n.5 (2000) (opinion

material in affidavits was inadmissible). An affidavit is inadmissible where it merely states

conclusions. *See, e.g., Haverty v. Commissioner of Correction*, 437 Mass. 737, 758-59 (2002)

(disregarding "generalized conclusions, unsupported by facts" in affidavits); *Godbout v.

Cousens*, 396 Mass. 254, 261 n.9 (1985) (disregarding portions of affidavit amounting to

"conclusions of law rather than statements of fact based on personal knowledge").

Moreover, Massachusetts courts disregard eleventh-hour affidavits that contradict

statements previously made under oath at a deposition. *See, e.g., Lyons v. Nutt*, 436 Mass. 244,

249 (2002); *O'Brien v. Analog Devices, Inc.*, 34 Mass. App. Ct. 905, 906 (1993).

Affidavits failing to meet the standards of Mass. R. Civ. P. 56(e) must be stricken and

may not be relied on when the opposing party appropriately moves to strike the offending

material. *See, e.g., Fowles v. Lingos*, 30 Mass. App. Ct. 435, 439-40 (1991); *see also Brunson v.

Wall*, 405 Mass. 446, 448 n.4 (1989).

As a result, the following portions of the Affidavit of Robert Lewis and Second Affidavit

of Robert Lewis must be stricken from the record:

**A.    <u>Affidavit of Robert Lewis</u>**

<u>Paragraph 5</u>: At the end of the first full paragraph the following should be stricken "and

sales of stocks, bonds and mutual funds beginning in 1994" along with paragraph 5(f). Each of

these statements represents that these are products offered by the Bank and conflicts with Mr. Lewis' deposition testimony on the same topic. (See Lewis Depo. Testimony at pages 35-38, 41, 103, 76, 95-98).

Paragraphs 12, 13 and 14: Should be stricken in their entirety. Lewis is relying on representations made by Kelly Myers, a witness identified as an expert by Plaintiffs and therefore the representations are hearsay and not based on personal knowledge. Further, these paragraphs reflect an interpretation, i.e., "opinion" of the data in the 1999 and 2001 surveys which cannot be offered by a witness who is not an expert . As a result, the 1999 and 2001 surveys should also be stricken as there is no foundation for their admissibility.

Paragraph 17: Entire paragraph should be stricken as statements are conclusory with no basis in fact.

Paragraph 22: Strike "Upon information and belief based on inquiries to the Secretary of State, a 1990 state registration by an apparently unrelated party expired because the owner did not renew it." Affidavits must be made on personal knowledge, not information and belief.

Paragraph 25: Strike "but does promote itself by other means that threaten dilution and confusion" as being a conclusory statement, not statement of fact. Also strike "some newspapers refer to it as Baystate, suggesting that it is still a very weak mark when applied to Baystate Financial." This is conclusory.

Paragraph 28: Strike entire paragraph because it is argumentative and not a representation of fact.

Paragraph 29: Strike entire paragraph and subparts. This entire paragraph contains conclusory allegations and relies on statements of Gerry Blodgett and Kelly Myers to support these conclusions. This is evidence that the statements were not made on personal knowledge.

The paragraph also makes statements of conclusions of law which are inappropriate in an affidavit, and in any event, there is no evidence that Mr. Lewis is a lawyer competent to attest to the status of the law.

**B.**  **Second Affidavit of Lewis**

Paragraph 3:  Strike "I believed at the time I signed the [PTO] declarations in support of each of the applications that the declarations were accurate and warranted and I continue to believe it today."  This is a conclusion and not a statement of fact.

Paragraph 4:  Strike entire paragraph.  This is a conclusory statement of Lewis' belief, not a statement of fact.

Paragraph 5:  Strike entire paragraph.  This is a conclusion and not a statement of fact.

Paragraph 9:  Strike entire paragraph.  This is a conclusion and a "belief" and not a statement of fact.

Paragraph 19:  Strike "The domain names were registered in good faith to identify source of services"; and "The Bank has received no inappropriate economic benefit at the expense of Bay State Financial from its domain name registrations, and had no improper intent."  Both of these statements are conclusory and not statements of fact.

> The Defendant,
> BAYSTATE FINANCIAL SERVICES, LLC.,
> By its attorneys,
>
>
> _____
> Christopher P. Litterio (BBO #551098)
> Maureen Mulligan (BBO#556482)
> RUBERTO, ISRAEL & WEINER, P.C.
> 100 North Washington Street
> Boston, Massachusetts 02114
> (617) 742-4200

Dated:  June 7, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon the attorney of record for plaintiff, James Donnelly, Esquire, Mirick, O'Connell, DeMallie & Lougee, LLP, 100 Front Street, Worcester, Massachusetts, 01608-1477 via mail and/or electronic service on June 7, 2006.

