UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

BAY STATE SAVINGS BANK,
    Plaintiff

    V.

BAYSTATE FINANCIAL SERVICES, LLC,
    Defendant

CIVIL ACTION NO. 4:03-CV-40273-NMG

## RESPONSE OF BAY STATE SAVINGS BANK TO BAYSTATE FINANCIAL SERVICES, LLC'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AND COUNTERSTATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, Plaintiff Bay State Savings Bank ("Bay State®") submits the following response to Baystate Financial Services, LLC's (Baystate Financial") Statement of Material Facts and Counterstatement of Material Facts establishing that there are genuine issues to be tried on Plaintiff's claims. Many of the responses to Baystate Financial's Statement of Material Facts are addressed in Bay State Savings Bank's Counterstatement of Material Facts ("CMF"). To that extent, citations to Counterstatement paragraphs have been provided and citations to affidavits, depositions and other documents are provided in the Counterstatement.

<u>Response to Baystate Financial's Statement of Material Facts</u>

1.     Bay State® admits the allegations of this paragraph.

2.     Bay State® admits the allegations of this paragraph to the extent that Bay State® is a Massachusetts chartered mutual savings bank. Bay State® denies the remainder of the paragraph. CMF ¶4. In fact, Baystate Financial's cites to ¶¶ 5-6 of the Complaint to support the proposition that Bay State® "traditionally offered loan and deposit banking services; however,

the Complaint actually states that Bay State® has continuously offered banking and financial services for nearly 109 years. Complaint, ¶6.

3.    Bay State® denies the allegations of this paragraph. CMF ¶¶49, 50.

4.    Bay State® admits that Baystate Financial offers the stated products and services but denies that Baystate Financial offered any of the products and services prior to 1997. CMF ¶¶46, 49, 50.

5.    Bay State® admits that Baystate Financial offers the stated products and services but denies that Baystate Financial offered any of the products any of the products and services prior to 1997. CMF ¶¶46, 49, 50. Bay State® further states that Baystate Financial does offer traditional banking services in the form of money market accounts and through its bank affiliation programs. CMF ¶46.

6.    Bay State® is not in possession of information to confirm or deny the allegations of this paragraph.

7.    Bay State® admits the 1982 Desautels & Wilson Annual Report is accurately quoted.

8.    Bay State® is not in possession of information to confirm or deny the allegations of this paragraph.

9.    Bay State® admits that the Wilson, Bergstrom & Denton Agency obtained a Massachusetts service mark Registration for "Baystate Financial Services" on April 10, 1990, but denies that the mark is enforceable or that it purports to cover services beyond "the sale of insurance products and actuarial services and financial planning services." BSF[1] Ex. 3, CMF ¶¶58-63.

---

[1]    Any reference in this document to the Exhibits used in support of Baystate Financial's Motion for Summary Judgment shall be referred to as "BSF Ex. _____."

10.    Bay State® denies the allegations in this paragraph.  The Affidavits of Porter, Wilson and Denton in support of Baystate Financial's motion are self-serving and fail to refer to even one document in which the Bay State® mark was used in commerce.  BSF Ex. 2-4.  Even the letter attached to the Wilson Affidavit as Exhibit B was merely a letter from one Baystate Financial employee to another.

11.    Bay State® is not in possession of information to confirm or deny the allegations of this paragraph.

12.    Bay State® is not in possession of information to confirm or deny the allegations of this paragraph.

13.    Bay State® denies the allegations of this paragraph.  CMF ¶¶55-63.

14.    Bay State® denies the allegations in this paragraph.  CMF ¶¶55-63.

15.    Bay State® denies the allegations of this paragraph.  CMF ¶¶55-63.

16.    Bay State® denies the allegations of this paragraph.  Other than the self-serving statement in Porter's Affidavit, Baystate Financial has failed to produce even one document that evidences use of the Bay State® mark by Baystate Financial in commerce between August 1996 and January 2, 1997.  In any event, Baystate Financial admitted in its 1997 State Registration Application that its first use of the mark was May 1, 1997.  CMF ¶56.

17.    Bay State® denies the allegations of this paragraph.  CMF ¶55-63.

18.    Bay State® denies the allegations of this paragraph.  Exhibit B to the Porter Affidavit indicates that the Amendment to Certificate of Organization was filed on May 16, 1997.  BSF Ex. 2 (Exhibit B).

19.    Bay State® denies the allegations of this paragraph.  Porter's statement in that Baystate Financial continuously used the mark in commerce is self-serving and not substantiated

by the documentary evidence. Exhibits C-H to the Porter Affidavit consist of blank letterhead and a business card (both undated) neither of which appear to have been used in commerce and four undated brochures with no record of distribution to anyone. BSF Ex. 2 (Exhibits C-H).

20.    Bay State® admits that Baystate Financial registered the mark on May 19, 1997 but denies the remainder of the paragraph. CMF ¶¶55-63.

21.    Bay State® denies the allegations of this paragraph. CMF ¶¶55-63.

22.    Bay State® admits the allegations of this paragraph.

23.    Bay State® admits the allegations of this paragraph to the extent that Baystate Financial responded to Bay State®'s cease and desist letter but denies the remainder of the paragraph. CMF ¶¶43, 46.

24.    Bay State® admits the allegations of this paragraph.

25.    Bay State® admits the allegations of this paragraph.

26.    Bay State® admits the allegations of this paragraph.

27.    Bay State® denies the allegations of this paragraph. CMF ¶¶4-10. Baystate Financial takes Mr. Lewis' testimony completely out of context. Mr. Lewis was clearly only referring to Bay State®'s offering of financial services under the "Bay State Investment Services" mark and not the other Bay State® marks which were used at all times in the past for the offering of financial services. BSF Ex. 5, pp.116-117.

28.    Bay State® admits that Bay State® offers the stated services but denies they were all deposit related products. Bay State® further states that it also offered many non-deposit products such as stocks and mutual funds under the Bay State® name through affiliates. CMF ¶¶4-10.

29.    Bay State® admits the allegations of this paragraph.

30.    Bay State® admits the allegations of this paragraph.

31.    Bay State® admits that Lewis stated he was not aware of the details of these products.  Bay State® further states that SBLI Life Insurance and Annuities are financial products first offered by Bay State® in 1962 and 1988 respectively.  These products are clearly not deposit products and compete directly with Baystate Financial's primary business, life insurance.  CMF ¶46.

