UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

BAY STATE SAVINGS BANK,
    Plaintiff

    V.

BAYSTATE FINANCIAL SERVICES, LLC,
    Defendant

CIVIL ACTION NO. :03-CV-40273-NMG

**BAY STATE SAVINGS BANK'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**James C. Donnelly, Jr., Esq.
BBO #129700
John T. McInnes, Esq.
BBO # 657488
Mirick, O'Connell, DeMallie & Lougee, LLP**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

I.      INTRODUCTION .................................................................................. 1

II.     RESPONSE TO DEFENDANT'S STATEMENT OF FACTS ......................... 2

III.    ARGUMENT........................................................................................ 3

      A.    As A Matter Of Law, There Is Sufficient Evidence To Prove That
          Bay State Savings Bank Has A Protectable Interest In The Bay
          State® Marks.................................................................................3

          1.    There Is Extensive Factual Evidence That The Bay State®
              Marks Have Acquired Distinctiveness And Secondary
              Meaning ..............................................................................3

              a.    The Bank's Use And Promotion Of The Bay State®
                  Marks For 111 Years Provides Sufficient Evidence
                  Of Secondary Meaning ...............................................3

              b.    The Surveys Provide Substantial Additional
                  Evidence That The Bay State® Marks Have
                  Acquired Secondary Meaning.......................................4

              2.    The Bay State® Registrations Are *Prima Facie* Evidence
              That The Bank Has A Protectable Interest In The Bay
              State® Marks And Are Sufficient In Themselves To Defeat
              Baystate Financial's Motion For Summary Judgment.................7

              3.    The Bank Is The First User And Has Priority Over Baystate
              Financial In The Field Of Banking And Financial Services
              Including Insurance, Retirement And Educational Savings
              Plans, And Financial Planning Services ...................................11

              4.    To The Extent (If Any) That The Bank Was Not Already In
              The Field Of Banking And Financial Services Including
              Insurance, Retirement And Educational Savings Plans, And
              Financial Planning Services, The Natural Expansion
              Doctrine Gives The Bank Priority Over Baystate Financial......13

              5.    The Case Of <u>Commerce Nat'l Ins. Servs. Inc. v. Commerce
              Insurance Agency</u>, 214 F.3d 432 (3rd Cir. 2000) Does Not
              Support Baystate Financial's Contentions In This Case............14

      B.    As A Matter Of Law, There Is Sufficient Evidence To Prove That
          The Bay State® Marks Have Become Distinctive For Purposes Of
          The Cyberpiracy & Dilution Claims ...................................................16

      C.    Bay State Savings Bank® Voluntarily Withdraws Its Claim Under
          M.G.L. Ch. 110, §4. .........................................................................17

      D.    There Is Sufficient Evidence To Prove That Baystate Financial
          Violated Ch. 93A. ..............................................................................17

IV.     CONCLUSION ................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

American Intern. Group v. London AM. Intern, 664 F.2d 348 (2nd Cir. 1981) .............................. 2

Americana Trading Inc. v. Russ Berrie & Co., 966 F. 2d 1284, 23 U.S.P.Q. 2d 1031 (9th Cir. 1992) ............................................................................................................................................. 10

Anchor Hocking Glass Corp. v. Corning Glassworks, 162 U.S.P.Q. 288 (TTAB 1969) .............. 5

Borenquin Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 78 U.S.P.Q.2d 1454 (1st Cir. 2006) ................................................................................................................................. 1, 8, 9

Boston Beer Co. v. Slesar Bros. Brewing Co., 9 F. 3d 175 (1st Cir. 1993) ........................... 6, 7, 8

Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F.Supp. 994 (D.Mass. 1988) ............. 3, 4

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .............................................................................. 10

Commerce Nat'l Ins. Servs. Inc. v. Commerce Insurance Agency, 214 F.3d 432 (3rd Cir. 2000) ..................................................................................................................................... 14, 15, 16

Commonwealth v. AmCan Enterprises Inc., 47 Mass. App. Ct. 330 (1999) ................................. 18

Flesner v. Technical Communications Corp., 410 Mass. 805 (1991) ............................................. 2

I.P. Lund Trading ApS v. Kohler Co., 118 F.Supp 2d 92 (D.Mass. 2000) ................................ 6, 7

McNeil-PPC, Inc. v. Granutek, Inc., 919 F.Supp. 198 (E.D. NC 1995) ........................................ 5

Mobile Oil Corp. v. Auto-Brite Carwash, Inc., 615 F.Supp. 628 (D.Mass. 1984) ...................... 17

Monsieur Henri Wines, Ltd. v. Duran, 204 U.S.P.Q. 601 (TTAB 1979) ....................................... 5

President and Trustees of Colby College v. Colby-College New Hampshire, 508 F.2d 804 (1st Cir. 1975) ................................................................................................................................... 3

R. J. Toomey Co. v. Toomey, 683 F.Supp. 873 (D.Mass. 1988) ................................................... 17

Thomas & Betts Co. v. Panduit Corp., 138 F.3d 277 (7th Cir. 1998) .......................................... 5

Yankee Candle Co. v. Bridgewater Candle Co., 99 F.Supp. 2d 140 (D.Mass. 2000) ................. 10

Zatarains Inc. v. Oak Grove Smokehouse, Inc., 698 F.2d 786 (5th Cir. 1983) ............................. 5

