UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BAY STATE SAVINGS BANK,<br><br>       Plaintiff,<br><br>v.<br><br>BAYSTATE FINANCIAL<br>SERVICES, LLC,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 4:03-cv-40273-FDS<br>)<br>)<br>)<br>)<br>)<br>) |

### REPLY OF BAYSTATE FINANCIAL SERVICES TO BANK'S OPPOSITION TO BAYSTATE FINANCIAL'S MOTION FOR SUMMARY JUDGMENT

This is a very simple case which need only focus on one fact – who was the first user of the mark "Baystate" in connection with nondeposit investment and insurance products. The first user in reference to these products is Baystate Financial Services and as such, there is no need to perform any additional analysis regarding secondary meaning. Although the court is not bound by the earlier preliminary injunction decision, this court did find at the time of the hearing that Baystate Financial Services was the first user in this regard. There has been no new evidence uncovered since the preliminary injunction hearing which would change this outcome. In fact, the testimony of the Bank's witnesses only reinforce the fact that the Bank only offered deposit products until 2001 and was prohibited by law from directly offering investment products such as stocks and mutual funds until 1999 and insurance products until 1998 – well after Baystate Financial was offering these products.

Despite the Bank's attempt to claim that its registration automatically confers ownership, this is not the case. Neither an application for, nor registration of a mark wipes out the prior non-registered, common law rights of others. The non-registered rights of a senior user are not

trumped by the later federal registration of a junior user. *Allard Enterprises Inc. v. Advanced Programming Resources, Inc.* 249 F.3d 564 (6th Cir. 2001) (Federal registration of a trademark does not create rights and priority over others who have previously used the mark in commerce). Even registered marks which have received incontestable status are still subject to a prior user's status. *Marshak v. Treadwell*, 240 F.3d 184 (3d Cir. 2001) (even if junior user's mark has attained incontestable status this does not cut off the rights of a senior user).

Under these circumstances it is immaterial whether or not the Bank established secondary meaning in its various "Bay State" marks. Where Baystate Financial can show that it is the first user, there is no obligation to prove that the Bank's Marks lack secondary meaning; and whether or not Baystate Financial Services has established secondary meaning in its mark is irrelevant to defeating the Bank's claim of infringement. Plaintiff attempts to create a dispute of fact where there is none and provides multitudes of documents to the court in an attempt to distract from the central issue of the case.

### I. Baystate Financial Services Is The First User Of The Mark In The Field Of Investment And Insurance Services And The Bank's Opposition Creates No Dispute Of Fact On This Issue.

Bay State Financial Services is the first user of the Baystate name in the field of nondeposit insurance and investment services. The evidence in this regard is undisputed and none of the Bank's submissions in its "Counter Statement of Material Facts" creates a material dispute.

- Baystate Financial has used the BAYSTATE Marks and the Baystate Financial Services trade name in connection with its various insurance and investment services since at least 1983. Rule 56.1 Stmt. ¶¶ 6-21.

2

- The savings bank life insurance (SBLI), IRA, SEP and Keogh accounts offered by the bank prior to 1994 were deposit related products and customers could not purchase stocks or mutual funds in connection with any of these products. Rule 56.1 Stmt., ¶¶ 28-31.

- The Glass-Steagall Act of 1933 prevented banks like Bay State Savings Bank from selling securities.

- In 1994, various federal banking agencies issued a statement allowing banks to sell certain nondeposit investment products through <u>independent</u> broker/dealers as long as the nondeposit products were physically separate from the banks' operations, that the independent operation not share a common name or logo with the bank and customers were informed that the securities sales were not deposits of the bank. *See* CFR, §§ 337.4. (a)(2) and 337.4(b) and Interagency Statement on Retail sales of Non Deposit Investment Products, 1 Fed. Reserve Ref. Serv. 3-1579.51. Banks could not sell these services directly. *See* Discussion at pp. 7-9 of Baystate Financial Memorandum in Support of Motion for Summary Judgment.

- As a result, in 1994 the Bank entered into a third party arrangement with FISCO an independent broker/dealer to provide investment services to the Bank customers. The Bank admits that FISCO and the Bank needed to be entirely separate and because of banking regulations FISCO was prevented from commingling any marketing materials with the Bank's materials; the two entities were kept physically separate in the Bank; the individuals offering the products were FISCO employees; customer accounts were maintained separately and all

written materials contained disclaimers that the products were not Bank products. Rule 56.1 Stmt., ¶¶ 33-37.

