UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BAY STATE SAVINGS BANK, )<br><br>Plaintiff, )<br><br>v. )<br><br>BAYSTATE FINANCIAL<br>SERVICES, LLC, )<br><br>Defendant. ) | Civil Action No. 4:03-cv-40273-FDS |

**REPLY OF BAYSTATE FINANCIAL SERVICES TO BAY STATE SAVINGS BANK'S
COUNTERSTATEMENT OF MATERIAL FACTS IN OPPOSITION TO BAYSTATE
FINANCIAL SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT**

**GENERAL REPLIES**

1.      The Bank does not properly respond to Baystate Financial's Rule 56.1 Statement

in that it fails to state whether the facts as stated by Baystate Financial Services are disputed or

undisputed. Instead, the Bank "admits" or "denies" the facts, and in some instances states that it

"is not in possession of information to confirm or deny the allegations" of the stated fact.

Although this is the method by which to answer a complaint, this does not conform to the Local

Rule 56.1 which requires the party opposing a motion for summary judgment to  "include a

concise statement of the material facts of record as to which it is contended that there exists a

genuine issue to be tried, with page references to affidavits, depositions and other

documentations." Instead, Plaintiff proposes a "Counterstatement of Material Facts." All of the

facts in Baystate Financial's Rule 56.1 Separate Statement should be deemed undisputed for

failure of the Bank to follow the rule and dispute the facts and provide countervailing evidence.

At the very least the facts to which the Bank responds that it "is not in possession of information

to confirm or deny the allegations of the stated facts" should be deemed undisputed. *See Ares-Serono, Inc. v. Organon Int'l B.V.*, 151 F.R.D. 215, 220 (D. Mass. 1993).

2.     Fed. R. Civ. P. 56 requires the opposing party to provide evidence to dispute the facts alleged by the moving party. The rule does not allow the submission of additional facts and therefore the Bank's entire Counterstatement of Materials Facts should be stricken.

3.     Most of the facts alleged in Plaintiff's Counterstatement of Material Facts were submitted in connection with Plaintiff's Rule 56.1 Statement in Support of its Motion for Summary Judgment on Counterclaims, and Baystate Financial has previously responded to these allegations in the context of its Opposition to the Bank's Summary Judgment Motion. However, the standards of proof and relevant facts are not identical between each parties' causes of action and Baystate Financial contends that even where disputed, many of these allegations are not material to the resolution of summary judgment on the Bank's complaint.

4.     The Bank cannot establish "genuine" disputes of fact by reliance upon evidence that contradicts their previous deposition testimony. "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Chapman v. Bernard's, Inc.*, 16 F. Supp. 2d 406, 419 (D. Mass. 2001).

5.     Plaintiffs also cannot rely on vague and conclusory statements or documents to establish issues of material fact. *Wyne v. Tufts Univ. School of Medicine*, 932 F. 2d 19, 28 (1st Cir. 1991) (conclusory statements in affidavit not allowed) "when a motion for summary judgment is made and properly supported, the nonmoving may not simply rest on pleadings, but must respond by affidavits or as otherwise provided in [Fed. R. Civ. P. 56 and] must set forth specific facts showing that there is a genuine issue of material facts showing that there is a

genuine issue for trial.  Mere assertions of the existence of disputed facts without evidentiary support cannot defeat the summary judgment motion.  *United States v. One Parcel of Real Property*, 900 F. 2d 470, 475 (1st Cir. 1990).

6.    Plaintiffs cannot rely upon expert testimony to opine on the ultimate legal issue as to what the parties intended when they signed the July 1998 Letter.  "Although expert testimony may be more inferential than that of fact witnesses, in order to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimate legal issue." *Hayes v. Douglas Dynamics, Inc.* 8 F.3d 88, 92 (1st Cir. 1993).

7.    Exhibits submitted with the Opposition are required to be introduced through affidavit or they may not be considered with the Motion.  *Cerqueira v. Cerqueira*, 828 F. 2d 863, 865 (1st Cir. 1987).  Therefore any Exhibits not authenticated by Affidavit must be stricken from the record and cannot be relied on by the Bank.

## SPECIFIC REPLIES

### Alleged Fact No. 1:

The Bank has used the name Bay State Savings Bank® continuously since 1895 and is often referred to Bay State Bank.  Lewis Aff., ¶2; Lewis Aff., ¶11; Ex. 8A-8E.

### Response to Alleged Fact No. 1:

Disputed.  Defendant Disputes that the Bank has used the name Bay State Savings Bank since 1895 in connection with Investment and Insurance products.  *See* Response to Fact No. 2.  Defendant also Disputes that the Bank is often referred to as "Bay State Bank."  The Bank President, Robert Lewis, testified that the Bank does not use "Bay State" standing alone and, in fact, is prohibited from doing so as the result of a trademark settlement agreement with Bay State Federal Savings Bank.  (Def. 56.1 Stmt., ¶61).

**Alleged Fact No. 2:**

It is headquartered in an attractive century old building facing the Worcester City Common and has branch locations in Worcester, Auburn and Holden. The Bay State® Mark is prominently displayed at each location. Lewis Aff., ¶3; Ex. 2; Ex. 6B.

**Response to Alleged Fact No. 2:**

Disputed. Defendant Disputes that there is such a thing as the "Bay State" Mark and

states that this is a matter of law to be determined by the Court.

**Alleged Fact No. 3:**

Bay States®'s primary geographic market consists of Worcester and the surrounding communities, but its customers live in approximately 431 different postal zip codes in Massachusetts and in 29 other states. Lewis Aff., ¶4.

**Response to Alleged Fact No. 3:**

Undisputed.

**Alleged Fact No. 4:**

Bay State® provides for a broad range of financial products and services. At first this consisted of savings accounts and home mortgages. St. 1907, c. 561 authorized savings banks to offer Savings Bank Life Insurance ("SBLI"). Available records show sales of SBLI dating to at least 1962. Lewis Aff., ¶5; Ex. 3. In addition to SBLI, the services have included sales of savings bonds since 1960; mortgage and disability insurance by 1971; IRA, SEP and Keogh retirement and educational accounts by 1976; Investment Unit Accounts by 1981; SBLI Live Saver Annuities by 1988; and sales of stocks, bonds and Mutual Funds from 1994 to 1998, and continuously since January 2000. Lewis Aff., ¶5; Ex. 4A-4M; Ex. 23A-23C; 2d Lewis Aff., ¶10, 11.

**Response to Alleged Fact No. 4:**

Disputed. Baystate Financial Disputes any implication that the offerings of savings

accounts, home mortgages, SBLI, IRA, SEP or Keogh accounts prior to 1994 included sales of

traditional insurance or investment or other financial services products such as stocks or mutual

funds. All of the above offerings were deposit related products and Bank customers could not

purchase stocks or mutual funds in connection with any of these products. Def. 56.1 Stmt. ¶¶28-31.

Baystate Financial Disputes that the Bank offered sales of stock, bonds and mutual funds from 1994 to 1998 and then continuously since January of 2000. In 1994, the Bank entered into a third party arrangement with "FISCO," an independent broker/dealer to provide investment services to Bank customers and fee income to the Bank. Because of banking regulations, FISCO was prevented from commingling any marketing materials with the Bank's materials, the two entities were kept physically separate in the Bank, the individuals offering the products were FISCO employees, the customer accounts were maintained separately, and all written materials contained disclaimers that the products were not Bank products. Robert Lewis testified at his deposition that from 1998 to 2001, there were no products offered by the Bank or through a third party vendor regarding the non-deposit investment and insurance products at issue in this case. The Bank's own records confirm that there were <u>no</u> offerings of stocks, bonds or mutual funds by the Bank in January, 2000, or that they were ever offered "by the Bank." Def. 56.1 Stmt. ¶¶33-34, 37-38.

Regarding the Bank's Third Party Vendor relationship with FISCO, Lewis stated at his deposition that "any nondeposit productivity would be conducted in the name of FISCO as it related to stocks, bonds and mutual funds. If they [the Bank] were selling insurance products through FISCO, it would be so identified as FISCO." Mulligan Ex. F, p. 37.

In February, 2000, the Bank entered into a contract with a third party Investment and Insurance Provider, Infinex Investments, Inc. and Infinex Insurance Agency. Mulligan Aff. Ex. A, pp. 1633-1647. There was a provision in the contract whereby the obligations of both parties to comply were contingent upon the Bank receiving all Governmental Approvals sanctioning the

third party arrangement. *Id.* at 1645, ¶24.  In fact, the Board of Directors of the Bank did not

approve the Non-Deposit Investment or Insurance program to be put in place under this contract

until October, 2000;  *See* Board Resolutions, *Id.* at p. 1603; and the Bank did not file its

application for the appropriate regulatory approval from the Insurance Division of Massachusetts

until March 15, 2001.  Mulligan Aff. Ex. A, p. 1549.

As further evidence that it was Infinex and not the Bank offering insurance and

investment services, the Bank specifically stated in its application to the insurance division that

the Bank would not be offering insurance sales.

> "The Bank has no present intention of initiating its own insurance and
> sales business within the Bank.  Instead, it will rely upon Infinex as a third
> party provider to conduct insurance sales in accordance with this Plan, in
> sales locations established pursuant to the Bank Policies on Retail Sales of
> Nondeposit Investment and Insurance Products, copies of which are
> attached hereto as Exhibit A."

Mulligan Aff., Ex. A at p. 1562.  *See also Id.* at pp. 1606-1607.

