UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| BAY STATE SAVINGS BANK <br>     Plaintiff <br><br> v. <br><br> BAY STATE BANCORP, INC. <br>   AND BAY STATE FEDERAL <br> SAVINGS BANK <br>     Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

99cv12383EFH

Civil Action No.

MEMORANDUM IN SUPPORT OF BAY STATE SAVINGS
BANK'S MOTION FOR PRELIMINARY INJUNCTION

I.    Nature and Status of Proceedings

This is a suit by plaintiff Bay State Savings Bank ("Bay State") for violation of

Sections 43(a) and 43(c) of the Lanham Act, 15 U.S.C. §1125(a), (c), and G.L.M. c.110B, §11,

and for unfair and deceptive trade practices in violation of G.L.M. c.93A, §11, arising from the

use by the defendants Bay State Bancorp, Inc. and Bay State Federal Savings Bank (collectively

referred to as "Federal") in interstate commerce of the service mark "Bay State Bank" and

Internet domain name "baystatebank.com" which are confusingly similar to Bay State's service

mark, "Bay State Savings Bank," and from the unauthorized registration by Federal of the

Internet domain name "baystatesavingsbank.com," which dilutes Bay State's service mark by

lessening its capacity to identify and distinguish Bay State's services from those of other financial

institutions.

Changes in the banking industry and the increasing role of "e-commerce" on the Internet

have spawned a number of similar trademark suits in recent years.  Apart from its Internet aspects,

this case is strikingly similar to Jefferson Bankshares, Inc. v. Jefferson Savings Bank,

13 U.S.P.Q.2d (BNA) 1485, 1989 U.S. Dist. LEXIS 10392 (W.D. Va. June 20, 1989)(granting

preliminary injunction), subsequent opinion at 14 U.S.P.Q.2d (BNA) 1443, 1989 U.S. Dist.

LEXIS 16165 (W.D. Va. 1989)(granting permanent injunction).  In Jefferson, the defendant

planned to truncate its name to "Jefferson Savings Bank" from its original "Jefferson Savings &

Loan Association."  Citing Proverbs 22:1 for the ancient proposition that "A good name is rather

to be chosen than riches," and a host of more recent authorities, the Jefferson court preliminarily,

and later permanently, enjoined the defendant bank from implementing the name change because

of the likelihood that consumers would confuse "Jefferson Savings Bank" with the plaintiff

Jefferson National Bank.[1]

    If anything, the facts of this case militate even more strongly than Jefferson in favor of

injunctive relief: (1) Bay State's survey evidence provides stronger and more compelling evidence

that consumers will likely be confused if Federal is allowed to become "Bay State Bank"; (2) the

survey evidence is corroborated by incidents of actual confusion involving customers and vendors

of both institutions; and (3) in addition to establishing a web site at "baystatebank.com" from

which it offers electronic banking services and self promotional information, Federal has

registered the Internet domain name "baystatesavingsbank.com."  Although there is no web site at

---

[1]    Other cases involving service mark disputes between banks include Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Ass'n, 651 F.2d 311 (5th Cir. 1981); Kyhos v. Perpetual Savings & Loan Ass'n, 480 F.2d 204 (4th Cir. 1973); First Keystone Federal Savings Bank v. First Keystone Mortgage, Inc., 923 F. Supp. 693 (E.D. Pa. 1996); Northern Trust Corp. v. Northern Bank & Trust Co., 22 U.S.P.Q.2d (BNA) 1391, 1991 U.S. Dist. LEXIS 20349 (D. Mass. Nov. 26, 1991); Dominion Bankshares Corp. v. Devon Holding Co., Inc., 690 F. Supp. 338, 344 (E.D. Pa. 1988); First Nationwide Bank v. Nationwide Savings & Loan Ass'n, 682 F. Supp. 965 (E.D. Ar. 1988); Chase Federal Savings & Loan Ass'n v. Chase Manhattan Financial Services, Inc., 681 F. Supp. 771 (S.D. Fla. 1987); Horizon Financial, F.A. v. Horizon Bank of Pennsylvania, 2 U.S.P.Q.2d (BNA) 1696, 1987 U.S. Dist. LEXIS 643 (E.D. Pa. Feb. 3, 1987); and Home Savings of America v. Home Savings Ass'n, 219 U.S.P.Q. (BNA) 157, 1982 U.S. Dist. LEXIS 10269 (S.D. Tex. Sept. 14, 1982).

that address, the mere registration by Federal denies Bay State the opportunity to use its own name for purposes of electronic commerce without any legitimate benefit to the public at large, or even to Federal's own customers, and itself constitutes service mark infringement and dilution under the Lanham Act and state law. See, e.g., Jews For Jesus v. Brodsky, 993 F. Supp. 282, 302 (D. N.J. 1998); Actmedia, Inc. v. Active Media Int'l, Inc., 1996 WL 466527, *1 (N.D. Ill. July 17, 1996); Panavision Int'l, L.P. v. Toeppen, 945 F. Supp. 1296, 1303 (C.D. Cal. 1996), aff'd, 141 F.3d 1316 (9th Cir. 1998). It is hard to conceive of an innocent explanation for Federal's registration of Bay State's service mark as a domain name.

On the basis of Jefferson and the recent spate of Internet trademark cases, Bay State asks this Court to issue a preliminary injunction ordering the defendants to cease using the name "Bay State Bank" in retail banking operations and as an Internet domain name and address, and to transfer to Bay State the Internet domain name "baystatesavingsbank.com."

## II.     Statement of Facts

Bay State was formed by special legislation entitled "An Act To Incorporate The Bay State Savings Bank" published as Ch. 107 of the Acts of 1895. It is a mutual corporation, meaning that ownership belongs to its depositors. This form of ownership emphasizes accountability to the community, rather than to remote stockholders whose interest is focused on investment returns and profitability. Affidavit of Robert J. Lewis ("Lewis Aff."), ¶2; **Exhibit A- 1.**[2]

Bay State is headquartered in Worcester. It has offered thrift, loan and other financial services to the banking public continuously since 1895. Id., ¶¶ 3, 4; **Exhibit A-6.** For almost 105 years, it has conducted advertising and promotional activities to enhance and promote its public

---

[2]     All of the exhibits referenced in this memorandum are found in Bay State's Appendix of Exhibits.

image. Advertising expenditures have grown steadily from $7,059 in 1960 to an estimated $300,000 in 1999. Over the last ten years, such expenditures have totaled approximately $1,557,582. Id., ¶5; **Exhibits A-8 through A-14**. The advertising media include high power radio stations whose listening area encompasses Central and Eastern Massachusetts, as well as newspapers with regional and statewide circulation. Id., ¶5(a), (d).

Advertising activities are supplemented by personal diplomacy. Bank representatives regularly speak to local groups to promote bank services, and tout its enviable record of community involvement. Id., ¶6; **Exhibits B-1 through B-6**.

