UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BAY STATE SAVINGS BANK,<br>    Plaintiff<br><br>V.<br><br>BAYSTATE FINANCIAL SERVICES, LLC,<br>    Defendant | CIVIL ACTION NO. 4:03-CV-40273-FDS |

POST HEARING MEMORANDUM OF BAY STATE SAVINGS BANK IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This post hearing memorandum addresses the issue of whether Bay State Savings Bank® can assert that its trademark rights encompass financial services that savings banks could not provide *directly* to consumers, without reliance on a registered broker dealer, prior to the Gram-Leach-Blily Act of 1999. Baystate Financial asserts that Bay State® could not possibly acquire trademark rights concerning such services. However, savings banks could (and often did) offer such services through contractual arrangements with broker dealers. Indeed, Baystate Financial's "bank affiliate program" was designed to provide such services and arrangements with banks, and actually did so with several banks that are generally similar to Bay State®. At the hearing on November 21, 2006, the Bank's counsel undertook to provide more authority on this issue.

DISCUSSION

Lanham Act §43(a), 15 U.S.C. §1125(a), and the Massachusetts antidilution statute, M.G.L. Ch. 110B, §12, seek to protect consumers by preventing confusion and dilution of established trademarks. The test of liability under Lanham Act §43(a) is not whether the junior

{H:\PA\Lit\16311\00003\A1006393.DOC}

user offers the exact same services as the trademark owner.  Section 43(a)(1)(A) provides a cause of action against any person who uses in commerce a word, term, symbol or device, or a false or misleading description or representation that:

> … is likely to cause confusion, or to cause mistake, or to deceive as to the *affiliation, connection or association* of such person with another person, or as to the origin, *sponsorship, or approval* of his or her goods, services or commercial activities by another person. (Emphasis added).

The essential point of the statute is that it is as much or more concerned with consumer perceptions of possible sponsorship or affiliation as with the actual activities of the parties.  The "likelihood of confusion" test under Lanham Act § 43(a)(1)(A) "encompasses any type of confusion, including: confusion of source; confusion of sponsorship; confusion of affiliation; or confusion of connection."  <u>McCarthy on Trademarks</u>, § 24:6, <u>citing</u> *inter alia* <u>In re Save Venice New York, Inc.</u>, 259 F.3d 1346, 1355, 59 U.S.P.Q. 2d 1778 (Fed. Cir. 2001).  The principle applies to situations that are likely to cause confusion on non-competitive but related goods or services that do not compete directly, but are "related" in some appropriate sense.  <u>Save Venice New York</u> explains:

> The related goods test measures whether a reasonably prudent consumer would believe that non-competitive but related goods sold under similar marks derive from the same source, or are affiliated with, connected with, or sponsored by the same trademark owner.

"The modern rule of law gives the trademark owner protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner."  <u>McCarthy on Trademarks</u>, § 24:6, <u>citing</u> *inter alia* <u>CAE, Inc. v. Clean Air Engineering, Inc.</u>, 267 F.3d 660, 680, 60 U.S.P.Q. 2d 1449 (7th Cir. 2001) (infringement can be found if

consumers "could conclude that [the junior user's] products and services are affiliated or associated with [the senior user].").

In Purolator, Inc. v. EFRA Distributors, Inc., 687 F.2d 554, 562, 216 U.S.P.Q. 457 (1st Cir. 1982) the court stated:

> [I]t is well settled that "(t)he protection which the law gives the owner of a trademark is not confined to the goods upon which it is, or has been, used by the owner of it but extends to products which would be reasonably thought by the buying public to come from the same source if sold under the same mark."

Purolator upheld an injunction barring defendant from any further use of the term "Puro" on automotive accessory products, including products not presently manufactured under plaintiff's "Purolator" trademark. Id. citing Baker v. Simmons Co., 307 F.2d 458, 462, 134 U.S.P.Q. 266 (1st Cir. 1962) (evidence sufficient to support finding of likelihood of confusion between plaintiff's registered mark "Simmons" for mattresses and sleep products, and defendant's name "Simmonds" for reupholstering services).

Bay State® began to offer banking services including savings accounts and mortgages in 1895. The scope of services expanded to include savings bonds by 1961; Savings Bank Life Insurance by 1962; mortgage life and disability insurance by 1971; IRA, SEP and Keogh Retirement Plans and Education Plans and services by 1976 and Investment Unit Accounts by 1981. In 1994, it began to offer stocks, bonds and mutual funds through an arrangement with a registered broker dealer. CMF ¶46. Baystate Financial's own expert, Michael C. Hanson, Esq., conceded that the Bank could properly offer each of these services on the date the service was introduced. SMF ¶¶ 29 & 30; CMF ¶43.

The services that Baystate Financial began to offer in 1997 – and for that matter the services that the Wilson Agency began to offer in 1982 – were sufficiently related that reasonably

prudent consumers could be misled.  Baystate Financial admits in its counterclaim that the marks are similar if not virtually identical: "The parties' core marks sound the same and look the same, and therefore convey the same commercial impression to consumers."  Defendant's Counterclaim, ¶32; SMF ¶52.

The registrations are *prima facie* evidence that the Bank is the owner of the registered marks and has the exclusive right to use them in the fields specified in the registrations.  15 U.S.C. §1115(a).  The specified fields include "Financial Investment In The Fields Of Real Estate, Stocks, Bonds, Commercial Paper And Other Securities, Financial Management And Planning And Financial Guarantee And Surety."  SMF ¶21 and 24.  Mr. Klein's survey shows that 22% of consumers in the Worcester area who view Baystate Financial's website are likely to think it is affiliated with or sponsored by Bay State Savings Bank®.  SMF ¶26.  The rate would likely be much higher in other situations where, for example, consumers listen to Baystate Financial's radio show.  SMF ¶74.

It makes no difference that the Bank did not offer certain services directly, but did so via a broker dealer whose activities it sponsored by providing space in its branches and by promoting the services to the Bank's own customers.  The decisive fact is that Baystate Financial's services are, and were at all material times, sufficiently related to cause confusion.

BAY STATE SAVINGS BANK
By its attorneys,

_____
James C. Donnelly, Jr., Esq., BBO # 129700
John T. McInnes, Esq., BBO # 657488
Kathryn V. Chelini, Esq., BBO #657839
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA  01608-1477
(508) 791-8500

Dated:  December 5, 2006

CERTIFICATE OF SERVICE

I, James C. Donnelly, Jr., hereby certify that I have this day served a copy of the foregoing document, by mailing a copy, first class mail, postage prepaid, to Christopher P. Litterio, Esq., Ruberto Israel & Weiner, PC, 100 North Washington Street, Boston, MA 02114.

_____
James C. Donnelly, Jr., Esq.

Dated: December 5, 2006