## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————
                                                )
**BAY STATE SAVINGS BANK,**                     )
                                                )
      **Plaintiff and**                     )
      **Counterclaim-Defendant,**            )       **Civil Action No.**
                                                )       **03-40273-FDS**
      **v.**                                 )
                                                )
**BAYSTATE FINANCIAL SERVICES, LLC,**           )
                                                )
      **Defendant and**                      )
      **Counterclaim-Plaintiff.**            )
———————————————————————  )

## MEMORANDUM AND ORDER ON
## CROSS MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

      This is a trademark infringement case concerning the use of the mark "Bay State" for

banking and insurance and investment services.[1]  Plaintiff Bay State Savings Bank filed a

complaint against defendant Baystate Financial Services, LLC alleging multiple violations of

federal trademark law, state trademark law, and Mass. Gen. Laws ch. 93A, § 11.  Defendant has

counterclaimed on similar legal theories, with the addition of a claim for common-law unfair

competition and claims alleging that plaintiff procured its registrations by fraud.

      Plaintiff is a savings bank; defendant provides insurance and investment services.  The

principal issue in dispute is whether the geographically descriptive mark "Bay State," which has

been used by Bay State Savings Bank since 1895, acquired secondary meaning in the fields of

insurance and investment services.  Defendant has moved for summary judgment on all counts

---

[1] Plaintiff uses the mark "Bay State," whereas defendant uses "Baystate."  For purposes of this analysis, there is no substantive difference between the two versions of the name.

against it.  Plaintiff has moved for summary judgment as to six issues that it contends will simplify the case, including summary judgment as to one count of the counterclaims.

For the reasons set forth below, the Court concludes that plaintiff's mark "Bay State" did not acquire secondary meaning in the fields of insurance and investment services prior to the time defendant began to use it.  Accordingly, defendant's motion for summary judgment will be granted, and plaintiff's motion for partial summary judgment will be granted in part and denied in part.

## I.    Factual Background

### A.    Bay State Savings Bank

#### 1.    Plaintiff's Business

Plaintiff Bay State Savings Bank is a Massachusetts-chartered mutual savings bank with a principal place of business in Worcester, Massachusetts.  It has operated under the name "Bay State Savings Bank" in central Massachusetts since 1895.  Plaintiff's primary geographic market consists of Worcester and the surrounding communities.  It presently has more than $250 million in assets.[2]

Plaintiff's principal business is providing traditional savings bank products and services, such as deposit accounts and home mortgages.  Before 1998, savings banks were generally prohibited by law from providing insurance or investment products or services.  *See generally* Raymond A. Guenter, *Bank Insurance Powers—Yesterday, Today and Tomorrow*, 17 Ann. Rev.

---

[2]  Plaintiff has advertised and promoted its business in newspapers and trade journals since 1895; the total amount spent on advertising from 1960 to 1997 was approximately $2.7 million.  It also has been featured in news articles reporting matters of public interest, including the appointment of community leaders to serve in various leadership positions and the bank's support of community activities.

Banking L. 351 (1998); Eugene M. Katz, *Securities Activities, Merchant Banking, and Functional Regulation under the Gramm-Leach-Bliley Act*, 56 Consumer Fin. L.Q. Rep. 182 (2002). There were, however, certain exceptions, most notably involving the sale of Savings Bank Life Insurance ("SBLI").[3] By the late 1980's, the range of products plaintiff offered had expanded beyond SBLI to include United States savings bonds; credit life and credit disability insurance, offered in connection with its lending services; Individual Retirement Accounts ("IRAs"), Simplified Employee Pension ("SEP") accounts, and Keogh retirement accounts; and SBLI annuities.[4] The parties disagree as to when plaintiff introduced each of these services. However, there is no dispute that plaintiff offered savings bonds at least by 1960; credit insurance by 1971; IRA, SEP, and Keogh accounts by 1976; and SBLI annuities by 1988.

## 2. Plaintiff's Arrangements with Third-Party Vendors

In 1994, plaintiff entered into a third-party arrangement with FISCO, an independent broker/dealer, to provide investment services to customers.[5] Because of then-existing banking regulations, the businesses were kept separate: the operations of FISCO were kept physically separate in plaintiff's facilities; the individuals offering the products were FISCO employees, not bank employees; customer accounts were maintained separately; marketing materials were kept

---

[3] In 1907, at the urging of Louis D. Brandeis, Massachusetts adopted SBLI as a means of providing low-cost, reliable life insurance, particularly to working-class families. Guenter, 17 Ann. Rev. Banking L. at 373-376; *DiBiase v. Comm'r of Insurance*, 428 Mass. 755, 755-76 (1999). Originally, SBLI was provided directly by savings banks, which set up small insurance companies as internal "departments" with separate assets and liabilities. Guenter at 374. Since 1991, the policies have been directly underwritten by a separate state-chartered life insurance company owned by the savings banks. *Id.*; *see* Mass. Gen. Laws ch. 178A.

[4] The IRA, SEP, and Keogh accounts offered by the bank appear to have been limited to deposit account products. Plaintiff has also submitted evidence that it offered "Investment Unit Accounts" beginning in 1981, although the nature of the product was not explained.

[5] Prior to 1994, the only non-deposit investment accounts plaintiff offered were SBLI annuities.

separate; and all FISCO written materials contained disclaimers that the products were not plaintiff's products.[6]  The relationship with FISCO ended in 1998.  Plaintiff's fee income from FISCO services constituted less than 0.1% of its total income for the years 1994-1998.