Maureen Mulligan

U:\MSM\Baystate Financial\pleadings\Memorandum in Support of Motion to Strike Lewis Affs.doc

# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BAY STATE SAVINGS BANK,<br>    Plaintiff<br><br>    V.<br><br>BAYSTATE FINANCIAL SERVICES, LLC,<br>    Defendant | CIVIL ACTION NO. 4:03-CV-40273-NMG |

### AFFIDAVIT OF ROBERT J. LEWIS

Robert J. Lewis on oath deposes and says:

1.      I am the president and CEO of Bay State Savings Bank ("Bay State"). This affidavit is submitted in support of Bay State's Motion for a Preliminary Injunction against Baystate Financial Services, LLC ("Baystate Financial").

2.      *Plaintiff has used the name Bay State Savings Bank® continuously since 1895 and is popularly known as Bay State®.* Bay State® was formed by special legislation entitled "An Act To Incorporate The Bay State Savings Bank" which is published as Ch. 107 of the Acts of 1895. Ex. 1.[1] It is a mutual corporation, meaning that ownership belongs to its depositors. This form of ownership emphasizes accountability to the community, rather than to remote stockholders whose interest is focused on investment returns and profitability.

3.      *Bay State® promotes consumer awareness by signage and trade dress at its headquarters and branch offices.* The headquarters is an attractive century-old building facing the Worcester City Common. Bay State® maintains six full service branch offices: four in

---

[1]    All exhibits are contained in a consolidated Appendix of Exhibits and referred to by number as "Ex. ___."

Worcester and one each in Auburn and Holden. It also maintains a loan center in Worcester and

a branch at Auburn High School during the school year. The branches all have consistent

architecture, color schemes, appearance and trade dress. All are attractively landscaped, and

provide parking. The Bay State® mark is prominently displayed at each location. Ex. 2.

    4.    *Bay State®'s primary geographic market consists of Worcester and the*

*surrounding communities, but its customers live in approximately 431 different postal zip codes*

*in Massachusetts, and in 29 other states.* It offers 24-hour telebanking and Internet banking

services to improve access for customers who are not located near Worcester.

    5.    *Bay State® provides a broad range of financial products and services.* At first,

this consisted of savings accounts and home mortgages. St. 1907, C. 561 authorized savings

banks to offer Savings Bank Life Insurance ("SBLI"). Bay State® has offered SBLI longer than

any of the current employees can remember. Available records show sales of SBLI dating to at

least 1962. Ex. 3. In addition to SBLI, the range of services has included savings bonds since at

least 1961; mortgage and disability insurance beginning in 1971; IRA, SEP and Keogh retirement

and educational accounts beginning in 1976; Investment Unit Accounts beginning in 1981; SBLI

Life Saver Annuities beginning in 1988; and sales of stocks, bonds and mutual funds beginning

in 1994.[2] The services that Bay State® has offered continuously since 1994 are as follows:

        a.    Thrift services with approximately 17 different kinds of savings and

            checking accounts, including IRA's, Roth and SEP retirement plans,

            Education IRA's and three kinds of Tax-Deferred Annuities, etc.;

---

[1]   All exhibits are contained in a consolidated Appendix of Exhibits and referred to by number as "Ex. ___."
[2]   Bay State's 1994 Annual Report states, in the Treasurer's Report section under the heading Alternative
Investment Program: "In late 1994, the Bank contracted with FIS Company (FISCO), an independent
broker/dealer to sell mutual funds and annuities in our branches. This program will provide customers with a
wider array of financial products to choose from while providing fee income to the Bank."

    b.    Consumer loan services with approximately 20 different loan programs including a broad variety of mortgages, construction loans, Title V septic loans, Affordable Housing Plan Mortgages, Equity and No-Equity lines of credit, auto loans, student loans, personal loans, Minuteman Plus Cash Reserve lines of credit, etc.;

    c.    Commercial loan services including a broad variety of commercial checking accounts, Entrepreneur and Non-Profit accounts, commercial and industrial loans, commercial real estate loans, SBA loans, letters of credit, equipment loans, etc.;

    d.    Insurance including SBLI, SBLI Annuities and mortgage life and disability insurance;

    e.    Consumer services including Visa Check Cards, Travelers Cheques, U.S. Savings Bonds, Money Orders, Bank By Mail Service, Direct Deposit of payroll, Social Security checks, and other pension checks, Safe Deposit Boxes, etc.; and

    f.    Investment services including purchases and sales of stocks, bonds and mutual funds, including services that Bay State® sponsored using the Minuteman Investment Services® mark from Jan. 2001 to Feb. 2002.

All such services were fully disclosed in Annual Reports, reviewed by state regulatory authorities and authorized by law. Ex. 4-A to 4-M.