32.    Bay State® denies the allegations of this paragraph.  Robert Lewis stated at his deposition that Paul Gilbody may have information concerning Bank revenues.  BSF Ex. 5 (pp.96-97).

33.    Bay State® admits the allegations of this paragraph.

34.    Bay State® admits the allegations of this paragraph.  Bay State® further states that FISCO products were marketed under the Bay State® name.

35.    Bay State® denies the allegations of this paragraph.  The question of whether the FISCO sales from 1994-1998 were sufficient to establish first use is a material fact in dispute requiring a trial for resolution.  Bay State® further states that it was offering SBLI insurance and annuities during this time frame.  CMF ¶46.

36.    Bay State® admits the allegations of this paragraph.

37.    Bay State® denies the allegations of this paragraph.  Bay State® offered SBLI life insurance and annuities throughout the 1998-2001 timeframe.  CMF ¶46.  These financial products are non-deposit financial investments and were in direct competition with Baystate Financial's primary business, life insurance.  CMF ¶46.

38.    Bay State® admits that in 2001, Bay State® offered stocks, bonds and mutual funds through INFINEX.  Bay State® denies the remainder of the paragraph.  CMF ¶¶8-10.

39.    Bay State® admits the allegations of this paragraph. Bay State® further states that Minuteman Investment Services was a sub-brand of Bay State®, that Bay State® had joint employees with INFINEX, has advertised and promoted by Bay State®, sold to Bay State® customers and at Bay State® locations. CMF ¶¶4, 8-10.

40.    Bay State® denies the allegations of this paragraph. In fact, Bay State® did want its investment arm marketed under the Bay State® marks. BSF Ex. 5, p. 10.

41.    Bay State® admits the allegations of this paragraph.

42.    Bay State® admits that it realized income in the amount of $223,200 in 2006, but denies that the amount is not substantial.

43.    Bay State® admits the allegations of this paragraph.

44.    Bay State® admits that Mr. Lewis did not know the 2001-2002 revenue totals for Minuteman/Bay State®, but stated that he could "clearly get that number." BSF Ex. 5, p. 89.

45.    Bay State® admits the allegations of this paragraph.

46.    Bay State® admits the allegations of this paragraph. Bay State® further states the preliminary rejections by the PTO are a common occurrence and may be overcome by submitting an affidavit under Lanham Act §2(F), 15 U.S.C. §1052(F). CMF ¶34.

47.    Bay State® admits the allegations of this paragraph.

48.    Bay State® admits the allegations of this paragraph.

49.    Bay State® admits the allegations of this paragraph.

50.    Bay State® admits that it submitted declarations stating that the first use of the mark was at least as early as 1895 and denies the remainder of the paragraph. Bay State® submitted specimens that show use of the mark in connection with both banking services and financial services such as Savings Bank Life Insurance. BSF Ex. 14 at 709; Ex. 15 at 792.

51.     Bay State® denies the allegations of this paragraph. Bay State® began offering financial services as listed in its trademark application significantly earlier than 2003. CMF ¶46. Baystate Financial takes Mr. Lewis' remark out of context. He was only referring to financial services offered under Bay State Investment Services mark. BSF Ex. 5, pp. 116-117; 54-57.

52.     Bay State® denies the allegations of this paragraph. The specimens clearly show that Bay State® was offering savings bank life insurance ("SBLI"), among other things, which is a financial investment pursuant to guaranteed surety in international class 36. BSF Ex. 14 at 709; Ex. 15 at 792.

53.     Bay State® denies the allegations of this paragraph. Baystate Financial's own Statement of Material Facts (¶¶26-44) show that Bay State® clearly offered financial services prior to 2003 through its SBLI program, savings bonds and affiliation with FISCO. CMF ¶46.

54.     Bay State® denies the allegations of this paragraph. Bay State® further states that the Blodgett testimony cited by Baystate Financial is misleading. The testimony indicates that Blodgett did intend for the June 28, 2000 Amendments to suggest that Bay State® was offering all of the services listed, at least in the broad sense. BSF Ex. 8.

55.     Bay State® admits the allegations of this paragraph.

56.     Bay State® denies the allegations of this paragraph. Blodgett states that he does not know whether Bay State® was offering stock sales directly. BSF Ex. 8, p. 92. He merely points out that the description of the service in the Amendment is broad and likely includes other indirect participation in stock sales through bank loans. BSF Ex. 8, p. 91. Clearly, Bay State® was offering stocks, bonds and mutual funds as early as 1994. CMF ¶46.

57.     Bay State® denies the allegations of this paragraph. The trademark application for "Baystate Financial Services" specifically states that it is offering insurance services. The

"Bay State" and "Bay State Savings Bank" mark descriptions state that Bay State® offers "other securities" which encompass savings bonds and annuities. CMF ¶33.

58.    Bay State® admits the allegations of this paragraph.

59.    Bay State® denies the allegations of this paragraph. Baystate Financial takes Mr. Lewis' testimony out of context. He was clearly indicating that his knowledge of Baystate Financial was not gained until after Bay State® registered "Minuteman" and "Bay State Financial Services" in 2002. His "firsthand knowledge of Baystate Financial was later on that year when someone from Baystate Financial called on the bank." BSF Ex. 5, p. 113. Clearly, Baystate Financial has mistakenly inserted its parenthetical concerning the timing of the search and Mr. Lewis' knowledge about Baystate Financial. The search was conducted for the Minuteman registrations in 2002. BSF Ex. 5, p. 114. Baystate Financial fails to cite Mr. Lewis' full answer which indicates that he did not have any "firsthand" knowledge until later that year, over two years after the Amendment Declaration. BSF Ex. 5, p. 113-114.

60.    Bay State® denies the allegations of this paragraph. Bay State® was offering insurance products since 1962 and annuities in 1988 and has continued to do so until the present. CMF ¶42. Further, sales of stocks, bonds and mutual funds commenced in 1994. From late 1998 through early 2000, Bay State® outsourced the sale of securities while it changed broker dealers. CMF ¶7.