**Statutes**

15 U.S.C. §1052(f) ......................................................................................................................... 10

15 U.S.C. 1115(a) ...................................................................................................................... 8, 18

15 U.S.C., §1125 (d) ...................................................................................................................... 16

Lanham Act §2(f) ........................................................................................................................... 10

Lanham Act §43(a), 15 U.S.C. §1125(a) .................................................................................. 5, 17

M.G.L. c. 110B, §12 ...................................................................................................................... 16

M.G.L. c. 93A .......................................................................................................................... 2, 17

M.G.L. Ch. 110, §4 ........................................................................................................................ 17

Mass. Gen. Laws Ch. 93A, §§2, 11 .............................................................................................. 17

**Other Authorities**

J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION 4, 5, 6, 10, 13

**Treatises**

McKenny & Long, Federal Unfair Competition: Lanham Act §43(a), §3.05 at 3-58 ................... 4

## I.    **INTRODUCTION**

Each of the four main arguments in the motion of Baystate Financial Services, LLC

("Baystate Financial") for summary judgment is based on the proposition that Bay State Savings

Bank® ("Bay State®" or the "Bank") will not be able to prove that it has a protectable interest in

the Bay State® Marks.[1]  However, the premise of that argument is incorrect in two respects.

First, there is ample evidence that the Bay State® Marks have acquired distinctiveness and

secondary meaning.  Second, the Bank's federal trademark registrations for Bay State® Marks

provide *prima facie* evidence of its exclusive right to use the distinctive Bay State® Mark.  The

effect of the registrations is to reverse the burden of proof.  Baystate Financial has failed to cross

the required threshold of proving that consumers in the field of banking and financial services

regard the Bay State® marks as merely descriptive of the State of Massachusetts.  See Borenquin

Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 119, 78 U.S.P.Q.2d 1454 (1st Cir. 2006).

In an effort to give its argument a veneer of credibility, Baystate Financial refers

extensively to the decision of this Court declining to grant the preliminary injunction, as if the

evidence and issues were frozen at the time of that decision.  But this approach is flawed in at

least three important respects.  First, the facts were not frozen at the time of that decision.

Discovery has provided deposition testimony and documents that were not available before.  The

new testimony and documents impeach, and in some cases plainly contradict, factual

representations that Baystate Financial made to Judge Gorton in opposition to the Motion for a

preliminary injunction.  Second, both sides have offered expert testimony that was not available

before.  Baystate Financial's expert witnesses have made admissions that support the Bank's

position in several important respects.  Third, as Judge Gorton would undoubtedly be the first to

point out, the issues on summary judgment are fundamentally different from the issues

1

concerning the preliminary injunction.  <u>American Intern. Group v. London AM. Intern</u>, 664 F.2d

348, 351 (2nd Cir. 1981); <u>Flesner v. Technical Communications Corp.</u>, 410 Mass. 805, 808-09

(1991).

This Memorandum and the supporting materials will show, *inter alia*, that:

- The Bank's use and promotion of the Bay State® Marks for a continuous period of 111 years has created distinctiveness and secondary meaning;

- Consumer surveys confirm that the Bay State® Marks have acquired distinctiveness and secondary meaning;

- The federal trademark registrations are *prima facie* evidence that the Bank has a protectable interest in the Bay State® Marks and are sufficient by themselves to defeat Baystate Financial's Motion for Summary Judgment;

- The Bank is the first user of the Bay State® Marks and has priority in the field of banking and financial services, including insurance, retirement and educational savings plans, and financial planning services;

- To the extent (if any) that the Bank was not already in the relevant field of insurance, retirement and educational savings plans, and financial planning services, the natural expansion doctrine gives it priority over Baystate Financial;

- The evidence is more than sufficient to prove the Bank's claims for cyberpiracy, dilution and violation of M.G.L. Ch. 93A.

Baystate Financial is not entitled to summary judgment.  The Bank has filed its own

Motion For Partial Summary Judgment to resolve certain issues concerning Baystate Financial's

counterclaims.  That motion is incorporated by reference in this response, and should be granted.

## II.    <u>RESPONSE TO DEFENDANT'S STATEMENT OF FACTS</u>

The arguments in this memorandum rely on facts asserted in the Bank's Response to the

Rule 56.1 Separate Statement of Material Facts ("RSMF"), its Counterstatement of Material

Facts ("CMF") and the supporting factual record.

---

[1]    The Bank has four separate federal trademark registrations including Bay State®, Bay State Savings Bank®, Bay State Online® and Bay State Investment Services® (collectively the Bay State® Marks).

## III.    **ARGUMENT**

A.    As A Matter Of Law, There Is Sufficient Evidence To Prove That Bay
State Savings Bank Has A Protectable Interest In The Bay State® Marks

1.    There Is Extensive Factual Evidence That The Bay State®
Marks Have Acquired Distinctiveness And Secondary
Meaning

a.    The Bank's Use And Promotion Of The Bay State® Marks For
111 Years Provides Sufficient Evidence Of Secondary Meaning

The proof that a mark has acquired distinctiveness and secondary meaning begins with

the history of its use. Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F.Supp. 994, 1008

(D.Mass. 1988), explains that:

> Secondary meaning can be established by evidence of: (1) long and exclusive use;
> (2) size and prominence of the plaintiff's enterprise; (3) extensive advertising and
> promotional efforts; and (4) direct evidence of secondary meaning among the
> product or service's public.