- Regarding the Bank's Third Party Vendor relationship with FISCO, Lewis stated at his deposition that "any nondeposit productivity would be conducted in the name of FISCO as it related to stocks, bonds and mutual funds. If they [the Bank] were selling insurance products through FISCO, it would be so identified as FISCO." Mulligan Aff., Ex. F, p. 37.

- Banks were prohibited by law from directly offering non-deposit investment services (i.e. stocks, bonds mutual funds) until 1999 and general insurance products until 1998. *See* discussion on pp. 4-10 of Bay State Financial Services Memorandum in Support of Motion for Summary Judgment.

- From 1998-2001 no non-deposit investment or insurance products were offered on the premises of the bank. Rule 56.1 Stmt., ¶37. The Bank's own records confirm that there were no offerings of stocks, bonds or mutual funds by the Bank in January, 2000, or that they were ever offered "by the Bank." Def. 56.1 Stmt., ¶¶33-34, 37-38.

- The Board of Directors of the Bank did not adopt a policy to offer non-deposit insurance and investment services by the Bank until October, 2000. Mulligan Aff., Ex. A, p. 1603.

- The Bank's October 2000 Non-Deposit Investment Policy states that "a non-deposit investment product will not have a name that is identical to the name of the Bank." Mulligan Aff., Ex. A, p. 1568.

4

- The Bank did not apply for a license to sell insurance until March, 2001 and in that application to the Massachusetts Insurance Division the Bank stated that "the Bank has no present intention of initiating its own insurance sales business within the Bank." Mulligan Aff., Ex. A, p. 1549, 1562, 1606-1607.

- The Bank did not become licensed to offer general insurance services until July, 2001 and did not begin offering investment services under any variation of its own name until April, 2003. Rule 56.1 Stmt. ¶¶ 27,52,66.

- From 2001- 2003, the Bank offered investment services through INFINEX under the name Minuteman Investment Services, but not under any version of the name Bay State. Rule 56.1 Stmt. ¶¶ 27-40.

- The Bank promulgated that in regards to its Infinex relationship, "there will be signage identifying Infinex Insurance Agency, Inc. and Infinex Investments, Inc. through whom NDIP and Insurance sales are being arranged. For securities transactions, Infinex Investments, Inc. will be identified as a member of National Association of Securities Dealers (NASD) and the Securities Investor Protection Corporation (SIPC) and appropriate signage will be prominently displayed." Mulligan Aff., Ex. A, p. 1563.

- In its Policy adopted in October, 2000 in connection with the offering of non-deposit products, the Bank specifically states that "because of the possibility of customer confusion, a non-deposit investment product will not have a name that is identical to the name of the Bank." *Id.* at 1568 and 1577.

- Both the Bank's Policy and the Contract with Infinex require the parties to maintain total separation of the two businesses. The Contract between Infinex and the Bank states specifically:

> "Subscriber [Bank] shall maintain strict and total separation of its business from the business conducted at each Infinex Center, including separation of records and of physical facilities, and shall conduct its business at all times so as not to lead to confusion between the business conducted by Subscriber and the business conducted by companies through operation of the Infinex Centers."

*Id.* at p. 1640.

These facts, which are undisputed, show that Baystate Financial Services is the senior user of the term "Baystate" in connection with the offering of investment and insurance services.

## II. Baystate Financial Services Does Not Have To Show That The Bank's Marks Do Not Have Secondary Meaning In Order To Defeat The Bank's Trademark Infringement Claims.

The Bank claims that in order to defeat its registration, that Baystate Financial needs to show that the Bank's Marks are descriptive and without secondary meaning. Throughout its papers, the Bank misstates and misuses the law governing trademarks. Relying on *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112 (1st Cir 2006) the Bank claims that Baystate Financial must rebut the presumption of the Bank's right to use the mark "Bay State" by proffering evidence that the Bay State mark is merely descriptive. This is not the standard when a contestable registration such as the Bank's is being challenged by a Prior User. *See Id.* at p. 118. The facts in *Borinquen* are clearly inopposite. In *Borinquen*, plaintiff had a registered trademark which was not yet incontestable. Defendant subsequently began using a mark similar to plaintiff's mark for a product which was the same as plaintiff. The parties did not dispute that plaintiff was the Senior User. However, Defendant claimed that the registration was contestable and that plaintiff could not show that the mark was inherently distinctive and therefore it was not

6

entitled to trademark protection. Here, in the instant matter where Baystate Financial is the senior user – it need not challenge the Bank's registration as not being inherently distinctive. First use alone is enough to defeat the infringement claim.