Further highlighting the fact that both the insurance, stock, bond and mutual fund products were

not going to be offered by the Bank, but through Infinex, the Plan of Operation attached to the

Insurance Application also stated that:

> "Identification of Infinex Investments, Inc. as Affiliated Broker/Dealer and
> Infinex Insurance Agency, Inc. as a licensed Insurance Agency.
>
> Because nondeposit investment and insurance products are offered through
> a third party on the Bank's premises, all efforts will be made to clearly
> identify Infinex Investments, Inc. as the broker/dealer and as a member of
> NASD and SIPC, and the identify of the Infinex Insurance Agency of
> Massachusetts, Inc. as insurance agent will be clearly disclosed in the sales
> area."

*Id.* at 1563.

and

> There will be signage identifying Infinex Insurance Agency, Inc. and
> Infinex Investments, Inc. through whom NDIP and Insurance sales are
> being arranged.  For securities transactions, Infinex Investments, Inc. will
> be identified as a member of National Association of Securities Dealers
> (NASD) and the Securities Investor Protection Corporation (SIPC) and
> appropriate signage will be prominently displayed.

*Id*. at 1563.

In its Policy adopted in October, 2000 in connection with the offering of non-deposit products,

the Bank specifically states that "because of the possibility of customer confusion, a non-deposit

investment product will not have a name that is identical to the name of the Bank."  *Id*. at 1568

and 1577.  Both the Bank's Policy and the Contract with Infinex require the parties to maintain

total separation of the two businesses.  The Contract between Infinex and the Bank states

specifically:

> "Subscriber [Bank] shall maintain strict and total separation of its business
> from the business conducted at each Infinex Center, including separation
> of records and of physical facilities, and shall conduct its business at all
> times so as not to lead to confusion between the business conducted by
> Subscriber and the business conducted by companies through operation of
> the Infinex Centers."

*Id*. at p. 1640.

In 2001, Bank began to offer the non-deposit investment and insurance products through

INFINEX.  The products were offered to customers under the name Minuteman Services, not

under the name Bay State Savings Bank or Bay State Investment Services.  Def. 56.1 Stmt. ¶38.

**Alleged Fact No. 5:**

From January 2000 to February 2002, the investment services were identified as a sub-
brand with the Minuteman Investment Services® mark.  Ex. 11K-11M; Lewis Aff., ¶6.

**Response to Alleged Fact No. 5:**

Disputed.  Mr. Lewis testified in his deposition that from 2001 until April 2003,

Minuteman Investment Services offered non-deposit investment products through INFINEX.

Def. 56.1 Stmt. at ¶¶38-39.  Also Disputed because Exhibits cited do not support statement

made.

**Alleged Fact No. 6:**

In the case of some products such as stocks, bonds and mutual funds, banks could not
actually function as a broker dealer until 1998.  However, banks could *sponsor* the sale of stocks,
bonds and mutual funds under their own name and trademark though contractual arrangements
with registered broker dealers.  Baystate Financial itself provides broker-dealer services to banks
that compete with Bay State®.  Ex. 39, p. 86:6-11; Ex. 40A-40C.

**Response to Alleged Fact No. 6:**

Disputed.  The first two sentences relate to an issue of law, not a statement of fact.

However, the Bank has misstated the law and Defendant Disputes that banks could offer the

sales of stocks, bonds and mutual funds in their own name.  The Regulation specifically states

otherwise.  See 12 CFR §§ 337.4(a)(2) and 337.4(b).  It is undisputed that Baystate Financial

provides broker-dealer services to banks.  The statement that Baystate Financial competes with

Bay State Savings Bank is conclusory.  However, inasmuch as the Court deems this a statement

of fact, it is disputed.  None of the banks which contract with Baystate Financial are in the

geographic area of "Worcester" as defined by Plaintiffs.  *See* Plaintiff's Exhibit 15A-E which

identifies the Bank Affiliate Program of Baystate Financial in Marlborough, Lowell, Franklin

and United Cooperative Bank.

**Alleged Fact No. 7:**

In 1994, the Bank entered a contractual arrangement with a registered broker dealer that
sponsored the sale of stocks, bonds and mutual funds.  2d Lewis Aff., ¶10.  As early as 1995, the
Bank has conducted estate planning seminars sponsored by their broker dealer, FISCO.  Ex. 56.
Baystate Financial has sponsored such events and acted in a similar capacity for banks that

compete with Bay State®.  Ex. 40A-40C.  Such sales of stocks, bonds and mutual funds were interrupted from late 1998 to January 2000 because of a change in broker dealers, but have continued uninterrupted ever since.  2d Lewis Aff., ¶11.

**Response to Alleged Fact No. 7:**

The first sentence is undisputed.  Bay State Financial Services does not dispute that

Exhibit 56 represents an Estate Planning seminar sponsored by the Bank and FISCO but disputes

that this is a fact material to this litigation.  Baystate Financial does not dispute that it offers

estate and financial planning services to its clients but does Dispute that Baystate Financial

Services has "acted in a similar capacity" for Banks that compete with the Bank.  The Bank has

defined its geographic area very narrowly in this litigation.   None of the Bank Partnership

programs with which Baystate Financial participates are within 5-10 miles of the central

Worcester branch of Bay State Savings Bank.  *See* Plaintiff's Exhibit 15.  Baystate Financial

Services denies the last sentence; Bay State Savings Bank did not offer stocks, bonds or

insurance products for approximately a 3 year period, from 1998 until January of 2001.  The

reason Baystate Financial Services did not offer such products is immaterial.

**Alleged Fact No. 8:**

In January 2000, Bay State® entered into an agreement with Infinex Investments, Inc. and Infinex Insurance Agency of Massachusetts Inc. ("the Infinex Agreement") whereby joint employees located at Bay State® banks would sell investment services, including securities and insurance.  Ex. 37; 2d Lewis Aff., ¶11.

**Response to Alleged Fact No. 8:**

Disputed.  Baystate Financial does not dispute that there were a certain class of

employees categorized as "mutual employees."  However, the duties of these mutual employees

were separate and distinct for each entity, i.e., the bank or Infinex.  *See* Mulligan Aff. Ex. At p.

1637 (Infinex Contract) and Insurance Sales Program plan of operation at pp. 1557-1558.  *See*

also Plaintiff's Ex. 37 at p.6, ¶8.

**Alleged Fact No. 9:**

The investment services sold pursuant to the Infinex Agreement were advertised and promoted by Bay State®. Ex. 5A-C.

**Response to Alleged Fact No. 9:**

Disputed. There is no record citation to support this statement.

**Alleged Fact No. 10:**

The investment services were exclusively sponsored by Bay State®; sold by personnel located in Bay State® offices; and target marketed primarily to Bay State® customers. Lewis Aff., ¶6.

**Response to Alleged Fact No. 10:**

Disputed. Infinex Investments was a company which offered investment services

through many banks in Massachusetts and services were not exclusively offered by the Bank.

*See* Bank's representation to the Massachusetts Insurance Division which states:

> "Infinex Insurance Agency of Massachusetts, Inc. is a Massachusetts business corporation licensed as an insurance agency in the State of Massachusetts (see attached license from the State of Massachusetts Division of Insurance, attached as Exhibit B) and its affiliate, Infinex Investments, Inc., is a registered broker-dealer that currently provides securities brokerage and investment advisory services to the general public, including depositors and other customers of the Bank. Infinex was originally organized to provide securities and insurance services to Connecticut banks by allowing some 16 Connecticut banks and several Massachusetts banks to invest and own a minority interest in the corporation."

Mulligan Aff. Ex. A, p. 1557.

The Bank's website stated that investment services were to be offered through Infinex

Financial Group. Mulligan Aff., Ex. F, p. 73. In addition, Lewis testified that money market

funds and tax deferred annuities were offered through Infinex. *Id.* at p. 75. He specifically states

"there is more product available as a result of our relationship with Infinex." *Id.*

**Alleged Fact No. 11:**

The investment services were fully disclosed in Annual Reports and authorized by law. Lewis Aff., ¶5; Ex. 4A-4M; 23A-23C.

**Response to Alleged Fact No. 11:**

The investment services were fully disclosed in Annual Reports and authorized by law.

Lewis Aff., ¶5; Ex. 4A-4M; 23A-23C.

**Alleged Fact No. 12:**

Bay State® has advertised and promoted itself in newspapers and trade journals since 1895. Lewis Aff., ¶7; Ex. 6A-C; Ex. 6E-6F.

**Response to Alleged Fact No. 12:**

Disputed. The Bank has advertised as Baystate Savings Bank not "Bay State." *See*

Plaintiff's Ex. 6A-C, E, F.

**Alleged Fact No. 13:**

Bay State® has invested in community relations by charitable giving. Lewis Aff., ¶8; 2d Lewis Aff., ¶12; Ex. 4A-4M; Ex. 23A-23C.

**Response to Alleged Fact No. 13:**

Disputed. Bay State Financial does not Dispute that "Bay State Savings Bank" has

invested in community relations but the attached Exhibits do not illustrate any activity by "Bay

State Investment Services" or "Bay State."

**Alleged Fact No. 14:**

Advertising expenditures have grown from $7,059 in 1960 (the first year in which they are segregated) to as much as $631,000. Lewis Aff., ¶7; 2d Lewis Aff., ¶21. Since at least 1995, this has included statewide advertising in The Banker & Tradesman. Lewis Aff., ¶7. The total from 1960 to 1997, when Baystate Financial incorporated, is approximately $2.7 million. *Id.* Total to date including the 2006 budget exceeds $6.1, without counting the charitable donations of several hundred thousand dollars. 2d Lewis Aff., ¶21. The advertising and promotional expenditures prior to the incorporation of Baystate Financial in 1997 and prior to the Wilson Agency's alleged first use in 1983 are $3,263,693 and $1,067,385 respectively. Ex. 41.