Bay State's record of community involvement is very enviable indeed. According to information published by the Small Business Administration ("SBA"), it is the ninth largest originator of SBA loans in Massachusetts, and the third largest originator of SBA loans to minority owned businesses. It is the fifth largest originator of home mortgages. Its record of reinvestment in the community is rated "Outstanding." Id., ¶8; **Exhibits D-1 through D-3**. Bay State's Vice President John S. Hamilton was recognized by the SBA as the Massachusetts Financial Services Advocate of the Year for 1999.[3] Id., ¶6 (a); **Exhibit B-1**.

As a result of its advertising expenditures and public relations activities, the trade name and service mark "Bay State Savings Bank" has acquired distinctiveness, and is associated by a large proportion of the public exclusively with banking and financial services provided by Bay State. Id., ¶10; **Exhibit F**.

---

[3]    The awards mentioned are only the most recent samples in a truly extraordinary record that is well documented in the materials supporting this motion. See **Exhibits B-1 through B-6**. Such activities have generated substantial public recognition. A selection of newspaper articles which chronicle Bay State's contributions to the community as far back as the 1920's are included in the Appendix of Exhibits as **Exhibit C**.

In addition, many members of the public have come to associate the name "Bay State Bank" exclusively with Bay State. This is evidenced not only by the recent public image survey (Id., ¶10; **Exhibit F**), but also by correspondence from third parties, including real estate brokers (who are a leading source of referrals for mortgage loans), customers and even a United States Senator. Id., ¶9; **Exhibits E-1 through E-5**.

As a result of the recognition arising from such activities, Bay State's assets have grown from $20,241 in 1895 to over $165 million as of September 30, 1999. It now conducts business from five full time branches in Worcester, Auburn and Holden, and one branch at Auburn High School, which operates during the school year. It has a work force of 60 full-time employees, and approximately 17,478 customer accounts of all kinds, with customers located in approximately 150 zip code locations across Massachusetts, and in twenty-nine other states. Id., ¶8; **Exhibits D-4 and D-5.**

Federal, by contrast, began business in 1920 under the name Coolidge Corner Cooperative Bank. Id., ¶11; **Exhibit G-1**. It only began using the name "Bay State Federal Savings Bank" in 1960. Id.; **Exhibit G-2**. As a result of a February 1997 merger with Union Federal Savings Bank, Federal now has a total of six branches, including two in Brookline, and one each in Boston, Dedham, Norwood, and Westwood, Massachusetts. Id., **Exhibit G-3**.

Until recently, Federal was a mutual bank, like Bay State. On February 12, 1998, it converted to stock ownership with all of its stock owned by Bay State Bancorp, a recently formed Delaware corporation. The conversion from mutual to stock ownership was financed by a public offering of approximately 2.3 million shares of stock, which generated net proceeds of approximately $45.3 million. According to its Annual Report, the purpose of the public offering

was to expand its loan portfolio and prepare for future acquisitions. As of September, 1999, Federal reported assets of slightly more than $350 million. Id., ¶12; **Exhibits G-4 through G-6.**

In approximately April 1999, Federal began to use the name "Bay State Bank" for certain promotional purposes. Its letterhead and some promotional materials identify it as "Bay State Bank." Id., ¶13; **Exhibit H-1.** It is now listed in the NYNEX yellow pages, and through Bell Atlantic directory assistance, simply as "Bay State Bank." Id.; **Exhibit H-2.** Federal's Internet web site is listed under the domain name "baystatebank.com" (Id.; **Exhibit H-3**), and the bank refers to itself by that name in documents which it has posted on the Internet for distribution via the PRNewswire. Id., **Exhibit H-4.** Federal has begun advertising under the name "Bay State Bank" in publications such as the Banker & Tradesman, a statewide trade publication which circulates extensively to real estate brokers and businesses and financial institutions across Massachusetts. Id.; **Exhibit H-5.** [4]

Before it began using the name "Bay State Bank," Federal was well aware of Bay State Saving's existence. Although their primary markets are slightly different, both have customers all across Massachusetts. Representatives of both institutions participate in similar industry functions. Both institutions advertise in statewide trade publications such as the Banker & Tradesman. Both share similar vendors, including Investors' Bank & Trust, which serves as the IRA custodian for both institutions, and the Connecticut On-Line Computer Center ("COCC"), which provides them both with data processing services.

Although the name "Bay State Bank" has been adopted for some purposes, the name "Bay State Federal Savings Bank" continues to be used for many others. The sign at Federal's

---

[4]    In the Banker & Tradesman advertisements, Federal's branch locations are printed in very small print at the bottom of the ad, de-emphasizing its location in Brookline, Dedham, Norwood, Westwood and Boston.

headquarters in Brookline has been changed to "Bay State Bank," but its five other branch locations continue to display exterior signs identifying them as "Bay State Federal Savings Bank." The names "Bay State Bank" and "Bay State Federal Savings Bank" are used interchangeably in product literature available at Federal's branch locations. Id., ¶15; **Exhibits H-6, H-7**.

Public recognition of Federal's attempt to adopt the trade name and service mark "Bay State Bank" is still quite limited. Independent publications such as The Boston Globe and The Boston Herald, without exception, continue to refer to the bank by its traditional name, "Bay State Federal." Id., ¶16; **Exhibit H-8**. So far as Bay State is aware, such publications have yet to refer to Federal even once under its newly assumed moniker, "Bay State Bank." Id.

Nevertheless, Federal's use of the name "Bay State Bank," and consequent elimination of the word "Federal" from its name, has been sufficient to generate significant confusion within a relatively short period of time. Bay State has received telephone calls from individuals inquiring about accounts at Federal. Id., ¶17; **Exhibits I-1 through I-6**. One noteworthy call, from the "Kennedy for Senate 2000" organization, asked whether a CD account was located at the Bay State Bank in Worcester or Brookline. The account in question was at Bay State, not Federal. Id., ¶17(a); **Exhibit I-1**. Bay State has also received credit verification requests on behalf of customers of Federal, and has unintentionally caused difficulty for those customers by reporting that they had no financial relationship with Bay State. In response to investor announcements issued by Federal, members of the public have called Bay State to ask about its stock. Presumably, such callers obtained Bay State Saving's phone number through Bell Atlantic directory assistance, the NYNEX Yellow Pages or from Federal customers who themselves had been confused into thinking that Bay State and Bay State Bank were the same institution. Such confusion even extends to the Federal Home Loan Bank, which on more than one occasion has

notified Bay State of maturing advances which were actually made to Federal. Id., ¶17(b)-(d);

**Exhibits I-2, I-3**.

The confusion also extends to vendors of both institutions, who have begun to confuse them repeatedly. Investors Bank & Trust has repeatedly sent documents that belong to Federal to Bay State, and vice versa. The documents received by Bay State include IRA applications and distribution requests from Federal customers which identify it only as "Bay State Bank." In some cases the name is typed on the form, presumably by Federal employees. Other times it is handwritten. In all cases, the form is signed by the Federal customer. Id., ¶17(e); **Exhibit I-4**. Another example is a form received by Bay State from Federal's Y2K compliance vendor, confirming a project to be performed for Federal. Id., ¶17(f); **Exhibit I-5**. A third example is the misdirection of correspondence from COCC, which provides data processing services to both institutions. This is especially remarkable, since, as noted above, Bay State and Federal are both shareholders of COCC, and Federal's CEO is a member of its board of directors. Id., ¶17(g); **Exhibit I-6**.