Beginning in 1998, banking statutes and regulations were changed to permit Massachusetts-chartered banks to sell insurance and to act as broker-dealers of securities under certain circumstances.  *See Guenter*, 17 Ann. Rev. Banking L. at 373-74; *Katz*, 56 Consumer Fin. L.Q. Rep. at 182-83.  In February 2000, plaintiff entered into a contract with a company named Infinex.[7]  The purpose of the arrangement was to provide plaintiff's customers with non-deposit investment and insurance offerings.  At the time that plaintiff filed for regulatory approval of the plan, plaintiff stated that it had "no present intention of initiating its own insurance sales business within the Bank.  Instead, it will rely upon Infinex as a third-party provider to conduct insurance sales . . . ."  The bank did not apply for regulatory approval to sell insurance until March 15, 2001, and did not obtain it until July 19, 2001.[8]

Infinex offered products and services under the name "Minuteman Investment Services" until February 2002, when the name was changed to "Bay State Investment Services."  The products and services were sold in plaintiff's branches by "mutual employees" of both Infinex and

---

[6] Although plaintiff contends that the FISCO products were marketed using the "Bay State" name, there is no evidence in the record to support that contention.

[7] Infinex was actually two companies, Infinex Investments, Inc. and Infinex Insurance Agency of Massachusetts, Inc.  For convenience, the Court will refer to them collectively as "Infinex."

[8] Other than SBLI life insurance and annuities, plaintiff did not offer any non-deposit investment and insurance products, whether directly or through a third-party vendor, between 1998 and 2001.

plaintiff, although Infinex was clearly identified as the broker/dealer.[9]  The lease agreement

between plaintiff and Infinex stated that plaintiff was required to "maintain strict and total

separation of its business from the business conducted at each Infinex Center, including separation

of records and of physical facilities, and shall conduct its business at all times so as not to lead to

confusion between the business conducted by [plaintiff] and the business conducted by [Infinex]."

In 2004, less than 2% of plaintiff's total revenue was earned from the Infinex arrangement.

### 3.    Plaintiff's Service Mark Registrations

On July 16, 1999, plaintiff filed applications with the United States Patent and Trademark

Office ("PTO") for registration of the marks "Bay State" and "Bay State Savings Bank."  In the

applications, plaintiff stated that the marks were used for "banking and financial services to

consumers and business" and had been used "at least as early as May 16, 1895."

Initially, the PTO denied plaintiff's applications because (1) it deemed the marks to be

geographically descriptive and (2) it found the term "financial services" to be "unacceptable as

indefinite because it does not provide sufficient specificity as to the nature of the applicant's

services."  In response, plaintiff amended its application to describe its "financial services" as

"financial investment in the field of real estate, stocks, bonds, commercial paper, and other

securities financial management and planning, and financial guaranty and surety."  Plaintiff also

submitted declarations under § 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), stating that the "Bay

State" marks had become distinctive as to those services—that is, "financial services"—through

---

[9] According to the terms of the lease agreement for Infinex Investments, the "mutual employees" were to act as "Infinex Representatives."  They entered into an employment agreement with Infinex, which exercised "exclusive control and direction of the Mutual Employees with respect to their conduct of business" for Infinex. Plaintiff was not to have "any involvement whatsoever in any of the services performed by the Mutual Employees on behalf of [Infinex]."

plaintiff's "substantially exclusive and continuous use" of the marks in commerce for at least the preceding five years—that is, from 1994 to 1999. Ultimately, the PTO approved the registration of the marks "Bay State" on May 15, 2001, and "Bay State Savings Bank" on May 22, 2001.[10]

On November 22, 1999, plaintiff filed an intent-to-use application with the PTO for registration of the mark "Bay State Investment Services" for the "sale of mutual funds, stocks and bonds, annuities, life insurance and long term care." Again, the PTO initially rejected the application in part because the mark was geographically descriptive, and again plaintiff submitted a declaration in which it stated that the "Bay State" mark had become distinctive through its "substantially exclusive and continuous use" for at least the preceding five years. Plaintiff stated that it had provided "investment services, namely, mutual fund brokerage and investment, annuity underwriting, brokerage in the field of stocks, bonds, life insurance and long-term care insurance and insurance agencies and underwriting in the field of life insurance and long-term care insurance," under the mark "Bay State Financial Services" for the preceding five years (1994 to 1999).[11] The PTO granted plaintiff a registration for the mark on July 30, 2002.

Finally, plaintiff obtained federal registration for the mark "Bay State Online" on October 10, 2002.[12]

---

[10] Plaintiff obtained Massachusetts registrations for the mark "Bay State Savings Bank" on July 20, 1999, and for the mark "Bay State" on October 14, 1999.

[11] As noted, plaintiff did not obtain regulatory approval to sell insurance until July 19, 2001.

[12] Plaintiff obtained Massachusetts registrations for the mark "Bay State Investment Services" on June 3, 2002, and for the mark "Bay State Online" on November 14, 2004.

B.     **Baystate Financial Services**

Defendant Baystate Financial Services, LLC is a Massachusetts limited liability company. Its principal place of business is in Boston, and it has additional locations in Worcester and four other cities and towns in Massachusetts.  Defendant presently offers a variety of financial planning, investment, and insurance products and services.  For businesses, defendant offers deferred compensation plans, business income insurance, key employee insurance, profit sharing plans, SEPs, 401(k) plans, managed care medical benefits, dental insurance, group life insurance, short-term and long-term disability insurance, and HMOs.  For individuals, it offers life insurance, long-term care insurance, mutual funds, annuities, IRAs, education funding, charitable giving, and estate and retirement planning.  Among other things, defendant promotes itself on the Internet under the name "Baystate Financial Services" and has created a website at the Internet address "Baystatefinancial.com."[13]

According to defendant, it began doing business under the "Baystate" name in January 1982, when the Desautels & Wilson Partnership, d/b/a Desautels & Wilson Insurance Agency, a general agency of New England Life Insurance Company ("NELCO"), began answering its telephones as "Baystate Financial Services."  In about 1983, the company became the Wilson, Bergstrom & Denton Agency ("WBD").  According to defendant, the company and its successors have used the name "Baystate Financial Services" continuously since 1983.[14]

---

[13] "Baystate Financial" is the domain name registrant of the website.