    6.    *From January 1999 to February 2002, Bay State marketed its investment services using the Minuteman Investment Services® mark, but the relationship between Bay State® and*

*Minuteman was similar to that between Ford and Taurus.* Minuteman Investment Services®

was exclusively sponsored by Bay State®; sold by personnel located in Bay State® offices; and

target marketed primarily to Bay State® customers and the public at large. The ad that originally

introduced Minuteman Investment Services® states:

> Now The People Who Take
> Banking Personally
> Take Investing Personally, Too

> No two investors are alike. That's why *Bay State Savings Bank introduces Minuteman Investment Services.* You will receive personal, one-on-one investment advice from investment executive Daniel Chase. He will meet with you on a regular basis to analyze your current financial situation and develop a written investment plan for the future. . . .

> \*\*\*

> Minuteman Investment Services Securities offered through Infinex Investment, Inc. *located at Bay State Savings Bank, 28 Franklin St., Worcester.* Ex. 5-A. (emphasis added).

Another ad featuring the Bay State mark states "Minuteman Investment Services, *a division of Bay State Savings Bank,* will be holding an Investment Check-Up Workshop." Ex. 5-B. In many

such ads, the Bay State® mark is more prominent than Minuteman Investment Services®. In

February 2002, the bank informed Minuteman Investment Services® customers that the name

would change to Bay State Investment Services®. On May 1, 2002, the name change was

announced in ads in The Boston Globe and the Providence Journal. Ex. 5-C. (emphasis added).

7.    *Bay State® has advertised and promoted itself in newspapers and trade journals for 109 years.* Advertising expenditures have grown from $7,059 in 1960 (the first year in which

they are segregated) to as much $415,000. Since at least 1995, this has included statewide

advertising in The Banker & Tradesman. The total from 1960 to 1997, when Baystate Financial

incorporated, is approximately $2.7 million. Total to date including the 2004 budget exceeds $5.2 million. Current advertising and promotional activities include the following:

a.   Extensive print advertising in publications of local, regional and statewide circulation including the Worcester Telegram & Gazette, the Worcester Business Journal, The Boston Globe, Worcester Magazine, the Banker & Tradesman, The Landmark, the Catholic Free Press, the Auburn News, the Senior Advocate, the Jewish Chronicle, the Catalog of Homes, Home Source, etc. Examples of advertising and promotional publications dating from the 1920's are included in Ex. 6-A.

b.   Product literature prominently displaying the Bay State® mark which is distributed at all branches, and in connection with promotional events, etc. Ex. 6-B.

c.   Display ads in the yellow pages promoting Bay State® services and branch locations. Ex. 6-C.

d.   Radio advertising at all of the high power radio stations including WTAG, WXLO, WSRS and WSFX, whose listener areas include Boston, Brookline, Dedham, Norwood and Westwood, in addition to Central Massachusetts. Ex. 6-D.

e.   Direct mail advertising to customers and potential customers which prominently displays the Bay State® mark. Ex. 6-E.

f.   Sponsorship of a book entitled "WORCESTER: A Portrait Of Central Massachusetts" (1998) which includes a one-page history of Bay State®.

The article quotes then-president Patricia Naumnik as saying that Bay

State®: "remains firmly committed to offering a full package of financial

services that responds to the changing needs of our customers and is

delivered, using superior technology, by a professional staff. Our people -

our customers - are our future." Ex. 6-F.

8.    *In addition to paid advertising, Bay State has invested in community relations by*

*providing financial support for community organizations through a regular program of*

*charitable giving.*  The giving program is usually described in the Annual Reports, and reported

in the news media. In 1997, when Baystate Financial was incorporated, Bay State donated a total

of $38,400 to 91 organizations. Ex. 4-H at p. 31. The amount reflected in the Annual Statement

for 2002 is $127,000. Ex. 4-M at pp. 4-5. The amount reflected in Annual Report for 2003,

which has just been released and has not been included in the Appendix of Exhibits, is $135,578.

9.    *Bay State® has been featured in many unsolicited news articles reporting matters*

*of public interest*, including the appointment of community leaders to serve in various leadership

positions, and the bank's support of community activities. For example, it has received

"outstanding" community reinvestment ratings from the FDIC and the Office of the

Commissioner of Banks for making loans that serve the local community. Ex. 7-A. It has

received the Silver Hammer award for its effort and financial commitment to revitalize and

restore a downtown building in the City of Worcester, namely, the Bay State Savings Bank

Building. Ex. 7-B. These are just two examples. A selection of newspaper articles dating back

as far as the 1920's, which chronicle Bay State®'s contributions to the community, are included

in Ex. 7-C.

10.     *Bay State® has increased in size, prominence, sales and customers.* Assets have grown from $20,241 in 1895 to well over $245 million. As of 1997, when Baystate Financial incorporated, loans and deposits were $90.5 million and $115.6 million, respectively. Ex. 4-H.