61.    Bay State® denies the allegations of this paragraph. Bay State® did secure state and federal registrations for the mark Bay State®. CMF ¶46.

62.    Bay State® denies the allegations of this paragraph. CMF ¶39.

63.    Bay State® admits the allegations of this paragraph.

64.    Bay State® admits the allegations of this paragraph.

65.    Bay State® admits the allegations of this paragraph.

66.    Bay State® denies the allegations of this paragraph. CMF ¶39.

67.    Bay State® admits that it did not obtain a license to directly sell general insurance products until July 19, 2001. However, Bay State® has been selling SBLI since 1962. CMF ¶42.

68.    Bay State® admits that its first use of the mark "Baystate Investment Services" to sell financial products was February 5, 2002. Further responding, Bay State® states that it has used the "Bay State" and "Bay State Savings Bank" marks to market and sell financial services since 1895. CMF ¶46. The registration of "Bay State Investment Services" and use of the Minuteman logo do not have any effect on Bay State®'s previous use of its mark.

69.    Bay State® denies the allegations of this paragraph. At the time that Bay State® submitted its Statement of Use for the "Bay State Financial Services" mark, it was marketing its financial services under the mark "Bay State" and its sub-brand, Minuteman. CMF ¶¶9, 10. Bay State®'s Statement of Use and declaration in support of its application were accurate and made in good faith. CMF ¶35. In fact, Baystate Financial's own expert admits that the Declaration and Statement of Use were made in good faith. CFM ¶40.

70.    Bay State® admits the allegations of this paragraph.

71.    Bay State® admits the allegations of this paragraph.

72.    Bay State® admits the allegations of this paragraph.

73.    Bay State® admits the allegations of this paragraph.

74.    Bay State® admits the allegations of this paragraph.

75.    Bay State® admits the allegations of this paragraph.

76.    Bay State® denies the allegations of this paragraph. Klien's statement does not indicate that the association percentage is weak. BSF Ex. 10, p. 98.

77.    Bay State® admits the allegations of this paragraph.

78.    Bay State® admits the allegations of this paragraph.

79.    Bay State® admits the allegations of this paragraph.

80.    Bay State® admits the allegations of this paragraph.

81.    Bay State® admits the allegations of this paragraph. Bay State® further responds that Klein's "experience" as an expert in this field, simple common sense, and evidence that consumed actually refer to Bay State® as "Bay State Bank" dictate that "Bay State Savings Bank" and "Bay State Bank" are interchangeable.

82.    Bay State® denies the allegations of this paragraph. Because "Bay State Savings Bank" and "Bay State Bank" are interchangeable, 38.6% of respondents make the association.

83.    Bay State® denies the allegations of this paragraph. Klien's survey question 1.3 specifically asks whether the respondent has used mutual funds, retirement plans, life insurance and other financial products. BSF Ex. 9. Baystate Financial fails to address this fact. BSF Ex. 10, p. 46.

84.    Bay State® admits that Klien was unaware that Bay State® was offering its financial investment products under the "Bay State Investment Services" starting in 2002.

85.    Bay State® admits the allegations of this paragraph.

86.    Bay State® admits the allegations of this paragraph.

87.    Bay State® admits the allegations of this paragraph.

88.    Bay State® admits the allegations of this paragraph.

89.    Bay State® admits the allegations of this paragraph.

90.    Bay State® admits the allegations of this paragraph.

91.    Bay State® admits that Dupont asked respondents of his secondary meaning survey the types of services that Merrill Lynch and Bay State® provide.  Bay State® denies the remainder of the paragraph.

92.    Bay State® denies the allegations of this paragraph.  The Court's decision concerning Bay State®'s Motion for Preliminary Injunction was made based on a completely different standard of review than that of Summary Judgment.  No conclusions can be drawn from it.

93.    Bay State® denies the allegations of this paragraph.  The purpose of the survey was for marketing; however, Meyers does not state that the survey cannot be used to determine secondary meaning.  BSF Ex. 11, p. 94.

94.    Bay State® admits the allegations of this paragraph.

95.    Bay State® denies the allegations of this paragraph.  Meyers states that he co-authored the design of the survey.  BSF Ex. 11, p. 57. Meyers independently evaluated the report that was directly based on the data.  BSF Ex. 11, p. 69.

96.    Bay State® denies the allegations of this paragraph.  Meyers stated that he understood "Bay State mark" to mean that "a private entity can establish a trademark name that is protected by law from others using it to their advantage or to their interest."  BSF Ex. 11, p. 72.

97.    Bay State® denies the allegations of this paragraph.  CMF ¶9.

Bay State®'s Counterstatement of Material Facts[2]

1.      The Bank has used the name Bay State Savings Bank® continuously since 1895 and is often referred to as Bay State Bank.  Lewis Aff., ¶¶2, 11; Ex. 8A-8E.

2.      It is headquartered in an attractive century old building facing the Worcester City Common and has branch locations in Worcester, Auburn and Holden.  The Bay State® Mark is prominently displayed at each location.  Lewis Aff., ¶3; Ex. 2; Ex. 6B.

3.      Bay States®'s primary geographic market consists of Worcester and the surrounding communities, but its customers live in approximately 431 different postal zip codes in Massachusetts and in 29 other states.  Lewis Aff., ¶4; Ex. 55A-55B.

4.      Bay State® provides a broad range of financial products and services.  At first this consisted of savings accounts and home mortgages.  St. 1907, c. 561 authorized savings banks to offer Savings Bank Life Insurance ("SBLI").  Available records show sales of SBLI dating to at least 1962.  Lewis Aff., ¶5; Ex 3.  In addition to SBLI, the services have included sales of savings bonds since 1960; mortgage and disability insurance by 1971; IRA, SEP and Keough retirement and educational accounts by 1976; Investment Unit Accounts by 1981; SBLI Life Saver Annuities by 1988; and sales of stocks, bonds and Mutual Funds from 1994 to 1998, and continuously since January 2000.  Lewis Aff. ¶5; 2d Lewis Aff.,¶¶ 10, 11; Ex. 4A-4M; Ex. 23A-23C.

5.      From January 2000 to February 2002, the investment services were identified as a sub-brand with the Minuteman Investment Services® mark.  Ex. 11K-11M; Lewis Aff.,¶6.