The Bank has used the Bay State® Marks continuously in the field of banking and

financial services for 111 years, since 1895. CMF ¶1. It has grown substantially and now boasts

assets exceeding $245 million. CMF ¶16. Its advertising and promotional expenditures exceed

$6.1 million, not including substantial charitable donations to community organizations. The

advertising and promotional expenditures prior to the incorporation of Baystate Financial in 1997

and prior to the Wilson Agency's alleged first use in 1983 are $3,263,693 and $1,067,385

respectively. CMF ¶14. The Bank has also been the subject of many unsolicited newspaper

articles reflecting favorable opinions of the Bank and its support of community interests,

including public recognition for substantial financial investments in the local business

community. CMF ¶15. See President and Trustees of Colby College v. Colby-College New

Hampshire, 508 F.2d 804, 808 (1st Cir. 1975)(normal consequence of favorable publicity can be

inferred); Calamari Fisheries, 698 F.Supp. at 1009 (through favorable restaurant reviews by the

media and its advertising, plaintiff became known to the restaurant-going public for its seafood);

3

McKenny & Long, <u>Federal Unfair Competition: Lanham Act §43(a)</u>, §3.05 at 3-58 (publicity by third-parties and other indicia of recognition of the product in the marketplace are evidence of secondary meaning)(citing cases).

        b.      The Surveys Provide Substantial Additional Evidence That The
                    Bay State® Marks Have Acquired Secondary Meaning

Although the Bank is not required to offer survey evidence, it has done so. Two surveys conducted for its own business purposes in 1999 and 2001, before the Bank became aware of Baystate Financial's infringement, show that the Bay State® Marks were widely recognized and highly regarded. CMF ¶17. The total proportion of the survey population who recognized the Bay State® Mark was 70% in 1999 and 76% in 2001. Half the respondents said that they had seen or heard Bay State® ads. CMF ¶18. Bay State®'s favorability ratings far surpassed those of larger and arguably more prominent competitors such as Fleet and Bank Boston. CMF ¶19.

A secondary meaning survey by Robert Klein, that was conducted for this lawsuit, asked whether the respondents associated the words "Bay State" with any particular financial organization. A total of 38.6% responded "Bay State Savings Bank" or "Bay State Bank." CMF ¶23. These results are ample evidence of "the bridge comprising the consumer's association between the trade name and the single provider of the product or service." <u>Calamari Fisheries</u> at p. 1008. J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, which Baystate Financial's trademark expert, Lawrence R. Robins, Esq., describes as authoritative[2], defines the survey standard as follows:

> It is not necessary that each and every member of the buyer class associate the mark with a single source. *Nor is it necessary that a majority of that group do so.* Many cases state that it is only necessary that a "substantial part" of the buying class makes such an association. It is apparent that "it is only necessary to show that a *substantial segment* of the relevant group of consumers made the requisite association" between the symbol and the source to prove secondary meaning.

---

[2]    Robins cites McCARTHY several times in his report, and testified at his deposition that this is an "authoritative" treatise that he and other trademark practitioners regularly rely on. He considered McCARTHY more authoritative than his own testimony. CMF ¶25.

Other courts have used the term "appreciable number" of the relevant customer class. Id., §15.45 at nn. 1-3 (citations omitted; emphasis added).

Elsewhere, MCCARTHY explains that "An 'appreciable' number is not necessarily a majority, and in fact can be much less than a majority." Id., §32:185 at n. 2. For example, 23% was sufficient in Zatarains Inc. v. Oak Grove Smokehouse, Inc., 698 F.2d 786, 795 (5th Cir. 1983); 30% was sufficient in Thomas & Betts Co. v. Panduit Corp., 138 F.3d 277, 293 (7th Cir. 1998); 32% of respondents who did not already own the trade marked product was sufficient in Anchor Hocking Glass Corp. v. Corning Glassworks, 162 U.S.P.Q. 288, 297 (TTAB 1969); 37% was sufficient in Monsieur Henri Wines, Ltd. v. Duran, 204 U.S.P.Q. 601, 605 (TTAB 1979); and 38% was sufficient in McNeil-PPC, Inc. v. Granutek, Inc., 919 F.Supp. 198, 202 (E.D. NC 1995). Courts look not just at the percentage of respondents who identify the mark with the source, but also the actual number of people when the percentage is projected to the relevant population. The sample of respondents for the secondary meaning survey was selected from people who live or work in Worcester, Auburn and Holden, where Bay State® branches are physically located. The total number of people who reside in those towns, some of whom work elsewhere, is 208,942. The number who work in those towns, some of whom reside elsewhere, is 100,308. CMF ¶26. Even the conservative 38.6% figure for recognition of the Bay State® Marks includes up to 80,652 residents and 38,719 workers just in those three communities. Consumer recognition undoubtedly goes beyond the borders of those three towns[3], but they are the Bank's core market. Id.[4]

---

[3]   The Bank has customers in 431 postal zip codes in Massachusetts, and in 29 other states. CMF ¶26.