### III.   The Facts Are Undisputed That The Bank's Marks Do Not Have Secondary Meaning.

Although Baystate Financial does not have to dispute secondary meaning, there is no evidence that the Bank's marks have secondary meaning in connection with insurance and investment products.

The Bank relies on two reports of Robert Klein including his survey and 1999 and 2001 image and positioning surveys to support its claim of secondary meaning. None of these surveys are admissible evidence as to secondary meaning. But, even if the evidence is admissible, they do not show secondary meaning of the Bank's Marks.

First and foremost, the Supplemental Report of Robert Klein which is attached as Exhibit 57 to the Bank's record, is inadmissible because the Bank failed to disclose this Rebuttal Report to Baystate Financial Services pursuant to Fed. R. Civ. P. 26(a). A motion for sanctions seeking to preclude admission of the new Report pursuant to Fed. R. Civ. P. 37(c) has been filed herewith.

Second, the Bank relies on the first expert report of Robert Klein to suggest that secondary meaning exists because 38.6% of respondents answered "Bay State Savings Bank" or "Bay State Bank" to the following question:

> Think about the Worcester area and the different types of financial institutions, when you hear the words Bay State, do you or do you not think of any particular financial institution in the Worcester area.

Rule 56.1 Stmt., ¶77. The Bank contends that 38.6% (1) is a high enough recognition to be indicative of secondary meaning; and that (2) combining answers for Bay State Savings Bank and Bay State Bank is of no consequence because to consumers, they mean the same institution.[1]

The Bank attempts to create a dispute of fact by suggesting that the 38.6% recognition figure is within a range accepted by the court as indicative of secondary meaning. Low survey evidence such as that found by Klein is only persuasive when combined with other persuasive factors. These additional factors are absent here. Standing alone, 38.6% does not convey secondary meaning. See Baystate Financial's Memorandum in Support of Summary Judgment at pp. 11-15. The cases cited by plaintiff do not shed any new light on the subject.

In *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir 1983) the district court only found the 23% survey evidence persuasive in connection with secondary meaning because it was coupled with other circumstantial evidence. The Fifth Circuit stated in reviewing the decision below that the number was so weak, if it were able to consider the issue de novo it might reach a different conclusion. In *Thomas & Betts v. Panduit*, 138 F.2d 786, 795 (7th Cir 1998) also relied on by the Bank, the Court actually establishes that figures in the 30% range are marginal and do not establish secondary meaning as a matter of law. Parties need to look at circumstantial evidence in addition to a 30% recognition to determine if secondary meaning exists. This type of circumstantial evidence is not available in this case.

Finally, in *McNeil-PPC v. Granutek*, 919 F. Supp. 198, 202 (E.D. NC 1995), there was evidence of intentional direct copying which the court determined established a prima facie case of secondary meaning. The survey evidence on its own was not persuasive.

---

[1] Both of the arguments are incorrect. There is also a question as to whether financial services is too broad of a term. We reserve our right to bring this issue to the Court's attention at a later date but will not address it at this time.

Even if secondary meaning surveys in the 38% range are relevant in some circumstances, Robert Klein's survey contains no reliable evidence to show that consumers believe Bay State Savings Bank and Bay State Bank are the same institutions. This was a quantum leap taken by Klein without <u>any</u> factual support.

When the responses are broken down and allocated specifically to "Bay State Savings Bank" or "Bay State Bank" only 18.3% of respondents associated "Bay State" with "Bay State Savings Bank".[2] Rule 56.1 Stmt. ¶ 82. Even if the court could be persuaded that the 38.6% number is enough for plaintiff to have created a presumption of secondary meaning – plaintiff has not provided any evidence – and it is plaintiff's burden to do so - to show that all of the answers it has included in the 38.6% calculation can accurately be attributed to the Bank. Therefore, 38.6% is not an accurate representation of the survey data; and is clearly not indicative of secondary meaning.

In determining that 38.6% of the respondents surveyed responded with "Bay State Savings Bank," Klein combined the answers of respondents who replied "Bay State Savings Bank" with those who replied "Bay State Bank." Rule 56.1 Stmt., ¶78. When Klein was asked at his deposition "How is it that you determined that the answer "Bay State Bank" is the equivalent of "Bay State Savings Bank" he answered : "It has been my experience that people tend to shorten names and don't give full names and full legal names in response to questions." (Rule 56.1 Stmt. ¶ 80). This assumption is not based on any scientific principal nor did Klein ask respondents if they intended their answer of "Bay State Bank" to mean "Bay State Savings

---

[2] Appendix K to the Klein Report (attached as Exhibit 9) illustrates the tabulation of data. This shows that 49 of the survey participants responded to the question with Bay State Savings Bank. The total number of respondents was 246. 49/246= 19.9%. Subtract the 1.6% for noise which Klein applied to all calculations and the respondents who identified Bay State with Bay State Savings Bank decreases to 18.3%. Rule 56.1 Stmt. ¶ 82.