**Response to Alleged Fact No. 14:**

Undisputed.

**Alleged Fact No. 15:**

Bay State® has been featured in many unsolicited news articles reporting matters of public interest, including the appointment of community leaders to serve in various leadership positions, and the bank's support of community activities.  Lewis Aff., ¶9; Ex. 7A-7C.

**Response to Alleged Fact No. 15:**

Disputed.  The Exhibits cited show "Bay State Savings Bank" not "Bay State."

**Alleged Fact No. 16:**

Bay State® has increased in size, prominence, sales and customers.  Assets have grown from $20,241 in 1895 to over $245 million.  Lewis Aff., ¶10.  In 1997, when Baystate Financial incorporated, loans and deposits were $90.5 million and $115.6 million, respectively (total assets were $206.1 million).  Lewis Aff., ¶10; Ex. 4H.  They presently exceed $284 million.

**Response to Alleged Fact No. 16:**

Disputed.  Bay State Financial Services does not dispute that Bay State Savings Bank may have assets of over $245 million, but disputes that any substantial portion of this revenue is related to investment services.  The Bank's Annual Reports for 1994 through 1998 show that the FISCO sales of investment services were insubstantial.  According to the Bank's documents and Mr. Lewis' deposition testimony, the Bank received fee income from the FISCO brokerage services between 0% and .1% of its total income for the years 1994 through 1998.  Def. 56.1 Stmt. at ¶35.  This amounts to $7,948 in 1994, $97,185 in 1995, $10,156 in 1996 and $4,650 in 1997.  Furthermore, Robert Lewis testified that in 2004 of the Bank's total revenue of $12 million, it earned only $223,200 from Bay State Investment Services.  In 2005, the Bank earned approximately $200,000 from Bay State Investment Services.  At the time of his deposition, Lewis was unaware of the revenue under Minuteman for 2001 and 2002 and the Bank has provided no other evidence of revenue generated in those years.  Def. 56.1 Stmt. at ¶¶42-44.

**Alleged Fact No. 17:**

Consumer surveys in August of 1999 and 2001 showed that the Bay State® mark was widely recognized and highly regarded.  Lewis Aff., ¶12; Myers Aff., ¶¶7, 10; Ex. 9, 10.

**Response to Alleged Fact No. 17:**

Disputed.  The consumer surveys which were prepared in August of 1999 and 2001 were designed to be used for marketing purposes and were not designed to test for secondary meaning.  Def. 56.1 Stmt. at ¶93.  Further, Kelly Myers testified at his deposition that the statement in his affidavit upon which the Bank relies which states that "the survey shows that the Bay State Mark is widely recognized and highly regarded" is not a statement made by him and that he does not know what the term "Bay State Mark" means.  Id. at ¶96.  In addition, the actual reports do not support the summary made by Plaintiff.  For example, the survey results in 1999 showed the following:

- When asked "when you think of Banks, what name comes to mind?," only 12% of the random sample mentioned the Bank.  See Plaintiff's Ex. 9,1999 Image and Positioning Survey at p. 580.

- When prompted, only 7 in 10 respondents from the random sample said they knew of the Bank.   The survey found that "this is a relatively weak level of total awareness when compared with others in the marketplace" and that the Bank's low level of total awareness "is a significant concern, since awareness precedes trial by potential prospects."  See Plaintiff's Ex. 9, 1999 Image and Positioning Survey at p. 582.

- They survey concluded that the Bank "shows significant weakness among prospective customers in terms of awareness."  See Plaintiff's Ex. 9, 1999 Image and Positioning Survey at p. 614.

The 2001 Survey fared no better.

- When asked to name all the banks they could think of without prompting, only 12% of the random sample mentioned First Bank and only 18% mentioned the Bank at all. Even among the Bank's customers, only 44% identified the Bank first. *See* Plaintiff's Ex. 10, 2001 Image and Positioning Survey at p. 647.

- When asked whether they recalled seeing, hearing or reading any advertising for any area banks in the past 12 months, only 11% of the random sample recalled any such advertising for the Bank. Among bank customers, only 45% recalled such advertising. *See* Plaintiff's Ex. 10, 2001 Image and Positioning Survey at p. 650.

- The survey found that "[c]onvenience appears to be the most important factor when choosing a bank." When known bank customers were asked how they first learned of their primary financial institution "over one half (52%) said that they found out about their primary bank because it was close to where they live." Only 8% of those respondents said that they first found out about their bank through some sort of advertising. *See* Plaintiff's Ex. 10, 2001 Image and Positioning Survey at p. 652.

**Alleged Fact No. 18:**

The total proportion of the survey population who recognized the Bay State® mark was 70% in 1999 and 76% in 2001. Lewis Aff., ¶12; Myers Aff., ¶¶7A, 10A; Ex. 9, pp. 7-8; Ex. 10. Half reported that they had seen or heard Bay State® ads. Lewis Aff., ¶12; Myers Aff., ¶¶7C;1 Ex. 9, p. 2, 9-10; Ex. 10.

**Response to Alleged Fact No. 18:**

Disputed. *See* Response to Fact 17. Also, Defendant Disputes that any of these statistics apply to the investment and insurance products at issue in this litigation. Mulligan Aff., Ex. B, Myers Dep., p. 93.

**Alleged Fact No. 19:**

Bay State®'s favorability ratings far surpassed those of larger competitors such as Fleet and Bank Boston. Lewis Aff., ¶12; Myers Aff., ¶¶7D, 10B; Ex. 9, pp. 2, 11; Ex. 10, pp. 2-3, Chart 7.

**Response to Alleged Fact No. 19:**

<u>Disputed</u>. The Affidavit of Kelly Myers uses this proposition to support his statement that the Bay State Mark is widely recognized and highly regarded. However, *see* Response to Alleged Fact 15.

**Alleged Fact No. 20:**

Bay State®'s rating for "products and services satisfaction" shows that consumers view the bank as providing a wide range of financial services. Myers Aff., ¶¶7E, 10E; Ex. 9, pp. 23-24, 27-30; Ex. 10, p. 10; Chart 26; Blodgett Aff., ¶5; Ex. 38, p. 5.

**Response to Alleged Fact No. 20:**

<u>Disputed</u>. The data cited at Exhibits 9 and 10 which are the 1999 and 2001 Image and Positioning Studies does not support this statement made above. The Blodgett Affidavit is conclusory and does not reference any facts to support the conclusory allegation.

**Alleged Fact No. 21**

The 1999 survey shows that Bay State® customers had a stronger appetite for Mutual Funds than the general population; kept half their household investment dollars at Bay State®; and believed that the products and services are improving. Myers Aff., ¶¶7F-I; Ex. 9, pp. 3, 23-24, 27-30. Over 81% of customers would recommend Bay State® to others, a higher proportion than customers of other banks. Myers Aff., ¶7J.

**Response to Alleged Fact No. 21:**

<u>Disputed</u>. *See* Motion to Strike Myers' testimony and facts cited in Resp. No. 17-19.

**Alleged Fact No. 22:**

The 2001 survey contains similar information, and shows that customers associate Bay State® with a wide range of financial services including insurance, mutual funds and bonds. Myers Aff., ¶10E; Ex. 10, p. 10, Chart 26; Blodgett Aff., ¶5, Ex. 38, p. 5.

**Response to Alleged Fact No. 22:**

Disputed. The affidavits are conclusory and the Survey at p. 10 and Chart 21 do not

support the statements alleged. Further, Lewis testified that the Bank was not offering insurance

and investment services from 1998 to 2001.

**Alleged Fact No. 23:**

A survey by Robert Klein, that was conducted for this lawsuit, asked whether the
respondents associated the words "Bay State" with any particular financial organization, 38.6%
responded "Bay State Savings Bank" or "Bay State Bank." Ex. 30, p. 2.

**Response to Alleged Fact No. 23:**

Disputed. *See* Defendant's Ex. 9 at p.8. But in any event this is not a fact material to

Baystate Financial's motion for summary judgment.

**Alleged Fact No. 24:**

The total number of respondents who associated the Bay State® marks with Bay State
Savings Bank®, prior to adjusting for a control group, was 40.2%. Ex. 30, p. 9

**Response to Alleged Fact No. 24:**

Disputed. Baystate Financial Services states that Robert Klein combined the response

"Bay State Savings Bank" and "Bay State Bank" to reach the percentage of respondents stated.

*See* Def. 56.1 Stmt. ¶¶ 78-81, Ex. 10 Klein Depo. at pp. 29 – 31; Ex. 9 Klein Survey, p. 9 Table

2, Appendix I, Appendix K. When the responses are separated out only 18.3% identify Bay

State with Bay State Savings Bank. Def. 56.1 Stmt. ¶¶ 81-82.    But the issue of secondary

meaning is not material to the Motion for Summary Judgment.

**Alleged Fact No. 25:**

J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION,
which Baystate Financial's trademark expert, Lawrence R. Robins, Esq., describes as an
authoritative publication that is routinely used and relied on by trademark practitioners –

including Mr. Robins, who cites MCCARTHY repeatedly in his report and endorsed it in his deposition[1] – defines the survey standard as follows:

> Most cases state that it is only necessary that a "substantial part" of the buying class makes such an association. It is apparent that "it is only necessary to show that a *substantial segment* of the relevant group of consumers made the requisite association" between the symbol and the source to prove secondary meaning. Other courts have used the term "appreciable number" of the relevant customer class. *Id.* § 15.45 at nn. 1-3 (citations omitted).