Incredibly, the confusion also extends to employees of Federal who, upon receiving telephone calls from Bay State personnel seeking to resolve the very issues in this suit and being told that the caller was from Bay State, have responded "Oh, so you're with us."[5] Id., ¶17(h).

A recent survey of customers and non-customers in Bay State Saving's primary market area shows that there is a very high recognition of the name Bay State Savings Bank. Almost two thirds of the survey participants also recognized the name "Bay State Bank," and most believed that the name "Bay State Bank" referred to Bay State. Very few had heard of a bank called "Bay

---

[5]    The foregoing summary is limited to those incidents presently known to Bay State. Discovery is likely to show that Federal has experienced similar incidents of confusion.

State Federal." The widespread perception that "Bay State Bank" refers to Bay State, rather than another institution, establishes a substantial likelihood of confusion and that Bay State will suffer irreparable harm unless Federal's use of "Bay State Bank" is enjoined. Id., ¶10; **Exhibit F**.

By letter dated April 29, 1999, Bay State's attorney notified Federal that its use of the name "Bay State Bank" was causing confusion, and should be discontinued. Id., ¶18; **Exhibit J**. Federal not only refused but, on July 16, 1999, retaliated by registering Bay State's own service mark "baystatesavingsbank.com" as an Internet domain name. Id., ¶19; **Exhibit K-1**. Bay State had registered the domain name "baystatesavings.com" some fifteen months earlier, in February, 1998. Id., ¶20. The registration by Federal can only have been intended to dilute that registration by picking up inquiries from customers searching for Bay State using its full name, "www.baystatesavingsbank.com," as the address.

The Service Agreement with Network Solutions, which governs the registration process, prohibits Federal's use of a registered name for any illegal purpose. It also requires that Federal to abide by Network Solutions' Domain Name Dispute Policy, which includes a representation by Federal that its registration does not interfere with or infringe upon the rights of any third party, and that the name is not being registered for any unlawful purpose. Id.; **Exhibits K-2, K-3**. Contrary to these representations, the only imaginable purpose for Federal's registration of "baystatesavingsbank.com" is to suppress competition and dilute Bay State's mark by depriving it of the use of its own name for legitimate advertising and promotional purposes in e-commerce. Id., ¶¶ 20, 21.

On July 16, 1999, Bay State applied to the Secretary of the Commonwealth of Massachusetts for the service mark "Bay State" in connection with banking and financial services. Id., ¶22. The registration was formally issued on October 14, 1999. Id.; **Exhibit L**. Unlike

Federal's reservation of the domain name "baystatesavingsbank.com," Bay State' state

registration was purely defensive. Bay State does not seek to prevent Federal from using the

words "Bay State" altogether. On a "belt and suspenders" theory, it seeks only to reaffirm and

supplement its right to the name "Bay State" as granted by Ch. 107 of the Acts of 1895. Bay

State stands ready to consent to the use by Federal of the geographically descriptive phrase "Bay

State," *provided* that the phrase is at all times used in conjunction with the word "Federal," which

should be printed in substantially the same style with prominence equal to "Bay State." Id.

III.    Argument

A party is entitled to preliminary injunctive relief in a trademark case[6] under Rule 65 of the

Federal Rules of Civil Procedure if it can show that (1) it is likely to succeed on the merits of its

claims, (2) it will suffer irreparable injury if the injunction is not granted, (3) such injury outweighs

the harm which the other party will suffer if the injunction is not granted, and (4) the public

interest will not be adversely affected by the granting of the injunction. TEC Engineering Corp. v.

Budget Molders Supply, Inc., 82 F.3d 542, 544 (1st Cir. 1996), following remand, 927 F. Supp.

528 (D. Mass. 1996).

A.    Bay State Is Likely To Succeed On The Merits Of Its
      Claims.

1.    Bay State is likely to prove a violation by Federal of
      Section 43(a) of the Lanham Act

Section 43(a) of the Lanham Act creates a federal cause of action for infringement of

unregistered service marks. Jefferson, 1989 U.S. Dist. LEXIS 10392, *5-6 (citing cases). To

prevail in a Section 43(a) action, Bay State must prove the exclusive right to use the service mark

---

[6]      While this case technically involves a service mark, as opposed to a trademark, the legal analysis is the
same. Black Dog Tavern Co., Inc. v. Hall, 823 F. Supp. 48, 52 n.4 (D. Mass. 1993), citing Boston
Athletic Assn' v. Sullivan, 867 F.2d 22, 23 n.1 (1st Cir. 1989).

"Bay State Savings Bank" in connection with banking services and that the use by Federal of the mark "Bay State Bank" is likely to confuse consumers as to the origin of the banking services provided by each bank. Jefferson, 1989 U.S. Dist. LEXIS 16165, *23-24, quoting Chase Federal, 681 F. Supp. at 779; Dominion Bankshares, 690 F. Supp. at 344; see also Horizon Financial, 1987 U.S. Dist. LEXIS 643, *18-19; Railroad Salvage of Connecticut v. Railroad Salvage, Inc., 561 F. Supp. 1014, 1019 (D. R.I. 1983)(Selya, J.). Likelihood of success on the merits of such claim is shown here.[7]

      a)    Bay State has the exclusive right to use the service
              mark "Bay State Savings Bank."