[14] Plaintiff disputes that defendant began using the "Bay State" name in 1983, contending that it was first used in 1997.  For the purposes of defendant's motion for summary judgment, the Court will view the first date of use as 1997.  For the purposes of plaintiff's motion for summary judgment, the Court will view the first date of use as 1983.

On April 10, 1990, WBD obtained a Massachusetts service mark registration for the mark "Baystate Financial Services," which listed the date of first use as January 1, 1983. The registration application listed the "sale of insurance products and actuarial services and financial planning services" as the services offered in connection with the mark.

According to defendant, in August 1996, WBD sold the state registration, the "Baystate" marks, the goodwill associated with those marks, and the "Baystate Financial Services" trade name to NELCO, which immediately sold them to David C. Porter. On January 2, 1997, Porter organized Porter/Desautels LLC ("P/D") and transferred to it the same rights and interests. Throughout these transfers, the enterprise continued doing business as "Baystate Financial Services."[15]

On May 19, 1997, P/D changed its name to "Baystate Financial Services, LLC" and re-registered the "Baystate Financial Services" mark in Massachusetts. Defendant contends that the first registration was properly conveyed to Porter in May 1997, and that it obtained the second registration in case its change in form to an LLC had any bearing on its use of the mark. When it re-registered the mark, however, defendant listed the date of first use of the mark as May 1, 1997.[16]

On November 23, 2003, defendant announced its merger with the Patriot Group, a local franchise of New England Financial, a subsidiary of MetLife, Inc. That merger included the

---

[15] Plaintiff contends that NELCO never transferred the rights to the name, and that the first registration expired in 2000 because it was not renewed. Defendant contends that the registration did not expire because a new registration was filed in 1997. On December 8, 2006, NELCO executed an assignment transferring and assigning to Porter whatever rights it may have retained in the "Baystate Financial" marks; according to defendant, it was merely a confirmatory assignment, undertaken as a precaution.

[16] The parties dispute why defendant listed May 1, 1997, as the date of first use. Defendant contends that it was simply a mistake, and the date of actual first use of the mark was 1983, not 1997.

acquisition of a 38-employee financial planning business located across the Worcester City Common from plaintiff's headquarters.

## II.     Procedural History

On December 4, 2003, plaintiff filed a complaint seeking injunctive, declaratory, and monetary relief against defendant.  The complaint asserts claims for (1) service mark infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) dilution of a "famous" mark under the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c); (3) cybersquatting under the Anticybersquatting Consumer Protection Act of 1999, 15 U.S.C. § 1125(d); (4) violation of the Massachusetts trademark statutes, Mass. Gen. Laws ch. 110B, §§ 11, 12, and 13; and (5) unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A, § 11.[17]

Defendant counterclaimed on similar legal theories, with the addition of a claim for common-law unfair competition and claims alleging that plaintiff procured its trademark registrations by fraud.  Plaintiff sought preliminary injunctive relief, enjoining use of the "Baystate" name, which was denied by this Court (Gorton, J.) on June 25, 2004.  On May 8, 2006, defendant moved for summary judgment as to all claims asserted by plaintiff.  That same day, plaintiff cross-moved for summary judgment as to the cybersquatting counterclaim and asked the Court to resolve six issues in its favor in order to "simplify and expedite the trial."

## III.     Summary Judgment Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Electric Co.*, 950 F.2d 816,

---

[17] Plaintiff also asserted a claim for unlawful use of a trade name under Mass. Gen. Laws ch. 110, § 4, which it later voluntarily withdrew.

822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  The

burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits,

"that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The court must view the entire record in the

light most hospitable to the non-moving party and indulge all reasonable inferences in that party's

favor.  *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).

## IV.    Defendant's Motion for Summary Judgment

### A.    Trademark Infringement

Count I asserts a claim for trademark infringement under § 43(a) of the Lanham Act, 15

U.S.C. § 1125(a).  To establish such a claim, plaintiff must prove (1) ownership of a distinctive

mark entitled to trademark protection; (2) use of that mark in interstate commerce; and (3) use of

the mark by defendant in a manner likely to cause confusion as to the origin of the goods or

services.  *Calamari Fisheries v. The Village Catch*, 698 F. Supp. 994, 1006 (D. Mass. 1988).

### 1.    Whether the Marks Are Distinctive

In order for a mark to be entitled to protection, it must be distinctive.  *See Two Pesos, Inc.*

*v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992); *Borinquen Biscuit v. M.V. Trading Corp.*, 443

F.3d 112, 116 (1st Cir. 2006). .  A mark is considered distinctive if it "either is inherently

distinctive or exhibits acquired distinctiveness gained through secondary meaning."  *Borinquen*,

443 F.3d at 116-17; *see Two Pesos*, 505 U.S. at 769.

In determining whether a mark is distinctive, courts "often employ a taxonomy that

classifies marks along a continuum of increasing distinctiveness."  *Borinquen*, 443 F.3d at 116.

The continuum consists of five categories:  generic, descriptive, suggestive, arbitrary, and fanciful

marks. *Id.* Generic marks can never be distinctive; by contrast, suggestive, arbitrary, and fanciful marks are considered inherently distinctive. *Id.*

"Bay State"—the nickname of Massachusetts—is a geographically descriptive mark. Descriptive marks are "tentatively considered non-distinctive but can attain distinctive status upon an affirmative showing of secondary meaning." *Id.* Secondary meaning may be established in a geographically descriptive mark "where the mark no longer causes the public to associate the goods with a particular place, but to associate the goods with a particular source." *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 181 (1st Cir. 1993); *see also First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.*, 923 F. Supp. 693, 704-05 (E.D. Pa. 1996).