11.     *The public commonly refers to the bank as "Bay State."* This is evidenced by correspondence from third parties, including real estate brokers who are a leading source of referrals for mortgage loans, customers and, even U.S. Senator John Kerry. Some specific examples include the following:

a.     "Call Reports Of State-Chartered Savings Banks" which refer to the bank as "Bay State." Ex. 8-A.

b.     A letter from U.S. Senator John Kerry congratulating Robert J. Lewis on becoming president of Bay State® addressed to "Bay State Bank." Ex. 8-B.

c.     The fact that Bay State® employees are commonly introduced to community and business groups as representatives of "Bay State." Ex. 8-C.

d.     A letter from Marcia Kringle of RE/MAX, a referral source in the real estate industry, thanking "Bay State Bank" for its sponsorship of the Greater Worcester Board of Realtors. Ex. 8-D.

e.     A letter from a customer addressed to "Bay State Bank" expressing thanks for the warm and sensitive assistance provided by a bank employee handling a transaction for two elderly customers. Ex. 8-E.

12.     *Consumer surveys in August of 1999 and 2001 show that the Bay State® mark is widely recognized and highly regarded.* The 1999 survey showed that 70% of the general population in Bay State®'s primary market recognize the Bay State mark, and 50% claimed to have seen or heard Bay State® ads. By 2001, the recognition factor had increased to 76%. Bay State's overall reputation ranked very high in both surveys, far surpassing the reputation of Fleet and Bank Boston. Its customer satisfaction in 2001 was the highest of any bank. The 1999 survey showed that Bay State customers had an above average appetite for stocks and mutual funds, that the proportions of their investments that are held at Bay State is higher than that of customers at other banks, and that they are more likely than customers of other banks to recommend the services of Bay State® to friends and family. Myers Aff., ¶¶7,10. Ex. 9 and 10.

13.     *The 1999 survey shows that Bay State® customers had a stronger appetite for stocks and bonds than the general population; kept half their total household investment dollars at Bay State®; and believed that the products and services were getting much better.* Over 80% said they would recommend Bay State® to others, a higher proportion than customers at other banks. Myers Aff., ¶6. Ex. 9.

14.     *The 2001 survey ratings for "products and services satisfaction" show that consumers view Bay State® as providing a wide range of financial services including stocks, bonds and mutual funds.* Some of the survey questions ask whether the bank: (1) "offers a wide variety of products and services to choose from"; (2) "informs you regularly about the specific products and services that are right for you"; (3) "offers one-stop shopping for all your financial services needs by providing non-traditional banking services, such as life insurance, mutual funds, stocks or bonds"; and (4) "offers professional financial planning and counseling." Bay

State® scored nearly 10 points higher than the combined average rating for all its competitors.
Myers Aff., ¶9. Ex. 10.

    15.    *Bay State® asserted common law trademark rights in 1999 in the case of Bay State Savings Bank v. Bay State Bancorp., 99cv12383-NMG, to successfully prevent another organization from using the names "Bay State" and "Bay State Bank."* The case arose when Bay State Federal Savings Bank of Brookline, MA became a publicly owned company named Bay State Bancorp and attempted to adopt the name "Bay State Bank." Bay State® brought suit to prevent it. As a result of negotiations in connection with a hearing on a Motion For Preliminary Injunction, Bay State Bancorp agreed that it would not use the name Bay State Bank; that it would return to its original name of Bay State Federal; that it would confine its use of that name to existing branches mostly located in Norfolk County; that it would not expand its geographic use of the Bay State Federal name; that it would adopt appropriate measures to prevent confusion; and that it would consent to Bay State®'s registration of the name. Bay State Bancorp subsequently merged into Compass Bank, and no longer uses the Bay State® name in any capacity.

    16.    *Bay State® obtained state and federal service mark registrations in 1999 and 2001, respectively.* Ex. 11-A to 11-M. All of the registrations are in International Class ("IC") 36, which includes insurance, financial affairs, monetary affairs, and real estate affairs.

    17.    *Bay State® used highly reputable trademark counsel to prosecute the trademark registrations on its behalf.* Gerry A. Blodgett, Esq. of Worcester represented the bank in the trademark applications. Mr. Blodgett specializes in Intellectual Property including trademarks and is licensed to practice before the PTO. There was no misrepresentation or fraud. See

Blodgett Aff.  The registrations resulting from the bank's and Mr. Blodgett's efforts include the

following:

| Mark | First Use | Federal Registration | State Registration | Services described |
|---|---|---|---|---|
| Bay State | 5/16/1895 | 5/15/01 | 10/14/99 | IC 036. US 100 101 102. G & S: Banking Services And Financial Services, Namely, Financial Investment In The Field Of Real Estate, Stocks, Bonds, Commercial Paper, And Other Securities, Financial Management And Planning And Financial Guarantee And Surety. |
| Bay State Savings Bank | 5/16/1895 | 5/22·01 | 7/20/99 | IC 036. US 100 101 102. G & S: Banking Services And Financial Services, Namely, Financial Investment In The Field Of Real Estate, Stocks, Bonds, Commercial Paper, And Other Securities, Financial Management And Planning, And Financial Guarantee And Surety. |
| Bay State Online | 7/5/01 | 10/1/02 | 11/14/01 | IC 036. US 100 101 102. G & S: Banking services provided by means of a global computer network. |
| Bay State Investment Services | 2/5/02 | 7/30/02 | 6/3/02 | Investment Services, namely, mutual fund brokerage and investment, annuity underwriting, brokerage in the field of stocks, bonds, life insurance and long term care insurance and insurance agencies and underwriting in the field of life insurance and long term care insurance, in Class 36 (U.S. Cls. 100, 101 and 102) |
| Bay State Bank | 5/30/03 | pending | 6/19/03 | IC 036. US 100 101 102. G & S: Banking services and on-line banking services; and financial services, namely, financial investment in the field of real estate, stocks, bonds, commercial paper, and other securities, financial management and planning and financial guarantee and surety |
| Bay State Savings Bank & Minuteman Head Design | 11/25/99 | 7/16/02 | 1/7/00 | IC 036. Us 100 101 102. G & S: Banking Services And Financial Services, Said Financial Services Being Namely; Financial Investment Advice And Brokerage In The Field Of Real Estate, Stocks, Bonds, Commercial Paper, And Other Securities; Risk Management Insurance And Annuity Brokerage; Brokerage Of Insurance Primarily Designed As An Investment And Investment Annuity Brokerage; Financial Management And Planning; And Financial Guarantee And Surety |
| Minuteman Investment Services | 1/10/01 | 7/16/02 | | Brokerage and investment, annuity underwriting and brokerage in the field of stocks and bonds. |

  18. *Baystate Financial incorporated on May 1, 1997.*  It is an agent for New England

Life Insurance Company and its affiliate, New England Financial Services.  Annual Reports

describe its business as providing "financial planning services and products."  Ex. 12.

19.    *On May 27, 1997, Baystate Financial filed a Massachusetts state service mark registration stating under oath that it first used the Bay State® mark for financial services on May 1, 1997.* It has not sought federal registration. The state registration is in IC 36, the same as Bay State®'s registrations. Ex. 13.

20.    *Baystate Financial uses the mark to promote products and services that are generally quite similar to those of Bay State®.* A comparison of services based on Baystate Financial's web site (Ex. 14) and Bay State®'s annual reports (Ex. 4) is as follows:

| **GENERAL SERVICES** | |
| --- | --- |
| **Baystate Financial** | **Bay State Savings Bank** |
| "Gathering data to help you determine your goals." | "take the time to understand your financial goals and dreams." |
| "Recommending specifically tailored solutions." | "Working with you, we will help develop a prudent, written plan to achieve your goals." |
| "Analyzing your current financial situation." | "help you understand all the financial options available to you, and how to integrate various elements into a results-driven plan." |

| **BUSINESS SERVICES** | |
| --- | --- |
| **Baystate Financial** | **Bay State Savings Bank** |
| *Executive Benefit Planning:* <br><br> • Deferred Compensation <br> • Group Carve-Out <br> • Individual Disability Insurance <br> • Split Dollar Life Insurance <br> • Selective Executive Retirement Plan | • Long Term Care <br> • Disability <br> • All Types of Life Insurance |
| *Business Continuation Planning:* <br><br> • Business Income Insurance <br> • Buy-Sell Arrangements <br> • Section 303 Stock Redemption <br> • Key Employee Insurance | • Life Insurance |
| *Tax-Qualified Retirement Plans:* <br><br> • Profit Sharing | |

| | |
|---|---|
| • Money Purchase<br>• Target Benefit<br>• Defined Benefit Plan<br>• Simplified Employee Pension (SEPs)<br>• SIMPLE IRA<br>• 401(k) Plan | • Simplified Employee Pension (SEPs)<br>• SIMPLE IRA<br>• 401(k) Plan |
| • *Employee Benefits Products:*<br><br>• Managed Care Medical Benefits<br>• Dental Insurance<br>• Group Life Insurance<br>• Short-term and Long-term<br>  Disability Insurance<br>• HMO's | • Disability Insurance |

| **INDIVIDUAL SERVICES** | |
|---|---|
| **Baystate Financial** | **Bay State Savings Bank** |
| • *Family Protection:*<br><br>• Permanent Life Insurance<br>• Term Insurance<br>• Variable Life Insurance<br>• Disability Income Insurance<br>• Long Term Care Insurance<br>• Estate Planning<br>• Charitable Giving | • Permanent Life Insurance<br>• Term Insurance<br>• Variable Life Insurance<br>• Disability Income Insurance<br>• Long Term Care Insurance<br>• Estate Planning<br>• Charitable Giving |
| • *Wealth Accumulation Strategies:*<br><br>• Mutual Funds<br>• Variable Annuities<br>• Managed Accounts (New England Securities<br>Investment Manager Program)<br>• Regular IRA/Roth IRA<br>• Education Funding<br>• Retirement Planning | • Mutual Funds<br>• Variable Annuities<br>• Managed Accounts<br><br>• Regular IRA/Roth IRA<br>• College Planning<br>• Retirement Planning |

21.     *Baystate Financial uses the mark in similar channels of trade.*  Through its "Bank

Affiliate Program," Baystate Financial sells its services through banks that are similar to Bay

State®, sometimes using the Bay State name to promote those services.  Baystate Financial states

there are nine such Affiliates.  They include Dean Bank of Franklin, MA; Marlborough Savings

Bank of Marlborough, MA; The Lowell Five Cent Savings Bank; United Cooperative Bank of

West Springfield; and Scituate Federal Savings Bank. Ex. 15.