---

[2]     This Opposition is supported by the Affidavits of Robert J. Lewis ("Lewis Aff." and "2d Lewis Aff."), Gerry A. Blodgett, Esq. ("Blodgett Aff."), David L. Porter ("Porter Aff.") and R. Kelley Myers ("Myers Aff.") and an Appendix of Exhibits, Volumes I-IV (referred to as "Ex. _").  Due to the large number of Exhibits in the Appendix, and pursuant to the Court's recommendation, Volumes I-III were filed under separate cover in support of Bay State®'s Partial Motion for Summary Judgment, and Volume IV was filed at the same time as this Opposition.

6.    In the case of some products such as stocks, bonds and mutual funds, banks could not actually function as a broker dealer until 1998. However, banks could *sponsor* the sale of stocks, bonds and mutual funds under their own name and trademark through contractual arrangements with registered broker dealers. Baystate Financial itself provides broker-dealer services to banks that compete with Bay State®. Ex. 39, p.86:6-11; Ex. 40A-40C

7.    In 1994, the Bank entered a contractual arrangement with a registered broker dealer that sponsored the sale of stocks, bonds and mutual funds. 2d Lewis Aff., ¶10. As early as 1995, the Bank has conducted estate planning seminars sponsored by their broker dealer, FISCO. Ex. 56. Baystate Financial has sponsored such events and acted in a similar capacity for banks that compete with Bay State®. Ex. 40 A-40C. Such sales of stocks, bonds and mutual funds were interrupted from late 1998 to January 2000 because of a change in broker dealers, but have continued uninterrupted ever since. 2d Lewis Aff., ¶11.

8.    In January, 2000, Bay State® entered into an agreement with Infinex Investments, Inc. and Infinex Insurance Agency of Massachusetts Inc. ("the Infinex Agreement") whereby joint employees located at Bay State® banks would sell investment services, including securities and insurance. Ex. 37; 2d Lewis Aff., ¶ 11.

9.    The investment services sold pursuant to the Infinex Agreement were advertised and promoted by Bay State®. Ex. 5 A-C.

10.    The investment services were exclusively sponsored by Bay State®; sold by personnel located in Bay State® offices; and target marketed primarily to Bay State® customers. Lewis Aff., ¶6.

11.    The investment services were fully disclosed in Annual Reports and authorized by law. Lewis Aff., ¶5; Ex. 4A-4M; 23A-23C.

12.    Bay State® has advertised and promoted itself in newspapers and trade journals since 1895. Lewis Aff., ¶7; Ex. 6A-C; Ex. 6E-6F.

13.    Bay State ® has invested in community relations by charitable giving. Lewis Aff., ¶8; 2d Lewis Aff., ¶12; Ex. 4A-4M; Ex. 23A-23C.

14.    Advertising expenditures have grown from $7,059 in 1960 (the first year in which they are segregated) to as much as $631,000. Lewis Aff., ¶7; 2d Lewis Aff.,¶21. Since at least 1995, this has included statewide advertising in The Banker & Tradesman. Lewis Aff., ¶7. The total from 1960 to 1997, when Baystate Financial incorporated, is approximately $2.7 million. Id. Total to date including the 2006 budget exceeds $6.1, without counting the charitable donations of several hundred thousand dollars. 2d Lewis Aff., ¶21. The advertising and promotional expenditures prior to the incorporation of Baystate Financial in 1997 and prior to the Wilson Agency's alleged first use in 1983 are $3,263,693 and $1,067,385 respectively. Ex. 41

15.    Bay State® has been featured in many unsolicited news articles reporting matters of public interest, including the appointment of community leaders to serve in various leadership positions, and the bank's support of community activities. Lewis Aff. ¶9; Ex. 7A-7C.

16.    Bay State® has increased in size, prominence, sales and customers. Assets have grown from $20,241 in 1895 to over $245 million in 2003. Lewis Aff., ¶10. In 1997, when Baystate Financial incorporated, loans and deposits were $90.5 million and $115.6 million, respectively, (total assets were $206.1 million). Lewis Aff., ¶10; Ex. 4H. They presently exceed $284 million.

17.    Consumer surveys in August of 1999 and 2001 showed that the Bay State® mark was widely recognized and highly regarded. Lewis Aff., ¶12; Meyers Aff., ¶¶7, 10; Ex. 9, 10.

14

18.    The total proportion of the survey population who recognized the Bay State® mark was 70% in 1999 and 76% in 2001. Lewis Aff., ¶12; Meyers Aff., ¶¶7A, 10A; Ex. 9, pp. 7-8; Ex. 10. Half reported that they had seen or heard Bay State® ads. Lewis Aff., ¶12; Meyers Aff., ¶7C; Ex. 9, p.2, 9-10; Ex. 10.

19.    Bay State®'s favorability ratings far surpassed those of larger competitors such as Fleet and Bank Boston. Lewis Aff., ¶12; Myers Aff., ¶¶7D, 10B; Ex. 9, pp.2, 11; Ex. 10, pp.2-3, Chart 7.

20.    Bay State®'s rating for "products and services satisfaction" shows that consumers view the bank as providing a wide range of financial services. Meyers Aff., ¶¶7E, 10E; Ex. 9, pp.23-24; Ex. 10, p.10; Chart 26; Blodgett Aff., ¶5; Ex. 38, p.5.

21.    The 1999 survey shows that Bay State® customers had a stronger appetite for Mutual Funds than the general population; kept half their household investment dollars at Bay State®; and believed that the products and services are improving. Meyers Aff., ¶¶7F-I; Ex. 9, pp.3, 23-24, 27-30. Over 81% of customers would recommend Bay State® to others, a higher proportion than customers of other banks. Meyers Aff., ¶7J.

22.    The 2001 survey contains similar information, and shows that customers associate Bay State® with a wide range of financial services including insurance, mutual funds and bonds. Myers Aff., ¶10E; Ex. 10, p.10, Chart 26; Blodgett Aff., ¶5; Ex. 38, p.5.

23.    A survey by Robert Klein, that was conducted for this lawsuit, asked whether the respondents associated the words "Bay State" with any particular financial organization, 38.6% responded "Bay State Savings Bank" or "Bay State Bank." Ex. 30, p.2.