[4]   Klein also concluded a likelihood of confusion survey for use in this lawsuit. CMF ¶23. The confusion survey shows that over 22% of consumers who view Baystate Financial's website are likely to think that it is affiliated with or sponsored by Bay State Savings Bank®. CMF ¶26. This is important in two respects. First, the website is relatively clear about the identity of Baystate Financial, so the likelihood of confusion would logically be much less than with other forms of promotion such as the radio show that Baystate Financial sponsors in the Worcester area where listeners respond only to the spoken word. Second, confusion is not limited to situations where consumers believe that Baystate Financial and Bay State Savings Bank® are one and the same. It includes situations where they perceive sponsorship or affiliation between the two organizations. Lanham Act §43(a), 15 U.S.C. §1125(a). In fact, there have been numerous incidents of actual confusion since Baystate Financial opened its office in Worcester. CMF ¶¶67-72.

5

Baystate Financial's expert, Thomas Dupont, conducted a secondary meaning survey that purports to show that only 8.9% of respondents were aware of Bay State® and associated it with financial services, but he improperly excludes those who responded "Bay State Bank" because defendant's counsel told him to assume that another institution had at one time used that name in Worcester. That information is incorrect. CMF ¶32.[5] In fact, customers use "Bay State Bank" as a nickname for Bay State Savings Bank®. CMF ¶1. Altogether, 28.9% identified the Bank with the Bay State® Marks. CMF ¶27. Dupont's survey and conclusions are fatally flawed in other respects,[6] including the failure to specify that financial services were at issue when asking whether respondents associated Bay State with any particular business. CMF ¶29. This distinction is fundamental and necessary for any valid secondary meaning survey. MCCARTHY ON TRADEMARKS §14:9. Therefore, Dupont's 8.9% figure has no scientific value when determining secondary meaning. CMF ¶29.

Baystate Financial cites I.P. Lund Trading ApS v. Kohler Co., 118 F.Supp 2d 92 (D.Mass. 2000) and Boston Beer Co. v. Slesar Bros. Brewing Co., 9 F.3d 175 (1st Cir. 1993) to suggest that the 38.6% consumer recognition in Mr. Klein's survey is insufficient to show secondary meaning. But there are material differences in the facts of those two cases that undermine Baystate Financial's position. *First*, Lund and Boston Beer only involved common law trademark rights. Neither party held a registration. Unlike the defendants in Lund and Boston Beer, Baystate Financial has the burden to prove that the Bay State® Marks are merely descriptive. See Section III.A.2 below. *Second*, Lund involved trade dress (i.e. an allegedly distinctive product shape) rather than the trademark. Consequently, the analysis involved other factors such as functionality and aesthetics. *Third*, neither Lund not Boston Beer involved a

---

[5]   Bay State Federal Savings Bank only did business in the Brookline area, and discontinued the use of its name not long after settling a trademark dispute with Bay State Savings Bank® several years ago. CMF ¶32.
[6]   Klein submitted a Supplemental Report dated June 2, 2006 addressing the information and conclusions of the Dupont Report. Ex. 57.

similar history of use. In <u>Lund</u>, for example, the plaintiff sold only between 972 and 1,800 of its allegedly distinctive products in any given year. Furthermore, "[t]he truly devastating blow [to the plaintiff] ... comes from [the plaintiff's] own advertisements which associate the design with many different retailers and sources, and sometimes with no source at all." <u>Id</u>. at 113. *Fourth,* the surveys themselves contained defects that are not present in Mr. Klein's survey. In <u>Lund</u> for example, 61% of respondents thought that the allegedly distinctive trade dress signified a single source of the product, but 46% of that 61% (representing 28% of all respondents) associated that design with someone other than the plaintiff. Some respondents even thought that the design was associated with the defendant! The remaining 44% did not associate the Mark with any source at all!! Likewise, in <u>Boston Beer</u>, "the survey results [d]emonstrated a product-place association as opposed to a product-source association."[7] 9 F.3d at 182. These are a stark contrast to the overall recognition rates of 70% and 76%, in 1999 and 2001, and the rate of 38.6% in the Klien survey for the registered Bay State® Marks.

> 2.  The Bay State® Registrations Are *Prima Facie* Evidence That The Bank Has A Protectable Interest In The Bay State® Marks And Are Sufficient In Themselves To Defeat Baystate Financial's Motion For Summary Judgment

The Bank has not just one, but four separate federal trademark registrations including Bay State®, Bay State Savings Bank®, Bay State Online® and Bay State Investment Services®, (collectively, the "Bay State® Marks"). Bay State® was registered on May 15, 2001. Bay State Savings Bank® was registered on May 22, 2001. Bay State Online® was registered on October 1, 2002. Bay State Investment Services® was registered on July 30, 2002. All four

---

[7] "Just because one-third of those surveyed, when presented with a list of beers and a brewer whose name contained the words 'Boston Beer,' matched that brewer with Samuel Adams beer, does not mean that the words 'Boston Beer,' used in connection with appellant's name, have necessarily assumed a secondary meaning. It is just as probable ... that consumers are simply aware of the fact that Samuel Adams is a Boston beer." Id. at 182-183. The Court noted other defects as well.

registrations are in international class ("IC") 36 whose definition includes insurance, financial

affairs, monetary affairs and real estate affairs. CMF ¶33.

The services covered in the Bay State® and Bay State Savings Bank® registrations

include:

> Banking Services And Financial Services, Namely, Financial Investment In The
> Field Of Real Estate, Stocks, Bonds, Commercial Paper And Other Securities,
> Financial Management And Planning And Financial Guarantee And Surety. Id.