9

Bank." (Rule 56.1 Stmt. ¶ 81). Further, the assumption is not supported by the facts of this case.

Bank President Robert Lewis testified in his deposition that the Bank never referred to itself as "Bay State Bank" and always referred to itself as "Bay State Savings Bank". (Rule 56.1 Stmt. ¶ 61). Further, there was a Massachusetts Bank named "Bay State Federal Savings Bank" which marketed itself as "Bay State Bank" – the exact name given by some of the respondents.

In 1999, Bay State Savings Bank filed a trademark infringement claim against Baystate Federal Savings Bank ("Federal") alleging that Federal's use of the name "Bay State Bank" was confusing with Bay State Savings Bank. In its Motion for Preliminary Injunction, the Bank represented to the Court that since customers of both Federal and Bay State Savings Bank referred to their Banks as "Bay State Bank" that this was causing confusion between the businesses. As a result, Bay State Savings Bank sought an order to prohibit Federal from calling itself "Bay State Bank." In the same papers, Bay State Savings Bank points out to the Court that "Federal's use of the name Bay State Bank and consequent elimination of the word Federal from its name had been sufficient to generate significant confusion with in a relatively short period of time. Bay State Savings Bank then lists two pages of examples of confusion between the two Banks from concurrent use of the name "Bay State Bank." See Third Mulligan Aff., ¶1, Ex. A. This is an acknowledgment by the Bank that more than one Massachusetts bank was called "Bay State Bank."

Since Klein failed to apply this fact to his analysis, by assuming that a response of "Bay State Bank" and "Bay State Savings Bank" were one in the same, he failed to apply his results to the facts of the case and therefore his conclusions are not relevant and constitute inadmissible testimony. *See* Motion to Strike Klein Report filed herewith.

IV. **References To Dupont's Survey Are Irrelevant As There Is No Burden On Baystate Financial To Prove Secondary Meaning Of Its Own Mark To Defeat A Trademark Action.**

Baystate Financial Services did have a secondary meaning study done by Thomas Dupont to test Klein's findings. But at the summary judgment stage, Baystate Financial does not rely on Mr. Dupont's report and does not refer to his report as containing material facts to support its Motion for Summary Judgment. Critiques of Mr. Klein's survey are purely as a matter of law and not in reference to any other expert's findings. Therefore, any comments or criticism of Dupont's report are irrelevant.

Furthermore, although the Bank alleges that Baystate Financial cannot prove secondary meaning of its own mark, there is no burden to do so to defeat the Bank's infringement claim. Inasmuch as this issue has any relevance at all to summary judgment, it is addressed in Baystate Financial's Opposition to the Bank's Motion for Summary Judgment.

V. **There Have Been No Facts Presented Which Would Cause A Dispute As To The Cyberpiracy Claim.**

Even if the Bank could show a distinctive mark, it has not presented any facts which would cause a dispute as to the fact that Baystate Financial did not act in bad faith in registering its domain name since it was the name of its business, has no intention to re-direct customers of the Bank and has not harmed the goodwill of the Bank.

VI. **Conclusion**

In connection with this Reply, Baystate Financial Services has moved to strike (1) the First Report of Robert Klein, (2) the 1999 and 2001 Image and Positioning Studies; and (3) portions of Affidavits of Blodgett, Myers and Lewis. Baystate Financial Services has also filed a Motion to exclude the Second Report of Robert Klein for failure to disclose pursuant to Rule 26(a).

The Defendant,<br>
BAYSTATE FINANCIAL SERVICES, LLC.,<br>
By its attorneys,

*/s/ Maureen Mulligan*

Christopher P. Litterio (BBO #551098)
Maureen Mulligan (BBO#556482)
RUBERTO, ISRAEL & WEINER, P.C.
100 North Washington Street
Boston, Massachusetts 02114
(617) 742-4200

Dated: June 16, 2006

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon the attorney of record for plaintiff, James Donnelly, Esquire, Mirick, O'Connell, DeMallie & Lougee, LLP, 100 Front Street, Worcester, Massachusetts, 01608-1477 via mail and/or electronic service on June 16, 2006.

*/s/ Maureen Mulligan*
Maureen Mulligan

U:\MSM\Baystate Financial\pleadings\Reply to Bank's Opposition to SJ.doc