Elsewhere, MCCARTHY explains that "An 'appreciable' number is not necessarily a majority, and in fact can be much less than a majority." *Id.* at §32:185 at n. 2. Courts look not just at the percentage of respondents who identify the mark with the source, but also the actual number of people when the percentage is projected to the relevant population.

### Response to Alleged Fact No. 25:

Baystate Financial Services states that this is a conclusion of law and reference to a legal treatise and does not represent a statement of fact. Baystate Financial does not dispute that Robins testified that the publication is authoritative but does dispute the remaining characterizations. Baystate Financial admits that Robins states that the attorneys that he has worked with use McCarthy, but dispute that the testimony cited or any testimony states that Robins considers McCarthy more authoritative than his own testimony. *See* Plaintiff's Ex. 58 pp. 13:9-14:2.

### Alleged Fact No. 26:

The sample of respondents for the secondary meaning survey was selected from people who live or work in the towns of Worcester, Auburn and Holden, where the Bay State® branches are physically located. Ex. 30, p. 7. The total number of people who reside in those towns is 208,942. Ex. 42. The number who work in those towns, some of whom reside elsewhere, is 100,308. *Id.* Thus, even taking the conservative 38.6% figure for unaided recognition of the Bay State® marks includes up to 80,652 residents and 38,197 workers in those communities. Id. This evidence of Consumer recognition goes beyond the borders of those three towns to include other consumers in other communities. Lewis Aff., ¶4, Ex. 55A-B. The Klein survey also shows that over 22% of consumers who view Baystate Financial's website are likely to think that it is affiliated with or sponsored by Bay State Savings Bank®. Ex. 30, p. 6.

---

[1]  Robins cites MCCARTHY several times in his report, and testified at his deposition that this is an "authoritative" treatise that he and other trademark practitioners regularly rely on. He considered MCCARTHY more authoritative than his own testimony. Ex. 58, pp. 13:9-14:2.

**Response to Alleged Fact No. 26:**

Disputed/Undisputed.  Baystate Financial does not dispute that the survey participants

were selected from Worcester, Holden and Auburn or the total number of people who live or

work in those towns.  Baystate Financial disputes the remainder of the paragraph for reasons

stated in Response 24 above; and , in addition the remainder of the paragraph contains

conclusions which are not statement of facts.

**Alleged Fact No. 27:**

Baystate Financial's only evidence of consumer perceptions is the survey of Thomas
Dupont. Ex. 35. Mr. Dupont's survey asked respondents whether they associated the words
"Bay State" with any particular business (Ex. 35, p. 7), but failed to direct their attention to
banking or financial services. Even so, his survey found that 28.9% associated the mark with
Bay State Savings Bank® or Bay State Bank. Id.

**Response to Alleged Fact No. 27:**

Disputed.  "Consumer perceptions" are not relevant to any aspect of Baystate's Motion

for Summary Judgment.  Mr. Dupont's survey was designed to test whether (a) the name "Bay

State" standing alone  brings to mind Bay State Savings Bank and (b) consumers identify Bay

State Saving Bank as a provider of non-banking financial services (i.e. investments, insurance,

financial planning).   Plaintiff's Exhibit 35 p.2.   Mr. Klein did direct his survey to the issue of

whether or not  consumers had ever heard of Bay State Savings Bank and if so what financial

services or products they associated with the Bank. *Id.* at 9.   However, these issues are not

material to Baystate Financial's  Motion for Summary Judgment.

**Alleged Fact No. 28:**

Mr. Dupont also found that 66.3% of survey respondents had heard of Bay State Savings
Bank®. Ex. 35, p. 9.  By way of comparison, 88.9% had heard of Merrill Lynch. Id.  Mr.
Dupont selected Merrill Lynch for comparison because he considered it to be the most famous of
all financial service providers. Ex. 43, p. 41:1-13.  According to Mr. Dupont's analysis, Bay
State Savings Bank® has attained 75% of the name recognition of Merrill Lynch.

**Response to Alleged Fact No. 28:**

Baystate Financial does not Dispute the first two sentences of this statement, but states

that the last sentence is a conclusory allegation which does not belong in the statement of facts.

**Alleged Fact No. 29:**

Mr. Dupont's secondary meaning survey for use in this litigation purports to show that
only 8.9% of respondents were aware of Bay State® and associated it with insurance or
investment services, but this calculation is misleading. Ex. 35, p. 5; *See* ¶32 below. Dupont's
survey and conclusions are fatally flawed because the questions fail to specify the category of
services at issue. Ex. 57, p. 3. This distinction is fundamentally necessary for any valid
secondary meaning survey. MCCARTHY ON TRADEMARKS AND UNFAIR
COMEPTITION Fourth Edition §14:9. Therefore, Dupont's 8.9% figure has no scientific value
when determining secondary meaning.[2]

**Response to Alleged Fact No. 29:**

This is a conclusory statement, argument, and opinion as to the interpretation of Mr.

Dupont's report and not a statement of fact. The reliance on the Supplemental Klein report is

misplaced and Baystate Financial has moved to strike that report for failure to timely disclose.

**Alleged Fact No. 30:**

In contrast, when Dupont asks whether respondents have ever heard of Bay State Savings
Bank, 66.3% of them responded "yes." Ex. 35, p. 9. This establishes a figure that is 75% of the
awareness of the most well known financial institution Dupont could identify, Merrill Lynch.
Ex. 57, p. 4. This is a significant measure of recognition in the Worcester area and supports Bay
State®'s claim of secondary meaning.

**Response to Alleged Fact No. 30:**

Baystate Financial does not dispute that 66% have heard of Baystate Savings Bank but

states that the remainder of the allegations are conclusory and not factual representations.

---

[2]  Klein submitted a Supplemental Report dated June 2, 2006 addressing the information and conclusions of the
Dupont Report. Ex. 57.

**Alleged Fact No. 31:**

Dupont's survey fails to accurately assess the number of respondents that associated Bay State® with a particular service. Ex. 57, p. 3. Any respondent that answered "banking" or "banking services" and did not clarify their answer concerning one of the listed categories was coded "None/Don't Know." This is misleading as to the respondent's answers and does not shed any light on the issue of confusion. Ex. 57, p. 5; Ex. 43, p. 50:5-20. Klein's confusion survey provides ample evidence on this point.[3]

**Response to Alleged Fact No. 31:**

Disputed. This is a misstatement of the testimony cited. Further the remainder of the

paragraph is conclusory and provides opinion and not a statement of fact.

**Alleged Fact No. 32:**

Dupont's conclusions are further flawed because he mistakenly eliminates respondent answers that refer to "Bay State Bank" and only counts the answers "Bay State Savings Bank." He reasons that respondents may have been referring to Bay State Federal Savings Bank. Ex. 57, p. 5. However, his deposition testimony reveals that he was told by defendant's counsel to assume that Bay State Federal operated in Worcester. Bay State Federal never operated a bank remotely close to Worcester County, no longer uses the name "Bay State," (Ex. 43, p. 23:6-24:16, p. 25:15-17) and Bay State Savings Bank is commonly referred to as "Bay State Bank." Ex. 43, p. 30:3-9. Bay State Federal Savings Bank only did business in the Brookline area, and discontinued the use of its name not long after settling a trademark dispute with Bay State Savings Bank® several years ago. Ex. 59. His theory that respondent may have been referring to Bay State Federal is not supported by any objective data. Ex. 57, p. 5.

**Response to Alleged Fact No. 32:**

The statements in this allegation are conclusory and opinion evidence and do not

represent statements of fact. Baystate Financial Disputes that the separation of responses of

"Bay State Bank" and Bay State Savings Bank" were not based on objective data. See Third

Mulligan Affidavit, Ex A. which is a Memorandum in Support of Motion for Preliminary

---

[3]  Klein also concluded a likelihood of confusion survey for use in this lawsuit. Ex. 30. The confusion survey shows that over 22% of consumers who view Baystate Financial's website are likely to think that it is affiliated with or sponsored by Bay State Savings Bank®. Ex. 30, p. 6. This is important in two respects. First, the website is relatively clear about the identity of Baystate Financial, so the likelihood of confusion would logically be much less than with other forms of promotion such as the radio show that Baystate Financial sponsors in the Worcester area where listeners respond only to the spoken word. Second, confusion is not limited to situations where consumers believe that Baystate Financial and Bay State Savings Bank® are one and the same. It includes situations where they perceive sponsorship or affiliation between the two organizations. Lanham Act §43(a), 15 U.S.C. §1125(a).

injunction where the Bank is seeking relief because of confusion between two Banks calling

themselves "Bay State Bank."

**Alleged Fact No. 33:**

Bay State® obtained state and federal service mark registrations in 1999 and 2001,
respectively. They include, among others:

| Mark | First Use | Federal Registration | State Registration | Services described |
|------|-----------|----------------------|--------------------|--------------------|
| Bay State | 5/16/1895 | 5/15/01 | 10/14/99 | IC 036: Banking Services And Financial Services, Namely, Financial Investment In The Field Of Real Estate, Stocks, Bonds, Commercial Paper, And Other Securities, Financial Management And Planning And Financial Guarantee And Surety |
| Bay State Savings Bank | 5/16/1895 | 5/22/01 | 7/20/99 | IC 036: Banking Services And Financial Services, Namely, Financial Investment In The Field Of Real Estate, Stocks, Bonds, Commercial Paper, And Other Securities, Financial Management And Planning And Financial Guarantee And Surety |
| Bay State Online | 7/5/01 | 10/1/02 | 11/14/01 | IC 036: US 100, 101, 102. G & S Banking services provided by means of a global computer network |
| Bay State Investment Services | 2/5/02 | 7/30/02 | 6/3/02 | IC 036: Investment Services, namely, mutual fund brokerage and investment, annuity underwriting, brokerage in the field of stocks, bonds, life insurance and long term care insurance and insurance agencies and underwriting in the field of life insurance and long term care insurance. |

Lewis Aff., ¶7.