Bay State is highly likely to show that the descriptive mark "Bay State Savings Bank" has developed secondary meaning so as to enjoy protection under Section 43(a) of the Lanham Act. It has been used exclusively by Bay State since the bank was created by the Massachusetts legislature in 1895. See Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F. Supp. 994, 1008 (D. Mass. 1988)(long and exclusive use a factor in establishing secondary meaning). Bay State is a large and prominent banking institution with customers all across Massachusetts and in twenty-nine other states. Id. (size and prominence of plaintiff's enterprise a factor in establishing secondary meaning). It has engaged in extensive advertising and promotional efforts over the years, and has been the subject of many newspaper articles documenting its distinguished record

---

[7]   Because the basis for an action under M.G.L. c.110B, §11 is "essentially the same" as under the Lanham Act, Bay State's showing that Federal's use of the mark "Bay State Bank" for retail and Internet banking services will probably cause confusion among consumers as to source warrants preliminary injunctive relief under that statute as well. See Bayshore Group, Ltd. v. Bay Shore Seafood Brokers, Inc., 762 F. Supp. 404, 409 n.1 (D. Mass. 1991), citing Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 486 (1st Cir. 1981). The presence of "'appreciable evidence of buyer confusion'" also entitles Bay State to injunctive relief under Chapter 93A. NEC Electronics, Inc. v. New England Circuit Sales, Inc., 722 F. Supp. 861, 867 (D. Mass. 1989), quoting Professional Economics, Inc. v. Professional Economic Services, Inc., 12 Mass. App. Ct. 70, 80 (1981); see American Airlines v. 1-800-American Corp., 622 F. Supp. 673, 686 (1985)(same conduct infringing American's registered service marks warranted injunctive relief under Illinois Uniform Deceptive Trade Practice Statute).

of community service.  See President & Trustees of Colby College v. Colby College-New

Hampshire, 508 F.2d 804, 808 (1st Cir. 1975)(normal consequence of substantial publicity may be

inferred); Calamari Fisheries, 698 F. Supp. at 1009 (through favorable restaurant reviews by the

media and its advertising, plaintiff became known to restaurant-going public for its seafood);

McKenney & Long, Federal Unfair Competition: Lanham Act §43(a), §3.05 at 3-58 (publicity by

third-parties and other indicia of recognition of the product in the marketplace are evidence of

secondary meaning)(citing cases).

    A recent survey provides direct evidence of secondary meaning by establishing that a

significant percentage of consumers associate the mark "Bay State Savings Bank" with the

plaintiff institution.  See Boston Beer Co. v. Slesar Bros. Brewing Co., 9 F.3d 175, 182 (1st Cir.

1993), citing inter alia President & Trustees of Colby College, 508 F.2d at 809; International

Kennel Club v. Mighty Star, Inc., 846 F.2d 1079, 1085 (7th Cir. 1988)(survey evidence well-

recognized means of establishing secondary meaning; in fact it is only direct evidence on the

question).[8]  The survey evidence, along with evidence as to Bay State's growth, size, advertising,

prominence in the community and 104-year exclusive public use of the phrase "Bay State" in

combination with words "Savings" and "Bank," establish that Bay State is highly likely to show

that the mark "Bay State Savings Bank" has developed a secondary meaning in the area of

banking and finance such that Bay State has a protectable interest in the mark under Section 43(a)

---

[8]    The survey is highly probative of secondary meaning because (a) it was not conducted for the purpose of
litigation, (b) a proper foundation has been laid for its admissibility, and (c) it obtained answers to
questions relevant to this litigation (e.g. "Does Bay State Savings Bank have a branch in Worcester?").
See Chase Federal, 681 F. Supp. at 779-781 (citing cases).

of the Lanham Act and Massachusetts law.  See Jefferson, 1989 U.S. Dist. LEXIS 16165, *18

(concluding on similar facts that mark "Jefferson National Bank" had developed a secondary

meaning in the area of banking and finance); see also President & Trustees of Colby College, 508

F.2d at 808 (secondary meaning established in a geographically descriptive mark where the mark

no longer causes the public to associate the services with a particular place but to associate the

goods with a particular place).

> b)    Federal's adoption of the name "Bay State Bank" is
>        likely to cause consumer confusion.

In the First Circuit, likelihood of confusion is determined by analyzing the following eight

factors, each of which requires its own factual findings:

> (1) the similarity of the marks; (2) the similarity of the goods;
> (3) the relationship between the parties' channels of trade; (4) the
> relationship between the parties advertising; (5) the classes of
> prospective purchasers; (6) evidence of actual confusion; (7) the
> defendant's intent in adopting its mark; and (8) the strength of
> plaintiff's mark.

Boston Athletic Ass'n. v. Sullivan, 867 F.2d 22, 29 (1st Cir. 1989).  Bay State is highly likely to

show that the public will be confused by having to distinguish between institutions named "Bay

State Savings Bank" and "Bay State Bank" and by Federal's adoption of the name "Bay State

Bank" and the domain names "baystatebank.com" and "baystatesavingsbank.com."

(1) *Similarity of marks.*  That the two service marks, "Bay State Savings Bank" and "Bay

State Bank," are very similar cannot be doubted.  See Horizon Financial, 1987 U.S. Dist. LEXIS

643, *25("Horizon Financial, F.A." and "Horizon Bank of Pennsylvania" found "strikingly

similar" in appearance, sound and meaning); First Nationwide Bank, 682 F. Supp. at 976 ("the

difference between the generic words 'savings' and 'bank' will not be the focus of purchasers'

attention."); Jefferson, 1989 U.S. Dist. LEXIS 10392, *7 ("Jefferson National Bank" and

"Jefferson Savings Bank" found "very similar"). The two marks share the dominant phrase "Bay State." First Keystone Bank, 923 F. Supp. at 704  Because that phrase is geographically descriptive, the elimination of the word "Federal" from the mark employed by Federal dramatically increases the degree of similarity between the marks "Bay State Savings Bank" and "Bay State Bank," thus increasing the likelihood of confusion between the two. Id. (where trademark is itself weak, minor additions or changes may "effectively negate any arguably confusing similarity"); Sun Banks, 651 F.2d at 316 (no likelihood of confusion between "Sun Banks" and "Sun Federal Savings and Loan Association").[9]

    (2) *Similarity of services.* Bay State and Federal are both savings and loans offering virtually identical banking services to the banking public. "This is not a case where the services of one bank greatly differ from the other bank or where each bank caters to a distinct customer group." Horizon Financial, 1987 U.S. Dist. LEXIS 643, *26; see Northern Trust, 1991 U.S. Dist. LEXIS 20349, *6-7. The fact that both parties are banks "adds substantially to the likelihood of confusion." First Nationwide Bank, 682 F. Supp. at 977, quoting Citibank, N.A. v. Citibanc Group, Inc., 724 F.2d 1540, 1548 (11th Cir. 1984). "With this similarity of service comes the potential for the public's mistaken assumption of connexity between the providers of the related services. The more likely the public is to make such an association, the less similarity

---

[9]    Like Jefferson, the issue in this case is whether Federal should be permitted to change its name to "Bay State Bank," *not* whether either Bay State or Federal enjoy exclusive right to the mark "Bay State" in connection with banking services. Jefferson, 1989 U.S. Dist. LEXIS 16165, *20 (distinguishing the Sun Banks case as involving an attempt by the plaintiff Sun Bank to enjoin the defendant Sun Federal Savings and Loan Association from using the word "Sun"). As the Jefferson court noted, Sun Banks establishes only that *neither* Bay State nor Federal may obtain exclusive rights to use "Bay State" on a stand-alone basis as a service mark for banking services without the use of additional, distinguishing words such as "Federal."

in the marks in the marks is needed for a finding of likelihood of confusion." <u>Sun Banks</u>, 651 F.2d
at 318.