Trademark rights are not based on registration, but on prior use—that is, "the one who first uses the marks in connection with a peculiar line of business." *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 815 (1st Cir. 1987). However, registration of a mark is considered "prima facie evidence of the validity of the registered mark," and the holder is entitled to a presumption that its marks are distinctive. 15 U.S.C. § 1115(a); *Borinquen*, 443 F.3d at 117. That presumption can be rebutted if a challenger proves, by a preponderance of the evidence, that the marks are merely descriptive. *Id.* The burden of persuasion then shifts back to the holder, who must prove that the mark has established secondary meaning.

### a.    <u>Inherent or Acquired Distinctiveness</u>

When the PTO registers a mark without first requiring the applicant to prove secondary meaning, the registrant is entitled "to a presumption that its registered trademark is inherently distinctive, as opposed to merely descriptive." *Borinquen*, 443 F.3d at 117, quoting *Equine*

11

*Techs., Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 545 (1st Cir. 1995).[18]  However, when the PTO registers a mark only after requiring an applicant to prove secondary meaning, the holder is entitled to a presumption that the mark is valid because it has acquired secondary meaning.  *Id.* at 117 n.2.

Here, plaintiff's applications for registration were initially rejected by the PTO on the basis that the marks were geographically descriptive.  Plaintiff then submitted declarations attesting that the marks had "become distinctive" through "substantially exclusive and continuous use."  The PTO resolved the issue in plaintiff's favor and registered the marks at various points between May 2001 and October 2002.  As a result, plaintiff is entitled to a presumption that its marks have acquired distinctiveness by acquiring secondary meaning.  *See id.; Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 870 (8th Cir. 1994) (applying the presumption that marks had acquired distinctiveness when owner of marks registered them under § 2(f) of Lanham Act).

The presumption is not, however, retroactive; instead, the marks are entitled to a presumption of secondary meaning only as of the dates the marks were registered.  *Aromatique*, 28 F.3d at 870.  Thus, plaintiff's marks are entitled to the presumption of secondary meaning only as of May 15, 2001, at the earliest.  Because, however, the alleged infringement dates back to at least 1997, the presumption is not applicable here.  *See Aromatique*, 28 F.3d at 870 (ruling that presumption of secondary meaning was not applicable where plaintiff first alleged that defendant infringed marks in 1985 but marks were not registered until 1988).  The burden of proof thus lies with the plaintiff to establish that the marks had acquired secondary meaning.

---

[18] The presumption is conclusive if the registered mark has obtained "incontestable" status.  15 U.S.C. § 1115(b); *Borinquen*, 443 F.3d at 117.

### b.    Secondary Meaning

Plaintiff is required to show that its marks had acquired secondary meaning before defendant began using the same or similar mark—in other words, before 1997.[19]  *Commerce Ins. Agency, Inc. v. Commerce Nat'l Ins. Serv., Inc.*, 214 F.3d 432, 439 (3rd Cir. 2000).  Because plaintiff is "attempting to establish rights to a commonplace, descriptive term used by a variety of businesses in a variety of contexts[,] . . . the evidentiary bar [is] placed somewhat higher."  *Id.* at 440.  Among the factors courts generally look to in determining whether a term has acquired secondary meaning are (1) the length or exclusivity of use of a mark; (2) the size or prominence of the plaintiff's enterprise; (3) the existence of substantial advertising by plaintiff; (4) the product's established place in the market; and (5) proof of intentional copying.  *I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 42 (1st Cir. 1998).  "Customer survey evidence, while not required, is a valuable method of showing secondary meaning."  *Id.*

Plaintiff here essentially offers five types of evidence in an effort to demonstrate secondary meaning:  evidence as to (1) its size and prominence in the field of banking; (2) its substantial advertising and promotional efforts; (3) its sales of investment products through third-party vendors; (4) its direct sales of insurance and investment products; and (5) the results of consumer surveys.

### (1)    Plaintiff's Size and Prominence as a Bank

Plaintiff first points to its size and prominence as a banking institution and the fact that it has used the "Bay State" mark continuously since 1895.  There is no genuine dispute as to either

---

[19] As noted, for purposes of defendant's motion for summary judgment, the Court will assume that defendant did not begin using the mark in 1983 (as defendant contends) but in 1997 (as plaintiff contends).

point.  Nonetheless, evidence of secondary meaning in the field of banking is not evidence of secondary meaning in the fields of insurance and investment services.  *See Commerce*, 214 F.3d at 440 (rejecting bank's attempt to establish secondary meaning in the "non-competing insurance service industry" by relying upon its $100 million in banking assets and exclusive use of mark in banking).

### (2)    Plaintiff's Advertising and Promotional Efforts

Plaintiff next points to its substantial advertising and promotional expenditures, which have occurred over many years, and to various instances of unsolicited newspaper publicity. However, all of the promotional efforts and publicity during the relevant time frame concerned plaintiff's *banking* activities, not its insurance and investment services.  Indeed, the earliest advertisements in the record describing plaintiff's insurance and investment services date from 2002, well after defendant entered the market.  *See Commerce*, 214 F.3d at 439.

### (3)    Plaintiff's Relationship with Third-Party Vendors

Plaintiff next points to the fact that it offered insurance and investment services to its clients through two third-party vendors:  FISCO (from 1994 to 1998) and Infinex (after 2001). Those services were not, however, offered under the "Bay State" name.  Under the relationship with FISCO, the companies were kept entirely separate, and all written materials describing the FISCO products contained disclaimers that the products were *not* plaintiff's.  Under the relationship with Infinex, the companies were similarly kept separate; moreover, the products were initially identified with the name "Minuteman Investment Services."  The program's name changed to "Bay State Investment Services" only in February 2002, well after defendant had already been using the name "Baystate Financial Services" to offer its own investment services.