22.    *Baystate Financial incorrectly alleges that predecessors in interest have used the*

*mark since 1983 and obtained a state registration in 1990.* Baystate Financial's state registration

states under oath that the mark was first used on May 1, 1997. Instruction on the application

clearly states that the applicant should report the first use by any predecessor affiliate. See Ex.

13. Upon information and belief based on inquiries to the Secretary of State, a 1990 state

registration by an apparently unrelated party expired because the owner did not renew it. Ex. 16.

23.    *On December 23, 2002, Bay State® notified Baystate Financial, in writing, to*

*discontinue use of the Bay State® mark.* Baystate Financial did not comply. Ex. 17.

24.    *On November 23, 2003, Baystate Financial announced a major expansion*

*including a 38-employee financial planning business located across the Worcester City Common*

*from Bay State®'s headquarters.* In newspaper coverage, Baystate Financial asserted that the

recent acquisition made it the largest financial planning operation in New England with 168

employees and annual sales of $176 million, and that the expansion will continue. Ex. 18.

25.    *Baystate Financial does not conduct paid advertising, but does promote itself by*

*other means that threaten dilution and confusion.* Until recently, its activities were confined to

Boston. Some newspapers refer to it as "Bay State," suggesting that it is still a very weak mark

when applied to Baystate Financial. Ex. 19.

26.    At least in its Worcester office, the principal signage is under the name of New

England Financial, for which it is an agent. The Baystate Financial mark is barely displayed. Ex.

20.

27.    The Boston Business Journal ("BBJ") recently observed that:

> Baystate Financial has been growing, *albeit under the radar*. However [Baystate Financial CEO David] Porter recently told the Boston Business Journal that "the next couple years will present solid growth opportunities - *and more recognition* - for Baystate Financial, as it looks to expand to Western Massachusetts and south toward Hartford." Ex. 21. (Emphasis added.)

28.   *Baystate Financial admits that the parties' present and proposed use of the Bay*

*State® mark will cause dilution and confusion.* Baystate Financial's counterclaim alleges that:

> The BAYSTATE Marks and Bank Marks are similar if not virtually identical. The dominant or core element of the respective marks is Baystate and Bay State. The only appreciable difference between the marks is a single space, an almost insignificant distinction. The parties' core marks sound the same and look the same, and therefore convey the same commercial impression to consumers. It is unlikely that consumers will be able to distinguish between the BAYSTATE Marks associated with Baystate Financial's long-standing and highly regarded financial services business and the Bank Marks representing the Bank's neophyte financial services offerings.

See Defendant's Counterclaim, ¶32.

29.   *Baystate Financial's allegations of fraud in the trademark application process*

*are incorrect.* The true facts (indexed against the false Counterclaim allegations to which they

relate) are as follows:

> a.   *The specimens included in the trademark applications were used in*
>
> *commerce in connection with the services described in the amended*
>
> *applications; and Bay State® was fully authorized to offer all such*
>
> *services.* Compare Counterclaim ¶¶ 38, 42, 47, 48. The authenticity and
>
> use of the specimens is confirmed in declarations supporting the
>
> applications. In the case of the Bay State Investment Service®
>
> application, the specimen is a promotional letter that Bay State® sent by
>
> mail to selected customers. Ex. 22. An advertisement for Bay State

Investment Services® was run in the newspapers at about the same time,
including ads in The Boston Globe and Providence Journal on May 1,
2002. Ex. 23. The services promoted in the letter are investment services
that involve interstate commerce, namely, selling stocks, bonds and mutual
funds that are publicly traded in the securities markets. According to Bay
State®'s trademark counsel, the specimens fulfill the requirement of
showing how the mark is used in commerce. See Affidavit of Gerry A.
Blodgett, Esq. ("Blodgett Aff.") at ¶¶12, 14, 16.

b.    *The applications correctly state that Bay State® has used the mark for*
      *banking and financial services since 1895.* To be sure, the range of
      services has expanded. Bay State® used the mark for all of the services
      identified in paragraph 5, above, from the date the services were
      introduced. The introduction of new investment services including stocks
      and mutual funds was announced in the 1994 Annual Report and passed
      review by state regulators. Compare Counterclaim ¶¶ 38, 42, 54. Counsel
      has advised that the recitations of services in the applications comply with
      application requirements. See Blodgett Aff., ¶15. Contrary to Baystate
      Financial's Counterclaim, federal law did not prohibit Bay State® from
      selling stocks, bonds and mutual funds prior to 1999. See General
      Counsel's Opinion No. 6, 48 Fed. Reg. 22989 (May 23, 1983).