24.    The total number of respondents who associated the Bay State® marks with Bay State Savings Bank®, prior to adjusting for a control group, was 40.2%. Ex. 30, p.9.

25.    J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR

COMPETITION, which Baystate Financial's trademark expert, Lawrence R. Robins, Esq.,

describes as an authoritative publication that is routinely used and relied on by trademark

practitioners – including Mr. Robins, who cites MCCARTHY repeatedly in his report and

endorsed it in his deposition[3]– defines the survey standard as follows:

> Most cases state that it is only necessary that a "substantial part" of the buying
> class makes such an association. It is apparent that "it is only necessary to show
> that a *substantial segment* of the relevant group of consumers made the requisite
> association" between the symbol and the source to prove secondary meaning.
> Other courts have used the term "appreciable number" of the relevant customer
> class. Id., §15.45 at nn. 1-3 (citations omitted).

Elsewhere, MCCARTHY explains that "An 'appreciable' number is not necessarily a majority,

and in fact can be much less than a majority." Id., §32:185 at n. 2.  Courts look not just at the

percentage of respondents who identify the mark with the source, but also the actual number of

people when the percentage is projected to the relevant population.

26.    The sample of respondents for the secondary meaning survey was selected from

people who live or work in the towns of Worcester, Auburn and Holden, where the Bay State®

branches are physically located  Ex. 30, p.7.  The total number of people who reside in those

towns is 208,942. Ex.42. The number who work in those towns, some of whom reside

elsewhere, is 100,308.  Id.  Thus, even taking the conservative 38.6% figure for unaided

recognition of the Bay State® Marks includes up to 80,652 residents and 38,197 workers in

those communities. Id. This evidence of Consumer recognition goes beyond the borders of those

three towns to include other consumers in other communities. Lewis Aff.,¶4. Ex. 55A-B. The

---

[3]    Robins cites McCARTHY several times in his report, and testified at his deposition that this is an
"authoritative" treatise that he and other trademark practitioners regularly rely on. He considered McCARTHY
more authoritative than his own testimony. Ex. 58, pp. 13:9-14:2.

Klein survey also shows that over 22% of consumers who view Baystate Financial's website are likely to think that it is affiliated with or sponsored by Bay State Savings Bank®. Ex. 30, p.6.

27.    Baystate Financial's only evidence of consumer perceptions is the survey of Thomas Dupont. Ex. 35. Mr. Dupont's survey asked respondents whether they associated the words "Bay State" with any particular business (Ex. 35, p.7.), but failed to direct their attention to banking or financial services. Even so, his survey found that 28.9% associated the mark with Bay State Savings Bank® or Bay State Bank. Id.

28.    Mr. Dupont also found that 66.3% of survey respondents had heard of Bay State Savings Bank®. Ex. 35, p.9. By way of comparison, 88.9% had heard of Merrill Lynch. Id. Mr. Dupont selected Merrill Lynch for comparison because he considered it to be the most famous of all financial service providers. Ex. 43, p.41:1-13. According to Mr. Dupont's analysis, Bay State Savings Bank® has attained 75% of the name recognition of Merrill Lynch.

29.    Mr. Dupont's, secondary meaning survey for use in this litigation purports to show that only 8.9% of respondents were aware of Bay State® and associated it with insurance or investment services, but this calculation is misleading. Ex. 35, p. 5; See ¶32, below. Dupont's survey and conclusions are fatally flawed because the questions fail to specify the category of services at issue. Ex. 57, p. 3. This distinction is fundamentally necessary for any valid secondary meaning survey. MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION Fourth Edition §14:9. Therefore, Dupont's 8.9 % figure has no scientific value when determining secondary meaning.[4]

30.    In contrast, when Dupont asks whether respondents have ever heard of Bay State Savings Bank, 66.3% of them responded "yes." Ex. 35, p. 9. This establishes a figure that is 75%

---

[4]    Klien submitted a Supplemental Report dated June 2, 2006 addressing the information and conclusions of the Dupont Report. Ex. 57.

of the awareness of the most well known financial institution Dupont could identify, Merrill

Lynch. Ex. 57, p. 4. This is a significant measure of recognition in the Worcester area and

supports Bay State®'s claim of secondary meaning.

     31.    Dupont's survey fails to accurately assess the number of respondents that

associated Bay State® with a particular service. Ex. 57, p.3. Any respondent that answered

"banking" or "banking services" and did not clarify their answer concerning one of the listed

categories was coded as "None/Don't Know." This is misleading as to the respondent's answers

and does not shed any light on the issue of confusion. Ex. 57, p. 5; Ex. 43,p. 50:5-20. Klein's

confusion survey provides ample evidence on this point.[5]

     32.    Dupont's conclusions are further flawed because he mistakenly eliminates

respondent answers that refer to "Bay State Bank" and only counts the answers "Bay State

Savings Bank." He reasons that respondents may have been referring to Bay State Federal

Savings Bank. Ex. 57, p. 5. However, his deposition testimony reveals that he was told by

defendant's counsel to assume that Bay State Federal operated in Worcester. Bay State Federal

never operated a bank remotely close to Worcester County, no longer uses the name "Bay State",

(Ex. 43, p. 23:6-24:16, p. 25:15-17.) and Bay State Savings Bank is commonly referred to as

"Bay State Bank." Ex. 43, p. 30:3-9. Bay State Federal Savings Bank only did business in the

Brookline area, and discontinued the use of its name not long after settling a trademark dispute

---

[5]   Klein also concluded a likelihood of confusion survey for use in this lawsuit. Ex. 30. The confusion survey shows that over 22% of consumers who view Baystate Financial's website are likely to think that it is affiliated with or sponsored by Bay State Savings Bank®. Ex. 30, p.6. This is important in two respects. First, the website is relatively clear about the identity of Baystate Financial, so the likelihood of confusion would logically be much less than with other forms of promotion such as the radio show that Baystate Financial sponsors in the Worcester area where listeners respond only to the spoken word. Second, confusion is not limited to situations where consumers believe that Baystate Financial and Bay State Savings Bank® are one and the same. It includes situations where they perceive sponsorship or affiliation between the two organizations. Lanham Act §43(a), 15 U.S.C. §1125(a).

with Bay State Savings Bank® several years ago.  Ex. 59.  His theory that respondent may have

been referring to Bay State Federal is not supported by any objective data. Ex. 57, p. 5.