The services covered by the Bay State Online® registration include "Banking Services

Provided By Means of a Global Computer Network." Id. The registration of Bay State

Investment Services® covers:

> Investment Services, namely, mutual fund brokerage and investment, annuity
> underwriting, brokerage in the fields of stocks, bonds, life insurance and
> long-term care insurance and insurance agencies and underwriting in the field of
> insurance and long-term care insurance. Id.

The registrations create a statutory presumption that the marks are protectable and that

the Bank is the owner of the marks. For example, 15 U.S.C. 1115(a) provides that such

registrations:

> ... shall be *prima facie* evidence of the validity of the registered mark and of the
> registration of the mark, of the registrant's ownership of the mark, and of the
> registrant's exclusive right to use the registered mark in commerce or in
> connection with the goods and services specified in the registration subject to any
> conditions or limitations stated therein.

Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 78 U.S.P.Q.2d 1454 (1st

Cir. 2006), defines the burden of a defendant who challenges such a registration:

> Simply *alleging* descriptiveness is insufficient to compel the holder of a registered
> mark to go forward with proof of secondary meaning; the putative infringer must
> *prove* descriptiveness by a preponderance of the evidence before the mix of issues
> changes and the burden of persuasion on the new issue (secondary meaning)
> reverts to the trademark holder. ... If the putative infringer does not cross that
> threshold, the presumption holds and distinctiveness is presumed. ... In that event,
> the court can proceed to consider the remaining elements of the infringement
> claim without first demanding that the trademark holder offer proof of secondary
> meaning. Id. at 118 (original emphasis, citations omitted).

Baystate Financial asserts that the marks are descriptive because the words "Bay State" describe Massachusetts. But the words "Bay State" are not purely descriptive. Unlike a purely descriptive term such as "Massachusetts Savings Bank," the consumer must exercise his mind to make the requisite association. In any event, the mere allegation of descriptiveness, unsupported by actual facts, is insufficient:

> With respect to a registered mark, ... the putative infringer's burden is not simply to show that the mark describes a feature of the trademark holder's product; rather it must show that consumers regard the mark as *merely* descriptive of that product. Id. at 119 (original emphasis).

Baystate Financial's only evidence of consumer perceptions is the secondary meaning survey of Thomas Dupont. CMF ¶27. Mr. Dupont's primary question (i.e., "when you hear the name BAY STATE, what company or business, if any, first comes to mind?") was defective because it failed to measure consumer perceptions of the Bay State® Marks *in the context of financial services.* CMF ¶¶29, 31. When he later asked whether the respondents had heard of Bay State Savings Bank®, 66.3% said they had. By way of comparison, 88.9% had heard of Merrill Lynch. Mr. Dupont selected Merrill Lynch for comparison because he considered it to be the most famous of all financial service providers. CMF ¶28. A simple mathematical calculation (66.3% ÷ by 88.9%) shows that Bay State Savings Bank® has attained 75% of the name recognition of Merrill Lynch. CMF ¶30. This is an apples-to-apples comparison, because the same question was used to determine the recognition of Bay State® and Merrill Lynch. Surely that comparison is enough to show that the mark has become distinctive.

Baystate Financial points out that the Patent and Trademark Office ("PTO") initially rejected the applications on the ground that "Bay State" is geographically descriptive. CMF ¶34. But preliminary rejections of applications at an early stage are a common occurrence. Applicants may overcome such rejections by submitting affidavits under Lanham Act §2(f), 15

9

U.S.C. §1052(f),[8] attesting that an otherwise descriptive mark *has become distinctive* because the applicant has used it for at least five years. This is precisely what Bank president Robert S. Lewis did in connection with the Bay State® applications.[9] Id. MCCARTHY explains the effect of a §2(f) affidavit as follows:

> If a mark was registered by the [PTO] by acceptance of proof of secondary meaning under §2(f), then this constitutes a *strong administrative presumption* that the mark is in fact distinctive and a valid trademark. The presumption to which a §2(f) registration is entitled is not that the designation is inherently distinctive, but that it had acquired secondary meaning as of the date of registration. Id. at §15.35 (citations omitted, emphasis added).

The presumption is not limited to administrative proceedings in the PTO. "Trademark law has long embraced the tenet that five years of continuous and exclusive use of a mark … generates a presumption of secondary meaning." Yankee Candle Co. v. Bridgewater Candle Co., 99 F.Supp. 2d 140, 154 (D.Mass. 2000).

The *prima facie* effect of a registration has an important impact on the summary judgment standard under Celotex Corp. v. Catrett, 477 U.S. 317 (1986) because it shifts to the defendant the burden to produce sufficient evidence to prove that the mark is invalid. As a matter of law, the effect of registration is sufficient to defeat Baystate Financial's motion for summary judgment. *See* Americana Trading Inc. v. Russ Berrie & Co., 966 F. 2d 1284, 23 U.S.P.Q. 2d 1031, 1034 (9th Cir. 1992)(reversing summary judgment for the defendant in a trademark action because "We believe … that the district court gave insufficient weight to the presumptive effect of [plaintiff's] federal registration").

---

[8]    Lanham Act §2(f) states in relevant part that: *"The Commissioner may accept as prima facie evidence that the mark has become distinctive,* as used on or primarily in connection with the applicant's goods in commerce, *proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for five years before the claim of distinctiveness is made."* (emphasis added).

[9]    The Lewis affidavit to the PTO only asserted that the Bank had used the Bay State® Marks for more than five years. CMF ¶34. This was an understatement, to say the least. The Bank had used and advertised the mark since 1895, a period of over 110 years.