**Response to Alleged Fact No. 33:**

Undisputed/Disputed. Bay State Financial Services does not dispute that Bay State

Savings Bank obtained registered marks for Bay State and Bay State Savings Bank in 2001.

Bay State Online and Bay State Investment Services registrations were not obtained until 2002.

Bay State Financial Services does dispute the validity of those marks as they relate to investment

and insurance products. Def. 56.1 Stmt. ¶¶33-38.

**Alleged Fact No. 34:**

The Patent and Trademark Office ("PTO") initially rejected the applications on the ground that "Bay State" is geographically descriptive. Ex. 11B, pp. 00710-00713. But preliminary rejections of applications at an early stage are a common occurrence. Applicants may overcome such rejections by submitting affidavits under Lanham Act §2(f), 15 U.S.C. §1052(f),[4] attesting that an otherwise descriptive mark *has become distinctive* because the applicant has used it for at least five years. This is precisely what Bank president Robert S. Lewis did in connection with the Bay State® applications.[5] Ex. 11B, pp. 00775-00776. MCCARTHY explains the effect of a §2(f) affidavit as follows:

> If a mark was registered by the [PTO] by acceptance of proof of secondary meaning under §2(f), then this constitutes a *strong administrative presumption* that the mark is in fact distinctive and a valid trademark. The presumption to which a §2(f) registration is entitled is not that the designation is inherently distinctive, but that it had acquired secondary meaning as of the date of registration. Id. at § 15.35 (citations omitted, emphasis added).

**Response to Alleged Fact No. 34:**

Undisputed that PTO initially rejected applications. But the remainder of Alleged Fact No. 34 is conclusory and an opinion as to the effect of rejected applications. Further, this allegation contains statements of law.

**Alleged Fact No. 35:**

The applications were handled by Gerry A. Blodgett, Esq., a reputable patent and experienced trademark attorney. Lewis Aff., ¶17; 2d Lewis Aff., ¶3; Blodgett Aff. ¶2; Ex. 38, p. 4.

---

[4]  Lanham Act §2(f) states in relevant part that, notwithstanding the general prohibition in §2(e) against registering a geographically descriptive mark that is not distinctive: "…nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Commissioner may accept as prima facie evidence that the mark has become distinctive, as used on or primarily in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicants in commerce for five years before the claim of distinctiveness is made."

[5]  The assertion that the Bank had used the mark for more than five years was an understatement. It had used and advertised the mark since 1895.

**Response to Alleged Fact No. 35:**

Disputed.  Bay State Financial Services Disputes that the trademark applications Bay

State Investment Services and Minuteman Investment Services were handled by Gerry Blodgett.

Mulligan Aff., Ex. C, p. 114, Plaintiff's Ex. 11M, p. 1028-29.

**Alleged Fact No. 36:**

The Bay State® and Bay State Savings Bank® applications state that the Bank had been
using the mark for "BANKING AND FINANCIAL SERVICES TO CONSUMERS AND
BUSINESSES" in International Class C ("IC") 36 since 1895.[6] Ex. 11A, 11B, p. 00703, 11C,
11D, p. 00785, p. 00967; Blodgett Aff., ¶2; Ex. 38, p. 4.

**Response to Alleged Fact No. 36:**

Disputed/Undisputed.  Bay State Financial does not dispute that the above statement is

actually made on the trademark applications, but does dispute that the information is accurate.

See Response to Alleged Fact 4 above.

**Alleged Fact No. 37:**

The description of services had been amended in good faith by July 18, 2000 at the
PTO's suggestion to add "FINANCIAL INVESTMENT IN THE FIELD OF REAL ESTATE,
STOCKS, BONDS, COMMERCIAL PAPER, AND OTHER SECURITIES FINANCIAL
MANAGEMENT AND PLANNING, AND FINANCIAL GUARANTY AND SURETY," all in
IC 36.  Blodgett Aff., ¶2; Ex. 11B p. 00762, 11D p. 00851, 11L p. 01003; Ex. 38, p. 4.

**Response to Alleged Fact No. 37:**

Disputed.  Bay State Financial Services disputes that Bay State Savings Bank was

obligated to adopt the PTO's suggested description for the services.  Plaintiff's Ex. 33, Expert

Report of Lawrence Robbins at pp. 11-12.  In fact, the PTO office action notice to the Bank

indicated that this description should only be offered if accurate.  Plaintiff's Ex. 11B, p. 734,

11D at p. 821, 11L at p. 1101.  Bay State Financial further disputes that the amended description

---

[6]  International Class ("IC") 36 includes: Insurance, financial affairs, monetary affairs and real estate affairs.

was made in good faith, and in any event, this is a conclusory statement which should not be given any weight by the Court.  *See* Response to Alleged Fact No. 26.

**Alleged Fact No. 38:**

Bay State® relied on Mr. Blodgett in all respects.  Lewis Aff., ¶17; 2d Lewis Aff., ¶3.

**Response to Alleged Fact No. 38:**

Disputed.  Gerry Blodgett testified at his deposition that he did not file the application for Bay State Investment Services.  Mulligan Aff., Ex. C, p. 114.  In addition, the application filed in November, 1999 for the registration of Minuteman Investment Services does not appear to have been drafted by Mr. Blodgett.  Neither the Bay State Investment Services mark which Blodgett admits that he did not file, nor the Minuteman Investment Services mark contains any reference to the law firm Blodgett & Blodgett.  *See* Plaintiff's Ex. 11H at p. 917-918, Plaintiff's Ex. 11M, p. 1028-1029 and compare with Plaintiff's Ex. 11D at pp. 785 – 787 (Bank appoints Blodgett & Blodgett to prosecute the application).  A further disputed fact is created by Gerry Blodgett's statement in his deposition that when a response to the office action relating to the Bay State Savings Bank marks was filed, Blodgett discussed the amended description of use of the mark with Robert Lewis, President of the Bank who affirmed that the description was accurate. Mulligan Aff., Ex. C, p. 102.

**Alleged Fact No. 39:**

The declarations supporting the trademark applications were made in good faith.  Bay State® President Robert J. Lewis believed when he signed the declarations, and still believes now, that the declarations were true and correct.  2d Lewis Aff., ¶3.  The same is true of the Internet domain name registrations.  2d Lewis Aff., ¶19.

**Response to Alleged Fact No. 39:**

Disputed.  These are conclusory allegations for which no supporting facts are supplied. Although Mr. Lewis attests in his Affidavits that he signed the declarations in connection with

the trademark filings in good faith, his testimony at his deposition, the Bank records and testimony of Gerry Blodgett create a dispute of fact as to whether that is a truthful statement. First and foremost, the Non-Deposit Investment Policy of the Bank was not enacted until October 2000, after the applications had been submitted to the PTO.  See Facts set out in Response to Alleged Fact 4 regarding the actual products and services offered by the Bank at the time the trademark applications were filed.   In addition, Gerry Blodgett testified at his deposition that his interpretation of the statement "investment in the field of real estate" indicates the idea that the bank would participate in investments in real estate by providing loans, construction loans and things like that."  Mulligan Aff., Ex. C, p. 90.  In regard to the statement in connection with the trademark application that the Bank offered financial investment in stocks, Blodgett stated in his deposition that he intended this to mean that people could borrow money from the bank and use that money to purchase stocks.  Blodgett testified that he did not mean to say that the bank was offering financial investments and stocks directly as of 2000. Mulligan Aff., Ex. C, pp. 91-92.

If in fact Mr. Lewis' statement is correct that he was relying on Mr. Blodgett in all respects, Blodgett testified that he did not really know what the bank was offering in terms of stock sale or purchases as of June 2000.  *Id*. at p. 93.  Blodgett also testified that he did not know at the time the application was filed whether or not the bank was offering construction bond services.  *Id*. at p. 95.

**Alleged Fact No. 40:**

Baystate Financial's trademark expert, Lawrence R. Robbins, Esq., testified that he saw no evidence of bad faith or misrepresentation in the applications for Bay State® marks. Ex. 24, p. 36:23-37:18; Ex. 33.

**Response to Alleged Fact No. 40:**

Disputed.  The testimony cited by plaintiff in no way supports the assertion made in ¶40

of the Statement of Facts.  The testimony is as follows:

Q.    And another point I am trying to establish is you also did not investigate or form
an opinion about whether Mr. Blodgett sincerely believed in the truth of his
expert report?

A.    I don't know how to answer that question.

Q.    Well, I know that it borders on the confusing, but at least whether he may be
right about what he asserted or wrong about what he asserted, but at least for
purposes of your analysis, good faith is not an issue?

A.    I think to answer that question I would really have to understand what you mean
by good faith.

Q.    In other words, you are not expressing an opinion about whether or not his
assertions are made with a fraudulent intent?

A.    I am not making a statement on that issue, no.

*See* Plaintiff's Ex. 24, pp. 36-37.

**Alleged Fact No. 41:**

He was asked to review Mr. Blodgett's report and Affidavit to identify areas he did not
agree with.  Mr. Blodgett's report represented that the applications were in good faith.  Mr.
Robbins did not take issue with that assertion and testified that he found no indication of bad
faith or misrepresentation. Ex. 24, p. 6:2-8, p. 36:23-37:18; Ex. 33; Ex. 38.