(3) *Channels of trade*, (4) *advertising*, and (5) *prospective purchasers*.[10] The channels of
trade, advertising and class of prospective purchasers are the same for both Bay State and
Federal. Both banks market their services through many of the same media and advertise the
same product - retail banking services. As savings banks offering comparable services, they
compete for the same prospective purchasers. See <u>Horizon Financial</u>, 1987 U.S. Dist. LEXIS
643, *26; <u>Sun Banks</u>, 651 F.2d at 318 (identity of prospective customers largely result of
comparable services offered). This is especially true given the exponentially increasing
prominence of Internet banking.[11]

(6) *Actual Confusion*. There is substantial evidence of actual confusion, which is the
"strongest evidence of a likelihood of confusion. ..." <u>Railroad Salvage</u>, 561 F. Supp. at 1023. In a
recent consumer survey, 55.8% of Bay State' customers and 65.8% of those surveyed at random
had heard of "Bay State Bank." Lewis Aff., ¶10; **Exhibit F**. When asked whether Bay State
Savings Bank and Bay State Bank were the same institution, 35.9% of Bay State customers and
44.2% of non-customers said they were. <u>Id.</u> That such a large percentage of those surveyed
associated the name "Bay State Bank" with "Bay State Savings Bank" is "credible evidence of
actual confusion." <u>Jefferson</u>, 1989 U.S. Dist. LEXIS 16165, *23 (survey showing that 26.1% of
all heads of household associated defendant's proposed name "Jefferson Savings Bank" with
plaintiff "Jefferson National Bank" viewed as "dispositive factor" in showing likelihood of

---

[10]  These factors are considered together. <u>See, e.g.</u>, <u>Volkswagenwerk Aktiengesellschaft v. Wheeler</u>, 814 F.2d 812, 816 (1ˢᵗ Cir. 1987).

[11]  Bay State is attempting to establish a Web site. The defendants' improper actions, however, prevent it from using the Internet domain name "baystatesavingsbank.com."

confusion).  As in <u>Jefferson</u>, if the defendant is allowed to adopt the name Bay State Bank, "a significant increase in confusion" will occur as demonstrated by Bay State's survey.  <u>Id.</u>

The survey results are corroborated by incidents of actual confusion by customers and vendors of both institutions, including *both* United States Senators from the Commonwealth. Lewis Aff., ¶17; **Exhibits I-1 through I-6**.

(7) *Intent*.  Bay State and Federal have generally been aware of each other's existence for many years.  Although they draw many of their customers from different primary market areas, both draw customers from all over Massachusetts, and both use statewide media.  Their officers participate in the same industry seminars and conferences.  Both institutions shares some of the same vendors, including COCC, of which both are shareholders.  Intent to trade on Bay State's name and goodwill can be inferred from Federal's adoption of the service mark "Bay State Bank" with knowledge of Bay State's long history of use of the similar mark "Bay State Savings Bank." See <u>Raxton Corp. v. Anania Associates, Inc.</u>, 635 F.2d 924, 930 & n.9 (1st Cir. 1980).

That Federal adopted the mark "Bay State Bank" in bad faith is further evidenced by its registration of an Internet domain name - "baystatesavingsbank.com" - *identical* to Bay State Saving's name and service mark *after* it was on notice that Bay State considered its adoption of the name "Bay State Bank" to be infringing and, presumably, after it was on notice that Bay State had registered the domain name "baystatesavings.com."  <u>Compare</u> <u>NEC Electronics</u>, 722 F. Supp. at 866 (no bad faith shown where defendant always used its full corporate name in marketing); <u>see</u> <u>Stern's Miracle-Gro</u> v. <u>Shark Products</u>, 823 F. Supp. 1077, 1087 (S.D.N.Y. 1993)("When a company appropriates an identical mark that is well-known and has acquired a secondary meaning, an inference can be drawn that the company intends to capitalize on the goodwill and reputation of the mark, as well as any confusion that might result as to the common origin

between the mark and the senior user's product."). The evidence clearly shows that, as in Stern's, the defendant has "continued to use ... [a mark confusingly similar to the Bay State name and Mark] with knowledge of plaintiff's objection to the use of the Mark. This continued use of the Mark tends to indicate a measure of bad faith on the defendant's part." Id.

(8) *Strength of Mark.* "Bay State Savings Bank" is a relatively strong mark. Bay State has used and actively advertised the name "Bay State Savings Bank" continuously since 1895. See NEC Electronics, 722 F. Supp. at 866 (considering mark "strong" based on active advertising for eleven years); First Nationwide Bank, 682 F. Supp. at 975 (geographically descriptive mark, ordinarily weak, can become strong through extensive advertising and sales). Bay State has received substantial and favorable publicity and has developed a reputation for reinvestment in the community and support of small and minority-owned businesses. It has promoted and advertised its business extensively. It has registered its mark with the Massachusetts Secretary of State.

Bay State provides significant banking services to customers throughout Massachusetts. It has grown substantially in recent years. That a significant number of Bay State's customers reside outside of its primary market area, including an appreciable number in the area of Eastern Massachusetts served by Federal, supports the conclusion that the number of such customers is not insignificant when compared to the total number of potential customers statewide. Such market penetration is sufficient to warrant statewide protection for the mark "Bay State Savings Bank." See Horizon Financial, 1987 U.S. Dist. LEXIS 643, *23; Bayshore, 762 F. Supp. at 414 ("Bayshore" relatively strong mark based on amount of advertising and registration of plaintiff's mark). Even if Bay State's mark is weak, "it is entitled to protection against use of a confusingly similar mark where [as here] directly competitive services are involved." Jefferson, 1989 U.S. Dist. LEXIS 16165, *21.

c)    Confusion is likely to be particularly acute among
Internet users

Federal's domain name "baystatesavingsbank.com" and Bay State's service mark are identical.[12] "'This fact alone gives rise to a strong inference of confusion.'" Jews For Jesus, 993 F. Supp. at 302, quoting Ford Motor Co. v. Summit Motor Prods. Inc., 930 F.2d 277, 297 (3rd Cir.), cert. denied, 502 U.S. 939 (1991); see, e.g., Actmedia, Inc. v. Active Media Int'l, Inc., 1996 WL 466527, *1 (N.D. Ill. July 17, 1996)(defendant's reservation of domain name "actmedia.com" likely to cause confusion in the marketplace that it was affiliated with plaintiff ActMedia); The Comp Examiner Agency, Inc. v. Juris, Inc., 1996 WL 376600, *1 (C.D. Calif. April 26, 1996)(use of "juris" mark as second level domain name and website and through other marketing channels likely to cause confusion as to source or sponsorship of goods and services with owner of trademark "JURIS"). "Where, as here, the defendant uses the identical mark ... as plaintiff, the confusion test under [Section 43(a) of the Lanham Act] is 'open and shut.'" Lozano Enterp. v. La Opinion Pub. Co., 44 U.S.P.Q.2d (BNA) 1764, 1997 U.S. Dist. LEXIS 20372, *9-10 (C.D. Cal. July 29, 1997), quoting Opticians Ass'n v. Independent Opticians, 920 F.2d 187, 193 (3rd Cir. 1990).