14

Plaintiff contends that because customers could buy insurance or investment products at its offices, it effectively vouched for the third-party vendors and provided customers "one-stop shopping." However, offering customers a means to buy services from another provider is not the same thing as actually offering the services—particularly when the products contained disclaimers that they were *not* being offered by plaintiff. Plaintiff's contention that its marks gained secondary meaning in the fields of investment and insurance services on the basis of its relationship with FISCO and Infinex is not supported by the evidence.

### (4)    Plaintiff's Insurance and Investment Products

Plaintiff next argues that its marks acquired secondary meaning in the fields of insurance and investment services because it directly offered those services for many years before defendant entered the market. As of 1997, however, plaintiff's investment services were limited almost entirely to providing deposit accounts (as opposed to, e.g., selling stocks or mutual funds).[20] The insurance products were likewise limited; indeed, prior to 1998, Massachusetts savings banks were generally prohibited by law from selling insurance. *See* Guenter, 17 Am. Rev. Banking L. at 373-74. The principal exception, SBLI insurance, was designed and marketed as a "savings bank" product, not a "Bay State" product, and was sold by dozens of savings banks throughout the state. *See id.* at 374. Plaintiff's relatively minimal offerings in the insurance and investment areas prior to 1997 are insufficient to establish that plaintiff's marks had acquired secondary meaning in those fields.

### (5)    Consumer Surveys

---

[20] The deposit products could be held in tax-preferred form, such as IRAs, SEPs, or Keogh accounts. As noted, the bank also sold United States savings bonds.

Finally, plaintiff points to three consumer surveys as proof that its marks had acquired secondary meaning in the fields of insurance and investment services.

### (a)      1999 and 2001 Consumer Surveys

In 1999 and 2001, plaintiff hired Kelly Myers, a research consultant, to conduct so-called "image and positioning" surveys.  The stated purpose of the surveys—which were not conducted in connection with this litigation—was to determine how plaintiff was perceived by both customers and non-customers.

According to the 1999 survey, 12% of respondents, when asked "when you think of banks, what name comes to mind?" mentioned plaintiff.  When asked directly whether they knew of plaintiff, 70% of respondents replied that they did.[21]

The 2001 survey produced similar results.  When asked to name all of the banks they could think of without prompting, 18% of the respondents mentioned plaintiff.  When asked directly whether they knew of plaintiff, 76% of respondents replied that they did.

The surveys did not inquire as to the public's association of the "Bay State" mark with plaintiff's insurance and investment services, and thus prove little as to secondary meaning. Indeed, they demonstrate that a relatively small proportion of consumers was familiar with the bank.

### (b)      2005-06 Secondary Meaning Survey

In connection with this lawsuit, plaintiff hired Robert Klein,  a research consultant, to conduct a survey to measure the extent to which the "Bay State" name had acquired secondary

---

[21] The survey concluded that the "relatively low level of total awareness" of plaintiff's business was "a significant concern . . . ."

16

meaning. The survey was conducted in the Worcester area in December 2005 and January 2006.

Survey respondents were asked the following question:

> Thinking about the Worcester area and the different types of financial institutions, when you hear the words 'Bay State' do you or do you not think of any particular financial institution or institutions in the Worcester area? That is, do you or do you not associate the words 'Bay State' with any particular financial institution or institutions in the Worcester area?

Klein found that 38.6% of respondents associated the words "Bay State" with "Bay State Savings Bank." In calculating that figure, Klein combined the answers of respondents who answered "Bay State Bank" and "Bay State Savings Bank."[22] Although the survey asked respondents whether they had used mutual funds, retirement plans, life insurance, and other financial products, it did not ask whether the respondents identified these products with plaintiff's (or defendant's) business. Klein concluded that "with regard to the secondary meaning of the words 'Bay State'. . . a substantial proportion of the relevant market associates the words 'Bay State' with 'Bay State Savings Bank.'"

The Klein survey is insufficient to establish secondary meaning for multiple reasons. First, the survey—which was conducted in 2005-06—is irrelevant to the issue of whether plaintiff's marks had acquired secondary meaning as of 1997. *See Commerce Insurance*, 214 F.3d at 440 (holding that a customer satisfaction survey taken in the late 1990's was irrelevant to whether the mark established secondary meaning as of 1983). Second, the survey did not evaluate whether

---

[22] Klein did not ask survey participants if they intended a response of "Bay State Bank" to mean "Bay State Savings Bank." Defendant contends that when the responses that make up the 38.6% association are broken down and allocated specifically to "Bay State Savings Bank or "Bay State Bank," only 18.3% of respondents associated "Bay State" with "Bay State Savings Bank." Plaintiff contends that the results should not be disaggregated, because "Bay State Savings Bank" and "Bay State Bank" are interchangeable. Resolution of the dispute is not required for purposes of defendant's summary judgment motion.

respondents associated the name "Bay State" with institutions providing investment or insurance services.[23]  Instead, it asked only if respondents associated the words "Bay State" with a "financial institution or institutions in the Worcester area."  Thus, at best, the survey demonstrates that a portion of respondents associated the words "Bay State" with "Bay State Savings Bank."  Finally, the number of respondents who associated the name "Bay State" with plaintiff was not high enough to prove secondary meaning.  Courts typically view survey evidence indicating that 50% or more of the consuming public associate a mark with the company's products as sufficient to demonstrate secondary meaning.  *See I.P. Lund Trading v. Kohler Co.*, 118 F. Supp. 2d 92, 107 (D. Mass. 2000); *see also, e.g., President & Trustees of Colby College v. Colby College-New Hampshire*, 508 F.2d 804, 809 (1st Cir. 1974) (average well over 50% of all respondents meets standard); *Beacon Mut. Ins. Co. v. OneBeacon Ins. Corp.*, 376 F. Supp. 2d 251, 257-58 (D.R.I. 2005) (69% meets standard).  Although percentages below 50% can be a factor to consider in establishing secondary meaning, "a figure in the thirties can only be considered marginal." *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992).