c.    *Baystate Financial was not the senior user of the Bay State® mark.* Bay
      State® has used the mark continuously since 1895. The range of services
      and the dates they were introduced are detailed above in paragraph 5. The

1999 and 2001 surveys show that Bay State® has an excellent reputation, and that both customers and the general public regard the bank as offering a wide range of financial services. Compare Counterclaim ¶¶ 40(i), 45(i), 50(i) and 54(i). See Blodgett Aff., ¶¶4-10.

d.   *Bay State® had in fact been using the mark in commerce for the services described in the applications for more than five (5) years.* Compare Counterclaim ¶¶ 40(ii), 45(ii), 50(ii) and 54(ii). Counsel has advised that the descriptions were correct. See Blodgett Aff., ¶¶12-14.

e.   *The Bay State® mark had become distinctive of the banking and financial services described in the applications.* This is shown by the long history of use described above, and by the 1999 and 2001 consumer surveys. Bay State® sponsored, and surveys show a public perception that it sponsored, financial services including stocks, bonds, etc., even when the services were offered under the Minuteman® mark. Compare Counterclaim ¶¶ 40(iii), 45(iii), 50(iii) and 54(iii). See Blodgett Aff., ¶17.

f.   *Bay State® was not prohibited by law from offering investment services in the period from 1933 to 1999.* It could and did offer new and additional investment services including stocks and mutual funds beginning in 1994. Contrary to what Baystate Financial apparently believes, the Glass-Steagall Act of 1933 and the Bank Holding Company Act of 1956 did not prohibit state chartered banks such as Bay State® from selling such investments. See General Counsel's Opinion No. 6, 48 Fed. Reg. 22989

(May 23, 1983). <u>Compare</u> Counterclaim ¶¶ 40(iv), 45(iv), 50(iv) and 54(iv); Blodgett Aff., ¶15.

g.    *The Bay State Investment Services® application was based on "intent to use" the name.* Bay State® used the Bay State Investment Services® mark in commerce on the dates stated to the PTO. The distinctiveness of the Bay State® mark as to investment services is shown by surveys conducted in 1999 and 2001. Blodgett Aff., ¶¶16,17.

VERIFICATION

I, Robert J. Lewis, became the President of Bay State Savings Bank® in April 1999 and have personal knowledge of events from that time forward. Facts prior to that date are based on diligent investigations by Bay State® staff or attorneys. They are true to the best of my knowledge, information and belief, based on diligent inquiry.

Signed under pains and penalties of perjury this 24th day of March 2004.

Robert J. Lewis

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BAY STATE SAVINGS BANK,
     Plaintiff

     V.

BAYSTATE FINANCIAL SERVICES, LLC,
     Defendant

Civil Action No. 4:03-cv-40273-FDS

## SECOND AFFIDAVIT OF ROBERT J. LEWIS

Robert J. Lewis on oath deposes and states:

1.      I am the President and CEO of Bay State Savings Bank ("Bay State" or the "Bank"). Bay State is a mutual corporation that is operated for the benefit of its depositors under the laws that govern savings banks. There are no stockholders.

2.      On March 24, 2004 I filed an Affidavit and Exhibits in support of Bay State Savings Bank's Motion for Preliminary Injunction. I reaffirm that each of the statements made in that Affidavit are true and accurate. This Affidavit supplements my earlier statements and deposition testimony for purposes of the Bank's Motion For Partial Summary Judgment. It relies on exhibits that were submitted in support of the Motion for Preliminary Injunction, and also on the additional documents and transcripts that will accompany the Affidavit of John T. McInnes, Esq.

3.      As indicated in my earlier Affidavit, the Bank has obtained state and federal service mark registrations for Bay State®, Bay State Savings Bank®, Bay State Online®, and Bay State Investment Services®. The bank used the services of Gerry A. Blodgett, Esq., an experienced and reputable attorney who specializes in patents and trademarks. I consulted Mr. Blodgett and relied on his advice in all respects pertaining to the applications. I believed

at the time I signed declarations in support of each of the applications that the declarations were accurate and warranted, and I continue to believe it today.

4.    To the best of my knowledge, then and now, the Bank is the senior user of the Bay State® marks for banking and financial services, as described in my previous affidavit.

5.    I believed at the time I signed declarations that the descriptions of services for the Bay State® and Bay State Savings Bank® registrations were appropriate and justified, and I continue to believe it today.

6.    The descriptions for the Bay State Online® and Bay State Investment Services® registrations were prepared at a later date, and are slightly different from the earlier registrations. This is because the Bay State Online® and Bay State Investment Services® marks were intended for use with particular categories of products and services that were slightly different than the earlier registrations, although still within the same International Class 36 category of banking and financial services.