33.     Bay State® obtained state and federal service mark registrations in 1999 and

2001, respectively.  They include, among others:

| Mark | First Use | Federal Registration | State Registration | Services described |
|------|-----------|----------------------|--------------------|--------------------|
| Bay State | 5/16/1895 | 5/15/01 | 10/14/99 | IC 036: Banking Services And Financial Services, Namely, Financial Investment In The Field Of Real Estate, Stocks, Bonds, Commercial Paper, And Other Securities, Financial Management And Planning And Financial Guarantee And Surety. |
| Bay State Savings Bank | 5/16/1895 | 5/22/01 | 7/20/99 | IC 036: Banking Services And Financial Services, Namely, Financial Investment In The Field Of Real Estate, Stocks, Bonds, Commercial Paper, And Other Securities, Financial Management And Planning And Financial Guarantee And Surety. |
| Bay State Online | 7/5/01 | 10/1/02 | 11/14/01 | IC 036: US 100, 101, 102. G & S Banking services provided by means of a global computer network. |
| Bay State Investment Services | 2/5/02 | 7/30/02 | 6/3/02 | IC 036: Investment Services, namely, mutual fund brokerage and investment, annuity underwriting, brokerage in the field of stocks, bonds, life insurance and long term care insurance and insurance agencies and underwriting in the field of life insurance and long term care insurance. |

Lewis Aff., ¶17.

34.     The Patent and Trademark Office ("PTO") initially rejected the applications on

the ground that "Bay State" is geographically descriptive.  Ex. 11B, pp. 00710-00713.  But

preliminary rejections of applications at an early stage are a common occurrence.  Applicants

may overcome such rejections by submitting affidavits under Lanham Act §2(f), 15 U.S.C.

§1052(f),[6] attesting that an otherwise descriptive mark *has become distinctive* because the

applicant has used it for at least five years.  This is precisely what Bank president Robert S.

---

[6]    Lanham Act §2(f) states in relevant part that, notwithstanding the general prohibition in §2(e) against
registering a geographically descriptive mark that is not distinctive: "... nothing in this chapter shall prevent the
registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce.
The Commissioner may accept as prima facie evidence that the mark has become distinctive, as used on or
primarily in connection with the applicant's goods in commerce, proof of substantially exclusive and
continuous use thereof as a mark by the applicant in commerce for five years before the claim of distinctiveness
is made."

Lewis did in connection with the Bay State® applications.[7]  Ex. 11B, pp. 00775-00776.

MCCARTHY explains the effect of a §2(f) affidavit as follows:

> If a mark was registered by the [PTO] by acceptance of proof of secondary meaning under §2(f), then this constitutes a *strong administrative presumption* that the mark is in fact distinctive and a valid trademark. The presumption to which a §2(f) registration is entitled is not that the designation is inherently distinctive, but that it had acquired secondary meaning as of the date of registration. Id. at §15.35 (citations omitted, emphasis added).

35.    The applications were handled by Gerry A. Blodgett, Esq., a reputable patent and experienced trademark attorney. Lewis Aff., ¶17; 2d Lewis Aff., ¶3; Blodgett Aff., ¶2; Ex. 38, p.4.

36.    The Bay State® and Bay State Savings Bank® applications state that the Bank had been using the mark for "BANKING AND FINANCIAL SERVICES TO CONSUMERS AND BUSINESSES" in International Class ("IC") 36 since 1895.[8]  Ex. 11A, 11B, p.00703, 11C, 11D, p.00785, 11L, p.00967; Blodgett Aff., ¶2; Ex. 38, p.4.

37.    The description of services had been amended in good faith by July 18, 2000 at the PTO's suggestion to add "FINANCIAL INVESTMENT IN THE FIELD OF REAL ESTATE, STOCKS, BONDS, COMMERCIAL PAPER, AND OTHER SECURITIES FINANCIAL MANAGEMENT AND PLANNING, AND FINANCIAL GUARANTY AND SURETY," all in IC 36. Blodgett Aff., ¶2; Ex. 11B p.00762, 11D p.00851,11L p.01003; Ex. 38, p.4.

38.    Bay State® relied on Mr. Blodgett in all respects. Lewis Aff., ¶17; 2d Lewis Aff., ¶3.

---

[7]    The assertion that the Bank had used the mark for more than five years was an understatement. It had used and advertised the mark since 1895.

[8]    International Class ("IC") 36 includes:  Insurance, financial affairs, monetary affairs, and real estate affairs.

39.    The declarations supporting the trademark applications were made in good faith.
Bay State® President Robert J. Lewis believed when he signed the declarations, and still
believes now, that the declarations were true and correct.  2d Lewis Aff., ¶3.  The same is true of
the Internet domain name registrations.  2d Lewis Aff.,¶19.

40.    Baystate Financial's trademark expert, Lawrence R. Robins, Esq., testified that he
saw no evidence of bad faith or misrepresentation in the applications for the Bay State® marks.
Ex. 24, p. 36:23-37:18; Ex. 33.

41.    He was asked to review Mr. Blodgett's report and Affidavit to identify areas he
did not agree with.  Mr. Blodgett's report represented that the applications were in good faith.
Mr. Robins did not take issue with that assertion and testified that he found no indication of bad
faith or misrepresentation.  Ex. 24, p. 6:2-8, p. 36:23-37:18; Ex. 33; Ex. 38

42.    Bay State® was not prohibited from offering insurance and investment products
because of federal banking legislation.  Lewis Aff. ¶5.  See ¶¶43-47, below.

43.    Baystate Financial's banking law expert, former Massachusetts Banks
Commissioner Michael C. Hanson, Esq., testified that the Bank could properly offer all the
services described in Mr. Lewis' Affidavit from the date the affidavit says the services were
introduced including SBLI life insurance since 1962, mortgage life and disability insurance since
1971, retirement and educational savings plans since 1976, SBLI annuities since 1988 and stocks
and bonds since 1994. Ex. 25, p.28:1-13, p.28:14-30:19, p.31:2-33:1, p.33:2-34:8. Ex. 44,p.35:5-
13.