3.    The Bank Is The First User And Has Priority Over Baystate
Financial In The Field Of Banking And Financial Services
Including Insurance, Retirement And Educational Savings
Plans, And Financial Planning Services

Bay State Savings Bank® has used the Bay State® and Bay State Savings Bank® Marks

continuously since 1895.  CMF ¶1.  The following chart compares the dates on which Bay State

Savings Bank®, Baystate Financial and Baystate Financial's alleged predecessor, the Wilson

Agency, introduced the services at issue in this case:

| Year | Bay State Savings Bank® | The Wilson Agency | Baystate Financial |
|------|-------------------------|-------------------|--------------------|
| 1895 | Savings Accounts, Home Mortgages And Financial Planning Services | | |
| 1961 | Savings Bonds | | |
| 1962 | Savings Bank Life Insurance | | |
| 1971 | Mortgage Life And Disability Insurance | | |
| 1976 | IRA, SEP, Keogh Retirement And Educational Plans And Services | | |
| 1981 | Investment Unit Accounts | | |
| 1982 | | Life Insurance, IRA, SEP, Keogh Retirement, Educational And Investment Accounts And Financial Planning Services | |
| 1988 | SBLI Lifesaver Annuities | | |
| 1994 | Stocks, Bonds And Mutual Funds Through A Registered Broker Dealer | | |
| 1997 | | | Life Insurance, IRA, SEP, Keogh Retirement, Educational And Investment Accounts Including Stocks, Bonds, Mutual Funds And Financial Planning Services |

CMF ¶46.

Baystate Financial did not exist until approximately April 1997.  At that point, it

commenced the sale of life insurance (which accounts for substantially more than a majority of

11

its business), retirement products and investments. Investments are the smallest category of products and services. CMF ¶49.

Baystate Financial asserts that its rights date back to 1982 when the Wilson Insurance Agency first began using the name Baystate Financial Services. CMF ¶56. There are several defects in this assertion. First, the Wilson Agency Annual Report for 1982 portrayed itself mainly as a provider of insurance, retirement, educational and financial planning services. The Bank preceded the Wilson Agency in all these areas. Second, the description of Baystate Financial's "Investment Department" focuses mainly on tax shelter sales, without any reference to stocks, bonds and mutual funds. CMF ¶57. Third, the Annual Report is in any event just an internal document. There is no evidence of any written promotional materials that circulated to consumers. CMF ¶57. Baystate Financial's survey expert, Thomas Dupont, admits that even now, after 23 years of alleged use, the Baystate Financial Mark has not acquired secondary meaning. CMF ¶53. Fourth, Baystate Financial has failed to offer substantial evidence that any rights of the Wilson Agency were actually transferred to Baystate Financial. CMF ¶¶60-63. There are no documents evidencing transfer of trademark rights, or even goodwill. CMF ¶63. Fifth, Baystate Financial's Rule 30(b)(6 witness did not identify trademark rights or goodwill as assets that were acquired when the company was formed in 1997.[10] CMF ¶62-63.

The only area in which the Wilson Agency even arguably introduced a service before Bay State Savings Bank® was the sale of investments that mainly consisted of tax shelters, *not* stocks, bonds and mutual funds. However, the Wilson Agency mainly concentrated on life insurance. "Investment" products accounted for no more than ten or fifteen percent of its sales at most. CMF ¶48.

---

[10]    These issues have already been addressed in the Bank's memorandum in support of its motion for partial summary judgment at §III. F., pp. 18-19; and SMF 41.

4.     To The Extent (If Any) That The Bank Was Not Already In
The Field Of Banking And Financial Services Including
Insurance, Retirement And Educational Savings Plans, And
Financial Planning Services, The Natural Expansion
Doctrine Gives The Bank Priority Over Baystate Financial

"When a senior user of a mark on product line A expands later into product line B and finds an intervening user, priority in product line B is determined by whether the expansion is 'natural' in that customers would have been confused as to source or affiliation of the time of the intervening user's appearance." McCARTHY ON TRADEMARKS §16.5 (2006)(citing cases).

Because Bay State Savings Bank® was the first user of the Bay State® Marks for banking and financial services including insurance, retirement and educational savings plans, and financial planning services, (CMF ¶46) the "natural expansion" doctrine is only marginally relevant. Baystate Financial's argument that the sales of such products were too small to establish priority is incorrect as a matter of law. "'The test used to determine continuous prior user is not the volume of sales or the degree of familiarizing of the public with the mark.' 'Even a single use in trade may sustain trademark rights if followed by continuous commercial utilization.' Even bona fide test marketing, promotional gifts and experimental sales in small volume may be sufficient to establish continuous prior use of the mark." McCARTHY ON TRADEMARKS, §16.6 (citing many cases).

Nevertheless, to the extent the natural expansion doctrine actually matters, Baystate Financial relies on the incorrect assertion that the Bank was *prohibited* from offering insurance and investment products because of federal banking legislation. This is contradicted by its own banking law expert, Michael C. Hanson, Esq., who admitted that the Bank could properly offer each of the services listed in its Annual Report on the date the service was actually introduced including: (1) SBLI life insurance since 1962; (2) mortgage life and disability insurance since 1971; (3) retirement and educational savings plans since 1976; (4) SBLI annuities since 1988; and (5) stocks and bonds since 1994. CMF ¶43. It is true that banks could not actually function

13

as a broker-dealer of stocks and bonds until 1998. However, they could *sponsor* the sale of stocks, bonds and mutual funds under their own name and trademark based on contractual arrangements with registered broker-dealers. Baystate Financial must be aware of this fact because it provides broker-dealer services to banks that are similar to Bay State®. CMF ¶6.