**Response to Alleged Fact No. 41:**

Disputed.  See disputed facts stated in Paragraph 40 above.  Mr. Robbins was not asked

as part of his assignment to comment on whether or not Mr. Blodgett in filing the underlying

trademark applications had acted in good faith.  See Ex. 33, pp. 3-4.  Further, Mr. Robins did

state in his report, however, that "given among other things the possible malpractice issues

implicit in any assessment of an attorney's work, the conflict of interest inherent in the case of an

attorney witness offering expert testimony as to the reasonable nature of his very own actions is

obvious." Plaintiff's Ex. 33. Furthermore, whether the bank or Mr. Blodgett acted in good faith

is dependent on the facts of this matter not the assertion that they acted in good faith. To the

extent that a purported fact actually consists of a legal conclusion that lacks any factual

foundation, this does not create a disputed fact. *See O'Brion, Russell & Company v. LeMay*, 370

Mass. 243, 245 (1970) "affidavits and depositions must set forth averments of specific facts.

Vague and general allegations of expected proof are wholly inadequate." CF. *Commonwealth v.*

*Two Parcels of Land*, 48 Mass. App. Ct. 693, 696 (2000) quoting *LaLonde v. Eissner*, 405 Mass.

207, 209 (1989) (mere assertions of the existence of disputed facts without evidentiary support

cannot defeat the summary judgment motion).

**Alleged Fact No. 42:**

Bay State® was not prohibited from offering insurance and investment products because of federal banking legislation. Lewis Aff., ¶5. See ¶¶43-47 below.

**Response to Alleged Fact No. 42:**

This is a legal conclusion and not a proper statement of fact.

**Alleged Fact No. 43:**

Baystate Financial's banking law expert, former Massachusetts Banks Commissioner Michael C. Hanson, Esq., testified that the Bank could properly offer all the services described in Mr. Lewis' Affidavit from the date the affidavit says the services were introduced including SBLI life insurance since 1962, mortgage life and disability insurance since 1971, retirement and educational savings plans since 1976, SBLI annuities since 1988 and stocks and bonds since 1994. Ex. 25, p. 28:1-13, p. 28:14-30:19, p. 31:2-33:1, p. 33:2-34:8. Ex. 44, p. 35:5-13..

**Response to Alleged Fact No. 43:**

Disputed. Mr. Hanson more accurately stated "I cannot speak to whether or not in any

specific year a specific product of the Bank was authorized because it would depend on **the**

**product and the structure.** It also depends on what you mean by "offered." I know that he

[Lewis] includes in here his relationship with FISCO and there is some disagreement as to

whether or not FISCO is offering those products or the Bank is offering them, but I assume in his deposition and I assume in his affidavit, that he was using a very broad use of the word "offer" when I read this the first time." Plaintiff's Ex. 25, p. 27.  In general, Hanson states on pages 28-33 of his deposition that based on the representations made in the affidavit, he has no reason to believe that the Bank was engaging in any type of regulatory violation and that the products appear to be authorized.  However, he describes these as generally deposit type products. Plaintiff's Ex. 25 at p. 33.  When specifically asked by the Bank's attorney if he agreed with Mr. Lewis' Affidavit that the Bank offered investment services including stocks, bonds and mutual funds, Hanson stated that there were periods of time in which the Banks were prohibited from offering the services directly.  Plaintiff's Ex. 25 at pp. 40-41.  Whether or not the Bank was complying with the law is not a subject of expert testimony.

**Alleged Fact No. 44:**

In addition, the Bank Commissioner's Office imposed rigorous inspections every 12 to 18 months that would have detected irregularities, but there were no irregularities at Bay State Savings Bank®.  Ex. 25, p. 42:2-44:17; 2d Lewis Aff., ¶20.

**Response to Alleged Fact No. 44:**

Disputed.  Hanson stated at his deposition that while he was the banking commissioner, there was a regulatory requirement that banks be examined by the banking division at least every year or eighteen months.  But he had no recollection of any examination of Bay State Savings Bank.  Plaintiff's Ex. 25 at p. 42.

**Alleged Fact No. 45:**

Inspections are conducted by a team of three to ten examiners, and the inspections last for about two weeks.  They encompass every aspect of banking operations.  Mr. Hanson personally supervised that process during his term as Commission of Banks.  2d Lewis Aff., ¶20; Ex. 44, p. 42:2-45:9.

**Response to Alleged Fact No. 45:**

The Bank cannot rely on the conclusory affidavit of Robert Lewis to support the statements made about Mr. Hanson. Lewis needs to state facts upon which to base his allegations.

**Alleged Fact No. 46:**

Bay State Savings Bank® has used the Bay State® and Bay State Savings Bank® Marks continuously since 1895. The following chart depicts the dates on which Bay State Savings Bank®, Baystate Financial and Baystate Financial's alleged predecessor, the Wilson Agency, introduced the services at issue in this case:

| Year | Bay State Savings Bank® | The Wilson Agency | Baystate Financial |
|------|-------------------------|-------------------|--------------------|
| 1895 | Savings Accounts, Home Mortgages And Financial Planning Services. Lewis Aff., ¶5. | | |
| 1961 | Savings Bonds. Lewis Aff., ¶5. | | |
| 1962 | Savings Bank Life Insurance. Lewis Aff., ¶5. | | |
| 1971 | Mortgage Life And Disability Insurance. Lewis Aff., ¶5. | | |
| 1976 | IRA, SEP And Keogh Retirement And Educational Plans. Lewis Aff., ¶5. | | |
| 1981 | Investment Unit Accounts. Lewis Aff., ¶5. | | |
| 1982 | | Life Insurance, IRA, SEP And Keogh Retirement And Educational Accounts And Financial Planning Services. Wilson Aff., ¶9. | |
| 1988 | SBLI Lifesaver Annuities. Lewis Aff., ¶5. | | |
| 1994 | Stocks, Bonds And Mutual Funds Through A Registered Broker Dealer. Lewis Aff., ¶5. | | |
| 1997 | | | Life Insurance, IRA, SEP, Keogh Retirement, |

| | | | | |
|---|---|---|---|---|
| | | | | Educational And Investment Accounts Including Stocks, Bonds, Mutual Funds And Financial Planning. Porter Aff., ¶10, Ex. E. |
| 2001 | | | | Joint Marketing Agreement with Fidelity Co-Operative Bank authorizing Baystate Financial Representatives to offer Investment Accounts to Fidelity customers. Ex. 40C. Baystate Financial has since executed similar agreements with other "Traditional Banking Institutions." Ex. 39; Ex. 40A-40B. |

**Response to Alleged Fact No. 46:**

<u>Disputed</u>.  See Def. 56.1 Stmt. ¶¶ 4-44.

**Alleged Fact No. 47:**

Bay State Savings Bank® has publicly promoted the products listed above.  They are listed in its annual reports.  Ex. 11, A-M; Ex. 22, A-C.  The Bank consistently received very favorable ratings on its examinations.  It has never been cited for a violation.  2d Lewis Aff., ¶20.

**Response to Alleged Fact No. 47:**

Baystate Financial Services Disputes that the Evidence cited supports the statements made and therefore these representations are not properly before the court.  In any event, the material fact at issue in this litigation is that the products offered by the Bank were deposition products and to this there is no dispute.  See Def. 56.1 Stmt. ¶¶ 26-44.

**Alleged Fact No. 48:**

The only area in which the Wilson Agency even arguably introduced a service before Bay State Savings Bank® was the sale of tax shelters, not stocks, bonds and mutual funds. Wilson Aff., ¶9.  However, the Wilson Agency mainly concentrated on life insurance. "Investment" products accounted for no more than ten or fifteen percent of its sales. Ex. 45, p. 28:18-30:16.

**Response to Alleged Fact No. 48:**

Disputed. Baystate Financial disputes that there are any facts which support the statements made in this allegation. The facts stated are not supported by the deposition testimony cited. In fact, the deposition testimony shows that these statements are hypotheses of the attorney taking the deposition and that Mr. Wilson did not agree with these statements. See Plaintiff's Exhibit 45 p. 28-30.

**Alleged Fact No. 49:**

Baystate Financial did not exist until approximately April 1997. Porter Aff., ¶3, Ex. A; Ex. 13. At that point, it commenced the sale of life insurance (which accounts for more than a majority of its business), retirement products and investments. Retirement products and investments are the smallest category of products and services. Ex. 26, p. 34:3-22.

**Response to Alleged Fact No. 49:**

Disputed and not supported by record citations of Plaintiffs – therefore does not create a dispute of fact. See Def. 56.1 Stmt. ¶¶ 4-21; See also record evidence cited by plaintiff at Plaintiff's Exhibit 26, p. 34. This only references services provided on a separate fee basis and does no support the incorrect proposition alleged the paragraph regarding business services.

**Alleged Fact No. 50:**

Baystate Financial stated under oath, in its Massachusetts service mark application, that it first used the Bay State® mark for financial services on May 1, 1997. Ex. 13; Ex. 26, p. 12:24-14:5.

**Response to Alleged Fact No. 50:**

Undisputed as to what the document states but Disputed as to the accuracy of date of First Use.

**Alleged Fact No. 51:**

The registration is in IC 36, the same as Bay State®'s registrations. Ex. 13.

**Response to Alleged Fact No. 51:**

Undisputed.

**Alleged Fact No. 52:**

Baystate Financial filed the application without first conducting a search (Ex. 28), and claims that it did not know of Bay State Savings Bank® at the time. Ex. 26, p. 55:4-20. It has not sought federal registration. Lewis Aff., ¶19.

**Response to Alleged Fact No. 52:**

Disputed. Mr. Porter's deposition testimony actually states that he does not know if a search was conducted prior to filing the state trademark application but he believes that there was a search. Mr. Porter himself did not know of the Bay State Savings Bank's existence until he received a letter from Bay State's attorney asking him to stop using the mark. Mulligan Aff., Ex. D at pp. 55-56.