Federal's use of the domain name "baystatebank.com" is also highly likely to cause confusion. As the court explained in Panavision Int'l, L.P. v. Toeppen, 945 F. Supp. 1296, 1298 (C.D. Cal. 1996), aff'd, 141 F.3d 1316 (9th Cir. 1998):

---

[12]    The Internet is described in detail in MTV Networks v. Curry, 867 F. Supp. 202, 203-204, nn. 2 & 3 (S.D. N.Y. 1994) and Religious Technology Center v. Netcom On-Line Comm. Serv., Inc., 907 F. Supp. 1361, 1365 (N.D. Cal. 1995); see also Intermatic Inc. v. Toeppen, 947 F. Supp. 1227, 1230-1232 (N.D. Ill. 1996)(describing registration of domain names, web pages and hyperlinks); Jews For Jesus, 993 F. Supp. at 287 n. 3 (discussing use of domain names); Panavision Int'l, L.P. v. Toeppen, 945 F. Supp. 1296, 1299, 1998-99 (C.D. Cal. 1996)(discussing distinction between "top-level" and "second-level" domains).

One of the primary purposes of domain names "is to allow Internet users to locate web sites quickly and easily. If an Internet user knows the name of another user's web site, he or she can easily contact the site. ... Because users may have difficulty accessing web sites or may not be able to access web sites at all when they do not know (or cannot deduce) the proper domain name, business frequently register their names or trademarks as domain names. Therefore, having a known or deducible domain name is important to companies seeking to do business on the Internet, as well as important to consumers who want to locate those businesses' web sites.

Accord, Cardservice Int'l v. McGee, 950 F. Supp. 737, 741 (E.D. Va. 1997)("A customer who is unsure about a company's domain name will often guess that the domain name is also the company's name."); MTV Networks, 867 F. Supp. at 203-204 n.2 ("[A] domain name mirroring a corporate name may be a valuable corporate asset, as it facilitates communication with a customer base."). Because an appreciable number of consumers who believe "Bay State Bank" and "Bay State Savings Bank" are the same institution may, if unsure about Bay State's domain name, attempt to locate Bay State's web page, first by entering the address "www.baystatesavingsbank.com," and then, after finding no web site at that address, entering "www.baystatebank.com," they are likely to be confused into thinking that the web site at the latter address is affiliated, sponsored or owned by Bay State. See Panavision Int'l, 141 F.3d at 1326 n.8, quoting Peter Brown, New Issues in Internet Litigation, 17 Annual Institute on Computer Law: The Evolving Law of the Internet-Commerce, Free Speech, Security, Obscenity and Entertainment, 47 Prac. L. Inst. 151 (1997)(in instances of well-known trade names or trademarks, domain name may provide information as to the origin of the contents of the site).

    2.    Bay State is entitled to injunctive relief under the Federal
And Massachusetts Anti-Dilution Statutes

Bay State should also be granted injunctive relief against Federal's use of the domain

names "baystatesavingsbank.com" and "baystatebank.com" under the state and federal anti-

dilution statutes.  15 U.S.C. §1125(c)(1); G.L.M. c.110B, §12.

Under the state statute, injunctive relief is available where a plaintiff can show

"[l]ikelihood of ... dilution of the distinctive quality" of a registered mark or a mark or trade name

valid at common law.[13]  "Having established secondary meaning for its name and mark, plaintiff

has shown them to be distinctive. ... There is no question but that defendant's continued use of its

name and mark will erode the distinctiveness which plaintiff has developed at considerable

expense and with marked success."  American Optical Corp. v. North American Optical Corp.,

489 F. Supp. 443, 451 (N.D.N.Y. 1979)(interpreting identical New York anti-dilution statute);

see Pignons, 657 F.2d at 494 ("Trademark dilution has ... been applied to the injury that results

from the use of a mark by the defendant in a way that detracts from, or draws on or otherwise

appropriates the goodwill and reputation associated with the plaintiff's mark.").

---

[13]    The Federal Anti-Dilution Statute is substantially similar, providing that "[t]he owner of a famous mark
shall be entitled ... to an injunction against another person's commercial use in commerce of a mark or
trade name, if such use begins after the mark has become famous and causes dilution of the distinctive
quality of the mark. ..." 15 U.S.C. §1125(c)(1).

Bay State is also likely to show dilution of its mark[14] under the Section 43(c) of the

Lanham Act, 15 U.S.C. §1125(c), as a result of Federal's registration and use of the Internet

domain names "baystatebank.com" and "baystatesavingsbank.com" in at least two respects. "First,

[Federal]'s registration of the [baystatesavingsbank.com] domain name lessens the capacity of

[Bay State] to identify and distinguish its ... services by means of the Internet.  [Bay State] is not

currently free to use its mark as its domain name." Intermatic, 947 F. Supp. at 1240; accord,

Panavision Int'l, 945 F. Supp. at 1304 (registration of a famous mark as a domain name by

someone other than mark owner diluted the mark within meaning of Federal Anti-Dilution Statute

by preventing trademark owner from "using its marks in a new and important business medium").

Such "activity clearly violates the Congressional intent of encouraging the registration and

development of trademarks to assist the public in differentiating products [and services]."

Intermatic, 947 F. Supp. at 1240. "It would seriously undermine the trademark policy to prevent a

company from exercising its mark by reason of [Federal]'s conduct.  Such conduct lessens the

capacity of [Bay State] to identify its [services] to potential customers who would expect to

locate [Bay State] on the Internet through the [baystatesavingsbank.com or baystatebank.com]

---

14    The Federal Anti-Dilution Statute applies to "famous" marks.  It sets forth eight non-exclusive factors that
court "may consider" when determining whether the mark being litigated is a "famous" mark.  These
factors are: (1) "the degree of inherent or acquired distinctiveness of the mark;" (2) "the duration and
extent of use of the mark in connection with the goods or services with which the mark is used;" (3) "the
duration and extent of advertising and publicity of the mark;" (4) "the geographical extent of the trading
area in which the mark is used;" (5) "the channels of trade for the goods or services with which the mark
is used;" (6) "the degree of recognition of the mark in the trading areas and channels of trade used by the
mark's owner and the person against whom the injunction is sought;" (7) "the nature and extent of the use
of the same or similar mark by third parties;" and (8) "whether the mark was registered under the Act of
March 3, 1881, or the Act of February 20, 1905, or on the principal register."  15 U.S.C. §1125(c)(1).
The enumerated factors are remarkably similar to those utilized by courts in this circuit in evaluating
likelihood of confusion in trademark cases.  See Boston Athletic Ass'n, 867 F.2d at 29.

domain name[s]." Id.; see 15 U.S.C. §1127 (defining "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services").