In sum, plaintiff has failed to establish that its marks acquired secondary meaning in the fields of insurance and investment services.  *See Commerce*, 214 F.3d at 439-41.  While there is no dispute that plaintiff has used its marks in the banking industry since 1895, the evidence is insufficient to establish secondary meaning outside of that field.

---

[23] Plaintiff currently sells its investment services under the name Bay State Investment Services, not Bay State Savings Bank.  Klein testified that he was unaware of this distinction when he conducted the survey. Regardless, apparently not a single respondent answered "Bay State Investment Services" when asked to name a financial institution associated with the name "Bay State."

**2.**     **Whether the Mark is Protectable under the "Natural Expansion" Doctrine**

Finally, plaintiff seeks to enforce rights in the "Bay State" mark by invoking the "natural expansion doctrine." Under this doctrine, when the "senior user of a mark on product line A expands later into product line B and finds an intervening user, priority in product line B is determined by whether the expansion is 'natural' in that customers would have been confused as to source or affiliation *at the time of the intervening user's appearance*." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:5 (4th ed. 2006) (emphasis added). Whether the expansion is "natural" depends on "whether the nature of the industries was such that purchasers would reasonably expect the services rendered by these industries to originate from a common source." *Commerce*, 214 F.3d at 438.

As noted, when defendant began using the Bay State marks in 1997, plaintiff was legally prohibited from offering virtually any insurance and investment products and services, with only a handful of exceptions. Thus, no reasonable consumer would have expected plaintiff to be selling those products and services. *See Commerce*, 214 F.3d at 441-42 (recognizing that consumers in 1983, the year that defendant's business began, would not have expected bank to be selling insurance products generally). The "natural expansion doctrine" is therefore inapplicable.

*     *     *

In summary, plaintiff cannot establish that the mark "Bay State" acquired secondary meaning in the fields of insurance and investment services before defendant began using a similar mark in 1997. For that reason, summary judgment as to Count I of the complaint will be granted.

**B.**     **Dilution—Federal Law**

Count II asserts a claim under the federal anti-dilution statute, 15 U.S.C. § 1125(c).  The statute generally provides protection to the owner of a "famous mark" from any use that "causes dilution of the distinctive quality of the mark."  15 U.S.C. § 1125(c)(1).  Only a select number of marks, however, may qualify as "famous," and Congress intended the courts to be "discriminating and selective in categorizing a mark as famous."  *I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 46 (1st Cir. 1998).  As a result, the test of whether a mark has acquired fame is considered "more rigorous" and requires "a great deal more" than the analysis employed to determine if secondary meaning exists.  *Id.* at 47.

Because plaintiff cannot show that its mark is distinctive or has acquired secondary meaning, it cannot establish that it is "famous" and entitled to protection under the anti-dilution provisions of § 1125(c)(1).  *See id.* at 47 ("A trademark can certainly be distinctive without being famous, but it cannot be famous without being distinctive."), quoting J. Gilson, Trademark Protection & Practice, § 5.12 (1998).  The dilution claim must therefore fail.

### C.    Cybersquatting

Count III asserts a claim under 15 U.S.C. §1125(d) based on defendant's use of the domain name "baystatefinancial.com."  In order to succeed on a cybersquatting claim, plaintiff must show, among other things, that defendant had "a bad faith intent to profit" from plaintiff's marks.  15 U.S.C. §1125(d)(1)(A)(I).  In determining whether bad faith exists, the Court may consider the following nine non-exhaustive factors:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the *bona fide* offering of any goods or services; (IV) the person's *bona fide* noncommercial

or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark . . . ; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services . . . ; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name . . . ; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others . . . ; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous. . . .

15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX).

As noted, defendant had obtained a Massachusetts registration for "Baystate Financial Services," and had begun using the name, by May 19, 1997. As of that date, plaintiff's marks had not acquired secondary meaning in the insurance and investment fields and were not distinctive. Furthermore, the domain name used by defendant, "Baystate Financial," is a shortened form of its legal name. The first, second, third, fourth, and ninth factors thus weigh against a finding of bad faith, and plaintiff has offered no evidence as to the fifth, sixth, seventh, and eighth factors. Accordingly, because plaintiff has failed to establish any evidence of bad faith, it cannot succeed on its cybersquatting claim.

### D.    State Law Claims

Count V asserts claims under state trademark law, Mass. Gen. Laws ch. 110B, § § 11, 12, and 13. To the extent plaintiff asserts claims for infringement, federal and state law are essentially identical, and accordingly the state claims do not merit separate discussion. *See Leejay, Inc. v. Bed Bath & Beyond, Inc.*, 942 F. Supp. 699, 701 n.2 (D. Mass. 1996).

The state-law anti-dilution statute is likewise similar to its federal counterpart. Mass. Gen.

Laws ch. 110B, § 12 protects against "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of . . . a mark at common law, or a trade name valid at common law . . . ." In order to prevail on an anti-dilution claim under Chapter 110B, plaintiff is required to show that its marks are "distinctive" and that defendant's use of similar marks has created a likelihood of dilution. *See Black Dog Tavern*, 823 F. Supp. at 59. Relief under Section 12 is limited to "only the most distinctive trademarks." *Pignons S.A. de Mecanique v. Polaroid Corp.*, 498 F. Supp. 805, 817-18 (D. Mass. 1980). Again, because plaintiff's "Bay State" marks are geographically descriptive and do not have any particular inherent distinctiveness, plaintiff cannot succeed on its state-law dilution claim.

### E. Chapter 93A Claim

Finally, plaintiff alleges that defendant has engaged in unfair methods of competition and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A. Because defendant had the legal right to use the "Baystate Financial" mark to market its insurance and investment services and because there is no evidence that defendant acted improperly or in bad faith, plaintiff cannot establish that defendant's acts were "immoral, unethical, oppressive, or unscrupulous," or otherwise violated Chapter 93A. *See Black Dog Tavern*, 823 F. Supp. at 60.