7.    For example, the Bay State Online® mark was intended for use in connection with Internet Banking services that applied Internet technology to traditional banking practices.

8.    Similarly, the Bay State Investment Services® mark was intended for use in connection with services that previously carried the sub-brand Minuteman Investment Services®. The Minuteman services had previously been offered under general sponsorship of the Bay State® marks, just as the Camry sub-brand is sponsored under the Toyota Motor Company trademark. For example, newspaper ads for Minuteman Investment Services included the Bay State® marks, and indicated that Bay State® sponsored the services.

9.    I believed at the time I signed the supporting declarations that the description
of services for each of the Bay State® applications was accurate and fully warranted, and I
continue to believe it today.

10.    My earlier affidavit describes (at ¶5) a list of services that the Bank now offers
and the dates they were introduced. The description is generally accurate, but there is one
issue I wish to clarify. The Bank first sponsored sales of stocks, bonds and mutual funds
starting in 1994 under an arrangement with a registered broker dealer named FISCO. The
Bank promoted FISCO's services using the Bay State marks, and the services were offered in
the Bank's branches, but FISCO provided the broker dealer services.

11.    The FISCO relationship terminated in approximately 1998, but the Bank
intended to (and did) replace FISCO after conducting due diligence to find an appropriate
replacement. The Bank entered a new relationship with a different broker dealer named
INFINEX in January 2000. The new relationship was in place, and the Bank was offering
stocks, bonds and mutual funds to its customers through INFINEX by the time those products
were added to the trademark applications. Even during the interim between FISCO and
INFINEX the Bank sold savings bonds and other securities including savings bonds,
retirement accounts and annuities. The Bank has been selling savings bonds to customers
since at least 1961, various retirement accounts since 1976 and SBLI Life Saver Annuities
since 1988.

12.    The Bank makes real estate investments for its own account in community
development and economic development projects. Examples of these investments include the
Harbor Point project in Boston and The Odd Fellows Project on South Main Street,
Worcester. The Bank also provides financing for various Community Development Corp.
("CDC") and other projects to create urban housing or promote economic development. The

Bank often publicly identifies itself as a lender or sponsor of these projects on signage and otherwise, especially where the projects serve community purposes.

13.    Throughout its existence, Bay State Savings Bank® has offered financial management and planning services at a very practical level. The Bank cultivates trusting relationships with customers. Customers often seek input and guidance from Bank personnel in a broad range of important financial decisions including home purchases, refinancing, retirement planning, college planning, etc.

14.    Bank personnel are trained to assist customers, and to undertake due diligence to assure that its products and services are suitable for the particular customer. This applies across the entire range of products and services.

15.    To give just one example, an annuity is a promise to pay a set sum of money to an individual. This is characterized in Massachusetts under the Banking Statutes as an insurance product, but annuities are also considered securities for certain purposes. Ex. 9, pg.53. Annuities are not suitable for all customers. Bank personnel obtain information about the customer's circumstances. They act as a conduit to the organization that offers the particular annuity. The Bank has sponsored and sold SBLI Life Saver Annuities since 1988 and annuities from other providers via FISCO and INFINEX.

16.    The Bank offers guarantee and surety services including letters of credit, performance bonds for infrastructure improvements and standing letters of credit for businesses that are required to furnish security to parties in various business and real estate development projects.

17.    The Bank sponsors the services of underwriters, including SBLI, when it offers their products to customers. The Bank performs due diligence, to determine the suitability of

investments to individual customers. It also takes applications and furnishes information to facilitate the underwriting process.

18.     Until 2001, SBLI products, including SBLI annuities, were sold directly by Bay State Savings Bank employees who were licensed for that purpose. Now, these activities are carried out by INFINEX under sponsorship by the Bank.

19.     The Bank has also registered various Internet domain names for use in connection with its Bay State Online® banking services. The domain names were registered in good faith to identify the source of the services. The Bank has received no inappropriate economic benefit at the expense of Bay State Financial from its domain name registrations, and had no improper intent.

20.     Baystate Financial's banking law expert, former Massachusetts Commissioner of Banks Michael C. Hanson, Esq., described in his deposition the rigorous examinations that are conducted by the Bank Commissioner's Office every 12 to 18 months. In Mr. Hanson's words, the examination teams include three to ten members, the process lasts up to two weeks, and the examiners inspect "everything" relating to the Bank's operation. The examinations of Bay State Savings Bank® have never criticized the Bank for offering products or services that were outside the scope permitted by state or federal law.

21.     My original affidavit estimated that the Bank's cumulative advertising expenses through 2004 were approximately $5.2 million. The total of 2005 expenses and the 2006 budget for advertising is over $900,000. Yearly advertising expenditures have now grown to as much as $631,000. Consequently, I estimate that the total amount the Bank has spent for advertising and promotions now exceeds $6.1 million.

Signed under the pains and penalties of perjury this 3rd day of May, 2006.

Robert J. Lewis