44.    In addition, the Bank Commissioner's Office imposed rigorous inspections every
12 to 18 months that would have detected irregularities, but there were no irregularities at Bay
State Savings Bank®.  Ex. 25, p.42:2-44:17; 2d Lewis Aff., ¶20.

21

45.    Inspections are conducted by a team of three to ten examiners, and the inspections last for about two weeks.  They encompass every aspect of banking operations.  Mr. Hanson personally supervised that process during his term as Commission of Banks.  2d Lewis Aff., ¶20; Ex. 44, p. 42:2-45:9.

46.    Bay State Savings Bank® has used the Bay State® and Bay State Savings Bank® Marks continuously since 1895.  The following chart depicts the dates on which Bay State Savings Bank®, Baystate Financial and Baystate Financial's alleged predecessor, the Wilson Agency, introduced the services at issue in this case:

| Year | Bay State Savings Bank® | The Wilson Agency | Baystate Financial |
|------|------------------------|-------------------|--------------------|
| 1895 | Savings Accounts, Home Mortgages And Financial Planning Services.  Lewis Aff., ¶5. | | |
| 1961 | Savings Bonds.  Lewis Aff., ¶5. | | |
| 1962 | Savings Bank Life Insurance.  Lewis Aff., ¶5. | | |
| 1971 | Mortgage Life And Disability Insurance.  Lewis Aff., ¶5. | | |
| 1976 | IRA, SEP And Keogh Retirement And Educational Plans.  Lewis Aff., ¶5. | | |
| 1981 | Investment Unit Accounts.  Lewis Aff., ¶5. | | |
| 1982 | | Life Insurance, IRA, SEP And Keogh Retirement And Educational Accounts And Financial Planning Services.  Wilson Aff., ¶9. | |
| 1988 | SBLI Lifesaver Annuities.  Lewis Aff., ¶5. | | |
| 1994 | Stocks, Bonds And Mutual Funds Through A Registered Broker Dealer.  Lewis Aff., ¶5. | | |

| | | | |
|---|---|---|---|
| 1997 | | | Life Insurance, IRA, SEP, Keogh Retirement, Educational And Investment Accounts Including Stocks, Bonds, Mutual Funds And Financial Planning Services. Porter Aff., ¶10, Ex. E |
| 2001 | | | Joint Marketing Agreement with Fidelity Co-Operative Bank authorizing Baystate Financial Representatives to offer Investment Accounts to Fidelity costumers. Ex. 40C. Baystate Financial has since executed similar agreements with other "Traditional Banking Institutions" Ex. 39; Ex. 40A-40B. |

47.    Bay State Savings Bank® has publicly promoted the products listed above. They are listed in its annual reports. Ex. 11, A-M; Ex. 22, A-C. The Bank consistently received very favorable ratings on its examinations. It has never been cited for a violation. 2d Lewis Aff., ¶20.

48.    The only area in which the Wilson Agency even arguably introduced a service before Bay State Savings Bank® was the sale of tax shelters, not stocks, bonds and mutual funds. Wilson Aff., ¶9. However, the Wilson Agency mainly concentrated on life insurance. "Investment" products accounted for no more than ten or fifteen percent of its sales. Ex. 45. p.28:18-30:16.

49.    Baystate Financial did not exist until approximately April 1997. Porter Aff., ¶3, Ex-A; Ex.13. At that point, it commenced the sale of life insurance (which accounts for more

than a majority of its business), retirement products and investments. Retirement products and investments are the smallest category of products and services. Ex. 26, p.34:3-22.

50.    Baystate Financial stated under oath, in its Massachusetts service mark application, that it first used the Bay State® mark for financial services on May 1, 1997. Ex. 13; Ex. 26, p.12:24-14:5.

51.    The registration is in IC 36, the same as Bay State®'s registrations. Ex. 13.

52.    Baystate Financial filed the application without first conducting a search, (Ex. 28), and claims that it did not know of Bay State Savings Bank® at the time. Ex. 26, p.55:4-20. It has not sought federal registration. Lewis Aff., ¶19.

53.    According to its own expert, Thomas D. Dupont, Baystate Financial's use of the Baystate name has not acquired secondary meeting. Ex. 27, p. 27:11-17.

54.    Its Rule 30(b)(6) witness David Porter indicated that Baystate Financial does very little advertising, that advertising expenditures were less than $10,000 last year, and it doesn't use an advertising agency. Ex. 26. p. 50:7-10, p. 62:12-14

55.    Baystate Financial claims to have the benefit of a state registration for the Baystate mark filed in 1990. Bay State® denies that any conveyance of the mark was made to Baystate Financial from any predecessor in interest. Lewis Aff. ¶22. See ¶¶56-63, below.

56.    Baystate Financial incorrectly alleges that predecessors in interest have used the mark since 1982 and obtained a state registration in 1990. This is contradicted by its state service mark application, which asserts under oath that Baystate Financial first used the Baystate mark on May 1, 1997. Ex. 13.

57.    The Wilson Agency Annual Report for 1982 portrayed itself mainly as a provider of insurance, retirement, educational and financial planning services. The Bank preceded the

24

Wilson Agency in all these areas. The description of the "Investment Department" focuses mainly on tax shelter sales, without any reference to stocks, bonds and mutual funds. Ex. 46, pp.18-19. There is no evidence of any written promotional materials that circulated to consumers.

58.    The Wilson, Bergstrom & Denton Insurance Agency (the "Wilson Agency") of Boston obtained a state registration for the name Baystate Financial Services in 1990, but a letter from its attorney warned that "registration of the name really is only proof that you have been using it. Were someone to come along who has been using this name since some date prior to you, they could theoretically stop you even they have not registered it". Ex. 28; Ex. 36; p.14:6-14.

59.    In any event, the 1990 registration expired in 2000 because the Wilson Agency did not renew it. Lewis Aff., ¶22; Blodgett Aff. ¶8; Ex. 16; Ex. 38. p.6

60.    In December 2003 the Wilson Agency purported to assign the expired registration to New England Life, but New England Life has not attempted to transfer the expired rights to any other party. Ex. 36, p.10:8-12:16; p.18:16-19:10.