Bay State Savings Bank® has publicly promoted the products listed above. They are listed in its annual reports. The Bank consistently received very favorable ratings on its examinations. It has undergone rigorous regulatory examinations on a regular basis, and never been cited for a violation.[11] CMF ¶¶44-47.

<div style="margin-left: 2em;">

5.    The Case Of <u>Commerce Nat'l Ins. Servs. Inc. v. Commerce Insurance Agency</u>, 214 F.3d 432 (3rd Cir. 2000) Does Not Support Baystate Financial's Contentions In This Case

</div>

Baystate Financial relies heavily on the case of <u>Commerce Nat'l Ins. Servs. Inc. v. Commerce Insurance Agency</u>, 214 F. 3d 432 (3rd Cir. 2000), which concerned a trademark dispute between a bank and an insurance company. But the similarity is superficial and misleading. Careful analysis of <u>Commerce</u> undermines Baystate Financial's argument, and supports the Bank. The contrast between the facts of this case and those of <u>Commerce</u> is stark. For example:

- The plaintiff, Commerce Bancorp Inc. ("CBI"), began using the Commerce mark in 1973. In contrast, Bay State Savings Bank® has used and promoted the Bay State® marks since 1895. CMF ¶1.

- The defendant, Commerce Insurance Agency ("CIA"), began using the Commerce mark in the insurance business just ten years after CBI, in 1983. In contrast, Baystate Financial was only created in 1997. CMF ¶49. There is insufficient evidence of a connection with Baystate Financial's alleged predecessor, the Wilson Agency (CMF ¶61), which allegedly began using the mark in 1983; but even the Wilson Agency fails to offer concrete evidence that it used the Baystate name for external communications. RSMF ¶10.

---

[11] Mr. Hanson also testified that the Massachusetts Banking Commission rigorously examines every state chartered bank at least once every twelve to eighteen months. A team of three to ten examiners visits each bank. The examinations last for about two weeks. They encompass every aspect of banking operations. Mr. Hanson personally supervised that process during his term as Commission of Banks. CMF ¶¶44-45.

- CBI not only failed to object to CIA's use of the Commerce mark for 13 years from 1983 to 1996, but cultivated CIA as an important customer during that period.[12] Id. at 435-436. In contrast, Bay State® learned of Baystate Financial for the first time in approximately December 2002 and promptly caused its attorney to send a demand that it cease using the name. CMF ¶64.

- "CBI offered no evidence as to the extent to which it had promoted the 'Commerce' mark by 1983", when CIA commenced operations. Id. at 439. In contrast, Bay State Savings Bank® has offered extensive evidence, including financial records showing the expenditure of $3,263,693 for advertising to promote the Bay State® name from 1960 (the first year for which records are still available) to the formation of Baystate Financial in 1997, and $1,067,385 prior to the Wilson Agency's alleged first use of the Baystate name in 1983. CMF ¶14.

- CBI did not offer a consumer survey. In contrast, Bay State Savings Bank® has offered surveys showing that 70% and 76% of respondents recognized its name in 1999 and 2001, 50% recalled seeing its ads (CMF ¶18), 38.6% have recognition of the Bay State® Marks, (CMF ¶23) and 22% are likely to associate Baystate Financial's website with Bay State Savings Bank®. CMF ¶26.

- CBI failed to present evidence that it had offered any products or services at all in the area of insurance. In contrast, Bay State Savings Bank® introduced life insurance in 1962; mortgage, life and disability insurance in 1971; IRA, SEP and Keogh retirement and education plans in 1976; and SBLI annuities in 1988. CMF ¶46.

- "CBI offered no evidence to demonstrate that trade journals or other publications referred to it as "Commerce" in 1983. Id. In contrast, Bay State Savings Bank® has offered extensive evidence of community recognition including not only unsolicited news coverage but various awards and recognition for its support of the local community. CMF ¶15.

- CBI offered no evidence of confusion. Id. at 440. In contrast, Bay State Savings Bank® offers both actual confusion[13] (CMF ¶¶66-72) and a survey from a qualified expert Robert Klein, that twenty-two percent (22%) of people who view

---

[12] CIA maintained bank accounts in its own name with CBI, the security lines of credit from CBI and rented a safe deposit box. CIA and CBI referred customers to each other. CIA's principal owner established a "good" relationship with a CBI branch manager and "personal" relationship with CBI's regional vice president. CBI invited CIA to participate in a golf tournament and printed its name as a contributor in the program booklet and on a sign posted at the golf tournament. Commerce Nat'l Servs. Inc., 214 F.3d at 435-36..

[13] Since Baystate Financial opened its Worcester office, the Bank receives occasional telephone calls and correspondence that are intended for Baystate Financial. CMF ¶¶69-70. Its attorney has received unsolicited e-mail communications that implicate the Bank in an alleged federal investigation of Baystate Financial. CMF ¶72.