**Alleged Fact No. 53:**

According to its own expert, Thomas D. Dupont, Baystate Financial's use of the Baystate name has not acquired secondary meeting. Ex. 27, p. 27:11-17.

**Response to Alleged Fact No. 53:**

Disputed. The testimony cited by Plaintiffs is out of context as Mr. Dupont was never asked to test whether or not Baystate Financial Services has acquired secondary meaning. The testimony actually states:

Q.  Incidentally one of the other issues your report does not address is whether Baystate Financial had secondary meaning. Did you ever consider that issue?

A.  The report actually indicates that it doesn't, that Bay State does not bring to mind Baystate Financial.

Q.  We've already talked about the fact that that might not be the final definition of secondary meaning. Let me ask the direct question of whether you in any way address the issue of whether the Baystate Financial mark has achieved secondary meaning for any particular class of goods or services?

A.    No.  I never tested the Baystate Financial mark.

Q.    And you have no opinion on that issue?

A.    No.

**Alleged Fact No. 54:**

It's Rule 30(b)(6) witness David Porter indicated that Baystate Financial does very little advertising, that advertising expenditures were less than $10,000 last year, and it doesn't use an advertising agency.  Ex. 26, p. 50:7-10, p. 62:12-14.

**Response to Alleged Fact No. 54:**

Disputed.  Porter claimed that Baystate Financial does very little newspaper advertising because Baystate Financial is in a relationship business not a transaction business.  Mulligan Aff., Ex. D, p. 50.  Porter testified that name recognition in the financial services business comes from doing a good job for the client and referring them in third party lines to CPA firms, law firms, property and casualty firms and you don't advertise to those people.  Instead, promotion is done through continuing education seminars or hosting dinners where current clients bring a new prospect.  Mulligan Aff., Ex. D, pp. 50-54.  Baystate Financial Services promoted itself at trade meetings like the Boston Life Underwriters Association and used business cards and letterhead to market to the public.  Def. 56.1 Stmt. ¶10.

**Alleged Fact No. 55:**

Baystate Financial claims to have the benefit of a state registration for the Baystate mark filed in 1990.  Bay State® denies that any conveyance of the mark was made to Baystate Financial from any predecessor in interest.  Lewis Aff., ¶22.  See ¶56-63 below.

**Response to Alleged Fact No. 55:**

Disputed.  Baystate Financial's predecessors in interest continuously used the trademark Baystate Financial Services until the time it was properly conveyed to Baystate Financial Services in May, 1997.  See Def. 56.1 Stmt. ¶¶6-20.

**Alleged Fact No. 56:**

Baystate Financial incorrectly alleges that predecessors in interest have used the mark since 1983 and obtained a state registration in 1990. This is contradicted by its state service mark application, which asserts under oath that Baystate Financial first used the Baystate mark on May 1, 1997. Ex. 13.

**Response to Alleged Fact No. 56:**

Disputed. Def. 56.1 Stmt. ¶¶6-21.

**Alleged Fact No. 57:**

The Wilson Agency Annual Report for 1982 portrayed itself mainly as a provider of insurance, retirement, educational and financial planning services. The Bank preceded the Wilson Agency in all these areas. The description of the "Investment Department" focuses mainly on tax shelter sales, without any reference to stocks, bonds and mutual funds. Ex. 46, pp. 18-19. There is no evidence of any written promotional materials that circulated to consumers.

**Response to Alleged Fact No. 57:**

This does not create a dispute of fact because the evidence cited does not support the statement made. See def 56.1 Stmt. para 4-21. See also Plaintiff Ex. 46 pp. 18-19 (as cited by plaintiff) which identifies Baystate Financial Services as the #1 New England Life Agency for investment sales (p. 19); and also page 18 which lists the fact that Baystate Financial Services provides investment and financial planning services as well as insurance services.

**Alleged Fact No. 58:**

The Wilson, Bergstrom & Denton Insurance Agency (the "Wilson Agency") of Boston obtained a state registration for the name Baystate Financial Services in 1990, but a letter from its attorney warned that "registration of the name really is only proof that you have been using it. Were someone to come along who has been using this name since some date prior to you, they could theoretically stop you even they have not registered it." Ex. 28; Ex. 36; p. 14:6-14.

**Response to Alleged Fact No. 58:**

Undisputed as to fact that letter exists.

**Alleged Fact No. 59**

In any event, the 1990 registration expired in 2000 because the Wilson Agency did not renew it.  Lewis Aff., ¶22; Blodgett Aff., ¶8; Ex. 16; Ex. 38, p. 6.

**Response to Alleged Fact No. 59:**

Disputed.  Baystate Financial Services does not agree that the 1990 registration filed by the Wilson Agency expired in 2000 since a new registration was filed in 1997.  Even if this were not the case, a disruption in state registration would not affect the continuous use of the Mark.  Baystate Financial Services Disputes that this affects the validity of any successor in interest use of the mark.  See outline of continuous use at Def. 56.1 Stmt., ¶¶6-21.

**Alleged Fact No. 60:**

In December 2003, the Wilson Agency purported to assign the expired registration to New England Life, but New England Life has not attempted to transfer the expired rights to any other party.  Ex. 36, p. 10:8-12:16; p. 18:16-19:10.

**Response to Alleged Fact No. 60:**

Disputed.  Def. 56.1 Stmt. ¶¶6-21; Mulligan Aff., Ex. E, ¶¶9, 14-15.  On or about March 1, 1992, the Wilson & Berkstrom Agency assigned to the Wilson Insurance Agency (the "Wilson Agency") the First Registration, the continuing exclusive right to use the Bay State marks, the goodwill associated with the Bay State marks and the Baystate Financial Services tradename. Wilson continued to use the Bay State marks in commerce and continued to do business as Baystate Financial Services from March 1, 1992 until approximately August, 1996.  In August, 1996, the Wilson Agency sold all of the above rights and interests to New England Life.  New England Life purchased all of the assets and inventory of Baystate Financial Services including not only the registration of the Bay State marks but the use of the Bay State marks, the goodwill associated with the Bay State marks and the Baystate Financial Services tradename.  New England Life then sold all of its rights and interests to David Porter, as a general agency of New

England Life. From August, 1996 to approximately January 2, 1997, Porter continuously used

the Baystate Marks in commerce and continued doing business as Baystate Financial Services.

On January 2, 1997, Porter organized Porter/Desautels and transferred to it the First Registration,

the Baystate Financial Marks, the goodwill associated with those marks and the Baystate

Financial Services tradename. On May 19, 1997, Porter/Desautels changed its name to Baystate

Financial Services, LLC, the named defendant in this action. Baystate Financial Services, LLC

has continued to use the tradename Baystate Financial Services until this day. On May 19, 1997,

Baystate Financial reregistered the "BAYSTATE FINANCIAL SERVICES" mark with the

Secretary of the Commonwealth of Massachusetts (the "Second Registration"). It did so

because, until 1997, Baystate Financial's predecessors had operated as general agencies of New

England Life. After Baystate Financial established itself as an LLC in 1997, it decided to

reregister the BAYSTATE FINANCIAL SERVICES mark in case the change in the form of

ownership had any bearing on Baystate Financial's use of the mark. Mulligan Aff., Ex. E, ¶9.

The use has been continuous bestowing valid rights on Defendant.

**Alleged Fact No. 61:**

Baystate Financial is an independent agency and is not affiliated with New England Life.
Ex. 26, p. 14:21-15:7, p. 16:14-17:1; Porter Aff., ¶3.

### Response to Alleged Fact No. 61:

Disputed. Baystate Financial does not Dispute that it is an independent agency but does

not understand the term "affiliated" in reference to New England Life. David Porter states

"although Baystate Financial ceased being a general agency of New England Life when it

separately established itself as a Massachusetts limited liability company in 1997, Baystate

Financial maintains an ongoing association with New England Financial, the service mark for

New England Life." Mulligan Aff., Ex. E, ¶3. Furthermore, Mr. Porter testified in his

deposition that Baystate Financial Services sells and services the products that New England
Financial Services offers.  Mulligan Aff., Ex. D, p. 19.

**Alleged Fact No. 62:**

Baystate Financial incorrectly asserts that it acquired the rights of the earlier Baystate
Financial Services.  Its Rule 30(b)(6) witness, David C. Porter, was asked to describe the assets
that Baystate Financial acquired when it started business in 1997.  Ex. 26, p. 22:22-23:4.  His list
did not include rights to the Baystate Financial Services mark.  It only included physical assets.
Ex. 26, p. 23:11-17.

**Response to Alleged Fact No. 62:**

Disputed.  David Porter stated in an Affidavit filed prior to the time his deposition was
taken that in August, 1996, New England Life acquired from the predecessor Wilson
partnerships the first registration, the Bay State marks, the goodwill associated with the Bay
State marks and the Baystate Financial Services tradename.  Mulligan Aff., Ex. E, ¶14.  Porter
then states that New England Life immediately sold these rights and interest to David C. Porter
as a general agency of New England Life.  Mulligan Aff., Ex. E, ¶15.

**Alleged Fact No. 63:**

He said that Baystate Financial has no documents evidencing the acquisition of any such
rights to the Baystate name.  Ex. 26, p. 123:5-10.