"Second, [Federal]'s conduct dilutes the [Bay State] mark by using the [Bay State name] on its web page." Intermatic, 947 F. Supp. at 1240. If Federal is allowed to continue to use baystatebank.com, Bay State Saving's name and reputation would be at Federal's "mercy and could be associated with an unimaginable amount of messages on [Federal]'s web page." Id. "Dilution of [Bay State]'s mark is likely to occur because the domain name appears on the web page and is included on every page that is printed from the web page." Id.; see Panavision Int'l, 945 F. Supp. at 1299 ("second-level" domain is frequently the name of the company that maintains the Internet site; one purpose of domain names is to "identify the entity that owns the web site"). As the Intermatic court noted, "'the most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's [services].'" Id. at 1240-41, quoting Ideal Indus., Inc. v. Gardner Bender, Inc., 612 F.2d 1018, 1026 (7th Cir. 1979). "The fact that [baystatebank.com] will be displayed on every aspect of [Federal's] web page is sufficient to show that [Bay State]'s mark will likely be diluted." Id.

    B.    Bay State Will Suffer Irreparable Harm If Federal Is Allowed To Continue Holding Itself Out To The Public As "Bay State Bank."

"Likelihood of confusion due to the subsequent use of a confusingly similar mark by its very nature causes irreparable harm." Home Savings, 1982 U.S. Dist. LEXIS 10269, *5; see also Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 73 (2nd Cir. 1988)("In a Lanham Act case a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm ...."); Bayshore Group Ltd., 762 F. Supp. at 408, citing Camel Hair & Cashmere

<u>Inst. Of America, Inc. v. Associated Dry Goods Corp.</u>, 799 F.2d 6, 14 (1st Cir. 1986)("The Lanham Act requires a liberal interpretation of the irreparable injury factor, and considerable authority exists for the view that the irreparable injury factor is satisfied once the plaintiff demonstrates that the defendant is wrongly trading on the plaintiff's reputation.").

The use by Federal of a name similar to Bay State's service mark has caused actual confusion and threatens to seriously damage and dilute the distinctive quality of Bay State's mark and harm its business reputation.[15]  The damage is ongoing, and continues to increase the longer the defendants' use of the name Bay State Bank at retail and on the Internet is allowed to continue.

Furthermore, Federal's reservation of the baystatesavingsbank.com domain name will cause Bay State to suffer irreparable harm by "precluding [Bay State] from using its Mark as an Internet domain name." <u>ActMedia</u>, 1996 WL 466527, *2; <u>Comp Examiner</u>, 1996 WL 376600, *1 (use of the "juris" domain name causing irreparable injury to owner of trademark "JURIS").  To allow the status quo to continue threatens irreparable harm to Bay State's name and corporate goodwill.  See <u>Horizon Financial</u>, 1987 U.S. Dist. LEXIS 643, *33.

C.    <u>The Balance Of Harms Strongly Favors Bay State.</u>

The risk of irreparable harm to Bay State if injunctive relief is not granted outweighs any harm which Federal will suffer if an injunction issues.  Because of the close similarity of the names

---

15    Even a cursory comparison of the photographs of the Bay State and Federal locations reveals a substantial difference in the image each portrays to the public.  The Bay State branch locations present a uniform image to the banking public characterized by stand-alone buildings in a "Cape" style, attractive landscaping and dedicated customer parking.  By contrast, the Federal branches are "store-front" locations, without landscaping or dedicated parking and presenting no consistent visual image to the public.

"Bay State Savings Bank" and "Bay State Bank" and the nearly identical services the two financial institutions offer to the public, there is a risk of the public being confused about the identity of the institution providing the service if Federal is allowed to continue using the mark "Bay State Bank." This is especially true in the era of Internet banking. Bay State will suffer irreparable harm as a result. <u>Jefferson</u>, 1989 U.S. Dist. LEXIS 10392, *2.

Federal will suffer no irreparable harm if an injunction issues. It has used the name "Bay State Federal Savings Bank" for many years. Its use of the mark "Bay State Bank" is a recent phenomenon. That its branch locations all still bear signs and distribute promotional material which it identify it as "Bay State Federal Savings Bank" establishes that its transition to the new name is far from complete. The public still knows Federal under the name "Bay State Federal Savings Bank." <u>Jefferson</u>, 1989 U.S. Dist. LEXIS 10392, **4, 10. That is how independent media refer to it still. The only harm Federal will suffer if an injunction issues will be the loss of money spent on the name change, which is modest and can be fully compensated by money damages. <u>Id.</u>; <u>see</u> <u>First Nationwide Bank</u>, 682 F. Supp. at 978 ("[a]ny investment defendant may have made in the name [Bay State Bank] after plaintiff's objection was a calculated risk and is no reason to deny injunctive relief").

Furthermore, if no injunction issues, and Federal were allowed to complete its name change and operate for several additional months as "Bay State Bank" but then *lost* the case after a trial on the merits, the subsequent reversion to the name Federal Savings Bank" would "probably *guarantee* a great deal of confusion" about, and hence harm to, *both* parties. <u>Jefferson</u>, 1989 U.S. Dist. LEXIS 10392, *10-11 (emphasis supplied)(citing such possible scenario as an additional factor in favor of granting injunctive relief). In such circumstances, the balance of harms clearly favors Bay State and an injunction should issue. <u>Id.</u>, 1989 U.S. Dist. LEXIS 10392,

** 2, 11; see Horizon Financial, 1987 U.S. Dist. LEXIS 643, *34-35 (balancing of harms favored

plaintiff bank based on long use, significant good will, recent growth and advertising expenditures

and fact that defendant was still in "start up" phase).

Federal is also unlikely to suffer harm if it is ordered to discontinue use of

"baystatebank.com" as an Internet domain name and on its website and to turn over to Bay State

the Internet domain name "baystatesavingsbank.com." Comp Examiner, 1996 WL 376600, *1.

The flexibility of the Internet will permit the change to be implemented with appropriate

transitional features, such as "referral" notices, which should effectively eliminate any possible

confusion or harm to Federal. Comp Examiner, 1996 WL 376600, *1.