*    *    *

Accordingly, on the undisputed evidence, plaintiff cannot establish the elements of any of its five claims. Defendant is therefore entitled to summary judgment as to all counts of the complaint.

**V.**     **Plaintiff's Motion for Partial Summary Judgment**

In plaintiff's motion for partial summary judgment, it seeks to "resolve six issues" relating to defendant's counterclaims and affirmative defenses that, if granted, will allegedly "simplify and expedite the trial."[24]  Specifically, plaintiff requests partial summary judgment establishing that:

1.  defendant cannot prove by clear and convincing evidence that the Bay State registrations are invalid because of alleged fraud;

2.  defendant's state registration was improperly granted and should be canceled under Mass. Gen. Laws ch. 110B §§ 3 and 8;

3.  defendant cannot prove a "limited area defense";

4.  defendant cannot prove the essential elements of its counterclaim for cybersquatting;

5.  defendant cannot prove that it has used the "Baystate Financial" name continuously from a date prior to May 1, 1997, and cannot prove that it is in privity with any other party that used the name prior to that date; and

6.  the pleadings establish, as a matter of law, that defendant's use of the "Baystate" name is likely to cause confusion with the "Bay State" marks.

As a preliminary matter, because plaintiff is now the moving party, the Court must draw all inferences and consider any disputed facts in the light most favorable to defendant.  Among other things, this means that the Court will assume that defendant's first use of the mark

---

[24] In its motion for summary judgment, plaintiff states that it is moving for summary judgment as to all of defendant's counterclaims.  However, the text of the motion and the accompanying memorandum request only that certain "issues relating to Baystate Financial's defenses and counterclaims" be resolved.  The Court will address all six issues discussed in plaintiff's memorandum, but not any counterclaims that plaintiff itself does not address. *See Celotex*, 477 U.S. at 323 (stating that it is the moving party's responsibility to inform the court of the basis for its motion and to provide direction to the materials which demonstrate an absence of a dispute of material fact).

"Baystate Financial" was in 1983, not 1997.

### A.    First Issue:  Whether Plaintiff's Registrations are Invalid Because of Fraud

Plaintiff first requests that the Court find that defendant cannot establish that the Bay State registrations are invalid because of fraud.  Two of defendant's counterclaims allege fraudulent registration:  Count V alleges a claim under 15 U.S.C. § 1120, which imposes civil liability for the fraudulent registration of a mark, and Count VI alleges a claim for cancellation of plaintiff's federal registrations on the basis of fraudulent procurement.

In order to establish a claim of fraud in the procurement of a federal registration, plaintiff must prove the following by clear and convincing evidence:  (1) that defendant made a false representation to the PTO regarding a material fact; (2) that defendant knew that the representation was false; (3) that defendant intended to induce the PTO to act in reliance on the misrepresentation; and (4) the PTO was thereby deceived into registering the mark.  *See Marshak v. Treadwell*, 58 F. Supp. 2d 551, 566 (D.N.J. 1999)*; V & V Food Products, Inc. v. Cacique Cheese Co.*, 683 F. Supp. 662, 671-72 (N.D. Ill. 1988).  The "knowledge" element is satisfied where the applicant made material statements it knew or should have known were false. *McCarthy on Trademarks*, § 31:61.

Defendant contends, among other things, that plaintiff fraudulently represented that it had been using the marks for financial services "exclusively and continuously" for five years before filing the declarations.  Misrepresentations involving a trademark applicant's description of services may be grounds for a finding of fraud.  *See, e.g., General Car and Truck Leasing Systems, Inc. v. General Rent-A-Car, Inc.*, 17 U.S.P.Q. 2d 1398, 1401 (S.D. Fla. 1990) (plaintiff's statement that it leased aircraft and boats found to be fraudulent when the plaintiff had

never offered these services).[25]  For the reasons set forth above, there is clearly a disputed issue of material fact as to whether plaintiff offered investment and insurance services "continuously" for the five years preceding the applications.  The applications were submitted in 1999, but the relationship with FISCO lasted only from 1994 to 1998, and plaintiff did not contract with Infinex until 2000 (and Infinex did not begin to sell products until 2001).  Accordingly, summary judgment as to the claims of fraudulent registration will be denied.

**B.    Second Issue:  Whether Defendant's State Registration Was Improperly Granted**

Next, plaintiff seeks a ruling that defendant's state registration was granted improperly and should be canceled under Mass. Gen. Laws ch. 110B, §§ 3 and 8.[26]  In essence, plaintiff contends that it, not defendant, owns the mark "Bay State," and that the use of the mark by defendant is likely to cause confusion.  Again, plaintiff conflates use of the mark "Bay State" for banking services and its use for investment and insurance services.  Because plaintiff's mark did not acquire secondary meaning as to the latter, and because defendant began using the mark in 1983, summary judgment as to the cancellation claim will be denied.

**C.    Third Issue:  Whether Defendant Has a "Limited Area" Defense**

Plaintiff seeks summary judgment as to defendant's assertion of a so-called "limited area" defense.  Section 33(b)(5) of the Lanham Act, 15 U.S.C. §1115(b)(5) "confers upon a junior

---

[25] Likewise, when an applicant lacks a bona fide intent to use a mark for goods identified in its trademark application, the court may find that the applicant committed fraud.  *Universal Nutrition Corp. v. Carbolite Foods, Inc.*, 325 F. Supp. 2d 526, 531 (D.N.J. 2004).