61.    Baystate Financial is an independent agency and is not affiliated with New England Life. Ex. 26, p.14:21-15:7, p.16:14-17:1; Porter Aff., ¶3.

62.    Baystate Financial incorrectly asserts that it acquired the rights of the earlier Baystate Financial Services. Its Rule 30(b)(6) witness, David C. Porter, was asked to describe the assets that Baystate Financial acquired when it started business in 1997. Ex. 26, p.22:22-23:4. His list did not include rights to the Baystate Financial Services mark. It only included physical assets. Ex. 26, p. 23:11-17.

63.     He said that Baystate Financial has no documents evidencing the acquisition of any such rights to the Baystate name.  Ex. 26, p.23:5-10.

64.     On December 23, 2002, Bay State® notified Baystate Financial, in writing, to discontinue use of the Bay State® mark.  Ex. 17.  Baystate Financial did not comply.  Lewis Aff., ¶23.  It only learned of Baystate Financial when Baystate Financial established a small one-person office in Worcester early in 2003.  Ex. 54, p. 113:13-22.

65.     On November 23, 2003, Baystate Financial announced a major expansion including a 38-employee financial planning business located across the Worcester City Common from Bay State®'s headquarters.  The announcement asserts that the expansion made Baystate Financial the largest financial planning operation in New England with 168 employees and annual sales of $176 million, and that expansion will continue.  Lewis Aff., ¶24; Ex. 18.

66.     Baystate Financial does not conduct paid advertising but does promote itself by other means that threaten dilution and confusion.  Until 2003, its activities were confined to Boston.  Some newspapers misidentify it as "Bay State®" suggesting that the Baystate name is not well recognized.  Ex. 19; Lewis Aff., ¶25.

67.     Baystate Financial holds seminars for retirement planning.  This is an area in which Bay State® also operates.  Ex. 47A-47C.  However, Bay State® preceded Baystate Financial in this area of service by 21 years.  Lewis Aff.,¶5; Porter Aff.,¶10, Ex-A.  The invitations for Baystate Financial's seminars are sent to potential attendees in the Worcester County area and are conducted in facilities that are in the same geographic market in which Bay State® conducts its business.  Ex. 47A-47C.  Confusion is more likely than not considering the geographic area and similarity of name.

68.    Baystate Financial also promotes itself by distributing promotional materials in the same geographic market as Bay State® for the same or similar services. For example, Baystate Financial distributed a flier in Auburn, just miles from one of Bay State®'s branches that advertised many of the services provided by the bank, including but not limited to Mutual funds, IRA's and insurance and retirement planning. Ex. 48.

69.    The Bank's receptionist, Mary F. Gaudet, has testified that she has experienced instances of confusion where she has taken phone calls from members of the public who believe they are calling Baystate Financial. Ex. 49, pp. 4:9-6:18. She has stated that she receives these phone calls 3-4 times per month. On some occasions, she has been informed that those who are calling her had received a phone number to Bay State® from the telephone operator. Id.

70.    Bay State® has mistakenly received correspondence intended for Baystate Financial at the Bank's address. In one example, Robert Lewis, president of Bay State® received advertisement from the Fallon Clinic. The sender was under the false impression that Mr. Lewis was employed with Baystate Financial Services. Ex.50. In another example, Bay State® was mistakenly sent an invoice for services that was meant for Baystate Financial  Ex. 51.

71.    Baystate Financial is currently promoting itself through one of its broker dealers, Fidelity Bank. There is a large billboard reading "Bay State" at that facility, despite the fact that Bay State® has no affiliation with either Fidelity Bank of Baystate Financial. Ex. 52

72.    Attorney for Bay State®, James C. Donnelly, Jr., Esq., recently received an electronic communication through Internet Law Today that was under the impression that Attorney Donnelly represents Baystate Financial. This entity was looking to communicate with Attorney Donnelly as legal counsel for Baystate Financial in connection with an alleged securities fraud investigation of Baystate Financial. The message states in part: "The Securities

27

Fraud Prevention Organization…is currently investigating your client, their bank and insurance services department and how they relate to the unregistered sale of inter and intra state securities." The communication was intended for Baystate Financial, not the Bank. Ex. 53.

73.    At least in its Worcester office, the Baystate Financial mark is barely displayed. Lewis Aff., ¶26; Ex. 20.

74.    Baystate Financial sponsors a radio show concerning financial planning and investment issues. The show is broadcast from three stations including one in Worcester. It promotes Baystate Financial's name orally, in a manner that is susceptible to confusion. Ex. 6D; Ex. 26. p.59:17-61:23.

75.    The Boston Business Journal ("BBJ") recently observed that:

Baystate Financial has been growing, albeit under the radar. However [Baystate Financial CEO David] Porter recently told the Boston Business Journal that the next couple years will present solid growth opportunities - and more recognition - for Baystate Financial, as it looks to expand to Western Massachusetts and south toward Hartford. Lewis Aff., ¶27; Ex. 21. (Emphasis added).

76.    Baystate Financial admits that the parties' present and proposed use of the Bay State® mark will cause dilution and confusion. Baystate Financial's counterclaim alleges that:

The BAYSTATE Marks and Bank Marks are similar if not virtually identical. The dominant or core element of the respective marks is Baystate and Bay State. The only appreciable difference between the marks is a single space, an almost insignificant distinction. The parties' core marks sound the same and look the same, and therefore convey the same commercial impression to consumers. It is unlikely that consumers will be able to distinguish between the BAYSTATE Marks associated with Baystate Financial's long-standing and highly regarded financial services business *and the Bank Marks representing the Bank's neophyte financial services offerings.* See Defendant's Counterclaim, ¶32. (Emphasis added).

BAY STATE SAVINGS BANK

By its attorneys,

/s/ John T. McInnes
James C. Donnelly, Jr., Esq.
BBO #129700
John T. McInnes, Esq.
BBO # 657488
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502

Dated: June 7, 2006

## CERTIFICATE OF SERVICE

I, John T. McInnes, hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on Christopher P. Litterio, Esq., Ruberto Israel & Weiner, PC, 100 North Washington Street, Boston, MA 02114.

/s/ John T. McInnes
John T. McInnes, Esq.

Dated: June 7, 2006