Baystate Financial's website believe it is either affiliated with or sponsored by Bay State Savings Bank. CMF ¶26.[14]

- CIA, not CBI, held the federal trademark registration. Id. at 443. The Bank has four registrations, whereas Baystate Financial has none. CMF ¶33.

Finally, Commerce involved an issue of predatory intent that is not present in this case: "CBI was well aware of CIA and its mark when it decided to form CNIS and entered the general insurance services market. The two had known each other for years; they had done business with each other; they had referred individuals and businesses to each other." Id at 445. In contrast, Bay State Savings Bank® was the first to use the Bay State® Marks, not just for banking, but also for insurance, retirement plans, educational plans and annuities. CMF ¶46. It only learned of Baystate Financial when Baystate Financial established a small one-person office in Worcester in December 2002. The Bank promptly notified Baystate Financial of its superior position concerning the Bay State® marks. CMF ¶64. Within just a few months after receiving this warning, Baystate Financial acquired a 40 employee agency located directly across the Worcester City Common from the Bank's headquarters and commenced marketing its products and services in the Worcester area. CMF ¶65.

   B.    As A Matter Of Law, There Is Sufficient Evidence To Prove That The Bay State® Marks Have Become Distinctive For Purposes Of The Cyberpiracy & Dilution Claims

The argument that the Bank cannot prevail on its claims for dilution under M.G.L. c. 110B, §12 in Cyberpiracy under 15 U.S.C., §1125 (d) is predicated on the incorrect assertion that the Bank State® Marks have not become distinctive. The short answer, at least for purposes

---

[14]    The 22% figure is significant for two reasons. First, it exceeds the typical standard for proving likelihood of confusion. Second, it is inherently conservative because the survey "stimulus" was a screenshot of Baystate Financial's website. Notwithstanding the apparent clarity of the stimulus, 22% of the respondents perceived an affiliation between Baystate Financial and Bay State Savings Bank®.

of summary judgment, is that the Bay State® registrations are *prima facie* evidence of

distinctiveness and secondary meaning. Baystate Financial has the burden to prove that the Bay

State® Marks are merely descriptive. For reasons stated above, it has failed to carry that burden.

> C.    Bay State Savings Bank® Voluntarily Withdraws Its Claim Under M.G.L.
>       Ch. 110, §4.

Baystate Financial's characterization of Ch. 110, §4 is incorrect. It is not limited to cases

where a former business associate continues to use the name of the business without written

consent. It explicitly includes cases where a person *assumes* the name of another, to carry on a

business, without that person's consent.

However, after further analysis, the Bank concludes that it is inappropriate to pursue a

claim under Ch. 110, §4. Several cases suggest that the remedy is limited to situations where the

defendant adopts the plaintiff's name in its entirety, without any deviation whatsoever. Baystate

Financial admits in its pleadings that the marks at issue here are confusingly similar, but they are

not identical. Rather than devote judicial resources to this issue, Bay State Savings Bank®

voluntarily withdraws the claim under Ch. 110, §4. Instead, it relies on evidence including

Baystate Financial's judicial admission that the Marks are sufficiently similar to cause confusion.

CMF ¶¶77-78. This is sufficient to justify remedies under other statutes, even if Ch. 110, §4 does

not apply.

> D.    There Is Sufficient Evidence To Prove That Baystate Financial Violated
>       Ch. 93A.

There should be no question that M.G.L. c. 93A encompasses trademark violations. The

case of R. J. Toomey Co. v. Toomey, 683 F.Supp. 873 (D.Mass. 1988) explains that:

> As with §43(a) of the Lanham Act, the essential element of the action under the
> Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A, §§2, 11, is
> that defendant's use of a mark caused confusion among customers as to the source
> of the plaintiff's product. Mobile Oil Corp. v. Auto-Brite Carwash, Inc., 615
> F.Supp. 628, 631-32 (D.Mass. 1984). Therefore, in accordance with the
> following discussion, this Court holds that Toomey has competed unfairly in
> violation of Mass. Gen. Laws Ch. 93A, §§2 and 11. Id. at 879.

The Appeals Court reached a similar conclusion in Commonwealth v. AmCan

Enterprises Inc., 47 Mass. App. Ct. 330, 333-337 (1999) regarding a misleading solicitation for a

"yellow pages" telephone directory.  The erroneous assertion that Baystate Financial "was fully

within its rights to use the marks at issue and in fact has shown priority of use in the marks" is

dispatched just by pointing to the Bay State® registrations, which are *prima facie* evidence of the

Bank's exclusive right to use the mark in commerce in the field of banking and financial

services.  15 U.S.C., §1115(a).  See Section III.B.2 of this Memorandum, *supra*.

## IV.    **CONCLUSION**

For reasons set forth in this Memorandum and the Memorandum in support of its Motion

For Partial Summary Judgment, Bay State Savings Bank® request that Baystate Financial's

motion be denied, and that partial summary judgment be granted against Baystate Financial.

BAY STATE SAVINGS BANK

By its attorney,


/s/ John T. McInnes
James C. Donnelly, Jr., Esq., BBO #129700
John T. McInnes, Esq., BBO # 657488
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502

Dated: June 7, 2006

CERTIFICATE OF SERVICE

    I, John T. McInnes, hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on Christopher P. Litterio, Esq., Ruberto Israel & Weiner, PC, 100 North Washington Street, Boston, MA 02114.

                            /s/ John T. McInnes
                            John T. McInnes, Esq.

Dated: June 7, 2006