**Response to Alleged Fact No. 63:**

Disputed.  Mr. Porter stated that there was a written agreement regarding the transfer of
assets from New England Life but that he does not have a copy.  *Id.*

**Alleged Fact No. 64:**

On December 23, 2002, Bay State® notified Baystate Financial, in writing, to
discontinue use of the Bay State® mark.  Ex. 17.  Baystate Financial did not comply.  Lewis
Aff., ¶23.  It only learned of Baystate Financial when Baystate Financial established a small one-
person office in Worcester early in 2003.  Ex. 54, p. 113:13-22.

**Response to Alleged Fact No. 64:**

Undisputed as to first two sentences.  Disputed as to last sentence.  Testimony does not support representation made.

**Alleged Fact No. 65:**

On November 23, 2003, Baystate Financial announced a major expansion including a 38-employee financial planning business located across the Worcester City Common from Bay State®'s headquarters.  The announcement asserts that the expansion made Baystate Financial the largest financing planning operation in New England with 168 employees and annual sales of $176 million, and that expansion will continue.  Lewis Aff., ¶24; Ex. 18.

**Response to Alleged Fact No. 65:**

Disputed.  Baystate Financial does not dispute that it is the largest financial planning operation in New England with 168 employees and annual sales of $176 million.  It does dispute the characterization of the acquisition of the Worcester financial planning office as a major expansion as Baystate Financial Services has offices in Rhode Island, Maine, New Hampshire and Massachusetts.  Mulligan Aff., Ex. D, pp. 53-54.

**Alleged Fact No. 66:**

Baystate Financial does not conduct paid advertising but does promote itself by other means that threaten dilution and confusion.  Until 2003, its activities were confined to Boston.  Some newspapers misidentify it as "Bay State®" suggesting that the Baystate name is not well recognized.  Ex. 19; Lewis Aff., ¶25.

**Response to Alleged Fact No. 66:**

Disputed.  Baystate Financial Services contends that all statements made in connection with this paragraph are conclusory allegations which constitute argument and assumptions and not facts.  Baystate Financial Disputes the one fact regarding location and states that it operates in Maine, New Hampshire, Rhode Island and Massachusetts.  Mulligan Aff., Ex. D., pp. 53-54.  Baystate Financial does conduct paid advertising.  *Id*. at p. 50.

**Alleged Fact No. 67:**

Baystate Financial holds seminars for retirement planning. This is an area in which Bay State® also operates. Ex. 47A-47C. However, Bay State® preceded Baystate Financial in this area of service by 21 years. Lewis Aff., ¶5; Porter Aff., ¶10, Ex. A. The invitations for Baystate Financial's seminars are sent to potential attendees in the Worcester County area and are conducted in facilities that are in the same geographic market in which Bay State® conducts its business. Ex. 47A-47C. Confusion is more likely than not considering the geographic area and similarity of name.

**Response to Alleged Fact No. 67:**

Any conclusory statements relating to confusion are not admissible as part of a statement of facts. Baystate Financial does not dispute that it offers financial planning seminars but this does not create a dispute of material fact. Mr. Lewis's affidavit at ¶5 does not state that retirement planning seminars were held by the Bank at any point in time. Finally, the fact that Bay State Savings Bank and Baystate Financial Services have offered financial planning services does not mean that they offered similar products.

**Alleged Fact No. 68:**

Baystate Financial also promotes itself by distributing promotional materials in the same geographic market as Bay State® for the same or similar services. For example, Baystate Financial distributed a flier in Auburn, just miles from one of Bay State®'s branches that advertised many of the services provided by the bank, including but not limited to Mutual funds, IRA's and insurance and retirement planning. Ex. 48.

**Response to Alleged Fact No. 68:**

This does not create a dispute of a material fact because there are no allegations as to when the overlap, if any occurs. In any event, Baystate Financial services has stated that it is the first user in this market of Mutual Funds, IRAs and retirement planning and nothing that the Bank has submitted has created evidence to the contrary.

**Alleged Fact No. 69:**

The Bank's receptionist, Mary F. Gaudet, has testified that she has experienced instances of confusion where she has taken phone calls from members of the public who believe they are calling Baystate Financial. Ex. 49, pp. 4:9-6:18. She has stated that she receives these phone calls 3 – 4 times per month. On some occasions, she has been informed that those who are calling her had received a phone number to Bay State® from the telephone operator. Id.

**Response to Alleged Fact No. 69:**

Baystate financial does not dispute that this represent Ms. Gaudet's testimony. However, the issue of confusion is not relevant to the Bank's trademark infringement claim.

**Alleged Fact No. 70:**

Bay State® has mistakenly received correspondence intended for Baystate Financial at the Bank's address. In one example, Robert Lewis, president of Bay State® received advertisement from the Fallon Clinic. The sender was under the false impression that Mr. Lewis was employed with Baystate Financial Services. Ex. 50. In another example, Bay State® was mistakenly sent an invoice for services that was meant for Baystate Financial. Ex. 51.

**Response to Alleged Fact No. 70:**

Disputed. There is no evidence in the record as to what the sender intended, and the testimony is inadmissible hearsay and should be stricken from the record.

**Alleged Fact No. 71:**

Baystate Financial is currently promoting itself through one of its broker dealers, Fidelity Bank. There is a large billboard reading "Bay State" at that facility, despite the fact that Bay State® has no affiliation with either Fidelity Bank or Baystate Financial. Ex. 52.

**Response to Alleged Fact No. 71:**

There is no evidence in the record to show that this has any relationship to Baystate Financial Services, further, it is hearsay, is of no relevance and should be stricken from the record.

40

**Alleged Fact No. 72:**

Attorney for Bay State®, James C. Donnelly, Jr., Esq., recently received an electronic communication through Internet Law Today that was under the impression that Attorney Donnelly represents Baystate Financial. This entity was looking to communicate with Attorney Donnelly as legal counsel for Baystate Financial in connection with an alleged securities fraud investigation of Baystate Financial. The message states in part: "The Securities Fraud Prevention Organization…is currently investigating your client, their bank and insurance services department and how they relate to the unregistered sale of inter and intra state securities." The communication was intended for Baystate Financial, not the Bank. Ex. 53.

**Response to Alleged Fact No. 72:**

This entire statement, including the evidence required to support the statement is hearsay.

There is no affidavit from Attorney Donnelly attesting to his receipt of such an e-mail nor is he

qualified to testify as to the intent of the e-mail.

**Alleged Fact No. 73:**

At least in its Worcester office, the Baystate Financial mark is barely displayed. Lewis Aff., ¶26; Ex. 20.

**Response to Alleged Fact No. 73:**

Disputed.

**Alleged Fact No. 74:**

Baystate Financial sponsors a radio show concerning financial planning and investment issues. The show is broadcast from three stations including one in Worcester. It promotes Baystate Financial's name orally, in a manner that is susceptible to confusion. Ex. 6D; Ex. 26. p. 59:17-61:23.

**Response to Alleged Fact No. 74:**

Undisputed that Baystate Financial Services sponsors a radio show. The statement "in a

manner that is susceptible to confusion" is conclusory and an inadmissible fact.

**Alleged Fact No. 75:**

The Boston Business Journal ("BBL") recently observed that:

> Baystate Financial has been growing, albeit under the radar.  However
> [Baystate Financial CEO David] Porter recently told the Boston Business
> Journal that the next couple years will present solid growth opportunities
> – and more recognition – for Baystate Financial, as it looks to expand to
> Western Massachusetts and south toward Hartford."  Lewis Aff., ¶27; Ex.
> 21.  (Emphasis added).

**Response to Alleged Fact No. 75:**

Disputed.  Baystate Financial Services states that the sentence "Baystate Financial has

been growing under the radar" is a conclusion and not a statement of fact.  Baystate Financial

Services states that the remainder of the paragraph is hearsay and not a direct quote from Porter,

therefore is a conclusory allegation.

**Alleged Fact No. 76:**

Baystate Financial admits that the parties' present and proposed use of the Bay State®
mark will cause dilution and confusion.  Baystate Financial's counterclaim alleges that:

> The BAYSTATE Marks and Bank Marks are similar if not virtually identical.
> The dominant or core element of the respective marks is Baystate and Bay State.
> The only appreciable difference between the marks is a single space, an almost
> insignificant distinction.  The parties' core marks sound the same and look the
> same, and therefore convey the same commercial impression to consumers.  It is
> unlikely that consumers will be able to distinguish between the BAYSTATE
> Marks associated with Baystate Financial's long-standing and highly regarded
> financial services business *and the Bank Marks representing the Bank's neophyte
> financial services offerings.*  See Defendant's Counterclaim, ¶32.  (Emphasis
> added).

**Response to Alleged Fact No. 76:**

This is a conclusory statement and is taken out of the context of the pleading.  Further

responding, Plaintiff's recent use of the Bay State name for financial and investment services is

likely to harm Baystate Financial Services; Baystate Financial Services' continued use of its

name since 1983, without any confusion until Bay State Savings Bank's recent adoption of "Bay

State Investment Services" is compelling evidence that Plaintiff is palming off Baystate

Financial Services' mark and creating the confusion.

The Defendant,
BAYSTATE FINANCIAL SERVICES, LLC.,
By its attorneys,

_____

Christopher P. Litterio (BBO #551098)
Maureen Mulligan (BBO#556482)
RUBERTO, ISRAEL & WEINER, P.C.
100 North Washington Street
Boston, Massachusetts 02114
(617) 742-4200

Dated:  June 16, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon the attorney of record for plaintiff, James Donnelly, Esquire, Mirick, O'Connell, DeMallie & Lougee, LLP, 100 Front Street, Worcester, Massachusetts, 01608-1477  via mail and/or electronic service on June 16, 2006.

_____
Maureen Mulligan

U:\MSM\Baystate Financial\pleadings\Baystate Financial Reply to Bank CMF.doc