    D.    Granting injunctive relief will serve the public interest

"The policy behind statutory and court made trade mark law is to prevent customers'

confusion and protect those individuals or entities that have a valid right to use a specific name or

mark.  As matters now stand, customers of both institutions are being harmed by confusion over

such matters as credit verification, IRA transactions and the location of their assets.  "In light of

the likelihood of confusion caused by the defendant's use of the name [Bay State Bank] and the

similarity between the two trade marks, this court [should] conclude[ ] that the public interest is

best served by the granting of [a] preliminary injunction against defendant's use of the name and

mark because the injunction will prevent further confusion between plaintiff's and defendant's

services in [Massachusetts]."  Horizon Financial, 1987 U.S. Dist. LEXIS 643, *35-36.  The

issuance of the injunctive relief requiring that Federal cease using the Internet domain name

baystatebank.com and turn over to Bay State the domain name baystatesavings.com also will

serve the public interest.  ActMedia, 1996 WL 466527, *2; Comp Examiner, 1996 WL 376600,

*1.

E.    The Court Should Order Federal To Revert To Use Of The Mark
      "Bay State Federal," Cease Using The Internet Domain Name
      "baystatebank.com" And Turn Over The Internet Domain Name
      "baystatesavingsbank.com" to Bay State

Because Bay State is likely to establish that it has an exclusive right to use the mark "Bay

State Savings Bank" in connection with banking services and that the defendants' mark "Bay

State Bank" is so similar to that of "Bay State Savings Bank" that an appreciable number of

consumers will probably be confused as to the origin of banking services provided by the

defendant, Federal should be preliminarily enjoined from using the name "Bay State Bank" and

ordered to resume use of the name "Bay State Federal Savings Bank" pending a full hearing on

the merits of this case. See Jefferson, 1989 U.S. Dist. LEXIS 16165, *12 (granting preliminary

injunction on nearly identical facts); Chase Fed. Sav. & Loan, 681 F. Supp. at 788.

Until April, 1999, Federal had always used the word "Federal" along with "Bay State." It

has not established an exclusive right to use the phrase "Bay State" alone in connection with

banking services. Indeed, the Secretary of the Commonwealth has issued a certificate which

grants that name to Bay State for banking and financial services. The public still identifies Federal

as "Bay State Federal Savings Bank." "Any possibility of confusion between the parties can be

minimized ... by each party using its [full] name coupled with a distinctive logo." Chase Federal,

681 F. Supp. at 788; see First Keystone, 923 F. Supp. at 704 (citing cases)(in their full form,

parties' names not identical; use of such descriptive words as "Federal" and "Mortgage"

"effectively negate any arguably confusing similarity between the two").[16] As was the case in

Jefferson, "the present state of confusion between [Bay State Bank] and [Bay State Federal

---

[16]    That some consumers may refer colloquially to both Bay State Savings Bank and Bay State Federal
        Savings Bank as "Bay State Bank" simply reinforces the need for the two banks to use their full names so
        as to minimize any confusion.

Savings Bank] is manageable. ... [H]owever, ... if the defendant is allowed to change its name[ ] to [Bay State] Bank, a significant increase in confusion would occur" as demonstrated by the consumer survey showing that 40% of all those surveyed thought Bay State Bank and Bay State Savings Bank were the same institution. Jefferson Bankshares, 1989 U.S. Dist. LEXIS 16165, *23.

Federal should also be enjoined from using "baystatebank.com" as an Internet domain name and ordered to turn over to Bay State the domain name "baystatesavingsbank.com." See, e.g., Jews For Jesus, 993 F. Supp. at 293, citing inter alia Comp Examiner, 1996 WL 376600, * 1- 2 (preliminarily enjoining counterclaim defendants from using infringing Internet domain name or confusingly similar variation, requiring infringing company to remove all contents from website, cease operating site, but allowing for posting of a "referral notice" at the URL address); Hasbro, Inc. v. Internet Entertainment Group, Ltd., 1996 WL 84853 (W.D. Wash. Feb. 9, 1996)(same); Intermatic, 947 F. Supp. at 1240 (trademark owner may preclude use of trademark as Internet domain name by one who had made no prior use of the trademark prior to registration); see also Actmedia, 1996 WL 466527, *1-2(defendant's reservation of domain name which precluded plaintiff from reserving domain name incorporating its registered mark violated Section 43(a) of the Lanham Act; permanent injunction granted requiring defendant to turn domain name over to plaintiff). Due to the nature of Internet use, Federal's use of a confusingly similar mark as its domain name and home page address "cannot be adequately remedied by a disclaimer." Planned Parenthood Fed'n of Am. v. Bucci, 1997 WL 133313, at *12 (S.D.N.Y. March 24, 1997), aff'd by Summary Order (2nd Cir. Feb 9, 1998). "In addition, considering the vastness of the Internet and its relatively recent availability to the general public, many Internet users are not sophisticated enough to distinguish between the subtle difference in the domain

names of the parties." Jews For Jesus, 993 F. Supp. at 303, citing Green Products Co. v.

Independence Corn By-Prods. Co, 992 F. Supp. 1070, 1078 (N.D. Iowa 1997)(finding Internet

users do not undergo a highly sophisticated analysis when searching for domain names).  Because

the information provided by Federal on the baystatebank.com web site is similar to the

information provided by Bay State about its services, "a reading of the defendant's Internet site

will not eliminate the likelihood of confusion between the Defendant Internet site and the Mark

and/or the Name of the Plaintiff. ...  This is so even with the addition of [a] Disclaimer." Jews For

Jesus, 993 F. Supp. at 303-304.

      F.    No Bond Or Only A Nominal Bond Should Be Required.

      No bond or only a nominal bond should be required.  See Horizon Financial, 1987 U.S.

Dist. LEXIS 643, *33($25,000 bond); Comp Examiner, 1996 WL 376600, *1 ($5,000 bond);

ActMedia, 1996 WL 466527, *2 (no bond); Hotmail Corp. v. Van Money Pie Inc., 1998 U.S.

Dist. LEXIS 10729, *24 (N.D. Cal. April 16, 1998)($100 bond).

IV.    Conclusion

For the reasons stated, Bay State Savings Bank requests that this Court grant its motion

for preliminary injunction and order Bay State Bancorp., Inc. and Bay State Federal Savings Bank

to immediately cease using the name "Bay State Bank" in its retail and Internet banking

operations, and to immediately turn over to Bay State Savings Bank the Internet domain name

"baystatesavings.com."

BAY STATE SAVINGS BANK

By its attorneys,

James C. Donnelly, Jr., Esq.
B.B.O. No. 129700
Charles B. Straus, III, Esq.
B.B.O. No. 554181
Mirick, O'Connell, DeMallie &
   Lougee, LLP
100 Front Street
Worcester, MA  01608-1477
(508) 791-8500

Dated:  November 15, 1999