[26] Mass. Gen. Laws ch. 110B, § 3(f) prohibits the registration of any mark that "so resembles . . . the mark or trade name previously used in the Commonwealth by another and not abandoned, as to be likely, when applied to the goods and services of the applicant, to cause confusion or mistake or to deceive."  Mass. Gen. Laws ch. 110B, § 8(3)(b) provides for cancellation of any mark upon a finding "that the registrant is not the owner of the mark."

user . . . the right to continue use of an otherwise infringing mark in a remote geographical area if that use was established prior to the other party's federal registration." *Thrifty Rent-A-Car Syst., Inc. v. Thrift Cars, Inc.*, 831 F.2d 1177, 1181 (1st Cir. 1987). Once the senior user federally registers its mark, however, the junior user's "market area" is frozen and the limited area defense applies "only for the area in which such continuous prior use [before registration] is proved." *Id.*, quoting 15 U.S.C. § 1115(b)(5).

It is unclear whether defendant is actually asserting a "limited area" defense here, and whether the prerequisites (e.g., that plaintiff's mark has become "incontestable," *see* 15 U.S.C. § 1065) have been satisfied. In any event, defendant has submitted evidence that it has been using the mark "Baystate" for insurance and investment services since 1983, and therefore that it is the senior user, not the junior user. Summary judgment as to that issue is therefore inappropriate.

D.      **Fourth Issue:  Whether Defendant Can Prove the Elements of Cybersquatting**

Next, plaintiff seeks summary judgment as to Count IV of the counterclaim, which alleges unlawful cybersquatting under 15 U.S.C. § 1125(d). Defendant contends that plaintiff's use of the domain names "baystatesavingsbank.com," "baystateonline.com," "baystatesavingsbank.net," "baystatesavingsbank.biz," and "baystatesavingsbank.org" are confusingly similar to, and dilute the value of, its domain name "baystatefinancial.com."[27]

The anti-cybersquatting statute was passed "primarily in an effort to stop 'cybersquatters who register numerous domain names containing American trademarks or tradenames only to hold them ransom in exchange for money.'" *Northern Light Technology v. Northern Lights Club*,

---

[27] Plaintiff registered the trademark "Bay State Online" in Massachusetts on June 3, 2002 and with the PTO on October 1, 2002. Marks relating to the other domain names were not registered.

97 F. Supp. 2d 96, 115 (D. Mass. 2000), quoting H.R. Rep. No. 106-412 at 5.  In order to prove

a claim of cybersquatting, the proponent must prove (1) its marks are entitled to protection

because they are distinctive, famous, or registered with the PTO; (2) plaintiff's domain names are

identical or confusingly similar to defendant's marks; and (3) plaintiff registered the domain names

with the bad faith intent to profit from them.  *Shields v. Zuccarini*, 254 F.3d 476, 482 (3rd Cir.

2001).

        Plaintiff contends, among other things, that there is no evidence that it registered its

domain names with a bad faith intent to profit from them.  As noted, the Court may consider nine

non-exhaustive factors in determining the existence of bad faith.  *See* 15 U.S.C. §

1125(d)(1)(B)(i)(I)-(IX).  According to defendant, however, it "only need show that the Bank

was aware of the fact that it was not the superior user of the term 'Baystate' in connection with

the offering of investment and insurance products" to raise an issue of disputed fact as to

plaintiff's bad faith.  Defendant provides no support for that assertion, and has provided no other

evidence of plaintiff's alleged bad faith.  Under the circumstances presented here, where plaintiff's

domain name consists of a variation on its legal name, and where plaintiff legitimately uses its

website to promote its banking business, evidence that plaintiff was aware of defendant's earlier

use in a different business is not sufficient, standing alone, to demonstrate bad faith.  Summary

judgment will therefore be granted in plaintiff's favor on defendant's cybersquatting counterclaim.

E.    **Fifth Issue:  Whether Defendant Can Prove Continuous Use of the "Baystate Financial" Name**

Plaintiff requests that the Court find that defendant cannot prove it has used the "Baystate Financial" name continuously since before May 1, 1997, and cannot prove privity with any other party that used the name before that date.  To the extent that plaintiff's request relates to its own claims or defendant's affirmative defenses, it is moot.  The Court will therefore only consider the request in relation to defendant's counterclaims.

Plaintiff notes that defendant's application for its second registration lists May 1, 1997, as the date of first use, and further contends that there is no documentary evidence that the first registration was ever transferred to defendant.  In response, defendant has submitted an affidavit from David Porter stating, in substance, (1) that the mark was first used by a predecessor in 1983; (2) that NELCO transferred the rights associated with the "Baystate" marks to him and that he used the marks continuously from August 1996 to January 1997; (3) that he transferred those rights to defendant in January 1997; and (4) that the date listed on the application for the second registration was an inadvertent error.  Defendant has also produced what it contends is a confirmatory assignment from 2003 outlining the terms of the transfer between Wilson and NELCO in 1996.  This evidence is sufficient to create a dispute of fact as to the continuing use of the mark, and accordingly summary judgment as to this issue is inappropriate.

F.    **Sixth Issue:  Whether Defendant's Use of the "Baystate Financial" Name Is Likely to Cause Confusion**

Finally, plaintiff requests that the Court hold, as a matter of law, that defendant's use of the "Baystate" name is likely to cause confusion in relation to its "Bay State" marks.  Although plaintiff does not explain which claim or counterclaim this request is related to, it appears to

28

address plaintiff's, not defendant's, trademark infringement claim.  In light of the granting of summary judgment in defendant's favor as to that claim, the request is moot.

## VII.  <u>Conclusion</u>

For the reasons set forth above,

1.      Defendant's motion for summary judgment as to all counts of the complaint is GRANTED; and

2.      Plaintiff's motion for partial summary judgment is GRANTED as to Count IV of the counterclaim and otherwise DENIED.

**So Ordered.**

<u>/s/ F. Dennis Saylor</u>
F. Dennis Saylor IV
Dated: March 23, 2007                    United States District Judge

29